# **<u>EXHIBIT 1</u>**

JASON SMITH
MISSOURI,
*CHAIRMAN*

MARK ROMAN, STAFF DIRECTOR
(202) 225–3625

RICHARD E. NEAL
MASSACHUSETTS,
*RANKING MEMBER*

BRANDON CASEY, STAFF DIRECTOR
(202) 225–4021

# U.S. House of Representatives

### COMMITTEE ON WAYS AND MEANS

1139 Longworth House Office Building

Washington, DC 20515

July 14, 2023

The Honorable Merrick B. Garland
Attorney General
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable David C. Weiss
United States Attorney
District of Delaware
1313 North Market Street
Wilmington, Delaware 19899

**Re:**   *United States v. Robert Hunter Biden,* **1:23-mj-00274-MN**

Dear Attorney General Garland and U.S. Attorney Weiss,

     The U.S. House Committee on Ways and Means (Committee) recently voted to submit to the full House of Representatives (House)[1] the transcripts of whistleblower testimony provided by two Internal Revenue Service (IRS) employees regarding the investigation of Robert Hunter Biden.[2] Through that process, the transcripts became publicly available.[3] These whistleblowers provided information to the Committee under 26 U.S.C. § 6103(f)(5) and did so through voluntary transcribed interviews under questioning from both majority and minority counsel on May 26, 2023, and June 1, 2023.

     The testimony of the two whistleblowers raises serious concerns about the handling of this investigation and prosecution, and multiple congressional inquiries into the whistleblowers' allegations are ongoing. The whistleblowers alleged that prosecutors and Department of Justice

---

[1] H. Comm. on Ways and Means, Business Meeting, *Meeting on Documents Protected Under Internal Revenue Code Section 6103* (June 22, 2023), https://waysandmeans.house.gov/event/meeting-on-documents-protected-under-internal-revenue-code-section-6103/.

[2] The Committee is also aware of a related matter under a different case number: *United States v. Robert Hunter Biden*, 1:23-cr-00061-MN. Given the seeming connection between the two matters, we believe the judge should consider the attached material in the context of both matters as appropriate.

[3] H. Comm. on Ways and Means, Business Meeting, *Meeting on Documents Protected Under Internal Revenue Code Section 6103* (June 22, 2023), https://waysandmeans.house.gov/event/meeting-on-documents-protected-under-internal-revenue-code-section-6103/.

Letter to the Honorable Merrick B. Garland and The Honorable David C. Weiss
July 14, 2023
Page 2

officials engaged in unjustified delays and political interference that resulted, in part, in the statute of limitations expiring for tax years 2014 and 2015. According to the whistleblowers, the IRS recommended criminal charges be sought for tax years 2014 through 2019, including multiple felony counts. These represent only some of the allegations presented to the Committee by the whistleblowers, as they also provided numerous examples of unprecedented and unusual interference, delays, and roadblocks beyond what is described above, which appear to have hindered the investigation.

Over the course of a single week in June, the existence of a plea agreement in this matter became public, a plea hearing was scheduled, and the Committee submitted whistleblower testimony to the full House. Given the abruptness of the plea agreement announcement shortly after it became public that whistleblowers made disclosures to Congress, the seriousness of the whistleblower allegations, and the fact that multiple congressional investigations into the matter are ongoing, we ask that you file this letter and the attached information in the docket of the above referenced matter and confirm with the Committee that you have done so as soon as possible, but no later than 5pm on Tuesday, July 18, 2023.

Placing the attached materials into the record is critical because the testimony provided by the two IRS whistleblowers brings new and compelling facts to light, and because it is essential for the Judge in this matter to have relevant information before her when evaluating the plea agreement.

Judges can reject plea agreements and there is precedent for them to do so for a variety of reasons.[4] Legal experts have described situations where judges rejected plea agreements "if judges believe the agreements do not adequately address the nature of the crimes, the rights of victims, or the interests of the public" or when judges "disagree with prosecutors' proposed sentence in order to avoid any surprises at the later sentencing hearing."[5] For example, judges have rejected plea agreements because the plea agreement is "flawed" and they "don't agree with

---

[4] *See e.g.*, Jonathan Allen, *In rare move, U.S. judge rejects plea agreement by Ahmaud Arbery's murderers*, REUTERS (Jan. 31, 2022), https://www.reuters.com/world/us/us-prosecutors-reach-hate-crime-plea-deals-ahmaud-arbery-murder-court-filings-2022-01-31/ (reporting on *U.S. v. Travis McMichael*, Change of Plea/Entry of Plea Minutes, Jan. 31, 2022, Case No. 2:21-cr-00022-LGW-BWC, ECF No. 154 (S.D. Ga. 2022)); Celine Castronuovo, *Judge rejects plea deal with man described as world's largest child porn purveyor*, THE HILL (May 12, 2021), https://thehill.com/regulation/court-battles/553183-judge-rejects-plea-deal-with-man-described-as-worlds-largest-child/ (reporting on rejection of a plea deal because the judge was inclined to give the defendant a longer sentence in *U.S. v. Eric Eoin Marques*, Transcript of Proceedings – Sentencing Hearing Before The Hon. Theodore D., May 12, 2021, Case No. 8:19-cr-00200-TDC, ECF No. 93 (D. Md. 2021)); Kristen Weaver, *Judge Rejects Tulsa Murder Suspect's Plea Deal, Orders Him To Stand Trial*, NEWS ON 6 (July 14, 2021), https://www.newson6.com/story/60ef9b140a26b00c04ee6447/judge-rejects-tulsa-murder-suspects-plea-deal-orders-him-to-stand-trial- (reporting on *U.S. v. Sago*, Minute Sheet – Sentencing, July, 13, 2021, Case No. 4:20-cr-00094-GKF, ECF No. 45 (N.D. Okla. 2021)).
[5] Jonathan Allen, *In rare move, U.S. judge rejects plea agreement by Ahmaud Arbery's murderers*, REUTERS (Jan. 31, 2022), https://www.reuters.com/world/us/us-prosecutors-reach-hate-crime-plea-deals-ahmaud-arbery-murder-court-filings-2022-01-31/.

Letter to the Honorable Merrick B. Garland and The Honorable David C. Weiss
July 14, 2023
Page 3

the outcome;"[6] the judge finds "the sentencing options available strikingly deficient;"[7] the plea agreement "falls short given the backdrop of the parties' motivation, [the individual's] trusted employment position, and the threats to national and global security…that [the parties'] actions caused;"[8] and "[i]t was not in the best interest of the community, or the country, to accept the[] plea agreements."[9]

In one state court proceeding, a judge rejected a plea agreement because "[i]t is contrary to justice. Justice in this society cannot be seen as being able to buy oneself out of a felony conviction." The Judge also went on to say, "[m]any in our community steal much less and go to prison or to jail…. They steal much less and they don't get a deferred judgment because they don't have any money."[10]

Thus, entering this information into the formal record will ensure that the Judge can review and consider this relevant information prior to the scheduled plea hearing on July 26, 2023. Please find attached the materials the Committee submitted to the full House. Thank you for your prompt attention to this matter. Again, we ask that you respond to the Committee by 5pm on Tuesday, July 18, 2023.

Sincerely,

Jason Smith
Chairman
Committee on Ways and Means

---

[6] *U.S. v. Eric Eoin Marques*, Transcript of Proceedings – Sentencing Hearing Before The Hon. Theodore D., May 12, 2021, Case No. 8:19-cr-00200-TDC, ECF No. 93 (D. Md. 2021).

[7] *Judge rejects plea deal in submarine secrets case, saying sentences were too light*, NPR (Aug. 17, 2022), https://www.npr.org/2022/08/17/1117837082/judge-rejects-plea-deal-in-submarine-secrets-case-saying-sentences-were-too-ligh; *see also U.S. v. Jonathan Toebbe and Diana Toebbe*, Order Rejecting Plea Agreements, Permitting Defendants to Withdraw Guilty Pleas and Setting Trial Dates 2, Aug. 18, 2022, Case No. 3:21-cr-00049-GMG-RWT, ECF No. 113 (N.D.W. Va. 2022) (rejecting a plea deal and noting "that while she generally honors plea agreements, in this case she said the sentencing options were 'strikingly deficient' considering the seriousness of the charges.").

[8] *U.S. v. Jonathan Toebbe and Diana Toebbe*, Order Rejecting Plea Agreements, Permitting Defendants to Withdraw Guilty Pleas and Setting Trial Dates 2, Aug. 18, 2022, Case No. 3:21-cr-00049-GMG-RWT, ECF No. 113 (N.D.W. Va. 2022).

[9] *Id.*

[10] Justin Wingerter, *'Contrary to justice': Judge rejects probation plea deal for Bachar in $125K theft*, BusinessDen (Mar. 13, 2023), https://businessden.com/2023/03/13/contrary-to-justice-judge-rejects-probation-plea-deal-for-bachar-in-125k-theft/.

# <u>EXHIBIT 2</u>

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   GARY A. SHAPLEY, JR.

Friday, May 26, 2023

Washington, D.C.

The interview in the above matter was held in 5480 O'Neill House Office Building, commencing at 9:33 a.m.

Appearances:

For the COMMITTEE ON WAYS AND MEANS:

██████████, MAJORITY COUNSEL

██████████, MAJORITY COUNSEL

██████████, MAJORITY COUNSEL

████████████, MAJORITY STAFF

████████████, MAJORITY STAFF

██████████, MAJORITY COUNSEL

██████████████, MINORITY COUNSEL

██████████, MINORITY   COUNSEL

████████████████, MINORITY COUNSEL

For GARY A. SHAPLEY, JR.:

MARK D. LYTLE,

PARTNER,

NIXON PEABODY LLP

TRISTAN LEAVITT,

PRESIDENT,

EMPOWER OVERSIGHT

MAJORITY COUNSEL 1.    Good morning.    This is a transcribed interview of Internal Revenue Service Criminal Supervisory Special Agent Gary Shapley.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on April 19th, 2023, indicating Mr. Shapley's desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Would the witness please state your name for the record?

Mr. Shapley.    Gary Shapley.

MAJORITY COUNSEL 1.    Could counsel for the witness please state your names for the record?

Mr. Lytle.    Mark Lytle.

Mr. Leavitt.    Tristan Leavitt.

MAJORITY COUNSEL 1.    On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is ███████.    I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else from the committee who is here at the table introduce themselves as well.

MAJORITY COUNSEL 2.    ███████ with the majority staff.

MAJORITY COUNSEL 3.    ███████, majority staff.

MAJORITY STAFF.    ███████, majority staff.

MAJORITY COUNSEL 4.    ███████, majority staff.

MAJORITY STAFF.    ███████, majority staff.

MINORITY COUNSEL 1.        ████████████, minority staff.

MINORITY COUNSEL 2.        █████████████, minority staff.

MINORITY COUNSEL 3.        ██████████, minority.

MAJORITY COUNSEL 1.    Thank you.

I'd like to now go over the ground rules and guidelines we'll follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity to make an opening statement.

Following your statement, the questioning will proceed in rounds.    The majority will ask questions first for one hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.    We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break apart from that, please just let us know.

As you can see, there is an official court reporter taking down everything we say to make a written record, so we ask that you give verbal responses to all questions.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone at the end of the table can hear you.    It is important that we don't talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete, truthful manner as possible, so we will take our time.    If you have any questions or if you do not understand one of our questions, please let us know.

Our questions will cover a wide range of topics, so if you need clarification on any point, just say so.    If you honestly don't know the answer to a question or do not remember, it is best not to guess.    Please give us your best recollection.

It is okay to tell us if you learned the information from someone else.    Just indicate how you came to know the information.    If there are things you don't know or can't remember, just say so and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that, by law, you're required to answer questions from Congress truthfully.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    This also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or making a false statement under 18 U.S.C. 1001.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful answer to today's questions?

Mr. Shapley.    There is not.

MAJORITY COUNSEL 1.    Finally, I'd like to note the information discussed here today is confidential.    As an IRS agent, I know you understand the significance of our tax privacy laws.    Chairman Smith takes our tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

As I'm sure you know, 26 U.S.C. Section 6103 makes tax returns and return information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, that statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Do you wish to disclose such information to the committee today?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    In addition to Section 6103(f)(5), the chairman of the committee on Ways and Means has authority under Section 6103(f)(4)(A) to designate agents to receive and inspect returns and return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has designated the individuals in this room for the purposes of receiving the information you wish to share.    The chairman considers this entire interview and the resulting transcript as protected confidential information under Section 6103.

That means that this interview can only proceed so long as everyone in the room is properly designated to receive the information.    The chairman has designated the court reporter and the related individuals that provide transcription services to the House of Representatives.

I'd like to remind the witness and everyone in the room that 26 U.S.C. Section 7213 makes it unlawful to make any disclosure of returns or return information not authorized by Section 6103.    Unauthorized disclosure of such information can be a felony punishable by fine or imprisonment.

Given the statutory protection for this type of information, we ask that you not speak about what we discuss in this interview to individuals not designated to receive such information.

For the same reason, the marked exhibits that we use today will remain with the court reporter so that they can go in the official transcript, and any copies of those exhibits will be returned to us when we wrap up.

We also understand that you have alleged that you have been retaliated against for seeking to blow the whistle inside your agency and to Congress.    We will discuss that issue in more detail, but I will note that Chairman Smith values whistleblowers and knows

that whistleblowers take significant risks when disclosing wrongdoing.    That is why there are legal protections in place for whistleblowers making disclosures to Congress, such as the protections in 5 U.S.C. Section 2302(b)(8)(C), which your counsel identified in your initial letter to the committee.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers.    The IRS Commissioner replied, quote, "I can say without hesitation, any hesitation, there will be no retaliation for anyone making an allegation," end quote.

Since that time, you have shared additional information with the committee regarding allegations of retaliation.    This is very troubling, particularly given Commissioner Werfel's testimony before the committee.    We will discuss your allegations in greater detail today.

That is the end of my preamble.    Is there anything my colleagues from the minority would like to add?

MINORITY COUNSEL 1.    Thanks, ████.

Thank you very much for appearing before us today.    I personally am very happy that you were able to share with us some information in advance, because I think that helped us get prepared for this meeting today.    I look forward to hearing what you have to say.    Thank you for coming in.

MAJORITY COUNSEL 1.    And with that, we invite you to begin with an opening statement, after which we will begin questioning.

Mr. Shapley.    So thank you for having me here today.

My name is Gary Shapley.    I am a supervisory special agent with the Internal Revenue Service Criminal Investigation.    I have been an IRS agent since July 2009, and

have served as a supervisory special agent or acting assistant special agent in charge since April 2018.

I grew up in a little town in upstate New York and never thought that I would be in this position I am today.    I was taught to be proud of this country that had afforded me so many opportunities and to always do the right thing -- the right thing, a simple philosophy that has me sitting here today.    There is no reward for me for becoming a whistleblower.    The only win for me is to not be fired or arrested or retaliated against.

Before October of 2022, I had received the highest awards available to me in my agency and multiple awards from DOJ.    In October 2022, I was a senior leader, assistant special agent in charge of the Chicago Field Office, and received the highest performance rating available that year as an outstanding.

I was planning to transition to a new position in headquarters for an international collaboration of foreign tax organizations that I was picked to help set up and operated since 2018.    I have led, planned, and executed undercover operations and/or search warrants in over a dozen countries.    I have investigated and managed some of the largest cases in U.S. history and of the history of the agency, recovering over $3.5 billion for the United States Government.

Since October 2022, IRS CI has taken every opportunity to retaliate against me and my team.

I was passed over for a promotion for which I was clearly most qualified.

The special agent in charge and assistant special agent in charge of the Washington, D.C. Field Office have sent threats to the field office, suppressing additional potential whistleblowers from coming forward.

Even after IRS CI senior leadership had been made aware on a recurring basis that the Delaware U.S. Attorney's Office and the Department of Justice was acting improperly,

they acquiesced to a DOJ request to remove the entire team from the Hunter Biden investigation, a team that had been investigating it for over 5 years.    Passing the buck and deferring to others was a common theme with IRS CI leadership during this investigation.

After you hear my testimony, I believe you will understand why my conscience would not be silenced.    My oath of office would have been unfulfilled if I did nothing.    I went from a senior leader to a pariah, and the only thing that happened in between was that I blew the whistle.

I am blowing the whistle because the Delaware U.S. Attorney's Office, Department of Justice Tax, and Department of Justice provided preferential treatment and unchecked conflicts of interest in an important and high-profile investigation of the President's son, Hunter Biden.

The mission of IRS CI is to investigate potential criminal violations of Internal Revenue Code and related financial crimes in a manner that fosters confidence in the Code and compliance with the law.

That mission can only be met by treating every taxpayer we encounter the same. The normal process must be followed.    If search warrants or witness interviews or document requests that include the actual subjects' names are not allowed, for example, that is simply a deviation from the normal process that provided preferential treatment, in this case to Hunter Biden.

The case agent on this case is one of the best agents in the entire agency. Without his knowledge and persistence, DOJ would have prevented the investigative team from collecting enough evidence to make an informed assessment, which ultimately included even DOJ agreeing on the recommended criminal charges.

I am alleging, with evidence, that DOJ provided preferential treatment,

slow-walked the investigation, did nothing to avoid obvious conflicts of interest in this investigation.

I have absolutely no political activities in my past.   I vote in the general election and recently voted in the midterms because of an interest in the process for my children, who I took to witness one of the pillars of this Nation, the right to vote.

I have never given a dollar to any campaign, never attended a campaign event at any level of government, never had a campaign sign on my car, lawn, et cetera.   I do not own and have never owned a tee shirt or hat with any election topic.   I vote for the candidate, not the party.   I have voted for Presidents with both an R and/or a D in front of their names.

I speak on this topic so I can try to head off time that might be spent on it.   In the end, a fact is a fact, regardless of the political affiliation of the person who brought it to you.

I am hoping the whistleblower process will allow me to give this protected disclosure and leave it to you to make your determinations based on what my testimony and the documents say about the investigation.

I respect this institution and have faith that the issues I raise will be considered appropriately.   I beg of you to protect me from the coming retaliatory storm.   You are my only hope, and your actions send a message to all those out there that see wrongdoing but are terrified to bring it to light.

In this country, we believe in the rule of law, and that applies to everyone.   There is not a two-track justice system depending on who you are and who you're connected to.

But the criminal tax investigation of Hunter Biden, led by the United States Attorney's Office for the District of Delaware, has been handled differently than any investigation I've ever been a part of for the past 14 years of my IRS service.

Some of the decisions seem to be influenced by politics.    But whatever the motivations, at every stage decisions were made that had the effect of benefiting the subject of the investigation.    These decisions included slow-walking investigative steps, not allowing enforcement actions to be executed, limiting investigators' line of questioning for witnesses, misleading investigators on charging authority, delaying any and all actions months before elections to ensure the investigation did not go overt well before policy memorandum mandated the pause.    These are just only a few examples.

The investigation into Hunter Biden, code name Sportsman, was first opened in November 2018 as an offshoot of an investigation the IRS was conducting into a foreign-based amateur online pornography platform.    Special Agent ██████████ developed the investigative lead and was assigned to be the original case agent.

In October 2019, the FBI became aware that a repair shop had a laptop allegedly belonging to Hunter Biden and that the laptop might contain evidence of a crime.    The FBI verified its authenticity in November of 2019 by matching the device number against Hunter Biden's Apple iCloud ID.

When the FBI took possession of the device in December 2019, they notified the IRS that it likely contained evidence of tax crimes.    Thus, Special Agent ██████ drafted an affidavit for a Title 26 search warrant, which a magistrate judge approved that month.

In January 2020, I became the supervisor of the Sportsman case.    The group, known as the International Tax and Financial Crimes group, or the ITFC, is comprised of 12 elite agents who were selected based on their experience and performance in the area of complex high-dollar international tax investigations.

The IRS direct investigative team, including the co-case agent, case agent, and me, were working closely with the FBI and the Delaware U.S. Attorney's Office and Department of Justice Tax in biweekly prosecution team meetings, or pros meetings.

Yet, it soon became clear to me this case was being handled differently than any I'd seen before.

As early as March 6th, 2020, I sent a sensitive case report up through my chain of command at IRS reporting that by mid-March the IRS would be ready to seek approval for physical search warrants in California, Arkansas, New York, and Washington, D.C.

Special Agent ███ drafted an April 1st, 2020, affidavit establishing probable cause for these physical search warrants.   We also planned to conduct approximately 15 contemporaneous interviews at that time.

Yet, after former Vice President Joseph Biden became the presumptive Democratic nominee for President in early April 2020, career DOJ officials dragged their feet on the IRS taking these investigative steps.

By June 2020, those same career officials were already delaying overt investigative actions.   This was well before the typical 60- to 90-day period when DOJ would historically stand down before an election.   It was apparent that DOJ was purposely slow-walking investigative actions in this matter.

On a June 16th, 2020, call Special Agent ███ and I had with our chain of command up to the Director of Field Operations, I pointed out that if normal procedures had been followed we already would have executed search warrants, conducted interviews, and served document requests.   Nevertheless, my IRS chain of command decided we would defer to DOJ.

Thus, I became the highest-ranking IRS CI leader to participate in our prosecution team calls, be up to date on specific case strategies, to discuss the investigation with DOJ and the Delaware U.S. Attorney's Office, and to address concerns as they arose.

From around October 2020 through October 2022, I was the IRS CI manager who interacted directly with the United States Attorney, David Weiss, and individuals at DOJ

Tax Division the most.

Even after investigative steps were denied, enforcement operations were rejected by DOJ, leading to the election in November 2020, we continued to obtain further leads in the Sportsman's case and prepared for when we could go overt.

For example, in August 2020, we got the results back from an iCloud search warrant.   Unlike the laptop, these came to the investigative team from a third-party record keeper and included a set of messages.   The messages included material we clearly needed to follow up on.

Nevertheless, prosecutors denied investigators' requests to develop a strategy to look into the messages and denied investigators' suggestion to obtain location information to see where the texts were sent from.

For example, we obtained a July 30th, 2017, WhatsApp message from Hunter Biden to Henry Zhao, where Hunter Biden wrote:   "I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled.   Tell the director that I would like to resolve this now before it gets out of hand, and now means tonight.   And, Z, if I get a call or text from anyone involved in this other than you, Zhang, or the chairman, I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction.   I am sitting here waiting for the call with my father."

Communications like these made it clear we needed to search the guest house at the Bidens' Delaware residence where Hunter Biden stayed for a time.

In a September 3rd, 2023 [2020], pros meeting, the Assistant United States Attorney, Lesley Wolf, told us there was more than enough probable cause for the physical search warrant there, but the question was whether the juice was worth the squeeze.   She continued that optics were a driving factor in the decision on whether to

execute a search warrant.    She said a lot of evidence in our investigation would be found in the guest house of former Vice President Biden, but said there is no way we will get that approved.

The prosecutors even wanted to remove Hunter Biden's name from electronic search warrants, 2703(d) orders, and document requests.    Special Agent ███ said on the call he felt uncomfortable with removing the subject's name from those documents just based on what might or might not be approved, as that seemed unethical.    But his concerns were ignored.

And Department of Justice Tax Line Attorney Jack Morgan said, doing it without Hunter Biden's name would probably still get us, in quote, "most" of the data we sought. I have never been part of an investigation where only getting most of the data was considered sufficient.

On September 3rd, 2020, the slow-walking of process continued when AUSA Wolf stated that a search warrant for the emails for Blue Star Strategies was being sat on by OEO.    That's the Department of Justice Office -- actually, I'm sorry.    I don't know what it means, the acronym.

She indicated it would likely not get approved.    This was a significant blow to the Foreign Agents Registration Act piece of the investigation.

On September 4th, 2020, Deputy Attorney General Donoghue issued a cease and desist of all overt investigative activities due to the coming election.    AUSA Wolf made several odd statements, to include that DOJ was under fire and it was self-inflicted.    She stated that DOJ needed to repair their reputation.

At the next pros meeting, on September 21st, 2020, the FBI tried to dictate that we only do five of the planned interviews so FBI management could reevaluate if they wanted to continue assisting.    Special Agent ███ told them it seems inappropriate for

them to dictate in an IRS investigation who should be interviewed.

Later that day, I learned the FBI case agent in Delaware had only recently moved back to his hometown of Wilmington with his wife and family and was concerned about the consequences for him and his family if they conducted these sensitive interviews and executed a search warrant of the President Biden guest house.

On October 19th, 2020, I emailed Assistant United States Attorney Wolf:   "We need to talk about the computer.   It appears the FBI is making certain representations about the device, and the only reason we know what is on the device is because of the IRS CI affiant search warrant that allowed access to the documents.   If Durham also executed a search warrant on a device, we need to know so that my leadership is informed.   My management has to be looped into whatever the FBI is doing with the laptop.   It is IRS CI's responsibility to know what is happening.   Let me know when I can be briefed on this issue."

My email led to a special meeting on October 22nd, 2020, with the prosecution team and the FBI's computer analysis team to discuss Hunter Biden's laptop.   We once again objected that we still had not been given access to the laptop.

Special Agent ███████ asked about the full filter reviewed copy of the contents of the devices.   He stated he had not been provided with the data.   AUSA Lesley Wolf stated that she would not have seen it because, for a variety of reasons, prosecutors decided to keep it from the investigators.   This decision is unprecedented in my experience.

Investigators assigned to this investigation were obstructed from seeing all the available evidence.   It is unknown if all the evidence in the laptop was reviewed by agents or by prosecutors.

Based on guidance provided by the prosecutors on a recurring basis to not look

into anything related to President Biden, there is no way of knowing if evidence of other criminal activity existed concerning Hunter Biden or President Biden.

AUSA Wolf acknowledged that there was no reason to believe that any data was manipulated on devices by any third party.   She further supported this belief by mentioning that they corroborated the data with other sources of information received.

Also on an October 22nd, 2020, pros team call, AUSA Wolf stated that United States Attorney David Weiss had reviewed the affidavit for search warrant of Hunter Biden's residence and agreed that probable cause had been achieved.

Even though the legal requirements were met and the investigative team knew evidence would be in these locations, AUSA Wolf stated that they would not allow a physical search warrant on Hunter Biden.

The case agent and I raised the issue to IRS CI leadership on a continued basis, to include in a June 16th, 2020, meeting with the Director of Field Operations, where I stated:   "DOJ Tax has made a concerted effort to drag their feet concerning conducting search warrants and interviewing key witnesses in an effort to push those actions to a timeframe where they can invoke the Department of Justice rule of thumb concerning affecting elections."   No follow-up questions were asked and no action was taken by IRS CI senior leadership.

Because the 2020 election was contested, our original plan to go overt on or around November 17th was delayed.   DOJ pushed back against the day of action date because they did not want to approach Hunter Biden while he was in Delaware, potentially collocated with President Biden.

United States Attorney Weiss stated on November 10th, 2020, that he had to delay the day of action because it was a contested election.   He also stated that because there was no leak in the investigation to date, therefore not public at the time, that the

primary focus was to protect the integrity of the investigation, which meant to keep it concealed from the public.

We began preparing for what we called our day of action on December 8th, 2020. That included document requests and approximately 12 interviews around the country. The search warrant had been rejected by DOJ, and we included a possibility of a potential consent search of Hunter Biden's residence, which was a Hail Mary.

On December 3rd, 2020, we had around a 12-hour long meeting at the United States Attorney's Office in Delaware with the prosecution team.    United States Attorney Weiss came in at the beginning of the meeting and jubilantly congratulated the investigative team for keeping the investigation a "secret," quote.

Weiss was in and out for the rest of the meeting, but it went downhill from there. We shared with prosecutors our outline to interview Hunter Biden's associate, Rob Walker.    Among other things, we wanted to question Walker about an email that said: "Ten held by H for the big guy."    We had obvious questions like who was H, who the big guy was, and why this percentage was to be held separately with the association hidden.

But AUSA Wolf interjected and said she did not want to ask about the big guy and stated she did not want to ask questions about "dad."    When multiple people in the room spoke up and objected that we had to ask, she responded, there's no specific criminality to that line of questioning.

This upset the FBI too.    And as I'll explain in a moment, the IRS and FBI agents conducting this interview tried to skirt AUSA Wolf's direction.

Hunter Biden was assigned Secret Service protection on or around our December 3rd meeting.    So we developed a plan for the FBI Los Angeles special agent in charge to reach out at 8 a.m. on December 8th to the Secret Service Los Angeles special agent in charge and tell them that we would be coming to the residence to seek an interview with

Hunter Biden and that it was part of an official investigation.

However, the night before, December 7th, 2020, I was informed that FBI headquarters had notified Secret Service headquarters and the transition team about the planned actions the following day.   This essentially tipped off a group of people very close to President Biden and Hunter Biden and gave this group an opportunity to obstruct the approach on the witnesses.

The next morning, when I saw my FBI counterpart, Supervisory Special Agent Joe Gordon, he was clearly dejected about how our plan had been interfered with.   FBI SSA Gordon memorialized the new plan in an email the morning of December 8th, 2020, that stated the subject and the Secret Service protectees would be given the phone numbers of the FBI SSA Joe Gordon and I and the subject would call us if he wanted to speak with us.

SSA Gordon and I waited in the car outside of Hunter Biden's California residence waiting for a phone call.   It was no surprise that the phone call SSA Gordon received was from his ASAC Alfred Watson, who informed us that Hunter Biden would contact us through his attorneys.

We received a telephone call later that morning from Hunter Biden's attorneys, who said he would accept service for any document requests, but we couldn't talk to his client.   The public news of our investigation hit the press the next day.

I can't know for certain whether FBI's advance notice played a role or not, but the 12 interviews we hoped to conduct on our day of action, we only got one substantive interview.   It was with Rob Walker in Arkansas, and it was exactly the sort of interview we expected to have if the FBI hadn't tipped off Secret Service and the transition team.

In the interview, the FBI agent tried to get Rob Walker to talk about the "ten held by H" email while not directly contradicting AUSA Wolf's direction not to ask about the,

quote, "big guy."   The FBI agent said, this is a quote:   "The famous email that Tony was pointing out like the equity split, can you tell me your opinion of that, when it's going through like, you know, ten B dot-dot-dot held by H?"

Walker answered:   "I think that maybe James was wishful thinking or maybe he was just projecting that, you know, if this was a good relationship and this was something that was going to happen, the VP was never going to run, just protecting that, you know, maybe at some point he would be a piece of it, but he was more just, you know -- it looks terrible, but it's not.   I certainly never was thinking at any time the VP was a part of anything we were doing."

And yet it was clearly valuable for the investigators to ask about Hunter Biden's dad, as Walker went on to describe an instance in which the former Vice President showed up at a CEFC meeting.

Walker said:   "We were at the Four Seasons and we were having lunch and he stopped in, just said hello to everybody.   I don't even think he drank water.   I think Hunter Biden said, 'I may be trying to start a company or try to do something with these guys and could you?'   And I think he was like, if I'm around and he'd show up."

The FBI agent asked:   "So you definitely got the feeling that that was orchestrated by Hunter Biden to have like an appearance by his dad at that meeting just to kind of bolster your chances at making a deal work out?"

Walker answered:   "Sure."

The FBI agent continued:   "Any times when he was in office, or did you hear Hunter Biden say that he was setting up a meeting with his dad with them while dad was still in office?"

Walker answered:   "Yes."

And, inexplicably, the FBI agent changed the subject.

On December 10th, 2020, the prosecutorial team met again to discuss the next steps.   One piece of information that came out of the day of action was that Hunter Biden vacated the Washington, D.C., office of Owasco.   His documents all went into a storage unit in northern Virginia.   The IRS prepared an affidavit in support of a search warrant for the unit, but AUSA Wolf once again objected.

My special agent in charge and I scheduled a call with United States Attorney Weiss on December 14th just to talk about that specific issue.   United States Attorney Weiss agreed that if the storage unit wasn't accessed for 30 days we could execute a search warrant on it.

No sooner had we gotten off the call then we heard AUSA Wolf had simply reached out to Hunter Biden's defense counsel and told him about the storage unit, once again ruining our chance to get to evidence before being destroyed, manipulated, or concealed.

My special agent in charge at the time emailed that she would be informing the director of field operations and the deputy chief of IRS CI of her, quote, "frustration with the United States Attorney's Office not allowing us to go forward with a search warrant."

To this day, I have no way of knowing if the documents from that unit were among those ultimately provided to our team.

This was the second search warrant where prosecutors agreed that probable cause was achieved, but would not allow the investigators to execute a search warrant, a clear indication of preferential treatment of Hunter Biden.

In a briefing that I requested to make to Director of Field Operations Batdorf and SAC Waldon on March 2nd, 2021, investigators mentioned the possibility of blowing the whistle on how DOJ was handling this case.   My special agent in charge disengaged and was minimally involved moving forward.

This same sort of unprecedented behavior continued through 2021.   For example, as I wrote to my chain of command on a May 3rd, 2021, memo:   "This investigation has been hampered and slowed by claims of potential election meddling. Through interviews and review of evidence obtained, it appears there may be campaign finance criminal violations.   AUSA Wolf stated on the last prosecution team meeting that she did not want any of the agents to look into the allegation.   She cited a need to focus on the 2014 tax year, that we could not yet prove an allegation beyond a reasonable doubt, and that she does not want to include their Public Integrity Unit because they would take authority away from her.   We do not agree with her obstruction on this matter," end quote.

After we shared on August 18th, 2021, and multiple times thereafter about interviews we had planned, on September 9th, 2021, AUSA Wolf emailed us:   "I do not think you are going to be able to do these interviews as planned."   She told us they would require approval from the Tax Division.

These delays extended through September and into October.   Then the United States Attorney's Office raised other objections.   Part of what we examined were charges made with Hunter Biden's card that might conceivably have been done by his children.   However, on October 21st, 2021, AUSA Wolf told us it will get us into hot water if we interview the President's grandchildren.

As a result of this behavior, I went to my Director of Field Operations in November 2021 to express how poorly DOJ was handling this case.   Despite these obstacles, around this time Special Agent ███████ began drafting the Special Agent Report, or SAR, which is a document in which IRS recommends what charges should be brought.

A[nother] troubling issue occurred with IRS criminal tax attorneys, commonly known as CT counsel, related to their review of the SAR [that recommended] charging

Hunter Biden that laid out the evidence for each element of each violation.

The CT Counsel Line Attorney Christine Steinbrunner worked with the case agent to get questions answered and to understand the case and the evidence.   She indicated to the case agent that she was going to concur with all the recommended charges in the SAR.

On February 9th, 2022, a CT counsel attorney at the national office reached out to the co-case agent and told her that Ms. Steinbrunner had sent it forward with concur for all charges and that the five members of the review team at the national office concurred with the line attorney.

It then went to CT senior leadership Rick Lunger and Elizabeth Hadden, and direction was given to the line attorney, Ms. Steinbrunner, to change it to a nonconcur for all charges.

I informed SAC Waldon, and he telephoned Ms.   Steinbrunner's supervisor, Veena Luthra.   Ms. Luthra stated it had always been a nonconcur.   I then communicated with SAC Waldon that CT was misrepresenting the facts.

On February 11th, 2022, CT counsel issued the memorandum nonconcurring with all counts.   In a documented exchange with Ms. Steinbrunner, the case agent told her: "Did you know that they were saying that it's always been a nonconcur?"

Ms. Steinbrunner responded:   "What?   No, I sent them a yellow light."

I have no idea why Ms. Luthra would provide false information about this topic.

Since CT counsel's opinion is only advisory, on February 25th, 2022, the IRS sent the SAR to the Delaware U.S. Attorney's Office -- I'm sorry, that's incorrect.   They sent it to the Department of Justice Tax Division.

AUSA Wolf supported charging Hunter Biden for tax evasion and false return in 2014, 2018, and 2019, and failure to file or pay for 2015, 2016, and 2017.   It is my

understanding that the Tax Division then authored a 90-plus-page memo that recommended prosecution.

The proper venue for a tax case is where the subject resides or where the return is prepared or filed.   That meant the proper venue for the years we were looking into would either be Washington, D.C., or California, not Delaware.

In March 2022, DOJ's Tax Division presented its prosecution memo to the United States Attorney's Office for the District of Columbia, which had venue over the 2014 and 2015 tax years.   The case agent and I requested to be part of the presentation to the D.C. U.S. Attorney's Office, but were denied.

Department of Justice Tax Division Mark Daly telephoned the case agent and stated that the First Assistant at the D.C. U.S. Attorney's Office was optimistic and had stated she would assign an AUSA to assist.

Just a couple days later, Mark Daly called the case agent back and told him that the President Biden appointee to the United States Attorney for the District of Columbia, Matthew Graves, personally reviewed the report and did not support it.   We in the IRS didn't realize at the time that meant there was no ability to charge there.

Attorney General Merrick Garland appeared before the Senate Appropriations Committee on April 26th, 2022.   Senator Bill Hagerty asked him how the American people could be confident that the administration was conducting a serious investigation into the President's own son.

Garland testified:   "Because we put the investigation in the hands of a Trump appointee from the previous administration, who is the United States Attorney for the District of Delaware, and because you have me as the Attorney General, who is committed to the independence of the Justice Department from any influence from the White House in criminal matters."

Garland said:   "The Hunter Biden investigation is being run by and supervised by the United States Attorney for the District of Delaware.   He is in charge of that investigation.   There will not be interference of any political or improper kind."

We knew that President Biden-appointed U.S. Attorney Matthew Graves did not support the investigation, but DOJ and United States Attorney Weiss allowed us to believe that he had some special authority to charge.

From March 2022 through October 7th, 2022, I was under the impression that, based on AG Garland's testimony before Congress and statements by U.S. Attorney Weiss and prosecutors, that they were still deciding whether to charge 2014 and 2015 tax violations.

However, I would later be told by United States Attorney Weiss that the D.C. U.S. Attorney would not allow U.S. Attorney Weiss to charge those years in his district.   This resulted in United States Attorney Weiss requesting special counsel authority from Main DOJ to charge in the District of Columbia.   I don't know if he asked before or after the Attorney General's April 26th, 2022, statement, but Weiss said his request for that authority was denied and that he was told to follow DOJ's process.

That process meant no charges would ever be brought in the District of Columbia, where the statute of limitations on the 2014 and '15 charges would eventually expire. The years in question included foreign income from Burisma and a scheme to evade his income taxes through a partnership with a convicted felon.   There were also potential FARA issues relating to 2014 and 2015.   The purposeful exclusion of the 2014 and 2015 years sanitized the most substantive criminal conduct and concealed material facts.

Hunter Biden still has not reported approximately $400,000 in income from Burisma and has not paid the tax due and owing of around $125,000 even after being told multiple times by his partner, Eric Schwerin, that he had to amend his 2014 return to

report that income.

To make matters worse, defense counsel was willing to sign statute of limitations extensions for 2014 and 2015 and had done so several times.    Because United States Attorney Weiss had no ability to charge 2014 and 2015, DOJ allowed the statute of limitations to expire.    There is no mechanism available to collect the tax owed by Hunter Biden for 2014 other than in a voluntary fashion.

In the first week of May 2022, I received a call from FBI Supervisory Special Agent Joe Gordon.    Gordon was preparing a briefing for FBI leadership.    He told me that his field office thought they should push for this case to be given to a special counsel and said, quote:    "My leadership is wondering why your leadership isn't asking for a special counsel in this investigation."

I relayed that information to my Director of Field Operations, who simply responded:    "I wouldn't even know how to go about that."

But since we didn't know D.C., District of Columbia, had refused to bring charges and that United States Attorney Weiss had no authority to overrule them, we believed at that time that the case could still be prosecuted.

It is common practice for DOJ to ask for the case agents' communications in discovery, as they might have to testify in court.    However, it's much more unusual to ask for management communications, because it is simply not discoverable.

In March of 2022, DOJ requested of the IRS and FBI all management-level emails and documents on this case.    I didn't produce my emails, but I provided them with my sensitive case reports and memorandums that included contemporaneous documentation of DOJ's continued unethical conduct.

Much of that information was being provided up my chain of command for over 2 years on how I thought their handling of the case was unethical.    I didn't hear anything

back about this at the time, leading me to believe no one read the discovery I provided.

In our July 29th, 2022, prosecution team call, AUSA Wolf told us that United States Attorney Weiss indicated that the end of September would be his goal to charge the 2014 and 2015 years, because they did not want to get any closer to a midterm election.    She also said:    "The X factor on timing will include any delay defense counsel has requested."

Two weeks later, I learned how defense counsel felt about the case when prosecutors told us on a pros team call that Chris Clark, Hunter Biden's counsel from Latham and Watkins, told them that if they charge Hunter Biden, they would be committing "career suicide," end quote.

Around this time, there began to be discussions of the fact that the remaining tax years, 2016, '17, '18 and '19, needed to be brought in the Central District of California. There was no explanation as to why, after being declined in D.C. for 2014 and 2015, that it took until mid-September 2022 to present the case to the Central District of California United States Attorney's Office.

Prosecutors stated that they presented the case to the Central District of California in mid-September.    That happened to correspond with the confirmation of the President Biden appointee to the United States Attorney, Martin Estrada.    The case agent and I asked to participate in that presentation, but it was denied.

On a September 22nd, 2022, pros team call, AUSA Wolf announced we wouldn't be taking any actions until after the midterm elections, asking:    Why would we shoot ourselves in the foot by charging before the election?    This was decided even though DOJ's Public Integrity Section had provided instruction that there did not need to be a cease and desist on investigative actions due to the upcoming midterms.    It still appeared that decisions were being made to conceal from the public the results of the investigation.

The next meeting was in person on October 7th, 2022, and it took place in the Delaware U.S. Attorney's Office.    This meeting included only senior-level managers from IRS CI, FBI, and the Delaware U.S. Attorney's Office.    This ended up being my red-line meeting in our investigation for me.

United States Attorney Weiss was present for the meeting.    He surprised us by telling us on the charges, quote:    "I'm not the deciding official on whether charges are filed," unquote.

He then shocked us with the earth-shattering news that the Biden-appointed D.C. U.S. Attorney Matthew Graves would not allow him to charge in his district.

To add to the surprise, U.S. Attorney Weiss stated that he subsequently asked for special counsel authority from Main DOJ at that time and was denied that authority. Instead, he was told to follow the process, which was known to send U.S.    Attorney Weiss through another President Biden-appointed U.S. Attorney.

This was troubling, because he stated that, if California does not support charging, he has no authority to charge in California.    Because it had been denied, he informed us the government would not be bringing charges against Hunter Biden for the 2014-2015 tax years, for which the statute of limitations were set to expire in one month.

All of our years of effort getting to the bottom of the massive amounts of foreign money Hunter Biden received from Burisma and others during that period would be for nothing.

Weiss also told us that if the new United States Attorney for the Central District of California declined to support charging for the 2016 through 2019 years, he would have to request special counsel authority again from the Deputy Attorney General and/or the Attorney General.

I couldn't understand why the IRS wasn't told in the summer of 2022 that D.C. had

already declined charges.    Everyone in that meeting seemed shellshocked, and I felt misled by the Delaware United States Attorney's Office.

At this point, I expressed to United States Attorney Weiss several concerns with how this case had been handled from the beginning.    The meeting was very contentious and ended quite awkwardly.    It would be the last in-person meeting I had with United States Attorney Weiss.

We had one more call 10 days later on October 17th, 2022.    United States Attorney Weiss wasn't on this call.    In response to questions about more subpoena requests, we were told there was no grand jury any longer to issue subpoena requests out of.

When we asked when the Central District of California might make its decision on the case, DOJ Tax Mark Daly responded, quote:    "I'm not the boss of them."

After this call, DOJ either stopped scheduling prosecution team meetings or else just stopped inviting the IRS to them.

Disclosing our concerns to United States Attorney Weiss produced other problems too.    In May, I had produced all my sensitive case reports for enforcement to date. And now suddenly 5 months later, on October 24th, 2022, DOJ started asking for all those reports since May.

They also renewed the request for all my emails on the case, saying they needed to ensure they were aware of any exculpatory or impeachment effort in the case.    But their extraordinary request looked to us just like a fishing expedition to know what we'd been saying about their unethical handling of the case.

On November 7th, 2022, the FBI special agent on the case, Mike Dzielak, called me to tell me the United States Attorney's Office had requested both management- and senior management-level documents from the FBI related to the investigation.    He said

that had never happened before and that he was shocked at the request.    The FBI refused to provide any further discovery to the Delaware U.S. Attorney's Office.

I also shared with my leadership how inappropriate the whole situation was.    On December 12th, 2022, I emailed – "the United States Attorney's Office was so eager to get my emails, which they already had 95 percent of, then surprise they might have a problem with a few of them that memorialized their conduct.    If the content of what I documented in report or email is the cause of their consternation, I would direct them to consider their actions instead of who documented them.

I documented issues that I would normally have addressed as they occurred, because the United States Attorney's Office and Department of Justice Tax continued visceral reactions to any dissenting opinions or ideas.    Every single day was a battle to do our jobs.

I continually reported these issues up to IRS CI leadership beginning in the summer of 2020.    Now, because they realize I documented their conduct, they separate me out, cease all communication, and are now attempting to salvage their own conduct by attacking mine.    This is an attempt by the U.S. Attorney's Office to tarnish my good standing and position with IRS CI, and I expect IRS CI leadership to understand that.

As recent as the October 7th meeting, the Delaware U.S. Attorney's Office had nothing but good things to say about me and the team.    Then they finally read discovery items which were provided 6 months previous that are actually not discoverable, and they are beginning to defend their own unethical actions.

I have called into question the conduct of the United States Attorneys and DOJ Tax on this investigation on a recurring basis and am prepared to present these issues.

For over a year, I've had trouble sleeping and wake all hours of night thinking about this.    After some time, I realized it was because I subconsciously knew they were

not doing the right thing, but I could not fathom concluding that the United States Attorney's Office or DOJ Tax were in the wrong.

After I wrapped my mind around the fact that they were not infallible, I started to sleep better.    My choice was to turn a blind eye to their malfeasance and not sleep or to put myself in the crosshairs by doing the right thing.    My conscience chose the latter.

I hope IRS CI applauds the incredibly difficult position I have been put into instead of entertaining United States Attorney's Office attacks.    If they bring up something legitimate, I am sure we can address it, because it was not intentional.    Everything I do is with the goal of furthering IRS CI's mission, protecting the fairness of our tax system, and representing IRS CI with honor."

In January of this year, I learned United States Attorney Estrada had declined to bring the charges in the Central District of California.    For all intents and purposes, the case was dead, with the exception of one gun charge that could be brought in Delaware.

And yet, when Senator Chuck Grassley asked Attorney General Garland about the case on March 1st, 2023, Garland testified, quote:    "The United States Attorney had been advised that he has full authority to make those referrals you're talking about or to bring cases in other districts if he needs to do that.    He has been advised that he should get anything he needs.    I have not heard anything from that office that suggests they are not able to do anything that the U.S. Attorney wants them to do."

I don't have any firsthand information into why Garland said that, but to all of us who have been in the October 7th meeting with Weiss, this was clearly false testimony.

On March 16th, 2023, DOJ Tax Mark Daly was overheard on his telephone by one of my agents.    Mark Daly was talking to DOJ Tax Attorney Jack Morgan.    Mr. Daly stated that they would give United States Attorney Weiss the approvals required if he wanted them, but that he had no idea where he planned to charge Hunter Biden.

This indicates that after the Central District of California declined to allow charges to be brought there, the only route to United States Attorney Weiss was to request special counsel authority.   It appears that this case was not moving forward until Senator Grassley asked pointed questions that held AG Garland accountable.

After my attorney sent the first letter to Congress on April 19th, I started to hear rumblings that DOJ was picking the case back up again.   I don't believe that would have happened were it not for me blowing the whistle.

However, on Monday, May 15th, my special agent in charge called me and told me that DOJ had requested an entirely new team from the IRS and that none of the 12 agents in my group would be able to work the case.   This seems like clear retaliation for me making my disclosures.

What's worse, after Special Agent ███████ emailed the Commissioner to point out the human cost of the IRS simply implementing DOJ's retaliatory direction, my assistant special agent in charge threatened him with leaking (6)(E) material.

And my special agent in charge sent me and other supervisors an email at the same time that said we had to stay within our chain of command.   I interpreted this as a clear warning to me and anyone else who might be thinking of blowing the whistle.

I did not choose to sit here before you today.   I was compelled by my conscience when decision after decision has been made to deviate from our normal investigative processes.   I believe Congress needs to know this information.   I trust you'll do the right thing, because we have nothing if I can't trust this body.

MAJORITY COUNSEL 1.   Thank you very much for your thorough opening statement.

The time is 10:24.   We'll start the clock with majority questions.

To start, I'd like to mark this document as exhibit 1.

[Shapley Exhibit No. 1

Was marked for identification.]

tabbies'

1

**NIXON PEABODY**

Nixon Peabody LLP
799 9th Street NW
Suite 500
Washington, DC 20001-5327
**Attorneys at Law**
nixonpeabody.com
@NixonPeabodyLLP

**Mark D. Lytle**
Partner

T / 
F /

April 19, 2023

*Via Electronic Transmission*

The Honorable Ron Wyden
Chairman, Committee on Finance
Co-Chair, Whistleblower Protection Caucus
United States Senate

The Honorable Jason Smith
Chairman, Committee on Ways & Means
United States House of Representatives

The Honorable Mike Crapo
Ranking Member, Committee on Finance
United States Senate

The Honorable Richard Neal
Ranking Member, Committee on Ways & Means
United States House of Representatives

The Honorable Richard Durbin
Chairman, Committee on the Judiciary
United States Senate

The Honorable Jim Jordan
Chairman, Committee on the Judiciary
United States House of Representatives

The Honorable Lindsey Graham
Ranking Member, Committee on the Judiciary
United States Senate

The Honorable Jerrold Nadler
Ranking Member, Committee on the Judiciary
United States House of Representatives

The Honorable Charles Grassley
Co-Chair, Whistleblower Protection Caucus
Member, Committee on Finance
United States Senate

Dear Chairs and Ranking Members:

I represent a career IRS Criminal Supervisory Special Agent who has been overseeing the ongoing and sensitive investigation of a high-profile, controversial subject since early 2020 and would like to make protected whistleblower disclosures to Congress. Despite serious risks of retaliation, my client is offering to provide you with information necessary to exercise your constitutional oversight function and wishes to make the disclosures in a non-partisan manner to the leadership of the relevant committees on both sides of the political aisle.

My client has already made legally protected disclosures internally at the IRS, through counsel to the U.S. Treasury Inspector General for Tax Administration, and to the Department of Justice, Office of Inspector General. The protected disclosures: (1) contradict sworn testimony to Congress by a senior political appointee, (2) involve failure to mitigate clear conflicts of interest in the ultimate disposition of the case, and (3) detail examples of preferential treatment

April 19, 2023
Page 2

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

and politics improperly infecting decisions and protocols that would normally be followed by career law enforcement professionals in similar circumstances if the subject were not politically connected.

Some of the protected disclosures contain information that is restricted by statute from unauthorized disclosure to protect taxpayer and tax return information.

My client would like to share the same legally protected disclosures with Congress—pursuant to 26 U.S.C. § 6103(f)(5) and the protections afforded by 5 U.S.C. 2302(b)(8)(C)—that he has already shared with other oversight authorities. Out of an abundance of caution regarding taxpayer privacy laws, my client has refrained from sharing certain information even with me in the course of seeking legal advice. Thus, it is challenging for me to make fully informed judgments about how best to proceed.

My goal is to ensure that my client can properly share his lawfully protected disclosures with congressional committees. Thus, I respectfully request that your committees work with me to facilitate sharing this information with congress legally and with the fully informed advice of counsel. With the appropriate legal protections and in the appropriate setting, I would be happy to meet with you and provide a more detailed proffer of the testimony my client could provide to Congress.

Sincerely,

Mark D. Lytle
Partner

cc:     The Honorable Michael Horowitz
        Inspector General, U.S. Department of Justice

        The Honorable Russell George
        Inspector General for Tax Administration, U.S. Department of the Treasury

EXAMINATION

BY MAJORITY COUNSEL 1:

Q      Do you recognize this document?

A      Yes, I do.

Q      What is it?

A      This is the April 19th, 2023, letter sent to the chairs and ranking members

identified here by my attorneys Mark Lytle and -- oh, it's just from Mark Lytle.

Q      And this is the initial reason why we're here today?

A      This initiated what's happening, yes.

Q      Okay.    I'd like to talk a little bit about your background.

You mentioned, I believe, that you started at the IRS in 2009.    Is that correct?

A      Yes, that's correct.

Q      And what is your educational background?

A      I have an accounting and business degree from the University of Maryland,

and I have a master's in business administration from the University of Baltimore.

Q      And before you joined the IRS, what did you do for employment?

A      I was in the Office of Inspector General with the National Security Agency.

Q      And when did you begin in that position?

A      2007.

Q      Did you hold any other positions prior to that?

A      Internships and stuff like that.

Q      What was your motivation for joining the IRS?

A      I always planned on going into law enforcement and I really had a desire to

serve.    And that was why I went with the accounting degree and business degree and I

got my MBA, was for the purpose of getting that special agent job with the Federal Government.

Q      And you talked through sort of your history at the IRS during your opening statement.   Can you briefly summarize your roles and responsibilities in your current position?

A      Yes.   So I oversee 12 agents.   They are handpicked.   They sit all across the country.   We work all high-dollar, complex, international cases.   We work foreign financial institutions.   We do undercover operations and search warrants and all that stuff in other countries and in this country.

And I'm responsible for reviewing all enforcement actions and recommendation reports and case initiations and so on and so forth.   That's like my main job as the supervisory special agent of ITFC.

I'm also a representative in the Joint Chiefs of Global Tax Enforcement, working I guess directly under the Chief of IRS CI.   And it works with four other partner countries in trying to collaborate and attack tax noncompliance on a global scale and share information where we can legally.

Q      And who do you directly report to?

A      My current report is Assistant Special Agent in Charge Lola Watson.

        BY MAJORITY COUNSEL 2:

Q      Where does she sit?

A      Washington, D.C.

Q      She sits in Washington.   And your office is in Baltimore?

A      Yeah.   I either sit in D.C. or Baltimore.   I kind of split time.

Q      Okay.

        BY MAJORITY COUNSEL 1:

Q    In the typical situation in the criminal tax investigation, what is your understanding of the leadership and management structure at the Tax Division at the Department of Justice?

A    Well, with most of our cases, because they're complex and high-dollar and they usually align with the very top priorities in the agency, we usually have Department of Justice Tax attorneys that assist on the cases with us.

That's not typical for small cases, normal cases.    But in our cases and in this particular case, from the very beginning there were two Department of Justice Tax Division attorneys working side by side with us the entire time.    So they worked as prosecutors alongside the AUSAs in Delaware.

And then ultimately what happens is the prosecution recommendation report that is produced by Criminal Investigation gets sent to DOJ Tax.    And they absorb that report, and they usually put out a memo either approving, providing discretion, or declining. And in the normal course, it's usually a pretty quick turnaround, 30 days, 45 days.

Q    You mentioned two prosecutors in this case at DOJ Tax.    Who are those two individuals?

A    At the beginning, it was Jason Poole and Mark Daly.    And Mark Daly was definitely the lead.    Jason Poole took a different position at some point and Jack Morgan took his spot.

Q    And did those individuals sit in Washington, D.C.?

A    I know Mark Daly does.    I'm pretty sure -- yeah, Jack Morgan does as well, yes, yes.

Q    In the course of this investigation, did you interact with anyone else at the DOJ Tax Division?

A    I interacted with Jason Poole a lot, but in his new role, because he became

the chief of the Northern Division of the Department of Justice's Tax Division, and I had to call him on several occasions concerning issues we were having.

MAJORITY COUNSEL 2.    On this case?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Okay.    And in a typical case, what is IRS CI's relationship with any given U.S. Attorney's Office?

Mr. Shapley.    I'm sorry, can I add to my last question there?

MAJORITY COUNSEL 1.    Please.

Mr. Shapley.    So I also interacted with Stuart Goldberg, who I think is a Deputy Assistant Attorney General, I think is his title, on a few occasions.

MAJORITY COUNSEL 2.    And he's the head of the Tax Division?

Mr. Shapley.    I believe he's the head of the Civil Tax Division and the head of the Criminal is different, but there is not currently a person who's been confirmed there, I believe.

Usually Stuart Goldberg would not be the person overseeing the criminal tax stuff. It usually would go to the personal -- the Criminal Division.

MAJORITY COUNSEL 2.    Is it fair to say he was the senior-most official in the Tax Division?

Mr. Shapley.    Yes.    That's fair, yes.

BY MAJORITY COUNSEL 1:

Q      On this investigation?

A      That's correct.

Q      Okay.    What in a typical case would be IRS CI's relationship with the U.S. Attorney's Office?

A      On a case, we would talk strategy.    We would go and get the evidence,

bring the evidence to them.    We would be requesting to do, get certain document requests from them.

There are things like search warrants and undercover operations that all go through the United States Attorney's Office prosecutors.    And generally, the way it works is the agents go out and they get the information, and they have to be proactive in doing so.    And they bring that information to the prosecutor, and we kind of go forward from there.

Q     In your opening statement, you described prosecution team meetings.    In this case, individuals from which organizations participated in those meetings?

[10:32 a.m.]

Mr. Shapley.   Sure, yeah.   The prosecution team is the United States Attorney's Office for Delaware, Department of Justice Tax Division.

At some point in time, a Department of Justice National Security Division attorney came on.

MAJORITY COUNSEL 2.   Who was that?

Mr. Shapley.   McKenzie.   Brian McKenzie.

And then it was FBI.   And that was usually from the SSA to the case agents, and there was around four or five of them.

BY MAJORITY COUNSEL 1:

Q   Sorry.   What's SSA?

A   I'm sorry.   Supervisory special agent, SSA.

And then it was IRS.   And it was me, ▮▮▮▮▮▮▮, and the co-case agent, Christine Puglisi.   And there was also an IRS CI agent out of the Philadelphia Field Office that was working some ancillary issues, Anthony LoPiccolo, who would also participate in those.

And United States Attorney Weiss would be on those, but it wasn't scheduled. He'd be on some -- pop in, pop out, that type of thing.

Q   And is the structure of that prosecution team typical for a case of this size and profile?

A   It was -- we met more often, I think, because there were so many moving parts.   I wouldn't say that it's typical to have a prosecution team meeting every 2 weeks in other cases.   But it was just a way to get everybody at one spot at one time to have the conversations.

Q   And how did this specific investigation begin?

A       So Special Agent ███████ was working on another case, and during that case he found some reports that had some individuals' names in it.    And it was basically a case development tool he was using, and he looked at those and was seeing if he can initiate criminal investigations on that list of people, and Hunter Biden was one of the people on that list.

Q       And from that stage, how does an investigation open?    What's the process around that?

A       So the agent can write a PI evaluation report, and they send it to my level, the SSA, supervisory special agent.    And if it's a Title 26 case, it can just be approved and put on our system.

Now, under a PI, it's kind of unique at IRS CI.    There are only a few techniques you can use, and it does [not] include third-party contacts and stuff like that.

So there's a whole other effort to make a subject criminal investigation, and that's a more involved form, called the 9131, and it has a bunch of attachments.    And really it's an analysis of all the steps taken in the primary investigative phase.

And that 9131, in this case, if it's -- it goes forward to Department of Justice Tax Division for approval and -- yeah, yeah.    I'm sorry.

Generally.    If it's generally like a 9131, if it's going to be a grand jury investigation, request a grand jury investigation, generally a 9131 goes to Department of Justice Tax Division, who approves it, and you're allowed to participate in that grand jury.

Q       When a matter develops in this way, is there interaction on the civil side related to civil audits?    Are audits opened in connection with this process?

A       Audits aren't opened in partner with a criminal investigation.    Part of the primary investigative phase, as one of the things you would do, you would request all the information from IDRS, our internal system.    That would include checks for audits and

things like that in the past, but there would be no request to initiate any civil activity.

It's actually the exact opposite.    A form is issued that says -- the title of the form is Suspend Civil Activity, and the subject's identifiers are included.

Q    So in your opening statement you discussed tax years 2014 through 2019 for this particular taxpayer.    Do you know whether there are any issues related to 2020 or 2021?

A    No.    We never included that as part of the investigation. We did get the returns, but we didn't.

> [Shapley Exhibit No. 2
>
> Was marked for identification.]





ROBERT DOE ("RHB")

███████████
███:██████████
███████████

Years: 2014, 2015, 2016, 2017, 2018, 2019

Violation(s):Title 26, United States Code, Section 7201
Title 26, United States Code, Section 7206(1)
Title 26, United States Code, Section 7203

Special Agent: ████████████
Revenue Agent: ████████████

2. 

## CONCLUSIONS AND RECOMMENDATIONS

The recommendation for prosecution is based on the facts above and ███████
recommends that RHB be prosecuted under the provisions of Title 26 USC Sections 7201
and 7206 (1) for the tax years 2014, 2018 and 2019 and under the provisions of Title 26
USC Section 7203 for the tax years 2015, 2016, 2017, 2018 and 2019.

A draft of this SAR has been given to DOJ-Tax Senior Attorney Mark Daly, as well as
Assistant United States Attorney Lesley Wolf. AUSA Wolf has reviewed the appendices
and the charges cited in this report and agrees with the prosecution recommendation of
the above cited charges against RHB.



Special Agent
Cellular ███████

**Approved:**

Gary Shapley

Supervisory Special Agent, Criminal Investigation

Cellular          ████████████

BY <u>MAJORITY COUNSEL 1</u>:

Q      Okay.    I'd like to talk now a little bit about the specific tax years at issue.

The document being handed to you is marked as exhibit 2.

Are you familiar with this document?

A      Yes, I am.

Q      What is it?

A      This is the special agent report.

Q      And who is the subject of this report?

A      Yeah.    To clarify the last response, it's an excerpt from the special agent report.

Q      And who is the subject of this report?

A      So it says Robert Doe.    That was the name that was put into our internal system to attempt to keep anyone from revealing the name, and "RHB" stands for Robert Hunter Biden.

Q      And turning to the second page of the document, this excerpt includes the "Conclusions and Recommendations" section.    Can you describe the conclusions and recommendations made in this report?

A      Yes, I can.    The report includes itemized elements of each violation for each year up above it that I couldn't provide because of grand jury (6)(e) material.

This recommended felony tax evasion charges, that's 7201, is tax evasion, and 7206(1) is a false tax return, also a felony, for the tax years 2014, 2018, and 2019.    And for Title 26 7203, which is a failure to file or pay, that is a misdemeanor charge for '15, '16, '17, '18, and '19.

Also under that is a paragraph that is common when we work directly with

Department of Justice Tax Division and AUSA so closely.    We usually would give a statement saying what they wanted as well at that time.

This report was reviewed extensively with Mark Daly, and also a lot with AUSA Lesley Wolf, and each of them agreed with the recommendations as posed in this report.

Q    Okay.    And when was this document finalized and signed?

A    It was, I believe, January 27th of 2022.

BY MAJORITY COUNSEL 2:

Q    And can you just walk us through the process for this document?    This is an IRS document?

A    It is, yeah.

Q    And it is sent to who?

A    Yeah.    This document is a very robust document that includes everything that we do.    Internally it would go to CT counsel for their review.    They provide a memo, concur or nonconcur.    It's just advisory.    We don't have to follow what they say.

Q    Did they concur?

A    They nonconcurred.

Q    They did not concur?

A    Yeah.    There was a portion in my opening statement that described that event where the line attorney concurred with all charges and then it went to the national office to review on sensitive case.

The panel at the national office agreed with the line attorney that it was concur. And when it went up to their top two people at the CT counsel, they sent it back to the line attorney and told her to change it to nonconcur.

Q    Okay.

A    So I'm not even sure.    That could happen on occasion.    What was

incredibly outside the norm here was that they usually tell us, and we ask them to tell us if anything is going to be a nonconcur.    And all along they were saying it's a concur, it's a concur -- with all charges.    It was green for 2018, yellow for other years, which is all in the concur range.

And when we got the nonconcur, I went to my special agent in charge who called the line attorney's supervisor and she said, it's always been nonconcur.

And then it was really incredible that that statement was made, and maybe only IRS CI geeks care about that.    But then we communicate in an instant message that's captured with the line attorney saying, "They are telling us that this has always been a nonconcur," and she's like, "What, no, no.    It was a concur when I sent it up."

So for some reason, that got miscommunicated.

Q    Was any feedback provided as to why?

A    There's a robust document that was created by CT counsel -- I spent time rebutting it, but there was nothing that we hadn't considered in the investigative team with the prosecution team for the 3-plus years we'd been investigating.

Yeah, and this advisory.    Yeah, it is, I would say, 90-plus percent of everything that I do in my international tax group is nonconcur by CT counsel, and we ignore what they say.

So then this report goes, after that, to the Department of Justice Tax Division. It's transmitted to them.    And that's when they take it and they review it.    And usually it's approve, discretion, or declined in a normal course.    But we sent it to them on February 25th of 2022, and I have yet to see an approval, discretion, or declination.

Q    And what's the U.S. Attorney's Office in Delaware's role with this particular document?

A    So it's just to help advise them.    After DOJ Tax, if they approve a charge,

then that's DOJ Tax saying that you have to charge it.    And if the United States Attorney's Office, they can say, "We don't want to charge it here," but DOJ Tax then has to go and charge it.    They have the authority to do so.

Q    So did the U.S. Attorney's Office in Delaware concur with this?

A    They would never have [to as part of the process, but] they did when it was written, right?    They were on board with all the charges when it was written.    But there would never be an official time where we requested their concur or nonconcur.

Q    So did they review it before you submitted it to DOJ?

A    Oh, yes, yes.

Q    Okay.

A    Yes.

Q    And they had an opportunity to make suggestions or --

A    Yes.

Q    -- tell you to tweak things?

A    Yes.

Q    And they didn't.

A    Well, we did, but --

Q    The final document though --

A    Yeah.

Q    -- they concurred.

A    The final document was a compilation of everyone's understanding of what the evidence said and what should be charged.

Just a little bit more about this document.    I mean, this document is around – it's incredibly robust.    So I think it was around 85 pages, just the report, and it goes through the theory of investigation.    And then it goes, like I said, into each year and each

element.

      And it's each piece of evidence in each element, and it's cited to evidence.    So this report, in reality, crashes my computer every time it comes up because it includes all the evidence attached to it.    It's like 8-, 9-, 10,000 pages of evidence and documents. It's an incredibly robust document.

                [Shapley Exhibit No. 3

                Was marked for identification.]

nue Service Office of Appeals may request non-binding mediation on any issue unresolved at the conclusion of—

(A) appeals procedures; or

(B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.

**(2) Arbitration**

The Secretary shall establish a pilot program under which a taxpayer and the Internal Revenue Service Office of Appeals may jointly request binding arbitration on any issue unresolved at the conclusion of—

(A) appeals procedures; or

(B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.

(Added Pub. L. 105–206, title III, § 3465(a)(1), July 22, 1998, 112 Stat. 768.)

PRIOR PROVISIONS

A prior section 7123 was renumbered section 7124 of this title.

**§ 7124. Cross references**

For criminal penalties for concealment of property, false statement, or falsifying and destroying records, in connection with any closing agreement, compromise, or offer of compromise, see section **7206.**

(Aug. 16, 1954, ch. 736, 68A Stat. 850, § 7123; Pub. L. 97–258, § 3(f)(12), Sept. 13, 1982, 96 Stat. 1065; renumbered § 7124, Pub. L. 105–206, title III, § 3465(a)(1), July 22, 1998, 112 Stat. 767.)

AMENDMENTS

1998—Pub. L. 105–206 renumbered section 7123 of this title as this section.

1982—Subsec. (a). Pub. L. 97–258, § 3(f)(12)(A), struck out heading "Criminal penalties".

Subsec. (b). Pub. L. 97–258, § 3(f)(12)(B), struck out subsec. (b) which set forth cross reference to R.S. 3469 (31 U.S.C. 194) relating to compromises after judgment.

## CHAPTER 75—CRIMES, OTHER OFFENSES, AND FORFEITURES

| Subchapter | | Sec.[1] |
|---|---|---|
| A. | Crimes ................................................ | 7201 |
| B. | Other offenses ................................... | 7261 |
| C. | Forfeitures ........................................ | 7301 |
| D. | Miscellaneous penalty and forfeiture provisions ........................................... | 7341 |

### Subchapter A—Crimes

| Part | | |
|---|---|---|
| I. | General provisions. | |
| II. | Penalties applicable to certain taxes. | |

### PART I—GENERAL PROVISIONS

| Sec. | | |
|---|---|---|
| 7201. | Attempt to evade or defeat tax. | |
| 7202. | Willful failure to collect or pay over tax. | |
| 7203. | Willful failure to file return, supply information, or pay tax. | |
| 7204. | Fraudulent statement or failure to make statement to employees. | |
| 7205. | Fraudulent withholding exemption certificate or failure to supply information. | |
| 7206. | Fraud and false statements. | |

[1] Section numbers editorially supplied.

| Sec. | | |
|---|---|---|
| 7207. | Fraudulent returns, statements, or other documents. | |
| 7208. | Offenses relating to stamps. | |
| 7209. | Unauthorized use or sale of stamps. | |
| 7210. | Failure to obey summons. | |
| 7211. | False statements to purchasers or lessees relating to tax. | |
| 7212. | Attempts to interfere with administration of internal revenue laws. | |
| 7213. | Unauthorized disclosure of information. | |
| 7213A. | Unauthorized inspection of returns or return information. | |
| 7214. | Offenses by officers and employees of the United States. | |
| 7215. | Offenses with respect to collected taxes. | |
| 7216. | Disclosure or use of information by preparers of returns. | |
| 7217. | Prohibition on executive branch influence over taxpayer audits and other investigations. | |

AMENDMENTS

1998—Pub. L. 105–206, title I, § 1105(b), July 22, 1998, 112 Stat. 711, added item 7217.

1997—Pub. L. 105–35, § 2(b)(2), Aug. 5, 1997, 111 Stat. 1105, added item 7213A.

1982—Pub. L. 97–248, title III, § 357(b)(2), Sept. 3, 1982, 96 Stat. 646, struck out item 7217 "Civil damages for unauthorized disclosure of returns and return information".

1976—Pub. L. 94–455, title XII, § 1202(e)(2), Oct. 4, 1976, 90 Stat. 1687, added item 7217.

1971—Pub. L. 92–178, title III, § 316(b), Dec. 10, 1971, 85 Stat. 529, added item 7216.

1958—Pub. L. 85–321, § 3(b), Feb. 11, 1958, 72 Stat. 6, added item 7215.

**§ 7201. Attempt to evade or defeat tax**

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, § 329(a), Sept. 3, 1982, 96 Stat. 618.)

AMENDMENTS

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

EFFECTIVE DATE OF 1982 AMENDMENT

Section 329(e) of Pub. L. 97–248 provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

**§ 7202. Willful failure to collect or pay over tax**

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851.)

EXHIBIT

3

tabbies®

## § 7124. Cross references

For criminal penalties for concealment of property, false statement, or falsifying and destroying records, in connection with any closing agreement, compromise, or offer of compromise, see section 7206.

(Aug. 16, 1954, ch. 736, 68A Stat. 850, § 7123; Pub. L. 97–258, § 3(f)(12), Sept. 13, 1982, 96 Stat. 1065; renumbered § 7124, Pub. L. 105–206, title III, § 3465(a)(1), July 22, 1998, 112 Stat. 767.)

### Amendments

1998—Pub. L. 105–206 renumbered section 7123 of this title as this section.

1982—Subsec. (a). Pub. L. 97–258, § 3(f)(12)(A), struck out heading "Criminal penalties".

Subsec. (b). Pub. L. 97–258, § 3(f)(12)(B), struck out subsec. (b) which set forth cross reference to R.S. 3469 (31 U.S.C. 194) relating to compromises after judgment.

## CHAPTER 75—CRIMES, OTHER OFFENSES, AND FORFEITURES

| Subchapter | | Sec.[1] |
|---|---|---|
| A. | Crimes .................................................. | 7201 |
| B. | Other offenses ...................................... | 7261 |
| C. | Forfeitures ........................................... | 7301 |
| D. | Miscellaneous penalty and forfeiture provisions ........................................... | 7341 |

### Subchapter A—Crimes

| Part | |
|---|---|
| I. | General provisions. |
| II. | Penalties applicable to certain taxes. |

### PART I—GENERAL PROVISIONS

| Sec. | |
|---|---|
| 7201. | Attempt to evade or defeat tax. |
| 7202. | Willful failure to collect or pay over tax. |
| 7203. | Willful failure to file return, supply information, or pay tax. |
| 7204. | Fraudulent statement or failure to make statement to employees. |
| 7205. | Fraudulent withholding exemption certificate or failure to supply information. |
| 7206. | Fraud and false statements. |
| 7207. | Fraudulent returns, statements, or other documents. |
| 7208. | Offenses relating to stamps. |
| 7209. | Unauthorized use or sale of stamps. |
| 7210. | Failure to obey summons. |
| 7211. | False statements to purchasers or lessees relating to tax. |
| 7212. | Attempts to interfere with administration of internal revenue laws. |
| 7213. | Unauthorized disclosure of information. |
| 7213A. | Unauthorized inspection of returns or return information. |
| 7214. | Offenses by officers and employees of the United States. |
| 7215. | Offenses with respect to collected taxes. |
| 7216. | Disclosure or use of information by preparers of returns. |
| 7217. | Prohibition on executive branch influence over taxpayer audits and other investigations. |

### Amendments

1998—Pub. L. 105–206, title I, § 1105(b), July 22, 1998, 112 Stat. 711, added item 7217.

1997—Pub. L. 105–35, § 2(b)(2), Aug. 5, 1997, 111 Stat. 1105, added item 7213A.

1982—Pub. L. 97–248, title III, § 357(b)(2), Sept. 3, 1982, 96 Stat. 646, struck out item 7217 "Civil damages for un-

[1] Section numbers editorially supplied.

authorized disclosure of returns and return information".

1976—Pub. L. 94–455, title XII, § 1202(e)(2), Oct. 4, 1976, 90 Stat. 1687, added item 7217.

1971—Pub. L. 92–178, title III, § 316(b), Dec. 10, 1971, 85 Stat. 529, added item 7216.

1958—Pub. L. 85–321, § 3(b), Feb. 11, 1958, 72 Stat. 6, added item 7215.

## § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, § 329(a), Sept. 3, 1982, 96 Stat. 618.)

### Amendments

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

### Effective Date of 1982 Amendment

Pub. L. 97–248, title III, § 329(e), Sept. 3, 1982, 96 Stat. 619, provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

## § 7202. Willful failure to collect or pay over tax

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851.)

## § 7203. Willful failure to file return, supply information, or pay tax

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting

"felony" for "misdemeanor" and "5 years" for "1 year".

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 90-364, title I, §103(e)(5), June 28, 1968, 82 Stat. 264; Pub. L. 97-248, title III, §§327, 329(b), Sept. 3, 1982, 96 Stat. 617, 618; Pub. L. 98-369, div. A, title IV, §412(b)(9), July 18, 1984, 98 Stat. 792; Pub. L. 100-690, title VII, §7601(a)(2)(B), Nov. 18, 1988, 102 Stat. 4504; Pub. L. 101-647, title XXXIII, §3303(a), Nov. 29, 1990, 104 Stat. 4918.)

### AMENDMENTS

1990—Pub. L. 101-647 substituted "substituting 'felony' for 'misdemeanor' and'" for "substituting".

1988—Pub. L. 100-690 inserted at end "In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting '5 years' for '1 year'."

1984—Pub. L. 98-369 struck out "(other than a return required under the authority of section 6015)" after "to make a return".

1982—Pub. L. 97-248, §329(b), substituted "$25,000 ($100,000 in the case of a corporation)" for "$10,000".

Pub. L. 97-248, §327, inserted last sentence providing that, in the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure.

1968—Pub. L. 90-364 struck out reference to section 6016.

### EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101-647, title XXXIII, §3303(c), Nov. 29, 1990, 104 Stat. 4918, provided that: "The amendment made by subsection (a) [amending this section] shall apply to actions, and failures to act, occurring after the date of the enactment of this Act [Nov. 29, 1990]."

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100-690 applicable to actions after Nov. 18, 1988, see section 7601(a)(3) of Pub. L. 100-690, set out as a note under section 6050I of this title.

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98-369 applicable with respect to taxable years beginning after Dec. 31, 1984, see section 414(a)(1) of Pub. L. 98-369, set out as a note under section 6654 of this title.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 329(b) of Pub. L. 97-248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97-248, set out as a note under section 7201 of this title.

### EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90-364 applicable with respect to taxable years beginning after Dec. 31, 1967, except as provided by section 104 of Pub. L. 90-364, see section 103(f) of Pub. L. 90-364, set out as a note under section 243 of this title.

### §7204. Fraudulent statement or failure to make statement to employees

In lieu of any other penalty provided by law (except the penalty provided by section 6674) any person required under the provisions of section 6051 to furnish a statement who willfully furnishes a false or fraudulent statement or who willfully fails to furnish a statement in the manner, at the time, and showing the information required under section 6051, or regulations prescribed thereunder, shall, for each such of-

fense, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 852.)

### §7205. Fraudulent withholding exemption certificate or failure to supply information

#### (a) Withholding on wages

Any individual required to supply information to his employer under section 3402 who willfully supplies false or fraudulent information, or who willfully fails to supply information thereunder which would require an increase in the tax to be withheld under section 3402, shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

#### (b) Backup withholding on interest and dividends

If any individual willfully makes a false certification under paragraph (1) or (2)(C) of section 3406(d), then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 852; Pub. L. 89-368, title I, §101(e)(5), Mar. 15, 1966, 80 Stat. 62; Pub. L. 97-34, title VII, §721(b), Aug. 13, 1981, 95 Stat. 341; Pub. L. 97-248, title III, §§306(b), 308(a), Sept. 3, 1982, 96 Stat. 588, 591; Pub. L. 98-67, title I, §§102(a), 107(b), Aug. 5, 1983, 97 Stat. 369, 382; Pub. L. 98-369, div. A, title I, §159(a), July 18, 1984, 98 Stat. 696; Pub. L. 101-239, title VII, §7711(b)(2), Dec. 19, 1989, 103 Stat. 2393.)

### AMENDMENTS

1989—Subsec. (b). Pub. L. 101-239 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "If any individual willfully makes—

"(1) any false certification or affirmation on any statement required by a payor in order to meet the due diligence requirements of section 6676(b), or

"(2) a false certification under paragraph (1) or (2)(C) of section 3406(d),

then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both."

1984—Pub. L. 98-369 in subsecs. (a) and (b) substituted "in addition to" for "in lieu of" and struck out reference to penalty under section 6682 after "penalty provided by law".

1983—Pub. L. 98-67 designated existing provisions as subsec. (a), added subsec. (b), and repealed amendments made by Pub. L. 97-248. See 1982 Amendment note below.

1982—Pub. L. 97-248 provided that, applicable to payments of interest, dividends, and patronage dividends paid or credited after June 30, 1983, this section is amended by designating the existing provisions as subsec. (a) with a heading of "Withholding on wages", and by adding a new subsec. (b), (b) of Pub. L. 98-67, title I, Aug. 5, 1983, 97 Stat. 369, repealed subtitle A (§§301-308) of title III of Pub. L. 97-248 as of the close of June 30, 1983, and provided that the Internal Revenue Code of 1954 [now 1986] [this title] shall be applied and administered (subject to certain exceptions) as if such subtitle A (and the amendments made by such subtitle A) had not been enacted. Subsec. (b), referred to above, read as follows:

"(b) Withholding of interest and dividends

"Any person who—

then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.''

1984—Pub. L. 98–369 in subsecs. (a) and (b) substituted "in addition to" for "in lieu of" and struck out reference to penalty under section 6682 after "penalty provided by law".

1983—Pub. L. 98–67 designated existing provisions as subsec. (a), added subsec. (b), and repealed amendments made by Pub. L. 97–248. See 1982 Amendment note below.

1982—Pub. L. 97–248 provided that, applicable to payments of interest, dividends, and patronage dividends paid or credited after June 30, 1983, this section is amended by designating the existing provisions as subsec. (a) with a heading of "Withholding on wages", and by adding a new subsec. (b). Section 102(a), (b) of Pub. L. 98–67, title I, Aug. 5, 1983, 97 Stat. 369, repealed subtitle A (§§ 301–308) of title III of Pub. L. 97–248 as of the close of June 30, 1983, and provided that the Internal Revenue Code of 1954 [now 1986] [this title] shall be applied and administered (subject to certain exceptions) as if such subtitle A (and the amendments made by such subtitle A) had not been enacted. Subsec. (b), referred to above, read as follows:

"(b) Withholding of interest and dividends

"Any person who—

"(1) willfully files an exemption certificate with any payor under section 3452(f)(1)(A), which is known by him to be fraudulent or to be false as to any material matter, or

"(2) is required to furnish notice under section 3452(f)(1)(B), and willfully fails to furnish such notice in the manner and at the time required pursuant to section 3452(f)(1)(B) or the regulations prescribed thereunder,

shall, in lieu of any penalty otherwise provided, upon conviction thereof, be fined not more than $500, or imprisoned not more than 1 year, or both.''

1981—Pub. L. 97–34 substituted "$1,000" for "$500".

1966—Pub. L. 89–368 substituted "section 3402" and "any other penalty provided by law (except the penalty provided by section 6682)" for "section 3402(f)" and "any penalty otherwise provided" respectively.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1989 Amendment

Amendment by Pub. L. 101–239 applicable to returns and statements the due date for which (determined without regard to extensions) is after Dec. 31, 1989, see section 7711(c) of Pub. L. 101–239, set out as a note under section 6721 of this title.

#### Effective Date of 1984 Amendment

Pub. L. 98–369, div. A, title I, §159(b), July 18, 1984, 98 Stat. 696, provided that: "The amendments made by this section [amending this section] shall apply to actions and failures to act occurring after the date of the enactment of this Act [July 18, 1984]."

#### Effective Date of 1983 Amendment

Amendment by section 107(b) of Pub. L. 98–67 effective Aug. 5, 1983, see section 110(c) of Pub. L. 98–67, set out as a note under section 31 of this title.

#### Effective Date of 1981 Amendment

Amendment by Pub. L. 97–34 applicable to acts and failures to act after Dec. 31, 1981, see section 721(d) of Pub. L. 97–34, set out as a note under section 6682 of this title.

## § 7206. Fraud and false statements

Any person who—

### (1) Declaration under penalties of perjury

Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

### (2) Aid or assistance

Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; or

### (3) Fraudulent bonds, permits, and entries

Simulates or falsely or fraudulently executes or signs any bond, permit, entry, or other document required by the provisions of the internal revenue laws, or by any regulation made in pursuance thereof, or procures the same to be falsely or fraudulently executed, or advises, aids in, or connives at such execution thereof; or

### (4) Removal or concealment with intent to defraud

Removes, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title; or

### (5) Compromises and closing agreements

In connection with any compromise under section 7122, or offer of such compromise, or in connection with any closing agreement under section 7121, or offer to enter into any such agreement, willfully—

#### (A) Concealment of property

Conceals from any officer or employee of the United States any property belonging to the estate of a taxpayer or other person liable in respect of the tax, or

#### (B) Withholding, falsifying, and destroying records

Receives, withholds, destroys, mutilates, or falsifies any book, document, or record, or makes any false statement, relating to the estate or financial condition of the taxpayer or other person liable in respect of the tax;

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 852; Pub. L. 97–248, title III, §329(c), Sept. 3, 1982, 96 Stat. 618.)

### Editorial Notes

#### Amendments

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$5,000".

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

## § 7207. Fraudulent returns, statements, or other documents

Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both. Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 853; Pub. L. 87–792, § 7(m)(3), Oct. 10, 1962, 76 Stat. 831; Pub. L. 91–172, title I, § 101(e)(5), Dec. 30, 1969, 83 Stat. 524; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 96–603, § 1(d)(5), Dec. 28, 1980, 94 Stat. 3505; Pub. L. 97–248, title III, § 339(d), Sept. 3, 1982, 96 Stat. 619; Pub. L. 98–369, div. A, title IV, § 491(d)(51), July 18, 1984, 98 Stat. 852; Pub. L. 100–203, title X, § 10704(c), Dec. 22, 1987, 101 Stat. 1330–463; Pub. L. 105–277, div. J, title I, § 1004(b)(2)(E), Oct. 21, 1998, 112 Stat. 2681–890; Pub. L. 107–276, § 6(d), Nov. 2, 2002, 116 Stat. 1933.)

### Editorial Notes

#### AMENDMENTS

2002—Pub. L. 107–276 substituted "pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527" for "pursuant to subsection (b) of section 6047 or pursuant to subsection (d) of section 6104".

1998—Pub. L. 105–277 struck out "or (e)" after "subsection (d)".

1987—Pub. L. 100–203 inserted reference to subsec. (e) of section 6104.

1984—Pub. L. 98–369 struck out "or (c)" after "subsection (b)".

1982—Pub. L. 97–248 substituted "$10,000 ($50,000 in the case of a corporation)" for "$1,000" wherever appearing.

1980—Pub. L. 96–603 substituted "subsection (b) or (c) of section 6047 or pursuant to subsection (d) of section 6104" for "sections 6047(b) or (c), 6056, or 6104(d)".

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary".

1969—Pub. L. 91–172 substituted "sections 6047(b) or (c), 6056, or 6104(d)" for "section 6047(b) or (c)".

1962—Pub. L. 87–792 inserted sentence providing that any person required pursuant to section 6047(b) or (c) to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $1,000, or imprisoned not more than 1 year, or both.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2002 AMENDMENT

Pub. L. 107–276, § 6(h)(3), Nov. 2, 2002, 116 Stat. 1934, provided that: "The amendment made by subsection (d)

[amending this section] shall apply to reports and notices required to be filed on or after the date of the enactment of this Act [Nov. 2, 2002]."

#### EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–277 applicable to requests made after the later of Dec. 31, 1998, or the 60th day after the Secretary of the Treasury first issues the regulations referred to in section 6104(d)(4) of this title, see section 1004(b)(3) of Pub. L. 105–277, set out as a note under section 6104 of this title.

#### EFFECTIVE DATE OF 1987 AMENDMENT

Amendment by Pub. L. 100–203 applicable to returns for years beginning after Dec. 31, 1986, and on and after Dec. 22, 1987, in case of applications submitted after July 15, 1987, or on or before July 15, 1987, if the organization has a copy of the application on July 15, 1987, see section 10704(d) of Pub. L. 100–203, set out as a note under section 6652 of this title.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–369 applicable to obligations issued after Dec. 31, 1983, see section 491(f)(1) of Pub. L. 98–369, set out as a note under section 62 of this title.

#### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

#### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–603 applicable to taxable years beginning after Dec. 31, 1980, see section 1(f) of Pub. L. 96–603, set out as a note under section 6033 of this title.

#### EFFECTIVE DATE OF 1969 AMENDMENT

Amendment by Pub. L. 91–172 effective Jan. 1, 1970, see section 101(k)(1) of Pub. L. 91–172, set out as an Effective Date note under section 4940 of this title.

#### EFFECTIVE DATE OF 1962 AMENDMENT

Amendment by Pub. L. 87–792 applicable to taxable years beginning after Dec. 31, 1962, see section 8 of Pub. L. 87–792, set out as a note under section 22 of this title.

#### ANNUAL REPORTS

Pub. L. 110–428, § 2(e), Oct. 15, 2008, 122 Stat. 4840, provided that: "The Secretary of the Treasury shall annually submit to Congress and make publicly available a report on the filing of false and fraudulent returns by individuals incarcerated in Federal and State prisons. Such report shall include statistics on the number of false and fraudulent returns associated with each Federal and State prison."

## § 7208. Offenses relating to stamps

Any person who—

### (1) Counterfeiting

With intent to defraud, alters, forges, makes, or counterfeits any stamp, coupon, ticket, book, or other device prescribed under authority of this title for the collection or payment of any tax imposed by this title, or sells, lends, or has in his possession any such altered, forged, or counterfeited stamp, coupon, ticket, book, or other device, or makes, uses, sells, or has in his possession any material in imitation of the material used in the manufacture of such stamp, coupon, ticket, book, or other device; or

### (2) Mutilation or removal

Fraudulently cuts, tears, or removes from any vellum, parchment, paper, instrument,

BY <u>MAJORITY COUNSEL 1:</u>

Q    Okay.   The document just handed to you is being marked exhibit 3.    I'll give you a moment to look it over.

A    Oh, okay, yes.   Okay.

Q    So this document contains the relevant statutory citations included in the special agent report document you just looked at, and I'd like to walk through each of the relevant statutes briefly.

A    Okay.

Q    26 U.S.C. 7201 covers attempt to evade or defeat tax.   Is that correct?

A    That is.

Q    What are the elements of a 7201 offense?

A    So the elements are affirmative acts of evasion.   They are that there's a tax due and owing and -- I'm not used to reading it in this setting, so I'm sorry.   So it's willful attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof.   There has to be tax due and owing.   And the willfulness is a voluntary, intentional violation of a known legal duty.   And those are the elements.

Q    And what is the statute of limitations for this offense?

A    It's 6 -- this says 5 years.   Did that just change?   It was 6 years -- 6 years from the date.   Yeah.   This says 5 years.

<u>MINORITY COUNSEL 2.</u>   No, that's the prison sentence.

Mr. <u>Shapley.</u>   Oh, thank you very much.

Yeah, the statute of limitations is 6 years from when the return is filed or of an affirmative act of evasion that could occur after the filing of the tax returns.

BY <u>MAJORITY COUNSEL 1:</u>

Q      Okay.    And based on the conclusion in your report, the elements for that offense were met in tax years 2014, 2018, and 2019.    Is that correct?

A      That's correct.

Q      Okay.    26 U.S.C. 7203 covers willful failure to file, to supply information, or pay tax.    Is that correct?

A      It is.

Q      And what are the elements of a 7203 offense?

A      So that's that you had a requirement to file and that you had the knowledge that you did have to file, is how I know it.    I mean, would you --

Q      That's okay, you don't need to read the whole thing.

        BY MAJORITY COUNSEL 2:

Q      Yeah, we're just giving you the statute.    And this isn't a pop quiz.

A      Yeah, sorry, yeah.

Q      We're just trying to understand what the elements of these crimes are --

A      Yeah.

Q      -- what the statute of limitations is and so forth.    And since this is not a pop quiz, we just thought we would provide this as a resource.

A      Yeah.    I never see it in this format.

        BY MAJORITY COUNSEL 1:

Q      Understood.

And what's the statute of limitations for this?

A      It's 6 years.

Q      And based on this report, elements for that offense were met in 2015, 2016, 2017, 2018, and 2019.    Is that correct?

A      That's correct, yes.

Q      And same exercise, 26 U.S.C. 7206 (1) covers fraud or false statement.    Is that correct?

A      It is.

Q      And what are the elements of a 7206 (1) offense as you understand it?

A      So that there's a material misrepresentation of an item on that tax return, that they subscribe to that under penalties of perjury, and the willfulness and knowledge.

Q      Okay.    And what is the statute of limitations for that offense?

A      It's 6 years.

Q      And the elements for that offense were met in tax years 2014, 2018, and 2019.    Is that correct?

A      That's correct, yes.

Q      Is the tax liability at issue here related to just the individual taxpayer or to related companies controlled or that the taxpayer's --

A      These charges include related companies as well.

Q      Okay.    Can you tell us which companies were involved?

A      Yeah.    He was responsible for filing personal income tax returns as well as returns for Owasco P.C.

Q      And is there anything you can tell us about Owasco P.C., as far as what is the company, what does it do?

A      Oh.    So Owasco P.C., through the evidence that we obtained, was basically created with his partner Eric Schwerin.    And the crux of this, as I understand it, is that Hunter Biden had a history of noncompliance with his taxes, and he would often get large sums of money and wouldn't withhold.

So Owasco P.C. -- was initially for the -- the whole purpose was, Eric Schwerin came in to help him with his tax situation so it didn't continue to be a problem in the

future.

So all of his consulting fees and all that type of stuff would go into Owasco. There would be withholdings from it.    So then he didn't get -- when he filed his tax returns, they had withholdings to offset the taxes that he owed for that year.

Q     Okay.    Were there any other companies that you looked at in connection with this investigation?

A     Yes.

Q     A lot?

A     Yes, a lot.

Q     Okay.    The U.S. House Committee on Oversight and Accountability has publicly identified a series of companies, mostly LLCs, that are connected to this taxpayer. I'd like to walk through a list of those companies and just ask whether any of these companies were part of your investigative work.

Lion Hall Group, LLC?

A     Yes.

Q     Owasco P.C.?

A     Yes.

Q     Robinson Walker, LLC?

A     Yes.

Q     Skaneateles, LLC?

A     Yes.

Q     Seneca Global Advisers, LLC?

A     Yes.

Q     Rosemont Seneca Partners, LLC?

A     Yes.

Q      Rosemont Seneca Principal Investments, LLC?

A      Yes.

Q      Rosemont Realty, LLC?

A      Yes.

Q      Rosemont Seneca Technology Partners, LLC?

A      Not a hundred percent sure on that one.

Q      Rosemont Seneca Thornton, LLC?

A      Yes.

Q      Rosemont Seneca Advisors, LLC?

A      Yes.

Q      Rosemont Seneca Bohai, LLC?

A      Yes.

Q      JBB SR, Inc?

A      I'm not sure of that one.

Q      RSTP II Alpha Partners, LLC?

A      Yes.

Q      RSTP II Bravo Partners, LLC?

A      Yes.

Q      Owasco, LLC?

A      Yes.

Q      Hudson West III, LLC?

A      Yes.

Yes.   Sorry.

Q      Hudson West V, LLC?

A      I'm not sure about V.

Q       CEFC Infrastructure Investment U.S., LLC?

A       Yes.

Q       And in your line of work, are you familiar with what a form 1023 is?

MAJORITY COUNSEL 2.    FBI form 1023?

Mr. Shapley.    I don't know that form.

BY MAJORITY COUNSEL 1:

Q       In the course of your investigation, did any FBI agent ever make you aware of a form 1023 related to Hunter Biden or any of his family members?

A       We never discussed the form.

Q       Okay.    I think in your opening statement you discussed the jurisdiction in which the crimes we were just discussing took place, and you stated the District of Columbia.    Is that correct?

A       For 2014 and 2015, yes.

Q       Okay.    And Central District of California?    Is that correct?

A       That is correct.

Q       Any other jurisdictions?

A       The -- no, no.    I mean, there was a possibility of some, but it was always that those were the strongest, those were the ones that should be.

Q       And those are the jurisdictions related to the recommendations in the special agent report excerpt that we looked at earlier?

A       Yes, that's correct.

Q       And are you able to share details or estimates of the scope of the liability the taxpayer had to the U.S. Government or the loss to the U.S. Government in each of these tax years?

A       I probably couldn't itemize it off the top of my head, but altogether it was

around $2.2 million.

Q      Spanning 2014 through 2019 tax years?

A      Yes.    And that only includes tax liabilities that were determined on a filed tax return, because there's still unreported income in 2014 that there's no way to collect because the statute of limitations is gone.

Q      Okay.    So let's talk about that.

So you stated earlier that at the October 7th, 2022, meeting there was only 1 month remaining to collect taxes owed for tax years -- for tax year 2014.    Is that correct?

A      To charge.

Q      To charge?

A      Yes.

Q      For tax year 2014?

A      I believe it was '14 and '15.

Q      '14 and '15.    Okay.

Do you know or can you clarify whether there was a deadline for collecting those taxes?

A      I don't know if I understand your question.    Sorry.

Q      Is the deadline for collecting taxes the same as the statute of limitations period for the crime?

A      The deadline to collect, I guess, is what I'm confused about.    Like when the tax return is filed, even if it's only an extension and they're going to extend it, they have to pay the tax due and owing by the due date of the return.

And then if someone was charged and there was, say, a $2.2 million tax due and owing, it would be the courts that define when the payments are made as part of the sentencing.

Q     Okay.   Understood.

MAJORITY COUNSEL 2.   Was the statute about to run, though?   You talked about the October 7th, 2022, meeting.

Mr. Shapley.   Yeah.   The statute was about to blow in March of 2022.   And Department of Justice Tax Division and the U.S. Attorney's Office in Delaware were saying, "Get us the report, get us the report, get us the report."   They were pushing really hard to get the report to them because they wanted to go to defense counsel and say that it's been recommended, because they were hoping to initiate conversations.

Their plan was, was to go to D.C. and to charge pretty soon thereafter, which is why they requested discovery from all the agents at that time.   But what happened was the defense counsel said, "Whoa, whoa, whoa, whoa, don't charge, we'll sign statute of limitations waivers."

Mr. Lytle.   Extensions.

Mr. Shapley.   Extensions.   I'm sorry.   Statute of limitation extensions.   So I believe at least two of those were signed by defense counsel, and the prosecutors told us that they were willing to sign that, more of them, but they just didn't request it after the November limitation expired.

BY MAJORITY COUNSEL 2:

Q     Do you know when the extensions were signed and for what tax years?

A     Well, these were specific to 2014 and '15 because the statute of limitations were expiring.

Q     Okay.

A     And they -- didn't -- they just wanted to say, "Well, don't indict, my guy, like, we'll talk to you about it, we'll sign the extensions, and then you can --"

Q     And how long were the extensions good for?

A      I believe it was 6 months, each extension, but I'm not a hundred percent on that.   They could -- maybe they could being be defined as well.   I'm not -- because I know they signed at least two, and the last one was expiring in November of 2022.

Mr. Leavitt.   So they were shorter than 6 months.

Mr. Shapley.   Yeah, so they might be shorter than 6 months.

MAJORITY COUNSEL 2.   And ultimately the statute ran?

Mr. Shapley.   It was a conscious decision by DOJ to let that run.   They could've had them extend '14 and '15, but they said no.

MAJORITY COUNSEL 1.   And when you say DOJ, who, in your opinion, ultimately made that decision?

Mr. Shapley.   So, it had to be United States Attorney Weiss.   I don't know personally, but that's how it would usually work.

BY MAJORITY COUNSEL 2:

Q      It's not DOJ Tax?

A      In this case no.   The U.S. Attorney's Office would likely take the lead.   But then again, that's just based on my experience and how it would usually work, how I've seen it work.

Q      And can you give us any more information about the statute running in that particular instance?

A      I mean --

Q      Did you get any feedback from the U.S. Attorney's Office as to the blow-by-blow between their office and the taxpayer's lawyers?

A      They weren't very transparent with the interactions with defense counsel. I just know that in March when D.C. said no we still had that belief that he had some authority, because we were doing a lot of work to try to, like, overcome whatever issues

D.C. said that they had with the report.

And we thought that he still had the authority to charge.   And then October 7th meeting comes and he said we couldn't charge it there, and he requested special counsel authority.   It was denied.   So there was really no ability to charge it there.   He had no mechanism to charge it if what he said actually happened.   So they let the statute expire.

MAJORITY COUNSEL 1.   Okay.   I'm going to talk about specific issues in specific tax years to the extent you're able.   I know you said that special agent report was a very robust document.   And if you don't know or you don't recall the answers, that's totally fine.

For tax year 2014, what evidence led to the recommendation for charges for attempt to evade and false statement?

Mr. Lytle.   Can we just have a sort of an understanding that he can't speak about grand jury materials and protected (6)(E) just so it's clear that way?

MAJORITY COUNSEL 1.   Absolutely.   And if that's an issue, we'll certainly defer to you on that, what can and can't be talked about.

Mr. Lytle.   Great.

Mr. Shapley.   So, is the question for specific evidence or more of a theme of evidence?

MAJORITY COUNSEL 1.   Let's start with a theme.

Mr. Shapley.   So concerning the Burisma income, Hunter Biden basically used a nominee organization, Rosemont Seneca Bohai -- which a convicted felon was the partner of.

MAJORITY COUNSEL 2.   That's Mr. Archer?

Mr. Shapley.   Yes.   Yes, Devon Archer.

And so the way the money worked is there's a document which is the contract between Burisma and Hunter Biden.    Those are the two parties.    It was for $1 million per year.    Of course this was 2014, and it was negotiated in April, so the payments in that year were reduced by the months.    So it was $666,000, $83,000 a month he was receiving.

What Hunter Biden did with that is he told Burisma to send that income to Rosemont Seneca Bohai.    And then when the money came back to him, he booked it as a loan.

So there's all this machinations of nonsense happening over here in this nominee structure that, "Oh, this is complex, this is complex," and, well, it's not complex, because this is -- it was a taxable event as soon as the income came from Burisma to Hunter Biden. And whatever he did with it after it was really just a scheme to evade taxes for that year.

And to add to it, is that Rosemont Seneca Bohai and Archer, when the money came back to Hunter Biden, they booked that as an expense on their books.    So even the two parties didn't treat it the same way.

And then Eric Schwerin realized this and looked into it, and he even told Hunter Biden on multiple occasions, multiple communications, you need to amend your 2014 return to include the Burisma income.    And he never did, and the statute's gone now.

[Shapley Exhibit No. 4

Was marked for identification.]

From: **Eric Schwerin**
Subject: **Income**
Date: **January 16, 2017 at 3:11 PM**
To: **Hunter Biden**





In 2013, your taxes reported $833,614 in income.

In 2014, your taxes reported $847,328 in income. (To be amended at $1,247,328)

In 2015, your taxes reported $2,478,208 in income.

2013 and 2014 were normal years where your income was based pretty much solely on income from Rosemont Seneca and Boies. In 2014 you joined the Burisma board and we still need to amend your 2014 returns to reflect the unreported Burisma income. That is approximately $400,000 extra so your income in 2014 was closer to $1,247,328.

The reason for the increased income in 2015 was that your income broke down as follows:

$166,666 from Burnham (for RSA)
$216,000 from Boies
$365,403 from Owasco (for RSA)
$300,000 one time payment from Eudora (for the 1/3 of CitizensRx)

The above represents all the cash you received directly.

In addition, you reported $1,000,000 of income that all went to RSB and you report $188,616 in income that also went to RSB. You didn't receive this in cash and it is in reality "phantom income".

So, of the approximately $2.5m in income you never really received almost $1.2m of it. (My numbers are approximate but you get the idea.)

Of the $1,300,000 in cash you received you had to pay $751,294 in taxes. Since you couldn't have lived on approximately $550,000 a year you "borrowed" some money from RSB in advance of payments.

FYI, in 2014 and 2015 you also had expenses beyond the norm because you renovated the house. Across 2014 and 2015 the renovation payments totaled approx. $200,000.

The numbers for 2016 haven't been finalized yet but you made at least the following:

$1,295,000 from Owasco, P.C. (representing Burisma and any Romania payments)
$216,000 from Boies Schiller

Unlike the prior years you actually received the above cash but the total income for 2016 won't be close to 2015.

Hope this makes sense.


Eric D. Schwerin



EXHIBIT

4



Consider the environment before printing this email.

BY <u>MAJORITY COUNSEL 1:</u>

Q      What's been handed to you has been marked as exhibit 4.   I'll give you a moment to review it.

A      Yep.

Q      Have you seen this document before?

A      I haven't seen it in this form, but I've seen excerpts of this document.

Q      Is this one of the communications you were referencing just a moment ago?

A      I believe so, yes.

Q      And it looks like it's about the fourth paragraph down, it reads:   "In 2014 you joined the Burisma board and we still need to amend your 2014 returns to reflect the unreported Burisma income."

Do you see that?

A      Yes.

Q      And is that consistent with your understanding of the issues in the 2014 return?

A      Yeah, this is.   This is accurate, yes.

Q      Is there anything else on this document that stands out to you as significant?

A      Well, what's important to note here as well is that Owasco was set up for this exact reason, was to take in these type of consulting fees and to withhold taxes from it.   And Hunter Biden communicated with several folks that he wanted to keep this outside of the D.C. people, and we believe that to be Eric Schwerin and Owasco, and the purpose was to evade income taxes on that, in my understanding of the evidence.   So, that's kind of like laid over this as well.

And then when Eric Schwerin realizes there's money coming in, Hunter Biden is

telling him, "No, this is a loan, it's a loan, it's a loan, it's a loan," and then eventually Eric Schwerin is talking with Momtazi, who is the accountant for Devon Archer and Rosemont Seneca Bohai, and they start talking.    And that's when Eric Schwerin realizes that this is actual income, and he's like, "We're going to have to book this as income." And there's multiple communications in the evidence that talk about that.

MAJORITY COUNSEL 2.   So this was an affirmative scheme by the taxpayer to avoid paying taxes?

Mr. Shapley.    This is, like, textbook, I learned at basic training nominee stuff. And in all of the defenses, it was a loan, got to have a promissory note, you got to have defined interest, and you got to have repayments, and none of those were included.

And we raised that to DOJ Tax, and in one particular instance to Jack Morgan, specifically saying this is not a loan.    We don't have these three things.    In any case, these are the things we determine if it's a loan or not, and he said that this is not a typical case.

MAJORITY COUNSEL 2.    And do you think "This is not a typical case" referred to the fact that this was the Vice President's son?

Mr. Shapley.    Yeah, yeah.    I think that there was -- every single time the process could be bogged down by deferring to some other approval level, they took full advantage of that.

[Shapley Exhibit No. 5

Was marked for identification.]

**Mesires, George R.**
Re: Tax Analysis - Attorney Communication
April 12, 2016 at 11:19 PM
Levinson, Kenneth S.
Eric Schwerin ███████████, Hunter Biden ████████████, MacPhail, Michael R.
███████████, Klinefeldt, Nicholas A. ████

GM

I am out at those times so please proceed without me. Even if Mike or nick can't join then, I think Ken/Eric, and ideally Hunter, should connect. George.

## George R. Mesires
*Partner*

████████████████

**Direct:** ████████
**Mobile:** ████████

FaegreBD.com   Download vCard

## FAEGRE BAKER DANIELS LLP

█████████████

Sent from my iPhone

On Apr 12, 2016, at 10:16 PM, Levinson, Kenneth S. <████████████> wrote:

Eric, All

From my perspective, the 10 and 11:30 EDT time slots work for me tomorrow (Wednesday). I'm good with either of those, so when a critical mass is reached, please let us know and we'll have the call with whomever is available.

Thanks, and best regards.

Ken

On Apr 12, 2016, at 9:44 PM, Eric Schwerin <████████████> wrote:

Not sure of Hunter's availability tomorrow for this call but other than a call at 10, 11:30 and 2:30 EDT tomorrow I am free. Each of those calls should take no more than 30 minutes.

Are there any times in there that work for everyone else?

I can answer pretty much all of the questions in the email.

Eric D. Schwerin

████████████

Sent from my iPhone

On Apr 12, 2016, at 7:09 PM, Mesires, George R. <████████████> wrote:

Eric and Hunter:

Please see Ken's comments/questions attached. Please let us know when you are available for a call tomorrow to discuss this.

Thanks,

George

**EXHIBIT**

tabbies®

5

**From:** Eric Schwerin [mailto:████████████████████]
**Sent:** Monday, April 11, 2016 3:50 PM
**To:** Hunter Biden
**Cc:** Mesires, George R.
**Subject:** Tax Analysis - Attorney Communication

Hunter-

See below for analysis of Burisma payments through RSB for 2015.

For the first 10 months of 2015, total pre-tax Burisma payments through RSB = $606,666

RSB Agreed to Hold Back $245,498 of the above amount to cover taxes (approx. 38%) which left you with $361,168 in "post-tax" dollars to draw down.

For the first 10 months of 2015, you drew down approximately $413,000 from RSB. Therefore you drew down $51,835 more than you should have.

If RSB counts the first 10 months of Burisma payments as income to you, they should send you the $245,498 - $51,835 or $193,663 which could be put towards your tax liabilities for 2015.

So, on $606,666 in income you'll have $193,663 to go towards taxes.

Note that for November and December of 2015, the full $83,333 for each month was sent to Owasco, PC via RSB and you withheld the appropriate taxes yourself. It is only the first 10 months of 2015 that need to be taken care of.

The only other point to keep in mind is that while Burisma paid you $83,333 a month for the first 10 months of 2015, for the first 8 months, a portion of that ($27,778 a month) went to Alex as his Board Finders Fee. RSB has taken that amount as an expense and we need to figure out a way to capture that expense so that you are only paying taxes on $55,555 a month in income through the end of August 2015 instead of the full $83,333. I am going to assume the accountants can take care of that.

Let me know if you have questions.

Best,

Eric


Eric D. Schwerin
Rosemont Seneca Advisors, LLC



Consider the environment before printing this email.

<mime-attachment>

<u>MAJORITY COUNSEL 2.</u>    We've just given you exhibit 5.    I think it's more email communication with Schwerin and Hunter Biden's lawyer, George Mesires, partner at the Drinker Biddle firm or whatever the firm's called now, Faegre.

Have you seen this document before?

Mr. <u>Lytle.</u>    Can we talk to our client just briefly.

<u>MAJORITY COUNSEL 2.</u>    Of course.    We can go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>    We're back on the record.

BY <u>MAJORITY COUNSEL 2</u>:

Q    The question is whether you've seen this document before.

A    No.    Anything from George Mesires was considered privileged --

Q    Okay.

A    -- attorney-client privilege and was not provided to us.

Q    Okay.    And so that was kept from you by the FBI?

A    No.    It would be a filter team.

Q    Okay.

A    When we get any information, and even from the laptop and hard drive, it went through filter reviews, and we only saw what came back as nonprivileged.

Q    But who ran the filter team?

A    It was different each time.    We had agents assigned, groups of noninvolved agents assigned that were --

Q    With IRS or FBI?

A    It was a little bit of both.    I think that we took turns.    I remember at least two different filter teams made up of noninvolved IRS agents.

Q    Okay.

A    And these eventually go to the prosecutors, like after the filter review.

Q    Okay.

Mr. <u>Lytle</u>.    I'm sorry.    Is there DOJ attorneys assigned to the filter team as well?

Mr. <u>Shapley</u>.    Yes, yes.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    On page 2 -- it's an email chain, so it actually starts from the last page and works forward.    The communication here is Eric Schwerin to Hunter Biden, correct?

A      Appears so, yes.

Q      And Eric Schwerin is not Hunter Biden's lawyer, correct?

A      That's correct.

Q      Okay.    So you think they marked this attorney-client privilege just because they cc'd Mesires?

A      Absolutely.

Q      Okay.

A      That was one of the things, just a search term was the known legal counsel and just immediately went to --

Q      So if he cc's Mesires on every communication, it's all privileged?

A      That was the direction to the filter teams, and then it would go to the DOJ attorney that oversaw that, and they would make the ultimate decision.

Q      Okay.

A      But they basically claimed privilege on a huge amount of information to include the return preparers, Morgan Wingate, later on, and they said it was because they had a verbal Kovel agreement with them.

Q      Okay.

A      A Kovel agreement, do you want me to explain?    So I think it's from case law and it's basically that a defense team can bring in an accountant or CPA or return preparer into the defense team to assist them, so they become covered by the attorney-client privilege.

In this case, when we were attempting to interview the CPAs on it, Hunter Biden's legal team said there's a verbal Kovel team so you can't talk to them.

And we tried to get DOJ and U.S. Attorney's Office to pierce that, because everyone, even they said it was nonsense.    But they just wouldn't.    It took, like, 12

months to finally get to the CPAs to actually get information from them.

Q    Okay.    Looking at the content on page 2, if you and your team had access to this information, would that have been helpful, direct communication from Schwerin to Hunter Biden?    And you previously told us that one of Schwerin's main functions was to help ensure that Hunter Biden was paying his taxes correctly, right?

A    Yeah.    I'm not reading it -- I haven't read it all, but any discussions in this area, we need to know, we need to know that if it's truly a loan, then we can't include it. We need all the pieces of information that discuss income, which is why it's so important to ask about 10 percent for anybody else.

MAJORITY COUNSEL 2.    Let's go off the record for a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q    Now, was your team, were they permitted to use open-source methods for looking at the materials for this case?    Like, if materials were published on the internet related to Hunter Biden or related to Hunter Biden's business concerns, were you allowed to consult that?

A    No.    We were directed that if there's anything from the laptop from other sources to not look at it because then it's potential for it to be tainted.

Q    Okay.    So if it's posted on the internet, if it's written about in the newspaper, you were not allowed to consult that open source method?

A    Yeah.    We were directed not to.

Q    Is that customary?

A    I would say yes.    Yes.

Q    Okay.    Going back to the special agent report, after you submitted the

report recommending charges, could you just walk us through the timeline of what then happened?

A     From?

Q     You told us about what happened inside of IRS.

A     So February 25th, 2022, forward?

Q     Correct.

A     So we sent it to DOJ Tax Division, and that spurred their discussions with defense counsel.    We did not participate in that.

And I would say that I think it's not typical for the investigative team and the agents to never be in on proffers or reverse proffers with defense counsel.    We never once were allowed to do so.

And even though some communications occur with defense counsel without agents, I've never seen it where we've never been involved.

Then it went to D.C. U.S. Attorney's Office.    Department of Justice Tax Division authored a 99-page memorandum that was requested by Stuart Goldberg.    And my understanding is that it was for the purpose to support recommending that they move and be opened in D.C.    It was like a document to support opening up and charging in D.C. for 2014 and '15.

Q     Okay.    So you send what's exhibit 2, or the IRS sends it to DOJ Tax, and the result was DOJ Tax Division produced a 99-page memo to support what your memo had recommended?

A     I never saw it, but my understanding was, is that we were moving -- we were going to go to D.C., and we were going to charge, and here's the discovery.    That was the trajectory there.    So I've never seen the document, but it's been described to me as supporting those years and charging those years.

Q    Do you feel like the document was kept from you and your team?

A    Yeah.    I don't know there's any reason not to share it with us.    I don't know why.    And it's also outside the norm.    When a SAR goes to DOJ Tax, it usually gets -- if there's DOJ Tax attorneys working on that case, they -- those attorneys aren't the ones that get the report.    It's like a third-party supposedly objective person who looks at the report and writes up whether it's approved, discretion, whatever.

This whole 99-page report was a whole separate event, and John Kane at Department of Justice Tax Division was assigned to be the objective reviewer, and I still have never seen a report from him approving, discretion, or declining.

Q    Okay.    So, after receiving the 99-page memo from DOJ Tax, the U.S. attorney in Delaware initiates prosecution in the District of Columbia, correct -- or he seeks permission from --

A    Yeah, they send --

Q    -- U.S. Attorney Graves?

A    -- at least Mark Daly and I believe AUSA Wolf as well, to meet with the first assistant in D.C., and the first meeting was Mark Daly called my case agent and said, "Hey, looks good, they're going to assign AUSA."

Q    That was Special Agent █████?

A    That's correct.    And then it was 2 or 3 days later, Mark Daly calls █████ and says, "No, they don't support it.    So we're basically dead in the water."

Q    And that was the end of it?

A    Yeah.    At that point it became like a void.    For 2 months we were working to combat the potential defenses.    And I think it was all a ruse because we didn't know at the time that he requested special counsel authority and was denied.    So he had no ability to charge there whatsoever, but I feel like he just sent us on a fool's errand to try

to rebut it.

Q    And when was the decision made by the U.S. attorney in the District of Columbia not to go forward?

A    It was in the March time frame.    Like I said, we requested to be a part of that, but they didn't allow us to.

Q    And when did you learn of that decision?

A    I feel like it was same day.    It was a date in March, and, unfortunately, I don't know the date.

Q    Okay.

[Discussion off the record.]

Mr. Shapley.    Yeah.    So at the time we thought that he just didn't support it. And that David Weiss would still have the ability to charge at some point.    But later on, on October 7th, David Weiss tells us straight out that he didn't allow it to be charged in his district.    And then he says he also requested special counsel authority, which why would he request special counsel authority if he had the authority to charge.

So, yeah, it's a little bit nuanced, but what I knew then was that he just didn't support it.

BY MAJORITY COUNSEL 2:

Q    I want to call your attention to some testimony, and I believe you mentioned it in your opener.    But if the decision to not bring charges in D.C. was made in March of '22 --

A    Yes.

Q    -- okay, a month later, roughly, in April of 2022, at the Senate Appropriations Committee Subcommittee on Commerce, Justice, Science, held a hearing, a review of the DOJ's funding request.    And during the hearing under questioning from Senator

Hagerty -- and, again, I think you mentioned this -- regarding the Hunter Biden investigation, the Attorney General testified -- this is a month later -- that U.S. Attorney Weiss is supervising the investigation, is in charge of that investigation.    He also testified there will not be any interference of any political or improper kind.

Did you remember hearing that at the time?

A    I did not hear that at the time.

Q    And did anyone on your team ever bring that to your attention subsequently?

A    I learned of it on and around October 7th meeting --

Q    Okay.

A    -- because that's when it became substantive to me, like, because we still were misled to believe that U.S. Attorney Weiss had the ability to charge in D.C. and that we were still talking about the '14, '15 year.

And then when he tells us in the October 7th meeting that he's not the deciding official and he doesn't have the authority to decide and that he requested special counsel authority and was denied, that's when the statements of Attorney General Garland became apparent that they were not accurate.

Q    Right.    And subsequently -- and you mentioned this in your testimony -- Senator Grassley, on March 1st of 2023, so a whole year had gone by, asked the Attorney General about this, and the Attorney General responded -- you mentioned this -- "I promised to leave the matter of Hunter Biden in the hands of the U.S. attorney for the District of Delaware…I have pledged not to interfere with that investigation, and I have carried through on my pledge."

Is that a true statement?

A    It's not accurate.    No, it's not accurate.

Q      And by March of 2023, you had certainly known that the U.S. attorney in Delaware did not have special counsel authorities.    Is that correct?

A      By what he told us, yes.

Q      And when the Attorney General made that statement, that had been almost a year after the decision was made not to move forward in the district in D.C., correct?

A      Yes.

Q      Senator Grassley followed up:    "Without special counsel authority he could need permission of another U.S. attorney in certain circumstances to bring charges outside of the District of Delaware.    I'd like clarification from you," Senator Grassley said to the Attorney General, "with respect to these concerns."

And the Attorney General responded:    "The U.S. attorney in Delaware has been advised that he has full authority to make those kind[s] of referrals that you are talking about or bring cases in other jurisdictions."

Okay.    I'll just say it again.    The Attorney General said that he, meaning U.S. Attorney Weiss, "has full authority to make those kind[s] of referrals that you are talking about or bring cases in other jurisdictions if he feels it's necessary.    And I will assure that if he does, he will be able to do that."

Are you aware that the Attorney General responded in that way?

A      Yes, I am.

Q      Is that true?

A      No, that's not.    Based on what actually happened, as well as the statements provided by U.S. Attorney Weiss, those statements are false.

Q      And those statements were made in March of 2023, 1 year after the case was attempted to be brought in D.C. by the United States Attorney's Office for Delaware, correct?

A     That's right.

Q     And it also occurred many months after you learned in October of 2022 of this happening.   Is that correct?

A     Of this happening?   I'm sorry.

Q     Of the U.S. attorney in Delaware being denied the ability --

A     Oh.   Yes.

Q     -- to bring the case in D.C.?

A     Yes, that's correct, yes.

Q     Senator Grassley followed up:   "Does the Delaware U.S. attorney lack independent charging authority over certain criminal allegations against the President's son outside of the District of Delaware?"

And the Attorney General responded:   "He would have to bring…if it's in another district, he'd have to bring the case in another district.   But as I said, I have promised to ensure that he is able to carry out his investigation and that he be able to run it.   And if he needs to bring it in another jurisdiction -- again, if he needs to bring it in another jurisdiction -- he will have full authority to do that."

Did that happen?

A     No.

Q     Senator Grassley then said:   "Has the Delaware U.S. attorney sought permission of another United States Attorney's Office, such as the District of Columbia, or" -- presumably Senator Grassley meant the Central District of "California to bring charges?   If so, was it denied?"

And what's the actual answer to that question?

A     That he did bring it to both of them, and they both denied it.

Q     And, just remind me again, what was the timing of the Central District of

California denying?

        A     We were informed that they denied it in and around January of 2023.

        Q     Okay.   So 3 months before this testimony.

        A     Yes.

        Q     Approximately.

And the Attorney General followed up, and he said:   "I don't know the answer to that, and I don't want to get into the internal elements of the decision making by the U.S. attorney.   But he has been advised that he is not to be denied anything he needs.   And if that were to happen, it should ascend through the Department's ranks.   But I have not heard anything from that office to suggest that they're not able to do everything the U.S. attorney wants to do."

Do you think it's conceivable that the DAG's office or the head of DOJ Tax kept that information from the Attorney General?

        A     I feel like it's my opinion that you wouldn't make statements like that if you thought that was the case.

        <u>MAJORITY COUNSEL 2.</u>   I think our hour's up.   Going to have to stop there as our hour's up.

        Mr. <u>Shapley.</u>   Sure.

        [Recess.]

[11:40 a.m.]

BY <u>MINORITY COUNSEL 2:</u>

Q    Thank you again for coming in and providing your testimony before the committee.    I don't think we will take the full hour allotted.    Hopefully we will be able to move things along a little bit.

I actually wanted to start by just going back, way back in your initial testimony.    It is something our counterparts alluded to in the beginning of their questioning.    Your initial testimony that over the course of your career you worked on teams or worked on cases that collected in the neighborhood of something along the lines of $3.2 billion of previously uncollected tax revenue.    Obviously, $2 million or thereabouts, that amount at issue is relatively small, relative to the $3.2 billion over the course of your career you've collected.    I am just sort of trying to get a sense of the scope and scale of this investigation relative to what would be a normal size of a criminal investigation of the type that you work on.

You have a team of 12.    How many investigations does your team generally work on at one time?

A    I have 75 investigations that I am [in charge of] right now of 12 agents.

Q    And how many man-hours would you say that your team spent on this investigation?

A    I would just have to multiply it, right?    We have at least one agent working full-time on it for 4 years -- at least 4 years.    So it's 2,000 hours a year.

Q    And is it typical to assign an agent full-time for 4 years on an amount in issue of $2 million or thereabouts?

A    It would be normal with an IRS CI, right?    Like, the amount of time it takes,

we don't drive that bus.    So we have to work with our partners.    So they have an effect on the timing as well, but the case agent also had other cases as well.

Q       When you say work with your partners, do you mean work with defense counsel and work with -- who do you mean --

A       Like, FBI, DOJ.

Q       And presumably, though, in terms of how agents and your team and you allocate your time in terms of looking at these cases, does that all receive review in terms of allocation of resources?

A       Yeah, yeah.    In this particular case, we also work large cases, the initial case is a $6 billion case.    And then we also have spinoffs from these larger cases that we work, and that is the way that we do to on some other large cases we are working now. So this is an example of one of those spinoff cases that had an international nexus, so we kept it within the group.

Q       Right.    But presumably, there was a $6 billion case, and then evidence came to light and that evidence was referred to a spinoff case.    Presumably if the evidence, was an amount at issue of $1,000, the IRS wouldn't put a full-time employee on that audit for 4 years?

A       My agents would not spend time on $1,000.    And we are not auditors, we are criminal investigators.

Q       Criminal investigators.

A       Yeah, yeah, yeah, yeah.    Okay.

Q       So there is some sort of threshold and some sort of judgment applied to how many man-hours are applied on any given case, correct?

A       I don't know if there is any application of how many man-hours around each case.    I have never seen that.

Q       But somebody at some point does make a decision as to how many

resources, how much in terms of CI's resources they are going to devote to any given case

at any given time, right?    And presumably, that, at least in part, is dependent upon the

amount at issue?

A       It is definitely not about the amount, right?    If it is a case that is approved,

then if it takes 3 years or 4 years or however long it takes, they are going to let that play

out.    At some point, if the charges look not viable, then we discontinue the case.    But

that never occurred in this case.

Q       Right.    So the size of the tax liability is irrelevant to the resources that CI

puts into the investigation?

A       Like a $2.2 million case for 95 percent of the IRS CI special agents would be a

huge case for them.

Q       That is relevant information.

So this is generally considered within IRS CI to be a big case.

A       Yes.

Q       And a case of this size would typically have 12 or, for instance, 12

simultaneous interviews in terms of its investigatory step or something along those lines?

A       I mean --

Q       It wouldn't be unusual?

A       It's case-by-case.    Yeah, it is case by case, right?    We don't always do days

of actions.    We do lots of days of actions, but it is based on the case because you want

to do them simultaneously so that the witness pool isn't tainted by each other.    So that

is why the simultaneous interviews occurred in this particular case.

Q       So, the resources that were being devoted to this case, at the end of the day,

you did receive some sort of supervisory approval and up the chain, folks understood

what kind of resources were being devoted to the investigation here?

A    I guess I was confused about the resources, like, yeah, there are hours that are applied to the case.

Q    Think about hours being applied to the case as resources, so man-hours.

A    Okay.   So could you say the question again then?

Q    It was relatively understood by folks senior in CI, probably at DOJ Tax, how many man-hours were being devoted to the investigation of Hunter Biden's taxes?

A    Yeah, yeah.

Mr. Leavitt.    Did you want to talk about the supervisory approval process?

MINORITY COUNSEL 2.    If there is a supervisory approval process for the allocation of resources like that, then sure.    I am under the impression that there is not.

Mr. Leavitt.    I don't mean for the resources.    I just mean just for the case, the case being briefed up in terms of awareness of supervisors?

Mr. Shapley.    People are aware of the hours spent on the case, yes.    But it is not -- it is definitely -- DOJ would never, DOJ U.S. Attorney's Office they would never, they don't care how many hours are applied to a case, right?    And we even assigned a co-case agent to assist, try[ing] to keep the sphere small.    They would never know it.    It would really be hours applied to a case would be on our 17A CIMIS report, 17-As, and it is really like me as a supervisor or me as the ASAC, and I don't think that they go even higher than that.    I don't think that anyone -- like a special agent in charge probably wouldn't even like look at the allocation of resources on a case.    They just want to know if it is viable or if it is not viable.

Mr. Leavitt.    But you were briefing your supervisors about the case, in which case --

Mr. Shapley.    Oh, yeah, yeah.    But if we are talking about resources, that is my

answer.    If we are talking about case specifics, then that is a different story.

BY <u>MINORITY COUNSEL 2:</u>

Q    That is totally fine.

I would like to ask you a little bit about the special agent report that was discussed earlier.    Your special agent report was approximately 85 pages long and it recommended charging recommendations.    Could you once again, and I know you did it before, but it would be helpful for us again -- what specifically was the process by which it went to an entity that gave it a nonconcurrence?

A    Sure, yes.    When a special agent report is still in draft, it comes past my desk and we send it to our criminal tax attorneys, called CT counsel, and they do a review of it.    They create a -- it is called a CEM, I believe it is Criminal Enforcement Memorandum.    So yes, that is the process.

Then we get that and then, the management and the agent.    And then we sometimes take time to answer any concerns or to provide additional evidence that maybe they didn't see to make those recommendations.    But then, when it is a nonconcur from CT counsel, in order for it to go forward to the department of [Justice] Tax division, it has to be approved by the director of field operations which is -- so an IRS investigation is the chief, deputy chief, and then there is three director of field operations.    So, like, the third level.    So when there is a nonconcur from CT counsel, the director of field operations has to approve that to be transmitted to the Department of Justice tax division.

Q    Just -- sorry.    The director of op has to approve it to override the nonconcur to transmit?    When you say approve, what do you mean?

A    I don't think override is the correct term because CT counsel is advisory.

Q    Okay.

A      But I think it is an extra step in the process to ensure that more people have reviewed it and agree with the evidence since the elements were met.

Q      Could you say a little more about who comprises the makeup of the CT counsel?

A      Just by title or names or --

Q      If you have their names or what their experience is?

A      So the head, I am not sure if it is a director or chief of criminal tax is Rick Lunger.    And the number two there is Elizabeth Hadden, I believe.    And then there is area counsel and that is like a middle layer of management.    And for me on this case it was Veena Luthra.    Then my line attorney, it was Christine Steinbrunner and she went by Christy and -- I'm sorry, did I answer your whole question?

Q      What are their backgrounds?    Why are they designated to be in this role, which appears to be something of an advisory review role?

A      The --

Q      Their professional backgrounds, what lead them to be put on this CT -- on this counsel?

A      I mean --

Q      Are they appointed?

A      Oh, no, no, no, they are internal, just internal career hires.

Mr. Lytle.    Also, could you just pause your question and give him time to answer because sometimes you guys are talking over each other.    But he needs time to just digest what you are asking him.    Are you asking -- does he know the process of how people's qualifications are determined to serve on CT counsel?

MINORITY COUNSEL 2.    That is certainly a question I could be asking, yes.    If that is the question he wants to answer --

Mr. <u>Lytle.</u>   No, no.   I just wanted to clarify.

<u>MINORITY COUNSEL 2.</u>   He can answer it either or both ways, which is to say either do we know the specific individuals and what their qualification are, or if he does not -- what would make an individual qualified to serve on this counsel?

Mr. <u>Leavitt.</u>   Elizabeth would know more about it, wouldn't --

Mr. <u>Shapley.</u>   I mean, the only background I know is Elizabeth Hadden was at the Department of Justice tax division up until a year or 2 years ago maybe.   Like, 2 years ago.   And then she came over to be the number two in CT counsel.   In terms of background, that is all I know about them.

BY <u>MINORITY COUNSEL 2:</u>

Q     But in general, is it safe to say that they are experienced criminal tax attorneys, or criminal tax agents or having a fair amount of experience in criminal tax investigations?

A     They review our reports, our enforcement actions for legal sufficiency based on the Internal Revenue manual, yeah.

Yeah, well, yes, CT counsel is not a respected organization within IRS CI.   Their opinion, as I alluded to before, I bet you around 90 percent of everything that we do in the international realm are not concurred with them, and we just simply ignore them.   I have heard AUSA's and prosecutors in the past when the agent will be, like, Well, you know, CT counsel nonconcurred, I have heard them say, I don't care anything of what they are saying.   And then in this particular case -- it was either the August 16, 2022 meeting, or the October 7, 2022 meeting and -- Shawn Weede, who was the number two, I believe, at the U.S. Attorney's Office at Delaware actually had CT counsel's nonconcur memorandum, which, that is the first time I have ever seen a U.S. Attorney's office ever even interested in that document.   And they ostensibly laughed at the legal reasonings

in that document.

Q      Can you describe the legal reasonings?

A      I couldn't with specificity.    I really want to.    So --

Mr. Lytle.    If you recall.

Mr. Shapley.    I don't recall.    But internationally, there are things that they just in every single CEM they write, right?    Like, availability of foreign witnesses, one. Admissibility of foreign evidence, two, right?    There are these things, like, if a guy's 70-years-old, then they make some statement about how he could die before trial.    So, I don't remember the specific items in their memorandum, but those are the types of things that I see like consistent in their reviews of the international work.

Mr. Leavitt.    So you are saying it covers not just legal sufficiency but as a practical matter in success of trial for the ability to get to prosecution.

Mr. Shapley.    Yeah, it could.

BY MINORITY COUNSEL 2:

Q      Do charging decisions also depend on the practicality of success at trial as a general matter?

A      From?

Q      From the DOJ?

A      Yeah.

Q      If legal sufficiency is not solely the basis by which CT counsel makes its recommendations, then is that also true of the Department of Justice?

A      Reasonable likelihood of prosecution is the statement, as I understand it, but I am also not an attorney.

Q      Fair enough.

I want to go back to something you testified to -- you mentioned green light,

yellow light, red light on various [occasions] -- and I kind of wanted to flesh that out a

little bit more.   I think you testified that the line attorney had suggested that for every

tax year other than 2018, she had a yellow light, and then for 2018, it was a green light.

Can you describe to me what you view as a distinction between a yellow light and a green

light?

        A       Sure, yeah.   And this was described to me by CT counsel Christy

Steinbrunner where a yellow and green [is a] concur and red is that she did not concur.

Some of the reasons to be in yellow are that, like, I said before would be admissibility of

foreign evidence, and availability of foreign witnesses and things of that nature.   But to

be yellow, the elements of the crimes and the minimum legal requirements have to be

met.

        Q       But again, just for clarity, yellow indicates that notwithstanding [that] the

legality of a crime has been met, there may be other considerations regarding the

likelihood of success at trial?

        A       I don't know if it pertains to the likelihood of success, but it is definitely like

maybe there's complexities, like, international type issues in there.

        Q       Do you have any indication of what, for instance, you described 2014 and

you described a payment disguised as a loan, what would cause an evaluation of that year

[to] impact your chances of being yellow as opposed to green?

        A       I don't recall what she said specifically.   I could opine if you wanted me to.

        Q       If you had to guess, what would it be?   If you had to venture your best

professional judgment as to why it might be yellow?

        A       Sure.   So, as I described the income flows, that is how I would see it

presented to a jury, right?   Because you have got to consider the jury might be a

20-year-old auto mechanic, right?   As soon as a contract between the two parties

identified occurs and payments from that contract begin, that is the taxable path.    For instance you can't send your paycheck to someone else, and then them send you money and tell you to say it is a loan and then you not pay taxes on it.

So if you go into the other side, this construct, this scheme to evade, of course it is incredibly complex and confusing because it is made up.    So, that is an example of how that might work for 2014 as CT counsel's opinion.

Q    Then sort of continuing along with the special agent report, we discussed before I guess the nonconcur was over[ridden] -- but it was passed on to DOJ as a result of concurrence by who exactly?

A    Director of field operations.

Q    Director of field operations.    And then that went to DOJ tax.    And then DOJ tax authored a 99-page memo?

A    I don't want to commit to a timing of that memo, but it is around that time. And that was separate and distinct from the path of the SAR.    That SAR would never be reviewed [for approval] by the DOJ tax attorneys who are working the case.    It always would go to a separate person.    And in this particular instance, it was DOJ tax John Kane is his name.    So the 99 page [memo], I am sure it was being authored or maybe it was authored or it was said to author around that time.    But it was in process because we knew since at least June of 2021, there was no venue in Delaware.    So we knew that it had to go to D.C., it had to go to California.    So, I think this document, which was outside the norm, but maybe -- I am not saying that it is wrong, right, it is just outside the norm -- maybe it was for the purpose of helping them present it to the D.C. U.S. Attorney's Office, and eventually to CDCA, the Central District of California.

Q    Okay.    So this was a memo that was I would say not written necessarily in the normal course of an investigation, and it would not normally be something that was

produced in response to an SAR?

A     Yes.

Q     Have you ever seen a DOJ tax memo?

A     The 99-page memo?

Q     The 99-page memo.

A     I have not.    I have seen excerpts in a presentation.

Q     And did those excerpts give you a sense of whether or not DOJ tax was

recommending charges?

A     I don't think I could conclude from those excerpts that that happened.    But

I have worked with Mark Daly for 10 years and I talked to him almost daily, it was called

the "daily Daly," that was extra.    But you see all the action up until March, right?    And

you see the SAR being sent over on February 25, you see the discovery request.    They

anticipated it was going to go to D.C. and it was going to be opened in D.C. and it was

going to be charged in D.C.    So if they produced a 99-page memorandum that said

something other than that, would be surprised but I have not read that document.

Q     But you don't have any reason to believe that, or knowledge one way or the

other of whether or not the DOJ tax memo contained information about litigation risk for

instance?

A     I did not see that.    I wouldn't know that.

MINORITY COUNSEL 2.    ████, that is all I have.

BY MINORITY COUNSEL 1:

Q     Thank you for being here today.    I appreciate it.    I am going to go back

over some of the things you said that I probably just missed in my notes. I just want to

make sure that I have a clear record.

I think one of my colleagues had asked you when did this case begin.    And you

noted that it started on another case, and then it had basically spun off of that and he was on a list of individuals.    Do you have a date as to when the case started, like a year?

A      So 2018, internally, the IRS CI, yes.    And it went through like that PI, that primary investigation phase.    And then it went through the 9131 process to go to the U.S. Attorney's Office, the DOJ tax approval to go to the U.S. Attorney's Office.

Q      This was another question that I had.    I think it is exhibit 2, and it is just the list of the tax years and the conclusion.    On the front of it, it has a special agent and that person is redacted and the revenue agent is also redacted.    Are you able to provide the names or are you one of these individuals?    I just can't tell who wrote it.

A      Sure.    So special agent -- this report was written by ███████.    He is the case agent on this.

Q      Okay.

A      The revenue agent -- he had zero input into the authoring of this document. What a revenue agent's traditional responsibilities are as a special agent we might get all these income streams and get a compilation of what we believe to be income.    And we give it to these revenue agents -- and they are super educated in Tax Code and everything.    And they put it into a RAR, Revenue Agent Report, and it basically spits out for each year what the additional tax due and owing, taking into account additional income, maybe additional expenses that would lower that tax income, the tax due and owing.    But that is the role in it.    So -- I don't know why he's on the front of --

Q      Is that --

A      I don't know why he's on the front of the report, but I think it is kind of to throw him a bone because --

Q      Okay, okay.    Do you know if that person, the revenue agent, do they review the final document, the draft before it comes across your desk?

A     No.

Q     Or it is just really you are using their numbers and that is why they --

A     It's only numbers -- appendix A to every SAR is an additional tax [due] and owing for criminal purposes, that would be the revenue agent's -- that would be the only thing that they would create exhibits that populate that document, that document says all these years, this is how much they owe for criminal purposes.    That would be the extent of their interaction with this document.

Q     Okay.    So I am going to come back to exhibit 1 in a minute, but I wanted to look at exhibit 4 and 5.    So I want to start with exhibit 4.    Did you provide this email to the committee?

A     No.

Q     Okay.    Do you know where this email came from?

A     As part of the investigation I wouldn't be able to answer that question, unless you are asking me like literally where it came from on the document.

Q     Well, I am asking two things.    I was going to get to the person.    We have never seen these two documents on my side, and so I just don't know where they came from.    And the documents that I have been provided are the ones that you gave to the committee.    So I am just wondering if this is some second set of documents that we didn't receive, or where these documents actually came from?

A     No, I'm --

Mr. Lytle.    So two questions there.

MINORITY COUNSEL 1.    Yes.

Mr. Lytle.    Does he know how they were obtained?

MINORITY COUNSEL 1.    Yes.

Mr. Lytle.    Is a question.    Do you know that?

Mr. Shapley.    No, I don't.

Mr. Lytle.    Okay.    Second question, did you deliver Exhibit 4 to the committee?

Mr. Shapley.    No, I did not.

MINORITY COUNSEL 1.    Okay.

Mr. Leavitt.    Or 5.

        BY MINORITY COUNSEL 1:

Q    Did you deliver exhibit 5 to the committee?

A    I did not.

Q    Because I did actually read the documents that you provided, so I was surprised by these two documents.    Where they came from, I don't know, maybe the internet.    I don't know.

Can we talk about the individuals that are listed in exhibit 4?

A    Sure.

Q    Do you know who Eric Schwerin is?

A    Yes, I know who Eric Schwerin is, yes.

Q    And is he an attorney, a person, an accountant?    Do you know anything about his background or what is his relationship here?    I guess I am trying to understand why we have an email from Eric here.

A    Okay.    So I don't know if he's an attorney or CPA, but he is a very close friend of the family of the Bidens and a close friend of Hunter Biden.    And he is known to just be a very diligent guy.    And he was brought in and helped create OWASCO P.C. Based on the documents that I have read and understand to -- for the sole purpose of getting Hunter Biden into tax compliance.    Because in the early 2000s, he often had these large taxes due and owing, and then he couldn't pay them.    And he used to have problems and that stuff.    So he was brought in to help bring Hunter Biden into tax

compliance.

Q      Okay.    And this was back in 2017.    Okay.

And then on exhibit 5, it's the same question, George Mesires, and I think you might have mentioned him earlier, do you know his relationship?

A      Yeah.    I know him to be a personal, quote, unquote attorney to Hunter Biden.    And if I wasn't taken off the case, I would have been tainted by this document.

Q      And do you know who Eric is?    Eric is the same guy from exhibit 4, I guess.

A      Yeah, Eric Schwerin.

Q      And do you know if there is -- and maybe I missed it, do you see any response on here from Hunter Biden to these emails?

A      I don't.    This is the first time I have seen this so I don't see an email from Hunter Biden, or at least what this document shows.

Q      And then it appears in the top in the header, right after the date there a number of names.    But it also appears that there is a number of names that have been redacted.    The first one is Eric Schwerin, and then Hunter Biden, Michael McPhail and then Nicholas Klinefeldt.    But it seems some names that are missing.    Would you happen to know who those names might be?

A      I think they are there, but they are just grayed out.

Q      Oh.

A      I think it is email addresses.

Q      Oh, okay.

A      Yeah.    That is why I looked to see if it was a bleed-through, or yeah, they are just very faint.    So it looks like the email address is to those individuals.

Q      Okay.    Thank you.

Now I would like to go to exhibit 1.    This is a letter that was sent, and these are

some basic questions.    I want to make sure that I have my notes clear so that I remember what I am doing when I go back to look at this.    Okay.

Mr. Leavitt.    What was your question before whether there was an email from Hunter Biden or whether he was the recipient?

MINORITY COUNSEL 1.    Oh, no.    My question was I thought that there were names that had been redacted out.    But it turns out that they were actually the email addresses of those individuals?

Mr. Leavitt.    But prior to that you were asking about whether Hunter Biden was on this.

MINORITY COUNSEL 1.    No, whether there was a response from him.

Mr. Shapley.    That's how I understood it.

MINORITY COUNSEL 1.    And he said there was no response.

BY MINORITY COUNSEL 1:

Q    On the first letter which is dated April 19th, and is exhibit 1, it is mentioned in here that my client has already made legally protected disclosures internally at the IRS. I wanted to ask a little bit about those disclosures, when they were made and to whom they were made, and whether you made them by letter or email -- I know you can make them by phone call as well -- and if you received any acknowledgment.

So, we can break those down, but that is essentially it.    I want to know a little bit more about the line with the disclosures within the IRS.

A    I don't think I will be able to be all inclusive, but I will give you examples.

Q    That is fine.

A    I think that the first disclosure that I made that something was far outside the norm was a June 16th of 2020 memorandum.    That memorialized a meeting with the director of field operations and down, so it would be the SAC, the ASAC, me, case

agent.    I can't remember exact dates for some of these.

Q     That is okay.

A     It was something that the SCRs, these sensitive case reports, that went up to supposedly to the chief, they are authored for the chief.    And there is only a finite number of sensitive case reports produced in CI, because they are there for the purpose of informing the chief on these more sensitive cases.    And so, those were monthly on this case.    There were multiple of those where I raised various concerns to the chief.

Q     Do you know who the chief was at the time or maybe the chief changed over time, but --

A     So Don Fort was the chief through December 31st of 2020 and since then, the chief is Jim Lee.

There were briefings, there were meetings, at least, like once a year those occurred, sometimes twice a year.    And then as we got to 2022, we had those conversations more frequently, and they were surrounding bigger meetings, like a June 15th, 2022 meeting at Main DOJ, an October 7th, 2022 meeting.

Q     That is good, yeah.    Thank you.

At any time, did you make any disclosures outside of CI?    Did you make any disclosures out of the chain to, I don't know, the deputy commissioner of services and enforcement, or anyone outside of CI?

Mr. Lytle.    This is outside of CI, right?

MINORITY COUNSEL 1.    Yeah.

Mr. Lytle.    But within the IRS?

MINORITY COUNSEL 1.    Within the IRS.

Mr. Shapley.    So the chief would be, you know, that is the highest, right, like that we would usually go to unless of course I thought the chief was not doing something that

they should be doing.    I raise these issues to the U.S. Attorney's Office in Delaware, and

often to DOJ tax attorneys, but outside, I --

               BY <u>MINORITY COUNSEL 1</u>:

Q    But no one at Treasury?

A    Oh, no.

Q    No one at IRS above -- other than CI, no deputy commissioners, no

commissioner?

A    That is correct.    And, there was a common theme that ▮▮▮▮▮▮ and the

co-case agent Christine Puglisi would -- after all these pros team calls we would have a

follow-up call.    And sometimes FBI agents would be on there as well.    And it was

basically talking about the strategy and it often became like, Wow, they are not letting us

do this.    Can you believe they said that?    Like that type of thing.

And we -- in order to protect the record of the investigation basically it was me

that could only document that, right?    Because we wanted to make sure that the agents

weren't documenting things that would eventually be turned over in discovery and could

somehow affect the viability of the case.

So that is something that I documented moving forward.    And each time we

were, like, Wow, they didn't let us do the search warrant.    Like she said -- to overcome

probable cause with a search warrant is, like, that is it, right?    That is really, like, okay,

well, you are going to go do it, because we want evidence that is unfiltered, right?    But

the whole point is we were like, well, there is no way they are not going to charge us.

The evidence is there.    They say the evidence is there.    And we just really couldn't

believe that they would be doing something wrong.    It was a very heavy burden to

overcome from my experience and training to be, like, wow, there is something going on

here.

So it got to the point where we are like, well, they are just going to charge and all the things that they didn't do were just going to go away, right, and it is not going to matter.    But it just didn't happen.    And then the October 7th meeting, you know, changed everything for me and I could no longer stay silent.    And the case agent is also willing to come forward as well.

Q    Do you know if the chief reports to anyone on, like your SCRs?    Does that go anywhere up the chain at IRS, or does it just go to chief, so Mr. Fort at the time, and that is kind of the end of it.    Did he ever give you an acknowledgement that he read the SCR?

A    No, no.    Well, the first question is I don't know if goes above the chief. The second question is, you know, there is -- they never told me they read the document. It is for the chiefs, but I don't know if they read it.

Q    So no one gives you any feedback like, we need more information on this particular bullet point or something like that?

A    You know, that was a common theme along the investigation as well is that we would be raising these issues, right and my senior leadership was never, like, okay explain that to me.    Oh, okay, we disagree with you.    So we are not going to do anything.    In fact, there is multiple correspondence that basically show that they are, like, wow, yeah.    And then we understand and we support you and whatever.    And then even the prosecution recommendation, right?    So finally, when we heard that '14 -- they were kind of leaning toward -- we thought they were still deciding on '14 and '15 in August, and that they were leaning toward a no to charge those.    My DFO responds that he is going to go and talk to the deputy chief and tell him to call over to Stuart Goldberg and tell him that IRS CI supports 2014 and 2015.    It was kind of, like, I hate to be too colloquial but it was like literally burying their heads in the sand.    But

when it popped up, they even agreed, they even were able to say that they agreed with some of these charges that eventually were not charged.

Q      Okay.

Mr. Leavitt.    Could I just clear something up?

MINORITY COUNSEL 1.    Yes.

Mr. Leavitt.    When you asked about Treasury, are you just talking about Main Treasury or the inspector general there as well?

MINORITY COUNSEL 1.    I was really talking about Main Treasury.

Mr. Leavitt.    Okay.    Thank you.

MINORITY COUNSEL 1.    But if you'd like to answer about the inspector general that is fine, too, but I was asking about Main Treasury.

Mr. Lytle.    Just to clarify, his attorneys have made some disclosures to all of these entities so --

MINORITY COUNSEL 1.    That is fine.    But I am not asking about those.    I was asking more at the time --

Mr. Lytle.    Got it.

MINORITY COUNSEL 1.    -- whether there were any other channels or avenues for reporting up through the IRS beyond the chief, or someone else that he might have emailed.    I don't know [maybe] the chief counsel, or if there is someone else that is in that chain of command that we did not ask about.    My question was really just what he answered, which is did he or anyone else in that chain do anything within main Treasury.

Mr. Shapley.    I was a little confused by it, but -- okay, good.

MINORITY COUNSEL 1.    Okay, that is correct.

You guys have any other questions?    We're done.

Thank you very much.

MAJORITY COUNSEL 1.    Off the record.

[Discussion off the record.]

BY MAJORITY COUNSEL 3:

Q     We were surprised to learn that prosecutors walked away from a tax assessment of hundreds of thousands of dollars.    In a typical IRS audit there will be an examination of taxpayers records, either in person or via mail.    If the IRS determines that additional tax is owed, IRS exam will make a formal adjustment to tax liability. Interest and penalties may apply being an underpayment of tax.    And if there is no agreement between the taxpayer and the revenue agents on the amount of tax owed, there is an assessment, and the taxpayer has 30 days to consider their next course of action.    Again, this is in a civil case.    The taxpayer may choose to appeal the assessment administratively within the IRS, or to the Federal courts.    But the taxpayer owes that tax plus any interest and penalties.    If left unpaid, that can lead to criminal prosecution.    It is our sense that it would be rare for the IRS to simply walk away from a six-figure tax assessment on the civil side.    But based on your testimony, this case started within IRS CI.    Can you confirm?

A     Yeah, that is correct.

Q     So your team went through the course of this investigation.    You mentioned that there was $400,000 in underreported income for 2014 or 2015 or both. Can you confirm?

A     2014 was the $400,000.

Q     Thank you.    And that amount was reflected on an SAR?

A     Yes.

Q     Thank you.    Then as we discussed in 2022 the U.S. Attorney allowed the statute of limitations to expire with respect to that amount.    Can you confirm?

A      With respect to that tax year, which included --

Q      The 2014 tax year.

A      Yes.    That is correct.

Q      Is it typical for IRS CI to make an assessment of additional taxes owed, and then see the IRS and prosecutors simply allow the statute of limitations to run out?

A      So assessment is a civil term and assessment means that like that dollar amount goes on that taxpayer's account and then they owe that, right?    So assessment is kind of used a little bit outside of what I am used to.    So --

Q      I understand.    On an SAR, there will be a number, an assessed amount, or a deficiency in tax.    Is that correct?

A      Tax due and owing for criminal purposes, yes.

Q      Criminal purposes.    And is it typical for IRS and prosecutors to simply allow the statute of limitations to run out from the amounts shown on an SAR?    Is that a typical practice with cases that you have dealt with?

A      Letting a statute of limitations expire in an active criminal investigation is not normal.

Q      Thank you.

I would also add it seems that if Hunter Biden had been audited like any normal American, he definitely would not have received a free pass on a six-figure tax bill for 2014.    That would have been an assessment, that would have gone potentially through the courts.    It is not something that IRS on the civil side would have just walked away from.

A      I mean, based on my understanding of civil, yeah.    That is correct.

Q      Thank you.

Mr. Leavitt.    2015 is also when the statute of limitations --

Mr. <u>Shapley.</u>    Yeah, 2015 the statute of limitations also expired.    I mean, I just -- that particular year and that particular charge, I could see some issues with that that would preclude it being charged.

BY <u>MAJORITY COUNSEL 1:</u>

Q    When you say that particular year?

A    2015.

Q    2015.

A    Yeah, so, 2014 is -- the elements are met, absolutely should have been charged, any other case I ever worked with similar fact patterns, similar acts of evasion and similar tax due and owing.    2015 was a lower -- was a much lower amount.    And, you know, I don't -- I am not -- I wouldn't argue that 2015 should have been -- that if they didn't charge it that was a huge problem.

BY <u>MAJORITY COUNSEL 2:</u>

Q    And why was that?    What was the number in 2015?

A    It was lower it was like $23,000, $25,000.    It was really low.    And there were like, diamonds given, and it was like gifts and stuff -- so it was a little bit less straightforward.    2014 was just solid straightforward.

Q    And what was the number in 2014, if you know?

A    The tax -- again --

Q    So of unassessed -- per the report was, what was that?    I want to say it was $220,000 but I don't remember off the top of my head, 2014.    I do know that there is still that $125,000 of unreported that cannot be collected through civil or criminal means.

BY <u>MAJORITY COUNSEL 1:</u>

Q    And just to clarify that point, because of the way this played out on the criminal side, civil actions were suspended during the course of your investigation.    Is

that correct?

A      Yes, that is correct.

Q      And now that the statute was allowed to run for 2014, there is no mechanism by which the IRS can force the taxpayer to pay the amounts you believe are due?

A      That is correct.

Q      Okay, we just talked about tax year 2015.    We have talked a lot about tax year 2014.    I would like to just run through the other relevant years here.    For tax year 2016, what was the amount at issue, if you recall?

A      You know, I don't want to say individual tax years and the tax charges, just because I am just not -- I had that chart in my head and I am not confident enough to say -- I mean, it is 2.2 over those years so --

Q      Understood, understood.

        BY MAJORITY COUNSEL 2:

Q      Just going back to 2014 and 2015, do you know if he was paying taxes on his Burisma?    He was paid $1 million or so basically for nothing.    Do you know if he was paying taxes on that, the $80,000 a month coming in through the Rosemont Seneca Bohai, I believe?

A      So for 2014, the $400,000 of unreported income today is the Burisma income.

Q      Correct.

A      It was not reported, and no taxes were paid on that.

Q      Okay.    And you believe it's $400,000, not $1 million?

A      Well, the number was $666,000, because it was in April, right?

Q      Okay.

A      So it was $1 million per year.

Q      Okay.

A      So the beginning was $666,000.    And then we gave -- in criminal investigation we are very conservative with those numbers.    So in theory, it really should be -- that number should be $666,000 of tax due and owing.    And then the tax loss associated with that.    But we gave him the benefit of the doubt on anything -- on the amount between 666 and 400.

Q      And then in 2015 is he paying his tax on the Burisma money?

A      Not at the time, but he -- it does wind up because Eric Schwerin --

MAJORITY COUNSEL 1.    Let's go off record for one second.

I'm sorry, go ahead.    Back on the record.

Mr. Shapley.    Because Eric Schwerin is now involved in that whole process so he made sure that things are --

BY MAJORITY COUNSEL 2:

Q      And is there anything about 2016 that you remember, or stands out -- because you mentioned in 2014 it was Burisma, and 2015 you said it was complicated, there were some diamonds and some other hard-to-value assets that were provided to him as income.    Do you remember anything about 2016?

A      2016 was a failure to file [and] pay year so it wasn't -- it wasn't a position of unreported income and acts of evasion, it was just that he didn't file and/or pay what he was supposed to.

Mr. Lytle.    Can I just confer briefly to refresh his recollection?

MAJORITY COUNSEL 2.    Sure.    Of course.

MAJORITY COUNSEL 2.    We can go off the record while they are conferring.

[Discussion off the record.]

BY <u>MAJORITY COUNSEL 2:</u>

Q     So I was asking if anything about 2016 stuck out to you.     And you said it was a failure to file, failure to pay case.     And I think that is when we went off the record.

A     Yeah, yeah.     I mean, in terms of the actual conduct, I don't think I can get into it right now -- I don't want to mix up tax years.     And ultimately, the case agent on those things getting into each -- I mean, it will be very dissected and very --

Q     Okay.     How about 2017, anything that stands out to you?

A     It was a bigger dollar amount, right?     It was around $500,000 taxed and owing.

Mr. <u>Lytle.</u>     Are you asking the conduct that resulted in that income?

<u>MAJORITY COUNSEL 2.</u>     I am asking him about both.     I am asking if he's aware of roughly the dollar figure and what the dollar figure is for.     Like he mentioned in 2015, it related to some diamonds.     2014 it related to Burisma.     So I am just asking if he has any recollection about -- each year, now we are at 2017.

Mr. <u>Shapley.</u>     Yeah, no.     That was a failure to file pay year as well.     And the tax loss was around $500,000.

BY <u>MAJORITY COUNSEL 2:</u>

Q     And 2018?

A     Yeah, 2018 was -- yeah, there is a lot of -- 2018 was like said to be -- that was at green light year from even CT, like, from a low level.     There was -- even DOJ tax and U.S. Attorney's Office in Delaware was, like, this is a slam dunk case.     So what occurred in 2018 was -- it wasn't a tax return that was prepared until 2020 mind you so it was, like, late and stuff.     But he was expensing personal expenses, his business expenses.     So, I mean, everything, there was a payment that -- there was a $25,000 to one of his girlfriends and it said, "golf membership."     And then we went out and followed that

money it was for a sex club membership in LA.

And there were off-the-book employees.    So Lunden Roberts was -- she is the mother of one of his children in Arkansas.    And she was an off-the-book employee that he was giving her healthcare benefits, she wasn't working, you know.    All that was expensed.    There were multiple examples of prostitutes that were ordered basically, and we have all the communications between that where he would pay for these prostitutes, would book them a flight where even the flight ticket showed their name.    And then he expensed those.

Mr. Lytle.    First class?

Mr. Shapley.    I don't recall if it was first -- I think it was first class on some of them, but some of them was, like, Frontier, I don't think they were a first class.

So the worst part about 2018 is that Hunter Biden's accountants are sitting there with him at a table, and they have all the numbers in front of them, right?    The bank accounts in front of them and they are saying that, you know, you need to circle what are business expenses so that we know what to deduct.    So it becomes apparent to the accountants during this interaction that he's putting things on here that aren't expenses, that aren't true business expenses.    So the accountants create a representation letter that basically they said they have never done before.    And they had him sign this document, and it was basically because they didn't believe what he was saying, but they didn't -- if they were going to prepare his return, they had to listen to what he was saying. I mean, I guess they could have just chosen not to prepare his tax return would have been their only out.    But that was the type of conduct in 2018.

[12:49 p.m.]

BY <u>MAJORITY COUNSEL 2:</u>

Q    What do you think happened between 2014 and 2018?    You told us that he had utilized this Eric Schwerin fellow to try to get his taxes in order so he pays his taxes, but we get to 2018, and he's trying to expense prostitutes and whatnot.

A    Yeah, and --

Q    And for purposes of his tax returns, he's expensing them to what business?

A    To Owasco P.C., I believe.

Q    Okay.

A    Yeah, I believe it was Owasco.    So I don't have the date in front of me, but Eric Schwerin and Hunter Biden have a falling-out.

Q    Okay.

A    Yeah.    And so Eric Schwerin leaves and stops working with and for Hunter Biden.    And I think that's where -- it was in that timeframe where Schwerin was no longer participating.

Q    Okay.    Was the Owasco concern conducting any legitimate business that would need to expense anything?

A    I mean, they're a company that brought in his consulting fees.    So, if they were truly consulting fees and he was traveling to get his consulting fees, or some legitimate expenses can happen, like the office, and things like that.

Q    Do you know if they had an office?

A    Yeah.    Oh, yeah, at one point it did because --

Q    So Owasco had a separate office from Rosemont Seneca?

A    I don't know if it was separate because -- I don't know the answer to that.

Q      And then now we're at 2019.    Is there anything that stands out about that tax year, either an amount or procedurally?

A      No.    It's a -- no, not a whole lot for me.

Q      And as I understand it, at some point, the 2014, '15 and '16, was that --

Mr. Leavitt.    Sorry, if I could confer for a second.

MAJORITY COUNSEL 2.    Of course.    Off the record.

[Discussion held off the record.]

MAJORITY COUNSEL 2.    Back on the record.

Mr. Shapley.    So, you know, these tax debts were outstanding, and there was only 1 year there was a payment plan where he paid $10,000.

BY MAJORITY COUNSEL 2:

Q      Do you remember what year that was?

A      I think it was 2016, I believe.    But he paid it a few times, and then he stopped paying it.    And, then ultimately, in late 2019-2020, a Kevin Patrick Morris comes into the picture.    And he was described as meeting Hunter Biden at a campaign finance event.    And he paid off several different tranches of tax due and owing, to include Federal and D.C. tax due and owing.

And when they prepared some of these returns, they wrote that Kevin Patrick Morris gave him a loan for these.    So that's also not taxable.    So that was one of the points of -- that was a compilation of all the tax due and owing, so --

Q      Some of these years, they tried to file in D.C., and then in the Central District of California?    Do you know where the breakdown was?

Where the U.S. Attorney's Office for Delaware tried to bring a case in D.C., and then they also tried to bring it in the Central District of California, do you know the breakdown in years?

A      Yeah.    So, the venue for 2014 and 2015 was D.C., and the venue for 2016 through 2019 was Central District of California.

Q      So D.C. was only 2014 and 2015?

A      That is correct.

Q      And when was the statute supposed to run for 2014 to 2015 after the extensions?    And we probably covered that before.    I apologize for asking again.

A      After all the extensions, it was November of 2022.

Q      So when they learned in March of 2022 that the D.C. U.S. Attorney is not bringing that case, they had April, May through November of that year to do something about that tax liability, correct?

A      Yes.

Q      And they did not do anything?

A      They did not, no.

Q      They could have tolled the statute of limitations?    They could have shifted it over to the Civil Division to pursue it civilly, correct?

A      Yes to the first question.    To the civil statute, I don't know if it would have still been open.

Q      Okay.

A      So I don't know that.    But, I mean, one thing that they did do is he did request special counsel authority in that time, right?    He was denied so -- and that's a big point that I want to make.

So it's not just -- I've worked cases for a long time and very big cases.    And yes, there -- investigators sometimes have disagreements with prosecutors.

But if you look at this, you can see -- they brought the case to D.C.    Like, they're not bringing the case to D.C. because they don't support it and they don't think it should

be charged.    And then I don't know -- it just wouldn't make any sense to me that David Weiss requested special counsel authority if he didn't also think that those years should be charged.

So that's just kind of, some of the things that were happening in that time period.

Q    And you said that the Central District of California, that case was brought out there in January of 2023, you said?

A    No, September of 2022.

Q    September of 2022 is when they brought the case in California?

A    They brought the case to California.

Q    To California.

A    It was the same week that Martin Estrada was confirmed.

Q    Okay.

A    So, after 6 months, we're kind of in limbo, and we don't know why it took 6 months to then take the next step.    And, maybe it's coincidence, but it went there at the same time that --

Q    Okay.

Mr. Lytle.    Can we go off the record for a moment?

MAJORITY COUNSEL 2.    Off the record.

[Discussion held off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q    I know you're not sure of when the U.S. Attorney for Delaware asked for special counsel status, but do you have a timeframe?    Sometime between March of 2022 and January of 2023?    Is that fair?

A    My understanding was that it was right in March after he was told by

Matthew Graves that they didn't support it.

Q      And do you know if he asked for special counsel status at any time before he

brought the case to the Central District of California?

A      For California?

Q      Yes.

A      I don't know that.    But in the October 7th meeting, he did say that if

California tells him no, he has no authority to charge in California, and that he would have

to request special counsel authority in order to charge it.

Q      And you don't know if he did ask for special counsel authority a second

time?

A      I do not know.

Mr. Lytle COUNSEL 1.    Can we go off the record a moment?

MAJORITY COUNSEL 2.    Sure.

[Discussion held off the record.]

[Recess.]

[1:32 p.m.]

       <u>MAJORITY COUNSEL 2.</u>    Back on the record.    It's 1:32.

             [Shapley Exhibit No. 6

             Was marked for identification.]

**EXHIBIT**

6

Laptop and Hard Drive Timeline
10/22/2020 – 1000am

1. 3 laptops to the shop
2. Financial records show Sportsman was around Wilmington DE shop at a cigar shop on the same day
3. Other intelligence shows Sportsman was in the area
4. computer shop calls Sportsman to tell him to bring in an external hard drive to put recovered data on to. Sportsman returned to the shop with the external hard drive
    a. Phone records show shop called Sportsman and sportsman called the shop around this time
5. During data recovery effort (could not fix the computer so was just recovering any data he could recover)
6. At this point there was the laptop, external hard drive, and a hard drive at the computer shop (3 devices)-computer shop always kept a copy of the customers data for a period of time before purging the data off his system
7. October 16, 2019 – Richard Steven McKissack reported to the FBI office in Albequerque "his son is in possession of a sportsman computer that had not been retrieved and was not paid for...said it contains evidence of white collar crime...he did not view this data personally"
8. FBI Albuquerque generated a lead that went to Baltimore FBI.
9. FBI Baltimore received the lead on 10/17/2019.
10. Discussions began on what to do with the computer.
11. Reached out to Richard on 11/3/2019 and got John Paul's contact information
12. 11/6/2019 – Josh Wilson called John Paul
    a. Provided device number and FBI determined that device was registered to Sportsman via apple ID account/iCloud account
    b. Verification of device –
13. 11/7/2019 – FBI interviewed John Paul at his residence near Trolly Square right around the corner form the shop on Delaware Ave.
14. FBI produced a 302 and Dillon looked at the 302 to determine if there was any privileged information – produced because John Paul was providing statements about what he saw on the laptop
    a. Determined no taint items in 302 – but not being shared with prosecution team
15. 11/21/2019 – telephonic interview to clarify the steps taken to notify sportsman of completion of service request, request of payment and pick up of the item.
16. 12/9/2019
    a. Took property of laptop, external hard drive and copy of receipt signed by sportmans
    b. ▮▮▮▮ provided copy of ▮▮▮▮ and fbi receipt of property
17. SA ▮▮▮▮ began drafting search warrant affidavit for the computer on 12/3/2019

18. 12/13/2019 – obtained T26 SW signed by SA ▆▆▆▆ for laptop and external hard drive – presented a filter protocol to the magistrate with the SW

19. 12/12/2019 – OEO approval came concerning the search warrant for the laptop and hard drive

20. FBI determined in order to do a full forensic review a replacement laptop had to be purchased so the hard drive could be installed, booted and imaged.

21. Eric Overly, CART agent, imaged the external hard drive in Delaware.

22. 12/19/2019 – Image of hard drive is provided to RCFL. Went to Philadelphia so it stayed in Delaware district.

23. 1/6/2020 – forensic computer people at FBI started analysis

24. After forensics there were some initial emails about what computer analyst was seeing – many pictures with many body parts, file names, and things similar to this

25. SA ▆▆▆▆ never saw a forensic report of actual hard drive or laptop – they had to actually go to the device – no cellabright report of hard drive showing the analysis in pdf format.

26. 1/15/2020 – Josh sent an email that some information was put on a shared drive with various file extensions

27. LTFC – various emails around 1/23/2020 talking about data imaging, etc.

28. 1/27/2020 - DE1 and DE2 -exported file extensions - were first pieces of evidence that were provided by computer forensics that included some files sorted by extension – was provided on a USB drive

29. SA ▆▆▆▆ asked if all information on the hard drive had been reviewed…the answer is that they did not look at all of that…SA ▆▆▆ questions if Dillon reviewed all iMessage's that were relevant and not privileged. They would find the answer.

30. 2/27/2020 – DE3 with all messages from the hard drive were provided by computer forensics – via USB Drive

31. 2/10/2020 – Filter review completed – relevancy review began for the hard drive

32. 227 Productions
    a. DE3 – USB containing exported messages (ipad and macbook messages) No iphone messages

33. 3/31/2020 – email about quality and completeness of imaged/recovered information from the hard drive. (SA ▆▆▆▆ said he had no seen it. USAO said that he would not have seen it because for a variety of reasons they thought they needed to keep it from the agents – they were going to give a redacted version at some point in time to the agents – Stephania takes what comes form Dillon …)

Laptop – iphone messages were on the hard drive but encrypted they didn't get those messages until they looked at laptop and found a business card with the password on it so they were able to get into the iphone messages

34. [redacted] and [redacted] – is related to the ipad backup

35. 3/6/2020 – FBI received the image of the laptop

36. 3/10/2020 – went to RCFL in philly to facilitate the forensic exam

37. 4/7/2020 – First evidence produced DE4 from laptop – less than what was provide in DE1,2,3
   a. Because de-duped
   b. Josh Wilson accepted this personally

38. 4/10/2020 – thumb drive to LTFC

39. 4/17/2020 – Uploaded documents to USAFx but got an error – talked about all the various types of files that were provided; voicemials, messages, videos, etc.

40. 4/20/2020 – Dillon sent to AUSA's only
   a. Zip files with Pdf and html version of cell phone reports via usafx\
   b. Redacted cellabright file but 5gb so can upload separately if you want—contain wise it is identical to other productions
   c. SA [redacted] does not believe he ever received that cellabright file – Lesley said, "OK."

41. 5/11/2020 - The cellabright file was sent on thumb drive and uploaded at some point—timing is not exact

42. SA [redacted] – For items not seen by agents shouldn't they see everything because if they have to testify to it they need to see it
   a. Lesley response is that this is a historical review and we can discuss that later

43. Someone asked if we could tell if files had been added by the computer shop
   a. The computer guy said they could do a csv list that shows when everything was created
   b. He said that the laptop was "returned to original"
   c. Lesley said (while laughing) that because a lot of people are going to be asking for the laptop
   d. Josh Wilson stated that (while laughing) so whoever they are they are going to have to buy a laptop to put the hard drive in so they can read it.
   e. Lesley stated that this team trying to determine if anything was added to the computer by a third party which are allegations being made by people who are not the defendant in this case is not a priority. We have no reason to believe there is anything fabricated nefariously on the computer and or hard drive. There are emails and other items that corroborate the items on the laptop and hard drive.

Ended around 1258

BY <u>MAJORITY COUNSEL 2:</u>

Q      We just marked exhibit 6, and this is a document titled "Laptop and Hard Drive Timeline" dated October 22, 2020, 10 a.m.

Can you tell us about this document, who prepared it, and why?

A      Yes, I prepared this document.    It was to memorialize a meeting that we had with the prosecution team, plus the FBI CART team, which were the computer analysis team.

One of the things that prompted this was an email that I had sent a couple days earlier that basically asked AUSA Wolf to have a discussion about the laptop, because IRS CI was the affiant that actually allowed to get the contents of that laptop and devices. When I say laptops, there's a couple devices.

So then this occurred, and it was almost 4 hours, I think.    It was a long -- no. Yeah.    Three hours.    It was long and it was very detailed, and I just documented it here.

Q      Do you know what warrant the FBI used to obtain these devices?

A      It wasn't a warrant for the FBI to physically take custody of it.    They determined, because it was abandoned property, that it could be turned over via a document request.

[Witness confers with counsel.]

[Discussion held off the record.]

<u>MAJORITY COUNSEL 2.</u>    Back on the record.

BY <u>MAJORITY COUNSEL 2:</u>

Q      Who obtained the devices?

A      FBI did.

Q      Okay.    And could you tell us, you know, anything else about this document

that is worth knowing about?

    A    So would you like me to go through the document for high points or --

    Q    Just the significant parts.

    A    Yes.    So there are a couple significant parts of this.    One was that, at this time, the laptop was a very big story, so we were just making sure that everything was being handled appropriately.

So we wanted to go through the timeline of what happened with the laptop and devices.    I thought one of the most important first parts was that on November 6 of 2019, the FBI case agent, Josh Wilson, called up the computer shop owner, John Paul, and basically got the device numbers from him.

And then we bounced those device numbers off third-party records, and it showed that it was, in fact, Hunter Biden's device.    So it was a very first important step.

And then it's a lot of minutia with what they did with the information -- or with the analysis of the computers.    But what was important here was that ███████, the IRS case agent, pointed out a couple different times how he had not seen -- he was not given a cellabright report, which is just what they call the output of the FBI CART team analysis, and was questioning whether or not the investigators were provided everything.

And when it came down to item number 33 on page 2, Special Agent ██████ is saying like, well, I haven't seen this information.    And AUSA Lesley Wolf says, well, you haven't seen it because, for a variety of reasons, they kept it from the agents.    And she said that at some point they were going to give a redacted version, but we don't even think we got a full -- even a redacted version.    We only got piecemeal items.

So it was an example of pertinent, relevant evidence that a prosecutor kept from an agent, and I --

    Q    You're supposed to be on the same team, correct?

A       Yes.    And it had already gone through a filter review, right?    So there was
no attorney-client privilege.    So that couldn't be an excuse.

A prosecutor, in my experience, would never want that, right?    Because they
want the agents to go through the evidence and the agents to spend that time.    So, you
know, we don't really know what the full contents of that laptop ever had on it.

Q       And was it the U.S. Attorney's Office that was withholding the documents
from the investigative agents?

A       AUSA Wolf was the one who communicated it.    I don't know if they confer
with DOJ Tax or not, but AUSA Wolf's the one that made the statement.

Q       And flipping over to the last page, number 42, Special Agent ████, you
have listed here:    "For items not seen by agents, shouldn't they see everything because
if they have to testify, they need to see it."

And what was the response from the U.S. Attorney's Office, Assistant U.S.
Attorney Wolf?

A       It was a nonsensical response.    It was just something about historical
review.    But, you know, this 42 is an example of like -- this should have been such a
mundane task, right?    Like, after the analysis was complete, here you go, agents.    You
know, there was no attorney-client privileged information.    Agents, do your analysis.

This is such a -- this is an example of Special Agent ████ saying like, Look, like
shouldn't -- we got to see this.    I don't know how, as an IRS agent, if someone is getting
10 percent of the income, when I do a tax comp for criminal purposes for Hunter Biden, I
can't include the 10 percent if he's not getting that.    So we need to know where all the
10 percent is going, right?

Q       So if the 10 percent was going to the proverbial big guy?

A       Yeah.    So, I mean, this is just a very small example.    This is every -- like this

happened all the time.    Number 42 happened all the time where even on the smallest

items, for example, like the subpoenas that I alluded to in my opening statement it was a

time period in late summer 2021 where we had prioritized these interviews.

And we were to the point where we needed to go out to all these prostitutes,

because these were expensed.    So we had, it was probably four or five different weeks

where, ███████ would give the -- or I can't say that -- attachment for the document

request and have it, you know, ready to go the next week.

So I had to call Jason Poole multiple times, because they wouldn't give those

document requests without Stuart Goldberg personally approving them.    And, you

know, there were a couple different times he was on vacation 1 week.    So he just didn't

approve them.    So we had to move these trips.

But that's the side story.    But 42 is kind of like a microcosm of like many other

events that occurred similar to that.

Q    Okay.    And turning to 43, item C, Ms. Wolf said, while laughing, "that

because a lot of people are going to be asking for the laptop."

What did you take that to mean?    Was that just a nervous laughter that she was

suppressing something that needed to be addressed?

A    I think -- it was in the media a lot, a lot of talk about the laptop.    So I guess I

didn't take from it that it was nefarious.    It was really just that they were like joking

about how everyone wanted the laptop.

Q    Okay.

A    And then it was right after that that FBI --

Q    Including the IRS criminal investigators, correct?

A    Yes.    We would have also liked to have seen that, unfiltered and

unmanipulated by the prosecutors.

Q    Item E, Ms. Wolf stated:    "This team trying to determine if anything was added to the computer by a third party which are allegations being made by people who are not the defendant in this case, is not a priority.    We have no reason to believe there is anything fabricated nefariously on the computer and/or the hard drive."

So this is Ms. Wolf, the Assistant United States Attorney, stating, according to your contemporaneous notes, that we, meaning DOJ, and the prosecution team have no reason to believe there is anything fabricated nefariously on the computer and/or hard drive.    Is that correct?

A    That is correct.

Q    There are emails and other items that corroborate the items on the laptop and the hard drive.    Is that further evidence from Ms. Wolf that the items on the laptop are authentic?

A    That is correct.

Q    And are you aware of any point in time ever that Hunter Biden or his lawyers have asserted that anything on the laptop is not accurate or not legitimate or not authentic?

A    Like news reports?    Like, you know --

Q    Has it just come to your attention?    Has anyone made an allegation that knows anything about the laptop that it's not authentic, that they would have a reason to know?

A    Anyone in --

Q    Hunter Biden, his lawyers, anyone from the Biden camp?

A    Oh, I don't know.    I don't recall who was making what statements.    I mean, I --

Mr. Lytle.    You're not aware of them?

Mr. Shapley.    Yeah, I'm not aware of it.

BY MAJORITY COUNSEL 2:

Q    If you're not aware -- I'm not either -- of anyone, Hunter Biden or his lawyers saying that anything on the laptop is fraudulent, doctored.

A    Yeah.    I don't know of that, no.

Q    Okay.    And that never came up in the prosecution team discussions?

A    No, no.

Q    And if there was a question that there was doctored material or inauthentic material on the laptop, that would be something that the prosecution team would discuss, correct?

A    They were -- we were discussing it.

Q    Okay.

A    I think that there's even another bullet point here where they're talking about looking back to see if documents have been -- or if files have been manipulated. Yeah.    So A is:    The computer guy said that they could do a CSV list that shows when everything was created, and that the laptop was returned to original when they -- yes.

So, I mean, the whole discussion was about can we rely on this information on the laptop, is it Hunter Biden's?    And their opinion was, it was, and it was not manipulated in any way.

Q    It was reliable evidence?

A    That is correct.

Q    Okay.

I want to mark another document that you produced.    It will be number 7.

[Shapley Exhibit No. 7

Was marked for identification.]

*Ex. 7*





**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

## Memorandum of Conversation

| | |
|---|---|
| **Investigation #:** | ███████ |
| **Investigation Name:** | Doe, Robert |
| **Date:** | September 3, 2020 |
| **Time:** | Approx 1300-1415 |
| **Participant(s):** | See Below, |

**Location:**

1. The following individuals participated on this call or were invited to this call:
   a. ████████ – IRS-CI Special Agent
   b. Anthony Lopicolo – IRS-CI Special Agent
   c. Christine Puglisi – IRS-CI Special Agent
   d. Gary Shapley – IRS-CI Supervisory Special Agent (Author)
   e. Lesley Wolf – AUSA Delaware
   f. Carley Hudson – USAO Delaware
   g. Stefania Roca – USAO Delaware
   h. Jack Morgan – DOJ Tax
   i. Mark Daly – DOJ Tax
   j. FBI Agents with the following email addresses: ████████████ ████████████, ████████████ ████████████

2. AUSA Wolf stated that probable cause was not a question in determining if a physical search warrant was legally viable. She stated that there is more than enough probable cause. She stated that the decision was whether the "juice was worth the squeeze…" concerning whether the prosecution team thought that OEO and/or public integrity would approve these types of action.

3. AUSA Wolf stated that it is likely that a lot of the evidence sought in the T26 investigation would be found in the guest house of Joe Biden's residence and she stated, "…there is no way we will get that approved…" SA ████ interjected that there were several emails talking about the records stored at the guest house and that those communications stated that key evidence the prosecution team would seek would be sent to the subjects' California residence.

4. There was a discussion with prosecutors about removing the subjects name from several electronic search warrants, 2703-D orders and ████████ attachments. The theme was that with the subjects name in the document it would not be approved by "…people way above them…" SA ████ stated that he did not agree with removing the subjects name and instead said that we should not be changing the document to fit in

with what may or may not be approved. SA        said he was not comfortable with that as it would appear that the change was made for unethical purposes. AUSA Wolf basically disregarded SA        concerns and DOJ Tax Jack Morgan interjected stating that the removal of the subjects name would still ensure we received "most" of the data the team sought. AUSA Wolf moved to the next topic.

5. AUSA Wolf discussed the Blue Star Google email search warrant they authored and sent forward for approvals. She said that public integrity had approved it but that OEO was sitting on it. It appeared that behind the scenes she received communications that indicated that warrant would not be approved.

   *****Follow on call requested by AUSA Wolf on 9/4/2020 at 0945.*****

6. United States Attorney Weiss talked to Deputy Attorney General Donahue. They determined that the prosecution team can no longer issue any external requests (outside of government) whether search warrants,        2703-D orders, preservation letters etc. Everything needs to be vetted with USA Weiss and DAG Donahue. This is because it is 60 days out of the election even though it is not technically inside any parameters. AUSA Wolf said that DOJ has zero tolerance for risk that any of these requests somehow tip off someone who would leak this to the media.

7. SA        asked if the team would still be planning to go overt in November. AUSA Wolf said that the possibility of ballots still being counted and concerning the hand over of power that she cannot determine if that would happen.

8. AUSA Wolf said that DOJ is under fire and that it was self-inflicted. She said that DOJ needs to repair their reputation. AUSA Wolf said we should assume we would continue after the election.

9. AUSA Wolf said that the DAG's office is the one who made the decision.

I prepared this memorandum on September 3, 2020 and September 4, 2020, immediately after the conversation with see list above.

Gary Shapley
Supervisory Special Agent

☑ Double click here to sign
Witness

U.S. Treasury Criminal Investigation

110

BY <u>MAJORITY COUNSEL 2</u>:

Q      It's a memorandum of conversation regarding the Robert Doe investigation. This is a two-page document, two pages of content -- the document is three pages, the third page doesn't have anything on it -- prepared by yourself dated September 3, 2020.

A      Yes.

Q      And you wrote this document?

A      I did.

Q      Can you describe the significance of this document?

A      Yes.    So this was a pros team meeting September 3rd, 2020.    And we were having a discussion about being able to do the physical search warrants on Hunter Biden's residence and/or the guest house of President Biden's residence in Delaware.

And we had already established -- well, herein too this is when AUSA Wolf is stating that the probable cause had been achieved and that there was more than enough evidence and that there was likely evidence to be seized relevant to the investigation that could be found at these locations.

So she stated, "The decision was whether the juice was worth the squeeze."    And also a statement made here was that she said that, well, we had to consider the optics of doing a search warrant on, you know, Hunter Biden's residence and/or the guest house of President Biden.

She further states about the guest house of Joe Biden that there was no way we'd get that approved.    And here's another example of Case Agent ▮▮▮▮▮ interjecting, talking about that there were other documents that said that there was information that would be in the guest house and in the subject's California residence in Venice Beach at the time.

And further, there was another discussion about moving forward on these external document requests.    So we did multiple electronic search warrants, D orders, you know, document requests.

And prosecutors were pushing to remove the subject's name from those.    And the reasoning behind that was that they were worried that it would -- someone would -- out there that received these documents, these document requests, would leak the information, and that if it just had the entity that it would be less -- it would be more difficult to link it to Hunter Biden.    So, I mean, of course, the issue is that she said that it would not be approved way above them, right, which -- and I could talk about that in a moment.

And then we're having a long conversation about it and every one of the investigators are like, look, like this is not normal.    There is no way we'd ever send out -- how do you do a thorough investigation of a subject without the subject's name on it?    It's just -- it was absolutely absurd.

And then even Jack Morgan from DOJ Tax said, well, we'll receive most of the information.    And in my experience with working with prosecutors who might be going toward a trial, most is never going to -- never going to be good enough for them.

Q    Was there any overt discussion at these meetings that we're dealing with the son of a Presidential candidate?    Was that ever discussed explicitly?

A    I mean, they were careful.    They tried to be careful.    You know, that's why, you know, there's not a lot of emails, there's not a lot of documents they produced, right?    There were discussions that were obvious that they were talking about the issues with investigating a Presidential nominee at that time.

Q    When AUSA stated that the juice was -- whether the juice was worth the squeeze, what do you think she was referring to?    Whether the effort expended to get a

physical search warrant would be worth it?    It takes a lot of hard work and effort on the side of the investigative team to obtain a T-3 warrant, correct?

A    Well, it wasn't a T-3.

Q    Not a T-3.

A    A physical search warrant.

Q    A physical search warrant.

A    I think that she wasn't worried about that part.    She was worried about blow-back from doing a search warrant that was related to Hunter Biden.    I think all of these things that they didn't allow us to do, even back in June of 2020, was because their primary goal was to keep this investigation secret, right?

And even on December 3rd of 2020, when we're in Delaware U.S. Attorney's Office prepping for the day of action on December 8, Weiss came in and was like -- congratulations for keeping it secret.    And I was like, well, I thought that we were conducting an investigation here.    I didn't think that what we were doing was trying to keep a secret.

But there were multiple things like this that occurred -- and this wasn't specific to the upcoming election, right?    Like, we hadn't got the cease -- this was on September 3rd, 2020 -- we hadn't got a cease and desist from DOJ Public Integrity to stop.

So this was generally just that they wanted to remove the subject's name because they were so worried that some company got a document request and that they would give it to the media and that it would somehow out the investigation.

BY MAJORITY COUNSEL 1:

Q    When you said that AUSA Wolf was worried about blow-back, from who do you think she was worried about blow-back?

A    I think it was worried about, that there's going to be, suggestions of election

meddling, or that you're targeting targeting -- Hunter Biden.

I think -- all of her -- all of the reluctance to do all this I believe was related to that. Like, when she says, there's no way we'll get that approved, so at the time, right, like this is September 3rd of 2020.   So Bill Barr is the Attorney General, right?   So I would assume this would -- I don't know, but would this go to his level?   I don't know who's not approving it, right?

But I think that this was an excuse to not even send it up.   So I would -- I don't know 100 percent, but I'm almost positive that they just said, Well, we're not going to get that approved so we're not even going to send it up.   And that was always kind of an excuse, to use the process to slow it down and to kind of hide behind.

BY MAJORITY COUNSEL 2:

Q     And your belief, based on your experience, was they were afraid that maybe it would be approved?

A     Yes, yes.

Q     And so they wanted to stop it right there in Delaware, in the U.S. Attorney's Office in Delaware?

A     That is correct.   And even the storage unit search warrant.   I mean, that was after the election.   And there was no -- it was a storage unit in northern Virginia. No one would have known that was connected to Hunter Biden.

But we had information that there was -- the clean-out of the Owasco office was located in this storage unit in northern Virginia.   And after the day of action, we got a little bit more information about it, so we wanted to do it.

And the night of the day of action, ███████ sends a search warrant affidavit to Lesley Wolf saying, let's do it, right?   Now, there's not even an election issue, right? And it's in a storage unit.   It's not on someone's residence.

And still, AUSA Wolf and the prosecutors wouldn't allow us to do it, so much so that I set up a call with Weiss and my Special Agent in Charge at the time, and we said, Look, we got to do this.    We can't just rely on a document request for them to give us whatever.    We need unfettered access to this evidence.    We don't know what they're going to give us eventually.

And he agreed that -- look, if it's not -- Weiss agreed on that call that if it is not accessed, that storage unit, within 30 days that he would allow us to do a search warrant on that.

I'm feeling great, right?    So hang up the phone, an hour later I find out that AUSA Wolf and the other prosecutors told defense counsel about the storage unit.    So it was off the table.    And that was even after the election.

So there's many things.    Any other case I ever worked, if they were like there's a storage unit with documents from the business and personal documents in relation to the years under investigation -- the risk was zero, because it's on a storage unit, it's not on a residence -- there's no prosecutor I've ever worked with that wouldn't say, go get those documents.

Q    Do you think these decisions were made by Ms. Wolf, the AUSA, or do you think these decisions were made by the U.S. Attorney?

A    I don't know the answer to that.    Based on what I was led to believe that Weiss was in charge, right?    And that the prosecutors often use that as an excuse. Well, that's a great idea, we're going to go talk to Weiss about it.

Q    From some of your testimony, though, in the last few minutes, it seems that the AUSA Wolf may have been curtailing parts of the investigation, but the U.S. Attorney had expressed, at least overtly, that he was interested in moving forward, at least with the search warrant for the storage unit.

A      Yes.    That particular item, yeah.    I mean, Weiss -- I mean, I think Weiss

didn't have an opportunity to talk to Wolf, right?    And maybe they didn't communicate

that Weiss had agreed to that.

But the whole point is, is that December 8th, there's emails where Weiss and -- or,

I'm sorry, Wolf is asking for a search warrant affidavit.    Like, let's go do a search warrant,

right?

And then ██ gets the search warrant affidavit forward.    And then all of a sudden

they're like, we don't want to do that.    And they knew we were talking to Weiss about

the physical search warrant.    So I don't know why they would call the defense counsel at

the same time without speaking to Weiss about what came out of that meeting about the

physical storage unit.

BY MAJORITY COUNSEL 1:

Q      From an investigation process perspective, is it typical for prosecutors to

notify defense counsel before executing a search warrant?

A      No.    No, that wouldn't happen.

BY MAJORITY COUNSEL 2:

Q      Is that inappropriate?

A      Absolutely.    I mean, officer safety.    I mean, it's just incredible.    You know,

there's destruction of evidence.    I mean, you go into a door and they know you're

coming.    It's terrifying.

Q      So it's not just for the integrity of the investigation, there are safety issues?

A      Absolutely, yes.

Q      Let's talk about the day of action, which occurred a couple months later.

This memorandum of conversation we were discussing was September 3, 2020.    And the

day of action was going to be -- it turned out it wasn't very action-packed.    Is that

correct?

A      Yeah.    There was only one successful interview that day, but there were
lots of document requests.

Q      What other agencies were you coordinating with for the day of action?

A      FBI.

Q      Is that the only one?

A      Yes.

Q      And what was the original plan for the day of action?    I know you
mentioned 12 interviews, some in Arkansas, some in California.    But maybe you can just
walk us through, again, at a high level, what was planned for the day of action.

A      So the plan on how to execute that day?

Q      Yes.

A      All right.    So the plan that we discussed and agreed upon on that December
3rd meeting, and it might have morphed in a couple days after just to finalize some
things, was that for Hunter Biden, who now had a Secret Service detail, that we were
going to have the FBI Special Agent in Charge call the Secret Service Special Agent in
Charge the night before to just say, hey, I'm calling you at 8 a.m.    It's important.

And then 8 a.m. call.    FBI SSA Joe Gordon and I were the ones tasked with
interviewing Hunter Biden.

Q      So you're in California?

A      In California, yes.    So the night before -- so that was the plan.    I went to
FBI L.A. Field Office with the FBI SSA.    We talked to their management.    That's the plan.
We're going home, right?

Now it's December 7th, the night before the day of action.    And I'm prepping for
interviews, because I'm interviewing Hunter Biden and Kevin Patrick Morris, right?    So

I'm prepping.    I'm prepping.

I get a phone call from my Assistant Special Agent in Charge, George Murphy, who tells me that FBI headquarters notified Secret Service headquarters and the transition team that the day of action was occurring the next day.    And that the new plan became --

Q    Can I just stop you there?    Why did they tell the political officials?

A    I have no -- I have no idea, no idea.

Q    That certainly sounds strange to you, correct?

A    All of it is strange.

Q    It's one thing to tell the subject, but to tell the political officials introduces a whole range of topics of concern.    Isn't that correct?

A    Yeah.    All of it -- yes.    Yes to your answer, but all of it was incredible. There's also another officer safety issue, because these people close to him are going to know that we have agents out there out and about trying to do interviews and try to get information.

And then just, tampering with witnesses, right?    Now you're telling the witnesses that agents might be knocking on your door tomorrow, don't say anything.    And ultimately, we got one guy that talked.

Q    Right.    So of the 12 witnesses, do you remember who was on that list other than Hunter Biden and --

A    I generally know it was Joan Mayer, Eric Schwerin, Rob Walker.    It was Kathleen Buhle, Kevin Morris.

Q    These people are located in the United States?

A    Yes.

Q    Eric Schwerin, where is he located?

A      D.C., I think.

Q      And Rob Walker is in Arkansas?

A      That is correct, yes.    There were a few more, but I don't recall.

Q      And for the day of action, were you given any instructions -- and I think you mentioned this in your opening statement -- about what the agents could and could not ask?

A      Yes, we did.

Q      And could you tell us a little bit more about that, again?

A      Yes.    So on December 3rd, 2020, in the Delaware U.S. Attorney's Office, we were going over -- it was a very, very long day, because we had -- there were a group of like 12 or 15 people in the room.    Weiss was coming in and out.    And we were prepping for each individual witness.

So the agents that were going to conduct those interviews were Zooming into this meeting.    So we're going over each outline.    There were multiple times where Lesley Wolf said that she didn't want to ask questions about dad.    And dad was kind of how we referred to him.    We referred to Hunter Biden's father, you know, as dad.

Q      That's Joe Biden?

A      Yes.    James Biden as uncle.

Q      You were not allowed to refer to James Biden either?

A      We called him uncle.    I think it was so that we could speak more openly without, yelling, President Biden or James Biden.    I don't think that was nefarious, but -- she said, I don't want questions about dad.

So now we're in the Rob Walker, and the interview outline is eight, nine, 10 pages, and we're on page 4.    So we're not on priority items, but we're kind of gaining that rapport, getting him used to the interview, just like we do a lot of things.    Now we're

going to ask him substantive things that we really want to know.

So in there, it said:   "10 held by H for the big guy."   And it just said how -- what we were going to ask on that topic.   And Lesley Wolf stops and says, we're not asking -- I don't want to ask about the big guy.   And everyone -- basically, everyone in the room except for the prosecutors had a big problem with that.   There was a large debate about it.   And, she said, I don't want to talk about big guy.   I don't want to -- I don't want to ask about dad.   So you see in the --

Q     Do you know why?

A     I think that she was trying to limit where the investigation could go.

Q     And do you know what her motivation was?

A     I don't know what her motivation is, no.

Q     And did anyone on the team give her any feedback about what are you doing, this is crazy?

A     Everyone there -- the prosecutors are generally pretty silent.   So Lesley Wolf was the main voice, and the other ones were very subordinate and kind of only talked when they were asked to talk.

So FBI raised concerns.   ███████ raised concerns.   I raised concerns about it. She's like I don't want to talk about the big guy.   Don't ask about the big guy.   So you see in the Rob Walker interview --

MAJORITY COUNSEL 2.   And we can mark that.   It's No. 8.

[Shapley Exhibit No. 8

Was marked for identification.]

EXHIBIT
8
JJWilson - Page 1 of 214

272D-BA-3065729
JJW:glwm
H Drive

Date of Conversation:  December 8, 2020

(Transcribed from WAV file copy)

Participants:    1. SA Joshua J. Wilson,
                    Federal Bureau of Investigation (FBI)     =     Wilson
                 2. SA Adam Soline,
                    Internal Revenue Service (IRS),
                    Criminal Investigations                   =     Soline
                 3. John Robinson Walker, aka: Rob            =     Walker

Betsy (Walker?), wife of John Robinson Walker, aka: Rob = Betsy
A male voice in background (Unknown Male?) = Male
Unknown Female = Female (Wait Staff)
Unknown Male = Male (Wait Staff)

Type of Conversation:  Taped Interview

A transcription of the above-described conversation is as follows:

Preamble by
Wilson:         Okay, this is Special Agent Joshua Wilson with the FBI accompanied by...

Soline:         Special Agent Adam Soline, IRS, CI.

Wilson:         Okay, today's date is December 8th of 2020.  The local time in Little Rock, Arkansas is
                10:03 a.m.  Ah, the following will be an attempted interview with John Robinson Walker
                at his residence, ▮▮▮▮▮▮▮▮▮▮▮▮▮ also in Little Rock.

                (Background Noise.  Exit vehicle and slams car door.  Walking noise).

                (Pause).

(Counter #: 04:08:43/00:00:58):

Wilson:         I wonder if this..., anybody saw us coming through?

Soline:         Hmph, hmph, hmph.

                (Background Noise).

Soline:         I'm gonna (Unintelligible).

                (Background Noise).

1

Wilson:        Um.., as far as the.., the failed joint venture that was gonna be Sinohawk which involved Tony and James and you...

Walker:        Hmph hmph.

Wilson:        ...and.., and Hunter...,

Walker:        Hmph hmph.

Wilson:        ...um.., you know, it was kind of the, um, the famous email that Tony was pointing out like the.., the equity split.

Soline:        (Whispers).  Uh huh.

Wilson:        Um...

Walker:        Sure.

Wilson:        Who... Like can you tell me your opinion of that?  Like ah...  Ah, did you... I mean are you familiar with what I'm talking about.., that email.., when it's going through like, you know, ten b.., held by "H," you know, like...

Walker:        Yeah.

Wilson:        ...so you...

Walker:        Yeah, I saw that on Twitter or somethin'...

Wilson:        Okay.  (Laughs).  Right.

Walker:        ...or maybe.., maybe when Tucker Carlson...

Wilson:        Yeah.

Walker:        ...talks about it on his show.

Wilson:        So what.., w...  Like can you tell me about that?

Walker:        It was an email.  I think that maybe James was ah.., wishful thinking that ah.., or maybe he was ah, projecting that, you know, if this was a good relationship and if this was something that was gonna happen, that ah.., ah.., and if the.., the V. P. was never gonna run...,

Soline:        Hmph hmph.

Walker:        ...just projecting that, you know, maybe at some point, he would be a piece of it but he was more just, you know, ah, you know, it.., it.., it looks terrible but it's not.

| | |
|---|---|
| Wilson: | Right.  It was more of a "unicorns and rainbows" type email? |
| Walker: | Yeah..., and.., and.., and fuck Tony for..., for trying to..., I mean for taking little pieces of.., |
| Soline: | Uh huh. |
| Walker: | ...of emails or.., or, you know, and not showing it the.., the structure of a.., of an LLC or taking pieces of conversation that he recorded of me that ah.., to try to do that.  I don't know what's in it for Tony but.., but that email looks... |
| Soline: | Hmph hmph. |
| Walker: | ...bad and it's ah.., probably hard to explain for ah.., James.  Do I remember it?  No.  Does it look real?  Yeah.  And ah.., ah.., you know, I certainly never was thinking at any time that ah.., the V. P. was a part of anything we were doin'. |
| Wilson: | Okay.  Have you met the V. P.? |
| Walker: | Yes. |
| Wilson: | How many times roughly? |
| Walker: | Oh, I...my wife used to...(Unintelligible)... |
| Wilson: | Yeah, that's right. |
| Walker: | ...so..., |
| Wilson: | That's right. |
| Walker: | ...so... |
| Wilson: | Yeah. |
| Walker: | ...I mean I would get called and I'd.., I'd play golf with him probably eight to twelve times and... |
| Wilson: | Okay. |
| Walker: | ...ah.., um... |
| Wilson: | In Delaware or... |
| Walker: | Ah, I played with him at um.., ah.., Bully Rock in Havre de Grace with ah.., Beau and Hunter one time. |
| Wilson: | Okay. |

Walker:         That's probably the first time and then um..,

Soline:         Hmph hmph.

Walker:         ...played with 'em in D. C. probably ten times or so...

Wilson:         Okay.

Walker:         ...and it was really um.., more of ah.., hey, my dad's gonna go play golf..., you're...,
                you've gotta come with me.., and I'm  like at work.

Wilson:         Yeah.

Walker:         Too bad.

Wilson:         (Laughs).  Gotcha.

Walker:         Yeah.

Wilson:         Okay.

Walker:         So...

Wilson:         Um...

Walker:         And, you know, I guess and in that.., ah.., you know, if.., if Mazie was havin' a birthday
                party, I may be there...

Soline:         Hmph hmph.

Walker:         ...and he would stop by the Vietnam restaurant somewhere, somethin', or...

Soline:         (Sighs).

Walker:         ...if ah.., um.., you know, they're.., they're.., you know, Christmas things but even...  I
                mean I'm sure he knows who I am.  He knows I'm...

Wilson:         Okay.

Walker:         But he doesn't know me

Wilson:         Okay.  Did um.., did the V. P. ever show up at any CEFC meeting or anything like that..,
                even once he was out of office?

Walker:         Yes.

Wilson:         Okay.

Walker:      It was out-of-office.  Ah, we were in ah.., D. C. at the Four Seasons...

Soline:      Hmph hmph.

Walker:      ...and ah.., we were having lunch and he.., he stopped in...

Soline:      Hmph hmph.

Walker:      ...then he'd ah, leave.

Wilson:      Okay.

Walker:      That was it.

Wilson:      Just said hello to everybody and then...

Walker:      Yes.

Wilson:      ...took off?

Walker:      He literally sat down.  I don't even think he drank water.  I think Hunter said um.., I may be tryin' to start a company, ah, or tried to do something with these guys and could you.., and  think he was like "if I'm around"....and he'd show up.

Wilson:      Okay.  So I mean you definitely got the feeling that, that was orchestrated by Hunter to.., to have like a.., an appearance by his Dad at that meeting just to kind of..,

Walker:      Hmph hmph.

Wilson:      ...bolster your chances at...

Walker:      Hmph hmph.

Wilson:      ...makin' a deal work out.

Walker:      Sure.

Wilson:      Okay.  Um.., any other...  So that was the..., ah.., Four Seasons in D. C. after he was out of office?

Walker:      Yeah.

Wilson:      Um, where...  Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office?

Walker:      Yeah.

Wilson:       Okay.  All right.  Um.., when you started to learn about like you were going your separate ways as far as um.., splittin' off.., you and James were not gonna.., but you know that Hunter was continuing on and was...,

Walker:       Hmph hmph.

Wilson:       ...you know, involved with Hudson West...,

Walker:       Hmph hmph.

Wilson:       They...  I mean first of all, did you even know that or did you read that Senate report.., the Hudson West stuff?

Walker:       Um, I had ah.., I think .., specific things no.  Did I think that ah..., they...

Wilson:       He was still working with them?

Walker:       Did I think he was still working with them and then ah.., did I think that he had ah......received the money, sure, I was questioning that.

Wilson:       Uh huh.

Walker:       Um.., ah.., did I...  I never questioned him about it.  I was ah.., happy to be out.  If ah..., ah.., I read in the Senate Report where he received five or ten million dollars...

Wilson:       Okay.

Walker:       ...and ah..., ah..., I had ah.., always suspected it and I think ah.., Tony had suspected it also but ah.., I.., just at that point, I wasn't, you know, I didn't know anything for a fact.  I wasn't gonna divulge anything to Tony who would probably try to do something about it.

Wilson:       Right.

Walker:       Yeah.

Wilson:       And you probably heard it from Eric too 'cause Eric was still working with...

Soline:       Hmph hmph.

Wilson:       ...Hunter during that time.

Walker:       I'll say Eric didn't say anything directly but he alluded to it...,

Wilson:       Okay.

Walker:       ...to me at one point.

BY <u>MAJORITY COUNSEL 2</u>:

Q      This is a document of a December 8, 2020, interview by Special Agent Wilson

of the FBI and Rob Walker.

And just as I understand this document, this is a transcript of a recording?

A      Yeah.    This is an excerpt of a transcript of a recording.    That is correct.

Q      And so was Special Agent Wilson wearing a -- or recording it on his phone, or

how did it get recorded, to your knowledge?

A      Yes.    Mr. Walker was consensually monitored.

Q      Okay.   So he agreed to have the interview recorded?

A      No.    The agents were the consenting people to monitor.

Q      Okay.   So it's like a one-party State or --

A      Yeah, yeah.    Well, law enforcement, we have the consensual monitoring

rules.

Q      Okay.

A      And we got approvals to do consensual monitoring for these things.    So the

agents are the consensual.

Q      All right.    Now, are they wearing a wire or are they just using an iPhone, or

how does that happen?

A      It's different.   We have different tech.   Key fobs, coffee mugs, iPhones.

There's lots of different things.    I haven't seen a physical like what you think of as like

taped to your chest.

Q      Well, I used the term "wire," but what I mean is a specific device for

purposes of recording, not just an iPhone.

A      That is correct.    And this was to be able to be inserted into evidence at trial

transcript of that recording, excerpt of a transcript.

Q      Maybe you could draw our attention to the significant parts of this document.

A      Sure.    So, right up to the time when Special Agent Josh Wilson or Special Agent Adam Soline, who is an IRS agent, one of my agents, was going up to this door, they were deliberating.    They were basically debating about Lesley Wolf's directives.

And they were like, how can we not ask?    Like, that was wrong.    We got to ask. We got to ask.    And so they basically decided that they would ask the question without saying the words "big guy," and that then they would somehow be doing what they were asked to do.

So, as you can see in here, page 79, it's about right in the middle of the page where it says "Wilson" and it begins "who."    So this -- Wilson's question and -- do you want me to read it or --

Q      I can read it.

A      Okay.

Q      It says:    "Who...Like can you tell me your opinion of that?    Like" -- I won't read the ahs and the – "I mean are you familiar with what I'm talking about…, that email.., when it's going through like, you know, ten b.., held by "H"?    And Walker responds in the affirmative.

A      Yeah.

Q      And then Walker further says:    "Yeah, I saw that on Twitter."

A      Yes.

Q      And so what else is significant about this back-and-forth between Special Agent Wilson --

A      Sure.    So this just shows the lengths at which we had to do to -- and how it

affected actually our jobs and conducting these interviews.    But then you go --

Q      Because Walker was a business partner of Hunter Biden, correct?

A      That is correct, yeah.

Q      And so he was especially positioned to know what 10 for the big guy meant, right?

A      Yes, yes.

Q      And so by not asking directly about that, you're giving away a legitimate investigative lead, correct?

A      Definitely could be, yes.    So, as I kind of stated about -- I'll say it a little more directly.    They were debating about this, right?    But they were struggling to come to grips.

Even, you know, what is it, 5 days later when they're headed to do that interview and they know that it's wrong but they were agents and they did the best that they could.

So if you move down into this -- this couple pages, you can see that they're saying VP, VP, page 80.

Q      Okay.

A      They're calling him VP, and that was because they weren't supposed to call him dad.

Q      Okay.

A      Not call him dad.    So that's the --

Q      So VP wasn't on the list.    It was don't mention the big guy, don't mention dad?

A      Yeah.

Q      But VP wasn't on the list of barred terms?

A      It was a little bit of a protest, I guess, to say that we're asking it, but, we'll ask

it in a way that maybe she's not mad.

Q      Do you think she would have been mad, though, because clearly she was trying to steer the investigation away from Joe Biden, correct?

A      I mean -- yeah, of course.    She would have been -- she was the type of person that did not like dissenting opinions, and what she said went.

Q      Do you think at this point in this -- maybe you don't know, but I'm going to ask it anyway -- whether she was angling for some sort of position in the administration in the Justice Department?

A      I have no idea.

Q      Was there ever any chatter among your colleagues about that, if that was her motivation?

A      No, I've never heard that.

Q      Did you or any of her colleagues have any speculation about her motives, or was it just that she was trying to keep this case from moving forward?

A      Her motives are just difficult to assess, right?    We're just thinking about the investigation and how we have prosecutors on the case that are obstructing our efforts to get all the evidence.    That's really, eventually, the reason why we went a couple years of this type of conduct was because we just -- we have to do it.    We have to suck it up. We got to work this case.

I got a prosecutor that's not great to work with.    That happens sometimes.    We just got to move forward, right?    So that's what we did for a year, 2 years, 3 years.    So she was not pleasant to work with.    She was -- I don't want to belabor that point, but it was her way, right?

And if there was big guy in the transcript, she was either going to directly berate you, or she was probably going to give you the silent treatment, which was one of her

tactics, for a couple weeks and talk behind your back.

    MAJORITY COUNSEL 2.   Okay.   Our hour is up, so pivot to our colleagues.

    Mr. Shapley.   We can come back to that, right?   There's more on that.

    MAJORITY COUNSEL 2.   Correct.

    MAJORITY COUNSEL 1.   Go off the record.

    [Recess.]

    MAJORITY COUNSEL 2.   We are back on the record.   It's 2:20.

      BY MINORITY COUNSEL 2:

    Q      Thanks again.   I think on our side, we have sort of a smattering of clarifying questions and the like.

    First, I'd like to go back to a discussion we were having before regarding the relationship between civil tax investigations and civil tax liability and criminal tax liability.

    And I think I'd like to start with questions about something that you alluded to that I have not heard before. I just wanted to get clarity on it.

    You said in the discussions of the various tax years, when we got to, I believe it was 2016, or maybe my notes are a little bit fuzzy, there was a point where you said that Hunter Biden was paying off tax debts in installments.

    Could you describe a little more about what that was, what those payments were for exactly?

    A      Yes.   So he was assessed a civil tax assessment at some point, and he entered into a payment agreement with IRS civil side to pay $10,000 a month, I believe.

    Q      Do you know for what year that liability was assessed?

    A      I don't.

    Q      But not for any of the years in question?

    A      No.   They would have been prior.

Q    Prior, okay.    And then who is responsible or what is the process at IRS CI for, let's say, hypothetically, there's a case that comes before CI, and they review it and they decide that it doesn't necessarily meet the standard for criminal prosecution, but there's, nonetheless, tax liability.

Is there a process for referral to the civil?

A    Yes.    It's called just that, civil referral.

Q    Civil referral.    And did that occur in this case at all after -- after prosecution was declined, or the statute ran, the criminal statute ran?

A    No, it didn't, because the civil statutes had run.    The statute of limitations had run.    I'm sorry.

Q    The civil statute of limitations on fraud are infinite under IRS 6501(c).    And, similarly, the statute for failure to file also does not run if you don't file a return.

Was that thought of and acknowledged by Criminal Investigation when deciding whether to refer the case?

A    Are you asking about the civil fraud penalty?

Q    No, not the civil -- if there's fraud under 6501(c) -- if the IRS can demonstrate fraud, then the statute of 6 years does not apply, correct?

A    The civil fraud penalty which you are referring to -- it can only be assessed with a criminal conviction.    That's the standard for civil to be able to make that fraud assessment.    And there are some jurisdictions where it has to even be 7201, an evasion case, in order for the civil fraud penalty to be able to be assessed.

Q    6501 is the civil fraud penalty or -- maybe I'm mixed up, because I was under the impression that that was the limitation on assessment.    So put it aside.    I don't have my Code with me.

But I was pretty sure that the limitation on assessment -- in the case of fraud,

simply did not run.    But --

     A    I think you are partly correct, but the way that the precedence for proving

fraud, for the civil fraud penalty, is a criminal conviction or guilty plea.

     Q    That could -- we'll have to look.

     A    That's my understanding, and that's the way that I've seen it done in the

past.

     Q    Okay.    Fair enough.

     Skipping around, can we go back to AUSA Wolf for a moment?    If I recall, AUSA

Wolf was among the individuals who, at the end of the day, were in favor of charging

Hunter Biden in their recommendations to, for instance, the D.C. office of the DOJ?

     A    They were supportive of the charges in the SAR --

     Q    Yes.

     A    -- and moving forward to the D.C. U.S. Attorney's Office, and presumably to

the California U.S. Attorney's Office, yes.

     Q    Right.    So, when all was said and done, AUSA Wolf and Mr. Weiss as

well -- they didn't appear to be impartial -- to be biased in their conclusion as to whether

or not to charge Hunter Biden?

     A    I don't think that's an accurate statement.    There were -- during the

investigation, we have no way to know if we have all the evidence.    We were obstructed

from approaching certain witnesses.    We were obstructed from asking certain questions.

We limited the names that were on document requests.

     So we have no idea what's out there that could have linked us to one bank

account that opened up a whole other slew of evidence for us.    Just the search warrants

not being allowed after they've agreed that probable cause has been achieved.

     I look at it as is that there was all these obstructions, and at the end of the day,

the evidence was still strong enough to support them charging.    That's how I look at it.

Was that your question?    I'm sorry.

Q    It is my question.    But there's still a point where nonetheless they have discretion to agree or disagree with your recommendations, and they chose to agree with them.

A    Officially, and -- there's two different things you're talking about, right? There's the SAR that we give to them and they review.    And we've been working with them every single day.    They know every single piece of evidence.    They know more evidence than we do, because they withheld some from us.

So when that SAR went forward, we talked with them constantly about these are the charges that we're looking to recommend.    Is everyone on the same page, right? So we don't want to recommend something and then have some huge argument over it, right?    So everyone was on board then with the SAR.

Afterwards, with what happened at D.C., or happened at California, or if any charges have been approved officially yet or -- I don't know the answer to that.

Q    But nonetheless, they still supported your conclusion in the SAR at the end of the day?

A    That's accurate, yes.

Q    And that was despite what you perceived as obstructing various steps of evidentiary gathering along the way?

Mr. Leavitt.    Can we go off the record for a second?

MINORITY COUNSEL 2.    Of course.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

MINORITY COUNSEL 2.    Back on the record.

BY <u>MINORITY COUNSEL 2:</u>

Q      I was just clarifying that they agreed with your conclusions in the SAR, and I said that was despite what were your perceptions of those obstructing the obtaining of evidentiary material along the way and reaching those conclusions.

A      That is correct.    But I just want to go back to the fact that it could have been much more.    It could have been much bigger.    There could have been income streams, more income streams, to other people associated with it, to include the President.

So, that's my answer.

Q      And is it your opinion, not necessarily your professional opinion, but your opinion as a citizen that the FBI in 2016 and after the 2016 election took something of a reputational hit?

A      I don't really have a lot of opinion about that.    I don't --

Q      You're familiar with the Jim Comey memo and the like, presumably?

A      Yeah.    I'm not a big guy that reads a lot of news and stuff.    Obviously, you hear things.    And my NBC News app, I see once in a while stuff on that.    But, working with the FBI, it didn't seem like there was -- I don't -- is some factions of the media saying that there's a problem, but I didn't sense it.    I still -- I didn't sense it doing the work.

[2:28 p.m.]

BY <u>MINORITY COUNSEL 2:</u>

Q      That's fair, you're in the trenches and you're working closely with the things, but, obviously, the FBI was very much in the public eye as a result of the 2016 election and the Comey memo and the potential for interference there.

And, do you think, in general, in organizations that have sort of tiers of authority and tiers of responsibility, where, you have workers at a lower level and reporting up the chain to higher up, that those up the higher chain might have a different prudential outlook on the reputational concerns of an organization?

Mr. <u>Shapley.</u>    Yeah.

<u>MINORITY COUNSEL 2.</u>    Okay.    That's all I have.

<u>MINORITY COUNSEL 1.</u>    Thanks.

BY <u>MINORITY COUNSEL 1:</u>

Q      Okay.    I have a couple questions, and a lot of these are like my former questions.    I just want to go back and make sure that I have the record right and correct.

So earlier you had mentioned that, in 2015, there were some issues that were different.    You mentioned the diamonds, you mentioned the low amount for 2015, that maybe the case was less straightforward, I guess in the case of the loan.

Was there anything else in 2015 that made it, you think, different than 2014, other than the amount?    Were there any other issues that you can think of that maybe we haven't listed or talked about yet?

A      The conduct in 2015 and 2014 was entirely different.    So, there was a scheme to evade in 2014 by using Rosemont Seneca Bohai to divert income from Burisma under Devon Archer's entity.    In 2015, that was kind of sifted out through Eric Schwerin.

He became aware of that in 2015.    You got to think, 2015, the tax return's due in 2016, and if an extension is filed April 15th of 2016, then the return is not due until October 15, 2016.

So Eric Schwerin had become aware of the income, and that's kind of how that whole thing changed --

Q    And so maybe that's why the amount was lower in 2015, maybe he actually helped.   Okay.

A    Can I --

Q    Yeah, sure.

A    So, initially when the SAR was written, the amount of taxes owing was around $160,000 for that year.

Q    For 2015?

A    For 2015.

Q    Okay.

A    But, we were battling to get information from accountants and so on and so forth, right?    And we're trying to be as conservative as possible to give every benefit to the subject in terms of the actual tax due and owing.    So ultimately, 2015 just became something where it was -- to be conservative, it was not an issue.    I had no issue with that.

Mr. Leavitt.    And you're saying that was after the SAR had already gone forth.    Is that right?

Mr. Shapley.    Yeah.    So more information was received after that SAR went forward.

[Shapley Exhibit No. 6

Was marked for identification.]

BY <u>MINORITY COUNSEL 1</u>:

Q      Great, thanks.

Okay.    Now I want to talk about exhibit 6, which is your memo about the laptop and the hard drive.    Was this memo provided to anyone?

A      This memo was discussed in length with the case agent and co-case agent, but to protect the record, these I couldn't send to them.

Q      Okay.

A      So after each time we had calls like this, I would have conversations with them.    There was even a document that I produced where they were like, well, there was this problem, this problem, this problem.    So I was like, I'll record it, because we don't want this to potentially be discoverable and have any issues in the future.

So this is an example of that, where if there are at least two people that will say that we talked about this right after, and most of the conversation is to discuss what happened during that, to make sure that it was accurate.

Q      But you don't provide a copy to your supervisor or Mr. Fort or anyone else in your chain of command?

A      No.

Q      It just stays with you?

A      That's correct.

Q      Okay.    That's my question.

A      Yeah.

Q      And then in this exhibit 6, there's two items that are redacted -- it says December 9, 2019, and there's two redactions.    Why are those redactions there?

A      It was just a potential 6E type situation.

[Shapley Exhibit No. 7

Was marked for identification.]

Q     Okay.

Thank you.

Now I'm going to look at exhibit 7.     And the question is the same as the one

before it.     Was this memorandum provided to anyone or copied to anybody?

A     It was not.     Just to reiterate again, that this was discussed right after -- I

can't even think of a time when we didn't have a discussion immediately after these

meetings with just me, case agent, co-case agent, and sometimes with FBI agents on the

phone to discuss this.

Mr. Leavitt.     Let me just clarify, to discuss your documentation of the meeting,

which did include other parties?

Mr. Shapley.     That's correct.

MINORITY COUNSEL 1.     I thought that's what he was saying, but thank you.

BY MINORITY COUNSEL 1:

Q     Okay.     When we were talking about this exhibit 7, you mentioned that, at

the time, Bill Barr was the AG.     Why did you not take your concerns up the chain in 2020

at that time?

A     Well, as I said before, there is a healthy tension between investigators and

prosecutors, right?     And there are sometimes when I don't agree with a prosecutor, but

every time I don't agree with a prosecutor, I'm not going to run to Bill Barr or to senior

leadership to -- to blow the whistle or make a protected disclosure.     The whole focus

was to do what we had to do, even if it meant dealing with obstructions from prosecutors

to get this case across the finish line, if it was worthy of it.

And, that's what we did.     Every single time something happened wrong in this

investigation, I couldn't bring it to Bill Barr or anyone else, so --

Q      And did you think about, in 2020 at all, coming to the committee at that point in time?   Because I know that you mentioned that there were irregularities that you saw in the summer of 2020.   Did you think about coming to the committee or coming forward at that time or making a report to TIGTA in 2020?

A      Like I said, we are trained and we work with these prosecutors hours and hours, trips, and spend all this time.   We are just trained to trust them, and it was an incredibly high burden.   If I wasn't in the October 7th meeting, my red line might not have been crossed.

But the things in that meeting -- it solidified a lot of things that had happened previously and explained a lot of things that happened previously.   And it just got to the point where, okay, now all of these things that happened that might be investigator versus prosecutor-type thing, I just, I thought it got to the point where -- this is not a small thing.   I'm not coming to the House Ways and Means Committee when a prosecutor says we can't do one search warrant.   That's just not -- I'm not going to do -- I'm never going to do that, right?   This is a series of events over 3 years where every single thing was to obstruct the investigation.   Every single thing limited evidence that we were able to obtain.   And, so -- if I was in the wrong for not coming to House Ways and Means Committee, I don't know.

Q      I wasn't saying -- I wasn't implying that.

A      Okay.

Q      I was just asking, was that something that you considered in 2020, because it seems like a lot of things happened in 2020, especially at the end, and so hence my question.

A      Well, I had the exact opposite feeling right then, right, because we were going over -- we thought that the evidence we had so far -- we were going to get a bunch

of new evidence.    We thought the evidence we had so far would maybe lead to an early resolution of the case.

So there was a lot of excitement because we, for a year or so -- or a year for me, because I came on in January 2020, but longer than that from others, we couldn't do a drive-by of his residence without Stuart Goldberg approving it.

So, no -- we just wanted to move the investigation forward, and now we were finally doing that.    And so we were hoping that we'd get what we need and keep moving forward.

Q      And then, you just mentioned when you were talking, that you don't normally make it a routine to come to House Ways and Means Committee.    How many times, just generally so we get a sense, do you disagree maybe with something that a prosecutor says in a case?    Is it regularly?    Is it most cases?    Some cases? Sometimes?    This is the first time?    Can you give us some sense as to that interaction and how often they don't agree in your cases?

A      How many times have I disagreed with a prosecutor on a case?

Q      Yeah.    Just generally.

A      I mean --

Q      Is it every case there's always something or what's a general sense?

A      It's always a professional relationship where everyone is moving forward toward the common goal.    The mission of the agency, and their agency, right?    So if every -- I challenge prosecutors all the time.    They challenge me.    It's fantastic.    And then we go and everything's great, and we come in the next day and talk about our families.    It happens but, in this particular instance, it wasn't jovial.    It was just, this is the way it is.    And then even when we try to get support to go -- for example, to get my SAC involved, to bring her to Weiss, to try to get this search warrant and this physical

stores [storage] location, we still got the end around, so -- I don't know.    Did I answer your question?    I'm sorry.

Q      No, that answers my question.    That's what I wanted to know.    I just wanted to get some context.    Like, if you were to tell me that most of the time we all agree a hundred percent and this is the first time that we didn't agree, that would obviously be different than, well, there's normally give and take in a case, and so this is what we're seeing here.

Okay.    Moving to exhibit 8.

A      Well, I don't think that's what we're seeing here.    I don't think that -- that's not what I saw here.    Maybe you're just speaking generally.

Q      I am.

A      Okay.

Q      Yeah, I am.

Mr. Lytle.    Well, what did you want to say?

Mr. Shapley.    No.    I think I've said it, that this is not the norm.    This is -- I've worked with some great guys, some great prosecutors that went on to be U.S. attorneys and went on to be the deputy attorney general and, I think I have experience enough to where it means something.

And I can't even count a time -- I don't even think I can come up with a time where a prosecutor made a decision that I didn't agree with, that they didn't take the time to explain to me and I didn't walk away being like, I disagree, but that makes sense.    And that just did not -- countless things did not -- that did not happen here.

BY MINORITY COUNSEL 1:

Q      So do you think it was this prosecutor, is that what you're saying essentially, that's who your dealings were with?

A      I don't know what the ultimate motive was, right?    I only know what I know.    I know what the evidence said, I know what precedent is, I know what my experience is.    I know all of the things that happened in the investigation.

It just appears to me that based on taking all those factors into account, that there was some type of nefarious motive here, and I don't know what it is.    I don't know.

Q      At the beginning when you were giving your opening statement, you had mentioned that the committee was your last hope, last sort of chance.    And so, obviously, we're not a law enforcement body.    What are you hoping to get from the committee?    What is your outcome that you're looking for?    Is it a process change at IRS?    Is there something that you're hoping to get with your last hope, which was the way you described it?

A      So I'm just here to give the documents and give my testimony, and I can steer you to others that have documents and who can give testimony.    And the whole thing was that I have faith in the committee and this country, in general, to do the right thing.    And, ultimately, if you guys at the end of the day don't agree, that's not for me to say.    But, in terms of corrective actions or recommendations -- that's for you all to decide.

Q      Okay.    I was just making sure that there wasn't something that you wanted in this particular case.    That's what I was asking.

[Shapley Exhibit No. 8

Was marked for identification.]

BY MINORITY COUNSEL 1:

Q      Okay.    Looking at exhibit 8, which is the interview.

A      Yeah.

Q      As I'm reading this interview, it was held in a restaurant or some place,

because I notice here that it says "unknown female," and then it says "female, wait staff."

Where did the interview take place?

A     It was at his residence.

And I also noticed what you said, but at one point they were outside, and I couldn't tell by the transcript if they were mowing the lawn or if there was lawn maintenance -- I don't know what it was.

Q     Okay.

A     But they were in his residence.    They went to his residence.

Q     Okay.

A     And his wife was there as well.

Q     I did see the wife, and so that's why I wasn't sure.    It seemed like maybe they were in a restaurant or something.    That's why I asked the question.

A     No, no.    I don't think so, no.

Q     Okay.    And you said that the consent was given by the IRS agents for the recording of the interview.

Did he know that he was being recorded?    Do you tell the interviewee that they're being recorded?

A     We do not have to tell the interviewee that they're being recorded, and I don't know the answer as to whether we did tell him, because people can ask, right, if they're being recorded, and I don't have the answer to that side.    But we don't need to inform them that they're being recorded.

Q     Okay.    And then I was looking at the top of the transcript.    And I know that you gave us some excerpts, and we're on a couple pages, and then the total looks like 214 pages.    What else was discussed?    Was there anything else discussed in the other pages that we don't have that go to the tax, I guess, liabilities from 2014 to 2018?

I'm trying to get context on the other things that were discussed during this 214 pages that we only have a couple of these pages.

A       Sure, yeah.    So, I can't make a representation to all 214 pages, but the reason why I thought this was pertinent was because this was basically showing the outcome of the obstruction from the direction to not ask witnesses certain things.    And that's what brought this in.    So, that's why this section's included -- and I can't really remember -- if you're asking if there's dollars and cents in there for tax liabilities, I would say I don't think that there is.    But is there a different thing that you wanted me --

Q       No.    I was just wondering, in these types of interviews, and this one in particular, do you talk to him about some of the questions that you had?    I know, like 2015, you mentioned diamonds or other items.    When you're doing an interview with this person, Mr. Walker, would you talk to him about all the tax years and any issues that you might have in any of the years, or is it just limited to a single scope?    I'm trying to understand how the interview would work with him.

A       It's by witness.    So say Eric Schwerin would have been, and Joan Mayer, those are like every single year:    income, work, what's going on, expenses, in-depth type of things.    The accountant, CPA, return preparer, same thing.

This is a witness that was a business partner that was involved in a deal with CEFC, so most of the questions were kind of geared toward that and SinoHawk and some of these other things.    So this one in particular likely wouldn't even have broached the topic of how would Rob Walker know what Hunter Biden's tax situation is.    He wasn't involved in the preparation of stuff --

Q       Okay.

A       -- of it, so --

Q       Okay, that's fair.

And then the entire transcript, the whole 214 pages -- who does that go to? Would it go to AUSA Wolf?    You mentioned that she didn't want you to use the words "big guy" and other things.    So would she have seen that "VP" was used, and would she have commented on this transcript -- what happens to the transcript once you receive it?

A    So the evidence in a case should be available to everybody in the case -- prosecutors and investigators -- unless there's some type of confidential, classified type thing that could be partitioned into some SCIF or so and so forth, but everyone should have this.    And I would have to say that she read it.    I don't know directly that she read it, but it was 214 pages, so, maybe she had someone else read it.    I don't know, but --

Q    But it's available --

A    Absolutely.

Q    -- to the entire team?

A    Absolutely.

Q    Okay.    Okay.    And then I just noticed -- this is just a basic question.    I noticed through here there's a lot of these words like the "hmph," like h-m-p-h.    You see, that's kind of all throughout this interview.    What was that?    Was it like, hmph, like I'm agreeing with you, or, like, hmph, like, maybe that's a fact, or, hmph, that's not a fact, it's a question?    I don't know how to read the "hmph."    Do you recall anything from that interview that would help us with this phrase?

A    So, I wasn't in the interview, but I did chastise my agent from stop saying hmph hmph in the middle of it.    I did argue -- so I think you're absolutely right, and I think that if you listen to segments of the actual recording, you would almost have to -- when you read it in context, it makes sense, he's like, uh-huh, hmph, hmph, like, and then you can tell by the line of questioning that he responded in the affirmative.    But I

think it might require you to listen to that little section in the recording.

Q    Yeah.    Okay.

BY <u>MINORITY COUNSEL 1:</u>    I think that's all that I have.    Do you have

anything else?

That's all that we have for now.    Thank you.

<u>MAJORITY COUNSEL 1.</u>    You're welcome.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>    Back on the record.    It's 2:50.

Do you want to go first, ████, or do you want me to?

<u>MAJORITY COUNSEL 1.</u>    I have just a couple quick follow-ups.

<u>MAJORITY COUNSEL 2.</u>    Okay.

BY <u>MAJORITY COUNSEL 1:</u>

Q    I'd like to bring your attention back to exhibit 2, what we've been referring

to as the SAR, which is the special agent report.    Is that correct?

A    This is the excerpt from that, yes.

Q    And you were discussing earlier the idea about whether U.S. Attorney Weiss

and AUSA Wolf appeared impartial because they approved your recommendation in the

SAR.

Only AUSA Wolf is mentioned in this document.    Is that correct?

A    That is correct, yes.

Q    Okay.    And the reference in this document that AUSA Wolf agrees with the

prosecution recommendation, did you take that to include the endorsement of the U.S.

Attorney Weiss or just AUSA Wolf?

A    Well, I did take it to include him, but there are also other events that led me

to believe that he also concurred with it.    There were -- I can think of one specific time,

on that 6-15-2022 meeting at Main DOJ, Stuart Goldberg, Weiss, and everyone underneath is there, every level of everyone underneath is there.

And this was when DOJ Tax was kind of giving a presentation about potential problems with '14, '15.   Now they've already tried to bring it to D.C.   They already requested special counsel and got denied.   So now they're kind of trying to make this evidential issue for those years.

So on the side of that, in a break, Weiss comes up and he's talking to me on the side, and ████████ comes up, the case agent.   And Weiss was like, you guys always convince me, I agree with this, and then DOJ Tax tells me something else.

So I know that Weiss agreed with these charges, and -- I don't know.   At the end of the day, they should've been charged.   I offered to give prosecution recommendation reports from previous cases to show precedent, to show specific examples of this loan issue and how this would follow a precedent in other cases being charged, and it just kind of fell on deaf ears.

Q    Based on your knowledge, do you have an opinion of whether U.S. Attorney Weiss did everything -- took all appropriate steps to pursue charges that you just testified that you believe he concurred with?

A    Like with D.C., with Main Justice, with all that stuff?

Q    Yes.

A    As he described it, his process was go to D.C. and try to charge there, but he needed permission from the U.S. attorney there.   When that got denied, he requested special counsel authority.   Then in the October 7th meeting, he's basically explaining what happens in California, right, if he -- if he recom -- he's going to recommend to California -- well, it had already gone to California, right, but there was no answer yet.

He's like, well, if they say no, then I'm going to have to request special counsel

authority from the DAG or the AG.    All I know is what he told me he did, and that's all I can say, I think, to that.

Q    Just a clarifying point on the earlier discussion about sort of your decision to make protected disclosures, right?    You testified that the October 7th, 2022, meeting was the breaking point.    Is that correct?

A    Yes, it was.

Q    Okay.    And would it be correct to say that you sought to state your opinion and impact decision making short of protected disclosures before the October 7th meeting?

A    Well, I think I reached a level of protected disclosure internally to IRS senior leadership before that.

Q    And at what point was that first protected disclosure?

A    I believe it was June of 2020.    You got to understand, at the time, I wasn't making a protected disclosure.    I was just working a case raising issues, right?    It's not until we're down the road a hundred miles that that was a protect[ed disclosure] -- you know?

Q    Yeah.    Understood.

A    But it seems like the October 7th meeting, after that, after I raised issues directly to them, I explained to them the risk of not charging '14, '15.    I explained to them how we had no mechanism to ever recoup that money, and I went like kind of like point by point how the elements were met.

And, it was that meeting where I think DOJ started to look into the discovery that I had provided back to March, because I was like, this is not right, there's a big, huge problem here.    And it switched from me raising just concerns, hoping that they'd be remedied, to now I'm like, no, this is a problem.    And I think because of that, they went

and looked at all my documents that I contemporaneously documented over the years.

And then I think they started attacking me.    And I think I read a part in my opening

statement, the email that I sent to my director of field operations exactly on that topic.

Q    And who was the director of field operations that you sent that email to?

A    Mike Batdorf.

[Shapley Exhibit No. 9

Was marked for identification.]

| From: | Batdorf Michael T |
| To: | Shapley Gary A Jr; Waldon Darrell J |
| Subject: | RE: Shapley - Manager - Discovery Update |
| Date: | Tuesday, December 13, 2022 7:47:36 AM |
| Attachments: | image004.png |
| | image001.png |

Gary. Good Morning.

I have not reviewed the emails that were provided to the U.S. Attorney's Office nor had conversation with the prosecuting team regarding them. I plan to do both in the coming weeks. I understand through your emails that you believe the prosecuting team may have not conducted themselves in an ethical or proper manner to include prosecutorial misconduct. I am not the reviewing official, deciding official or expert on such matters. However, there are routes that you could take if you truly believe there are violations of ethical conduct or prosecutorial misconduct. Either way you choose, Darrell, Kareem, and I (along with the Chief and Deputy Chief) will continue to work through any potential issues on this investigation.

Enjoy your use of lose annual leave and the holidays with your family and friends.



**From:** Shapley Gary A Jr <
**Sent:** Monday, December 12, 2022 1:32 PM
**To:** Waldon Darrell J <
**Cc:** Batdorf Michael T <
**Subject:** RE: Shapley - Manager - Discovery Update

Darrell/Mike,

I am on use or lose beginning Wednesday, 12/14, returning 1/3/2023. I am off line most of tomorrow traveling to Alexandria, VA to do my annual medical exam.

If you have questions about any emails I would ask you share it in advance so I can look at them and be prepared to put them into context. The USAO was so eager to get my emails (which they already had 95% of)...then surprise...they "might" have a problem with a few of them that memorialized their conduct. If the content of what I documented, in report or email, is the cause of their consternation I would direct them to consider their actions instead of who documented them.



EXHIBIT

9

**I have done nothing wrong.** Instead of constant battles with the USAO/DOJ Tax, I chose to be politically savvy. I documented issues, that I would have normally addressed as they occurred, because of the USAO and DOJ Tax's continued visceral reactions to any dissenting opinions or ideas. Every single day was a battle to do our job. I continually reported these issues up to IRS-CI leadership beginning in the summer of 2020. Now, because they realized I documented their conduct they separate me out, cease all communication and are now attempting to salvage their own conduct by attacking mine. This is an attempt by the USAO to tarnish my good standing and position within IRS-CI...and I expect IRS-CI leadership to understand that. As recent as the October 7 meeting, the Delaware USAO had nothing but good things to say about me/us. Then they finally read "discovery" items (provided 6 months previous - that are not discoverable) and they are beginning to defend their own unethical actions.

Consider the below:

1. I am not a witness – therefore Jencks/Impeachment is not an issue.
2. I am not the receiver of original evidence nor engaged in any negative exculpatory language against the subject (Brady material is evidence the prosecution is required to disclose that involves any evidence favorable to the accused – evidence that goes towards negating a defendant's guilt, that would reduce a defendants potential sentence, or evidence going to the credibility of a witness) – therefore no Brady/Exculpatory information exists. My documentation only shows the USAO/DOJ Tax's preferential treatment of this subject.
3. I have called into question the conduct of the USAO and DOJ Tax on this investigation on a recurring basis and am prepared to present these issues.

For over a year I have had trouble sleeping; awake all hours of the night thinking about this. After some time, I realized it was because I subconsciously knew they were not doing the right thing. But I could not fathom concluding that the USAO/DOJ Tax were in the wrong. After I wrapped my mind around the fact that they are not infallible, I started to sleep better. My choice was to turn a blind eye to their malfeasance, and not sleep, or to put myself in the crosshairs by doing the right thing. My conscience chose the latter.

I hope IRS-CI applauds the incredibly difficult position I have been put into instead of entertaining the USAO's attacks. If they bring up something legitimate; I am sure we can address it because it was not intentional. Everything I do is with the goal of furthering IRS-CI's mission, protecting the fairness of our tax system and representing IRS-CI with honor.

I look forward to presenting these issues to you. I do have some obligations during my UorL, but will forfeit some leave if it is to protect my reputation and the agency's interests.

Thanks.

BY <u>MAJORITY COUNSEL 1:</u>

Q     Okay.   I've just marked as exhibit 9 the email you just referred to.    Just to confirm, can you describe this document?

A     Sure, yeah.    This is the email that I sent to Mike Batdorf, the director of field operations, and cc'd -- oh, I'm sorry -- I sent to Darrell Waldon, the SAC, and cc'd Mike Batdorf, the DFO.    And this was the culmination of an October 24th communication from Delaware U.S. Attorney's Office and -- well, it was really Lesley Wolf and Mark Daly who called the case agent, ███████, on the telephone and said, hey, we need -- we need Shapley's emails and his -- these sensitive case reports that he's authored back to May.

And they didn't ask for discovery for anybody else.    They didn't ask for, from the -- mind you, the agents had provided discovery March-April timeframe, so there was 6 months or so of additional discovery, and they're not asking for that, right?    They're only asking for mine.

So ███████ sends me an email with Wolf and Daly on it that says, hey, you know, they asked for this, you got to talk to Shapley.    I respond, hey, yeah, I'm available 9:15, let's chat.    And she sends that, she forwards my email to Shawn Weede, number [two] -- a senior level at Delaware U.S. Attorney's Office.

And then he contacts me about this discovery, and he's kind of putting a lot of pressure on me.    So even Weiss called up, the deputy chief, to complain about timing of the emails that got turned over from me at that request.    But, basically, I think that they understood that it was a serious issue, what they had told me on October 7th, and that I had a huge problem with it, so I think that they started looking into what I had done for 2 or 3 years.    And then they specifically targeted me, because there was an SCR in my

original discovery that went to the chief that said that these people are doing the wrong thing, and this is specific, not general, specific things that they're doing that are wrong.

So they wanted to get the universe of everything that I produced -- and then they eventually started attacking me on it.    And so October 17th was the last time we had an actual call together.    And then they canc- -- then there was -- and the next call was scheduled, and then there's an awkward cancellation right before.    And then they didn't -- they wouldn't talk to us anymore, and it was because they knew that I had documented their malfeasance contemporaneously over the years.

Q     Do you know whether those prosecution team's meetings continued after October 17th?

A     If they did, we were not invited.    IRS was not invited.    This is an email that kind of toward the end where I had turned over the documents.    The documents were easy, but I'm not going to get into why the emails, we had to create PST files, and, [I] don't want to get into it.    But it was like a 25-, 30-day process.

Q     Complicated?

A     I had to get computer people on my computer to remote in to get it.    I was actually in San Diego assisting with execution of search warrants on other cases, and I have computer people chiming in to try to get my emails, because Weiss is calling my deputy chief, who knows what they're saying.    So --

Q     And at what time was that all taking place?

A     It was right around Thanksgiving time.

Q     2022?

A     Yes, thank you, 2022.    And when the request came in -- it was like the next week I was in Australia for search warrants, and then I was traveling somewhere else for a week, Los Angeles, and then it was Thanksgiving.    And then I was in San Diego for search

warrants.   I had zero time to do this.   So that's why I was like, I can't get this done right now.   And so, they were bothered by that, so they called my deputy chief and God knows what they said.   I don't know.

Q      Okay.

A      But this email was basically, I sent to these guys to say, this is just completely unacceptable.   And I laid out to them Jencks and Brady, and why a manager's information would never be discoverable.

Now, if I had had a successful interview of Hunter Biden, that changes things, right?   I might be a witness, I could be impeached, et cetera, et cetera.   But other than that, because that didn't occur, they never ask for -- they never ask for discovery from my level or above.   Never.

Q      Okay.   And I was a little inartful before about protected disclosures.   I was trying to get at the point that the October 7th, 2022, meeting, is it accurate that that would've been -- after that that is when you started to, or sometime after that, started to consider the possibility of making a protected disclosure to Congress?

A      Yes.

Q      Okay.

A      That's when I became -- looked into the process and read 6103, you guys and Senate Finance, right, that's when that occurred, and that's when I sought counsel.

Q      Okay.

A      Did you want to finish document 8?

MAJORITY COUNSEL 2.   Sorry, sir.

Mr. Shapley.   Just a reminder, document 8, there are still things that we --

MAJORITY COUNSEL 2.   We are going to come back to that, right.

We're marking exhibit 10.

[Shapley Exhibit No. 10

Was marked for identification.]

| From: | Waldon Darrell J |
| To: | Shapley Gary A Jr; Batdorf Michael T |
| Subject: | RE: Sportsman Meeting Update |
| Date: | Tuesday, October 11, 2022 7:27:14 AM |
| Attachments: | image001.png |

Good morning, all –

Thanks, Gary. You covered it all. I am taking care of referral to TIGTA.

Mike – let me know if you have any questions.
Darrell

*Darrell J. Waldon*
*Special Agent in Charge*
*Washington, D.C. Field Office*
*(C)* ▮▮▮▮▮▮▮▮▮

> **From:** Shapley Gary A Jr < ▮▮▮▮▮▮▮▮▮ >
> **Sent:** Friday, October 07, 2022 6:09 PM
> **To:** Batdorf Michael T < ▮▮▮▮▮▮▮▮▮ >
> **Cc:** Waldon Darrell J < ▮▮▮▮▮▮▮▮▮ >
> **Subject:** Sportsman Meeting Update

Mike,

Darrell asked me to shoot an update from todays meeting. Darrell – feel free to comment if I miss something.

1. Discussion about the agent leak – requested the sphere stay as small as possible
   a. DOJ IG will be notified
   b. FBI – HQ is notified and they refer it to their Counter Intelligence squad in a field office for investigation
   c. IRS-CI – **We need to make a referral to TIGTA** – What do you need from me on this action item?

2. **Weiss stated that he is not the deciding person on whether charges are filed**
   a. I believe this to be a huge problem – inconsistent with DOJ public position and Merrick Garland testimony
   b. Process for decision:
      i. Needs DOJ Tax approval first – stated that DOJ Tax will give "discretion" (We explained what that means and why that is problematic)
      ii. No venue in Delaware has been known since at least June 2021
      iii. Went to D.C. USAO in early summer to request to charge there – Biden appointed USA said they could not charge in his district
         1. USA Weiss requested Special counsel authority when it was sent to D.C and Main DOJ denied his request and told him to follow the process

**EXHIBIT**

tabbies® **10**

       iv.   Mid-September they sent the case to the central district of California – coinciding with the confirmation of the new biden appointed USA – decision is still pending

       v.   If CA does not support charging USA Weiss has no authority to charge in CA –

           1.   He would have to request permission to bring charges in CA from the Deputy Attorney General/Attorney General (unclear on which he said)

       vi.   With DOJ Tax only giving "discretion" they are not bound to bring the charges in CA and **this case could end up without any charges**

3.   They are not going to charge 2014/2015 tax years

    a.   I stated, for the record, that I did not concur with that decision and put on the record that IRS will have a lot of risk associated with this decision because there is still a large amount of unreported income in that year from Burisma that we have no mechanism to recover

    b.   Their reason not to charge it does not overcome the scheme and affirmative acts – in my opinion

4.   FBI SAC asked the room if anyone thought the case had been politicized – we can discuss this is you prefer

5.   No major investigative actions remain

6.   Both us and the FBI brought up some general issues to include:

    a.   Communication issues

    b.   Update issues

    **c.   These issues were surprisingly contentious**

Always available to discuss.  Have a great weekend!

Text  Description automatically generated



**WARNING:**
**LAW ENFORCEMENT SENSITIVE (LES) - FOR OFFICIAL USE ONLY (FOUO)**
The information contained in this email is considered confidential and sensitive in nature as well as sensitive but unclassified and/or legally privileged information. It is not to be released to the media, the general public, or to non-law enforcement personnel who do not have a "need-to-know".  This information is not to be posted on the Internet, or disseminated through unsecured channels, and is intended for law enforcement personnel only. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

BY <u>MAJORITY COUNSEL 2:</u>

Q       This is an email chain that starts on October 7th, 2022.     Presumably this is after the meeting, correct?

A       That's correct.

Q       And you send this to Mr. Batdorf and Mr. Waldon.     And what is the upshot of this document?   Are you just giving a readout of the October 7th meeting?

A       Yeah.   I realized the gravity of what I just witnessed, so I didn't want it to be a memo to file that didn't go anywhere else.    So I did this to ensure that my information was corroborated right then, right there.

Q       Right.

A       So that people couldn't --

Q       Right.    So this is essentially your contemporaneous notes from that business meeting, correct?

A       Yeah.

Q       And at the top, Mr. Waldon indicates that this is an accurate reflection of what happened in the meeting?

A       That's correct.

Q       And he was in the meeting?

A       He was.

Q       Did you have any discussions with him outside of this doc -- did you tell him you were preparing the document?

A       Yes, I did.    I told him that I would be the one that would summarize it for Mike, the DFO, Batdorf, and I said that I'd cc you so that you can confirm.

Q       Okay.   So your email says: "Mike, Darrell asked me to shoot an update from

today's meeting."

Did Mr. Waldon ask you to prepare this?

A     I put it in front of him and he said sure, that sounds great.

Q     Okay.

A     So --

Q     And you're just trying to explain why you're sending the email, correct?

A     I'm trying to play nice because I was -- I'm trying to play nice.

Q     In No. 1 on this email you prepared, says:    "Discussion about the agent leak -- requested the sphere stay as small as possible...DOJ IG will be notified.    FBI -- HQ is notified."

What was the specific leak?

A     So there was a leak, I'm not sure what outlet, on October 6th of 2022 -- it appeared to come from the agent's level, who was critical of the prosecutors for not charging the case.

Q     Okay.    Talking about the Hunter Biden case?

A     Yes, not charging the Hunter Biden case.

So, obviously that was part of the discussion at the beginning.    And there have been multiple leaks in this case going back, and this one was handled a lot differently because I guess it was purportedly from the agent's level.

So this drastic -- you know, they used that as an excuse to kind of -- to do what they were doing to us after this meeting on the 7th, they kind of used that leak as an excuse to exclude us.

Q     And then the second item in the memo -- or the document you prepared, this summary of the meeting, AUSA "Weiss stated that he is not the deciding person on whether charges are filed...I believe this to be a huge problem -- inconsistent with DOJ

public position and Merrick Garland testimony."

It's pretty remarkable that the U.S. attorney on October 7th said he is not the deciding official.    Did he say it in those words?

A     Yeah.    He said, I am not the deciding person on whether charges are filed.

Q     So there's no ambiguity, he was crystal clear in what he was saying?

A     It was how I understood it, and it was also how the special agent in charge understood it.

Q     Okay.    Is there anything else in this document that is worth bringing to our attention?

A     Yeah.    So if you go down to 2 b ii, that's kind of the acknowledgement that it's been kept in Delaware since June, even though the venue is known or was in Delaware since 2021, which not -- it is what it is.    But that describes the reason why we run into these conflicts now in the political interference here.

So he says that when he went to D.C. U.S. Attorney's Office in early summer to request charge there, Biden-appointed U.S. attorney said they could not charge in his district.    So it said they could not charge.    So up to that point, I thought that he had just said we don't support this.

Q     Right.

A     And we thought that Weiss was still deciding.    And when he said this that said he could not charge, okay.    So that's a big difference -- that's a material difference in what was occurring.

And then he further says that he requested special counsel authority when it was sent to D.C. and the Main DOJ denied his request, told him to follow the process.

Now, following the process, as they would've only have known, was to go through another -- a non-Weiss-appointed U.S. attorney -- or not Weiss.    They were going to go

through somebody else.    And when AG Garland's first defense of why everything's okay here, he immediately goes to because is Weiss a Trump appointee.    So the materiality of this being a decision outside of Weiss is pretty significant, in my opinion.

So then it goes on to page 2.    So at the bottom of page 1, that's when Weiss requested special counsel authority.    That's the first time we'd heard that, and that he was denied.

And then he said that they went to Central District of California mid-September, and it was the same week that the Biden-appointed U.S. attorney was confirmed.    And then he says, if California does not support charging, Weiss has no authority to charge in California, which is obviously contrary to what Merrick Garland said.    Then he said that he would have to request permission to bring charges in California from the DAG or AG.

Q    Right.    And earlier this morning when we were talking about Senator Grassley and the Attorney General, and maybe my notes are wrong, but I thought we had discussed that the effort to bring the case to the Central District of California was in January of 2023, and this here seems that it was -- or a little bit earlier?

A    No, it was September.

Q    It was September.

A    September 2023?

Q    Okay.    I probably have it wrong.

A    Yeah.

Mr. Shapley.    September 2022.

Oh, in January 2023, we learned from SAC Waldon that California had declined to --

MAJORITY COUNSEL 2.    Okay.

Mr. Shapley.    -- declined the case.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Oh, okay.    I understand.    So in September of 2022, the materials are presented to the Central District of California?

A    That's correct.

Q    And it wasn't until January of 2023 that a resolution on that was determined?

A    It's when we learned of it.    I don't know if it had already been decided.

Q    Okay.    And along similar lines, is it fair to say that in March of 2022, the case was brought to the U.S. attorney for D.C.?

A    That's correct.

Q    And then in the early summer of 2022 is when you learned that the U.S. attorney in D.C. had declined to move that forward?

A    No.    It was right in March, because that was when Mark Daly was calling my case agent.

Q    Okay.

A    The one call was, hey, things kind of look good here.    Call a couple days later was, they said no.

Q    Okay.    So that was in March?

A    That was in March.

Q    And that was right away.    There was no delay or there was no --

A    There was very little delay.    We weren't involved in the presentation in D.C., so I don't know the exact date that it went over.    But it was right there at the end of March that it was declined.

Q    So in your notes on page 1, 2 b iii, went to D.C. U.S. attorney in early summer, is that Weiss sort of getting the dates --

A      Yeah, I think he was just --

Q      -- incorrect?

A      -- kind of being --

Q      Okay.

A      Yeah.

Q      But it should read March of 2022, correct?

A      He would've been more accurate to say spring than early summer.

Q      Okay.   And then flipping back to the second page, No. 3, this is what you stated for the record, that if they're not going to charge 2014 and 2015, they're just letting this Burisma income go untaxed, correct?

A      Yeah.

Q      And this is just a gift to the taxpayer, right?

A      It significantly reduced the egregiousness of his conduct if that wasn't included.

Q      Right.   And I think we had established that he was getting paid about a million bucks per year in 2014, and it started in April, so it was two-thirds of the million.

A      Yeah.

Q      So that was just going completely tax-free to the taxpayer Hunter Biden, correct?

A      That's correct.

Q      Did you get any feedback when you stated that for the record?

A      There was just some general discussion.

Q      Okay.

A      It wasn't anything reportable, I guess.

Q      So nobody said, Gary, whoa, whoa, whoa, there's a mix-up here, the reason

we can't do this is because of X reason?

A     No.    No.    There's an August email that maybe I alluded to before from DFO Batdorf that says that we support 2014 and '15, and we're going to have the deputy chief call over to Stuart Goldberg at DOJ Tax to tell him we support it.    And then SAC Waldon is in this meeting, right, FBI SAC Sobocinski and FBI ASAC Holley are there as well. It was just that was their decision.

Q     Okay.

A     But the funny thing is that now that he said he requested special counsel authority in D.C. and was denied back then, him saying that he decided not to charge '14 and '15 at that point in time was moot, because he had no ability to charge it.    So maybe that's a nuance that only I think is important.

Q     Right.

A     But, he's saying that he made the decision not to charge it, but he didn't make the decision not to charge it.    The D.C. U.S. Attorney's Office made the decision not to charge it.    And then when he was denied special counsel authority, he had no ability to charge it.

Q     Okay.

A     And that's my understanding.

MAJORITY COUNSEL 2.    Off the record a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q     We'll go back to exhibit 8.    There's a discussion at the bottom of page 81, where the Special Agent Wilson asked whether the VP, meaning now President Biden, ever showed up at any CEFC meeting.

Is it fair to say that the question is whether the President, the now President, ever showed up at his son's meetings to support his son, to give it some legitimacy?    Is that a fair reading of the question?

A    Yes.

Q    And the answer was "yes" from Rob Walker, correct?

A    Yes.    And this question was specific to out of office, and his request was yes.

Q    Right.    And did they also ask whether the President, when he was the VP, appeared at any meetings on behalf of his son, when he was in office?

A    Yes.    So the bottom of 82, FBI Agent Wilson, "Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office," and Walker's response was "Yeah."

Q    And then flipping to the next page, Special Agent Wilson said:    "Okay. All right. Um.., when you started to learn about like you were going your separate ways as far as um..,splittin' off.., you and James were not gonna.., but you know that Hunter was continuing on and was…,"

Is James a reference to James Biden?

A    Yes.

Q    And do you know what's going on in that exchange right there about James going his separate ways with Rob Walker?

A    I don't know anything too specific about that.

Q    Okay.    And there's also a reference to Tony in this document.

A    Yes.

Q    A little bit further down on page 83.    And Tony I think appears on page 80 as well.    I was just wondering, for the record, who Tony is, if you know.

A      That's Tony Bobulinski.

Q      Okay.    Tony Bobulinski.

A      So if I could add -- it was page 81 or 82, right in the middle.    And Walker basically describes that the VP "literally sat down.    I don't even think he drank water.    I think" -- and then he's basically saying Hunter told him about the company he's trying to start --

Q      Right.

A      -- with these guys.    And basically saying, well, if you're going to be around, Dad, can you like, stop by?    And, he'd show up, it said.    So then Wilson asks him, "so…you definitely got the feeling that, that was orchestrated by Hunter…to have…an appearance by his Dad at that meeting, just to kind of…bolster your chances at…makin' a deal work out."    And Walker said "sure."

Q      Walker agrees, but of course he agrees.    Why else would Hunter bring his dad into these meetings, correct?    He's trying to trade on the family name, and if he brings his dad to the meetings, it gives him a lot more credibility, correct?

A      It would make sense, yes.

Q      Is there anything else on this exhibit that we have not discussed that we ought to?

A      Yeah.    That was 82.    Yeah.    So he asked a question about when he was out of office, did he ever meet with him, but then he also said, well, when he was in office, did he --

Q      Right.

A      -- he responded that, yes.

Q      Right.    Okay.

A      Yeah.

Q      Next exhibit we're going to mark is the WhatsApp document.    This is number 11.

[Shapley Exhibit No. 11

Was marked for identification.]

| | |
|---|---|
| 7/30/2017 | WA message with SM and Zhao, SM says, "Z- Please have the director call me- not James or Tony or Jim- have him call me tonight. I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled. I am very concerned that the Chairman has either changed his mind and broken our deal without telling me or that he is unaware of the promises and assurances that have been made have not been kept. Tell the director that I would like to resolve this now before it gets out of hand. And now means tonight. And Z if I get a call or text from anyone involved in this other than you, Zhang or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction. All too often people mistake kindness for weakness --- and all too often I am standing over top of them saying I warned you. From this moment until whenever he reaches me. It I 9:45 AM here and i assume 9:45 PM there so his night is running out." Zhao responds, "Copy. I will call you on Whatsapp." SM says, "Ok my friend - I am sitting here waiting for the call with my father. I sure hope whatever it is you are doing is very very very important." Zhao says, "Hi Hunter, is it good time to call now? Hi Hunter, director did not answer my call. But he got the message you just mentioned." |
| 7/31/2017 | WA message with SM and Dong, SM says, "Kevin I was told by the Director through Zhao that we were to speak tonight. If there is some extraordinary reason you can not do so please let me know. I assume that you know that this is highly confidential and time sensitive." |
| 7/31/2017 | WA message with SM and Vuk Jeremic, SM  says, "Call u in a minute I'm on w/ director" |
| 7/31/2017 | WA message with SM and Zhao, Zhao sends Kevin Dong's foreign phone number. |
| 7/31/2017 | WA message with SM and Zhao, SM says, "Z – i reached out to K and he declined my call and has not returned my text. I assume he knows that our plan to speak is highly confidential. I just hope he isn't talking to Tony or J -- if he is we have a real problem. If I can reshape this partnership to what the chairman intended then James and Rob will be well taken care of but I will not have Tony dictating to me nor the director what we can and cannot do." Zhao responds, "I don't think he is talking to Tony or the other guys, mostly with the director. I just sent an email to each cc to Kevin. He has your phone number now. Hi Hunter, did you see the email from Kevin? The director would like to suggest you and Kevin have a meeting. CEFC is willing to cooperate with the family. He thinks now the priority is to solve the problem mentioned last night." |
| 7/31/2017 | WA message with SM and Zhao, Zhao sends SM an image of a message which reads. "Raymond (believed to be Zhao), many thanks for the introduction. Hunter I am based in New York and my US phone is [redacted] Let's talk tomorrow? Kevin" |
| 8/1/2017 | WA message with SM and Fran Persons, SM says, "Ok- want to talk Hong Kong and whether Bo intends to do 100 or understandable -- done his part" |
| 8/2/2017 | WA message with SM and Zhao, Zhao says, "Hi Hunter, director asked me to extend to you that Kevin has reported to him about your discussion. He supports your proposition and will act correspondingly." SM responds, "That is a great relief and very welcome news my friend - let My friend know that I'm looking forward to his arrival here with great anticipation- we will do extraordinary things together and I am happy to have him as a brother in this endeavor- and my family sends their best wishes and looks forward to playing some golf when the director has time." |
| 8/3/2017 | WA message with SM and Dong, Dong says, "I received the following and thought we were finished      Hi Hunter, sorry to ping you at late hours. I am texting to convey some info from director Zang: 1) His best regards to you, Jim and VP; 2) He fully supports cooperatino with you and the proposition provided by you.  Chairman also agrees upon you idea; 3) Kevin is designated by director Zang to discuss with you on technical matters.  The fund will be wired to the jointly administrated account in a timely manner. Thanks!" Dong asks, "From Zhao" and SM responds "Yes". |
| 8/3/2017 | WA Message with SM and Dong, SM says, "K- Very simple: 1. 10 M per annum budget to use to further the interst of the JV. This move to 5M is completely new to me and is not acceptable obviously. 2. All expenditures/ expenses salaries will be agreed to by board. My (Biden's) expenses and determination of how BIDEN (loan 5M) capital will be determined by Owasco  in consultation will Hudson. The Hudson capital will be utilized for expenses beyond those Biden/Owasco has committed to Monochromes business. (K we won't break 5 and the additional 5 can roll to next year if the Chairman and CEFC review is favorable. It all has to agreed to by Board - but if the Chairman doesn't value this relationship is being worth at leas 5M  then I'm just baffled. 3. You saw minor clarification of exclusivity. 4. We are all saying the same thing I hope . Please let's put this to bed tonight sign officially tomorrow (or anytime as late tonight as you want) and get to work. I am tired of this Kevin. I can make $5M in salary at any law firm in America. If you think this is about money it's not. The Biden's are the best I know at doing exactly what the Chairman wants from this partnershipn . Please let's not quibble over peanuts." and Dong responds, "Do you want me to talk to Zang or you want to have a call together?" |

**EXHIBIT**

tabbies®

11

BY <u>MAJORITY COUNSEL 2</u>:

Q      Could you tell us about this document, what is it, and how was it obtained --

A      Sure.    So there was an electronic search warrant for iCloud backup, and these messages were in that backup and provided --

Q      Okay.

A      -- from a third party, from iCloud.

Q      Okay.    Who was it provided to?

A      The -- the investigative team from --

Q      Okay.

A      It would go through all the same processes of -- since it's electronic, it would go to one of the computer analysis folks, and then they would put it in a readable format, and then it would go through filter review.

Q      Okay.    And these aren't WhatsApp messages, these are summaries of WhatsApp messages, correct?

A      Yeah, that's correct.    Because it was something about the readability of the actual piece, right?    It was easier to summarize in a spreadsheet.

Q      Okay.    And who did the summary?    Who prepared this document?

A      It was either the computer analysis guy or ████████, one or the other.

Q      And you referenced some of this document in your opening statement. And if you can draw our attention to the parts that you referenced in your opener.

A      Oh.    Do -- would you like me to --

Q      Well, you can just flag it --

A      Yeah.    So --

Q      -- by date -- or some of the dates are multiple dates, so --

A      The first one, July -- the top one, July 30 of 2017, and this is Hunter Biden emailing Zhao, who is one of the executives at CEFC.    He's basically saying have the director call him, and he's demanding that he doesn't call James Biden or Tony or Jim Bulger (ph).    Have him call me.    And it says, I'm sitting here with my father, and he would like to understand why the commitment made has not been fulfilled.

Mr. Leavitt.    Sorry.    You said "he."    "We" would like to understand.

Mr. Shapley.    Oh, sorry.

And we would like to understand why the commitment made was not fulfilled.

So I mean, I'm just looking down.

So it says, "And Z, if I get a call or text from anyone involved in this other than you, Zhang or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction."

So then there's, a little bit going on.    And then Hunter Biden responds, "Okay, my friend -- I am sitting here waiting for the call with my father.    I sure hope whatever it is you are doing is very very very important."

BY MAJORITY COUNSEL 2:

Q      That seems pretty threatening, doesn't it?

A      Yeah, yeah.    And there are other excerpts, some that are pretty pertinent where --

Q      And just for the record, SM stands for Sportsman?

A      That's correct.

Q      Which is Hunter Biden?

A      That's correct.

Q      Is it unusual to use a code name like that or code initials?    If you were just

investigating somebody who didn't have national prominence, would you make up a name like Sportsman?

A     We do use code names now and again.     FBI is really heavy in them.

Q     Okay.

A     So this code name did come from FBI --

Q     Okay.

A     -- on this particular one.     We probably would've went with Robert Doe.

Q     Okay.

A     But it does happen occasionally.

Q     Okay.

A     So some of the other pertinent things in here are just talking about, CEFC is willing to cooperate with the family.

Q     And what date was that?

A     That is 7-31-20- -- well, it's one, two, three, four, the fifth message --

Q     Okay.

A     -- second line from the bottom, go all the way over.

Q     Got it.

"The director would like to suggest you and Kevin have a meeting.     CEFC is willing to cooperate with the family."

And the family is the Biden family, correct?

A     Yeah.     And he even alludes to that later on, all the way in the very bottom of No. 4, of the last part of that message where --

Q     Who is Kevin Dong?

A     So he's like the CEFC spokesperson kind of in -- he's Gon Win Dong (ph), and he goes by Kevin.

Q      Okay.

A      So he's just connected with CEFC.    He's kind of the runner.

So that No. 4, fourth line up from the very bottom, "put this to bed tonight…I can make $5 [million] in salary at any law firm in America.    If you think this is about money it's not.    The Bidens are the best I know at doing exactly what the Chairman wants from this partnership…let's not quibble over peanuts."

But, you know, he alludes to "the Bidens are the best I know at" again here.

Q      And who is saying "the Bidens are the best I know"?

A      Hunter Biden is saying that.

Q      Okay.    So Hunter Biden is referring to sort of his family here, "the Bidens are the best I know"?

A      Yep.

Q      So he's self-identifying that his family is good at doing this?

A      At doing what the chairman wants from this partnership.    Chairman Ye is who he's speaking about.

Q      Okay.

A      And --

[Discussion off the record.]

Mr. Shapley.    Yeah.    I just flagged the third message to Vuk Jeremic.

MAJORITY COUNSEL 2.    Okay.

Mr. Shapley.    And that's from Hunter Biden to Vuk Jeremic.    And it says, "Call u in a minute I'm on w/ director."

So Vuk Jeremic is that former Serbian politician and former -- I don't know what his title was but of the U.N. Assembly.    And so because of something like that in this, let alone the rest of it, we wanted to look into this.

And the reason why this was included in here was because that when agents saw this in late August, September of 2020, we went to the prosecutors.    We said, we got to ask questions about this, we got to figure this out, we got to -- like, what's going on with this?    And the response was, No.    No, we're not going to do it.

You want to know why?    And it makes a little bit of sense, right?    Well, we don't know if he was lying that his father was sitting next to him, right?

So then we said, well, let's get the location data for the messages, and if they're co-located, then we're on better ground here, right?

MAJORITY COUNSEL 2.    Right.

Mr. Shapley.    And they, no, we're not going to do that.    And we even brought that up in a pros-team meeting because ██████████ created an agenda for every single meeting, and the agenda item number, like, 2 or 3, or whatever it was, location data, and that was specific to this, and they didn't allow us to do it.

[3:29 p.m.]

BY <u>MAJORITY COUNSEL 2:</u>

Q      And the reason you wanted to look into this is because there could have been a lot of money coming in from CEFC that was untaxed, correct?

A      Yeah.    We're talking about a lot of things there.    There's FARA in play. And the FBI is considering a lot of national security type issues here.    And we were precluded from doing anything.

Q      Is there anything else from this exhibit 11 that we haven't covered that we should?

Mr. <u>Lytle.</u>    Can we confer for a second?

<u>MAJORITY COUNSEL 2.</u>    Excuse me?

Mr. <u>Lytle.</u>    Can we confer for a second?

<u>MAJORITY COUNSEL 2.</u>    Of course.

<u>MAJORITY COUNSEL 1.</u>    Off the record.

<u>MAJORITY COUNSEL 2.</u>    Go off the record, please.

[Discussion off the record.]

Mr. <u>Shapley.</u>   I had alluded to FARA and some other things there.   But, some of these people in here, Chairman Ye, Gon Win Dong (ph), Zhao, are believed to be connected to the Chinese Communist Party.

BY <u>MAJORITY COUNSEL 2:</u>

Q   Okay.   So there could be national security implications with communications with those officials, correct?

A   That is correct.

Q   And was that sentiment also shared by the FBI?

A   Yes.

Q   And despite those concerns that the FBI had and that the rest of the team had, that was not looked into.   Is that correct?

A   The prosecutors said don't do it.   And then we asked for location, they said, no, we're not going to do that.   And if FBI did something at some level, I'm not privy to it.

Q   So you don't know if FBI CT went off and --

A   You would almost hope that they did, but I don't know if they did.

Q   Okay.   We're going to turn our attention to some of the retaliation you have faced.

BY <u>MAJORITY COUNSEL 1:</u>

Q   We talked about the email you sent up to Mr. Waldon, talking to Michael Batdorf.   And you read a portion of that in your opening statement as well.

Subsequent to that and in other material that you have shared with the committee, you referenced a failure to select situation.   Can you explain what happened with that situation?

A   Sure, yeah.   So I was selected in 2018 to help stand up the Joint Chiefs of

Global Tax Enforcement called the J5.   It's an assembly of Australia, U.K., Canada, Netherlands, and United States.   And because of my reputation working on international cases and working with other countries, and my experience, Chief Don Fort at the time selected me.   It wasn't something where it was even a job announcement.   It was all of a sudden you are a member of the J5, and I had to ask what the J5 was.

So I helped stand up the group.   My agents worked a vast majority of the operational cases that are considered J5 cases.   And ultimately there was a J5 lead.   It was an IR-1 position, like a deputy director level position at headquarters.   She was retiring.   And, everyone thought that that was the job that I was going to get, right, and I wanted that job.   And I was already an IR-1 because I was the assistant special agent in charge at the Chicago field office during that time.   And I received and outstanding rating during that rating period and everything.   So I applied for that job.

There were two people that were original members of the J5.   I was one of them. And ultimately, I didn't get that job.   The interview was one day after this email, and --

Q      That interview was on December 14th?

A      That's correct.   And this email was December 13th.   Well -- I'm sorry. The bottom one is December 12, 2022, top one is December 13, 2022.

So, being that J5 lead, they work directly with the chief, because they're basically a spokesman for the chief in J5 matters.   So -- ultimately I interviewed.   And then on January 3rd, 2023, in senior staff meeting they announced the other person, Oleg, had gotten the position.

I'm friends with a lot of people on senior staff, and they called me and said, what's going on here.   And it wasn't till the next day that Scott Goodlin, the director of IO, called me and told me that I wasn't selected for the job.   And I'm the one that had to brief Scott Goodlin when he got that job about what the J5 was.

So -- the person selected -- he hadn't been an ASAC.    I'd been an ASAC for 16 months at two different SES field offices, New York and Chicago.    I wasn't --

Q    So you believe you were qualified for the position?

A    Yes, I do.

Q    And you believe you had qualifications superior to the individual selected?

A    Yes.

Q    And why do you believe you were not selected?

A    Because I'm raising these issues.    And I think that -- Weiss calling my deputy chief, and right before this, right around this time, and who knows what he said, but I think it tainted me.    I think that they retaliated against me because of that.    There's really no other explanation for it.    Even what was explained to me by Scott Goodlin as to why Oleg got it, it almost -- it made no -- I don't even know if Scott Goodlin understands it made no sense, but it made no sense, right?    So yeah.

Q    Did you hear from colleagues after that decision was made about the fact that you hadn't gotten the position?

A    Yeah.    Several of our foreign partners, one of them is like the deputy chief of the Australian taxation office, basically was dejected and was like how -- I don't even know -- it was twofold; one, because I told them I was going to resign from my J5 duties, which I did do.    And they were like, well, number one, what are they going to do without you?    But I was in charge of a vast majority of operational stuff.    And I had the institutional knowledge since it stood up, many of the things I helped stand up.    So -- I'm sorry.

So after I resigned to the director of global ops Kareem Carter, who is actually now the SAC of Washington, D.C. field office.    It was Lola Watson ASAC, Kareem Carter SAC. He was the director of global ops.    And I sent him an email, and said, I'm resigning my J5

duties.   And they had no idea what to do.   And then I'm talking to some of the analysts

there.   Are there any discussions?   They are like, no, we don't know what's going

on -- obviously they had one chief brief -- monthly I briefed the chief and the top

executives on the J5 stuff.

So I wasn't on the first call after I resigned.   And they were like, there were no

questions answered because I wasn't there.   And -- sorry, I just lost my train of thought.

Q     It's okay.   Is it fair to say that there are others inside the agency that would

share your opinion that you were more qualified than the person selected?

A     Oh, absolutely, yes.   There were even times when the person who got

selected, he couldn't do what he needed to do, so he had to call me in to do it.   One was

a trip to Australia in February timeframe to go and represent in the intelligence group

there and the J5.   And he just simply would have added no value, so I had to go.   And

then there was a briefing to, it's called a JSEIT, it's joint strategic -- JSEIT, it's J-S-E-I-T, it's a

joint strategic emerging issues task -- I don't know what T is for.   I apologize.

So I presented on three of the J5 cases within my group at this JSEIT meeting,

which is basically a bunch of executives from all over the different business operating

divisions within IRS.   And I presented three cases that we are working on J5.   And when

they asked for someone to speak to that group, it came through Kareem Carter to Scott

Goodlin, director of IO, to Oleg.   And Oleg responds with, well, the only person that can

give this presentation is Shapley.

So then I give the briefing, and now I'm the lead of one of the working groups out

of there.   And I was just asked to be the lead of a second working group, which I asked

them, please, I don't have the time.

Q     Understood.   Okay.   Moving forward to May 15th, 2023, the committee

received the letter from your counsel noting that you and your entire investigative team

were removed from an ongoing investigation of a high-profile controversial subject, who

we've been discussing is Hunter Biden.    Is that correct?

A    That is correct.

Q    How long had you been working on this investigation when you were

removed?

A    Since January 2020.

Q    Who informed you that you and your team were being removed from the

investigation?

A    SAC Kareem Carter.

Q    How were you informed?

A    The ASAC Lola Watson put a meeting on my calendar, and it was a telephone

call, conference call.    And the subject was Sportsman update.    ███████ wasn't

invited, but I had him on the line anyway, and he witnessed the telephone call.    We

produced a memo which both of us signed, because was taken off the investigation as

well, so he can see and sign all documents.

Q    Okay.    And remind me -- I know you covered this earlier, but just for the

record, when you say the whole team was removed, how many people was that?

A    Sure.    Yeah.    So it was me, Case Agent ███████, Co-Case Agent Christine

Puglisi, and the rest of my team, which is 12 in total, were not allowed to take the

investigation.    So they basically ensured that it was not under my supervision anymore.

Q    Were you given a reason on that phone call as to why the team was

removed?

A    I specifically asked and he said, no, didn't give a reason.    To which I said,

how could you possibly make a decision like that in a case like this without being given a

reason?    So then I said, well, if you were given a reason and you can't tell me, okay, just

don't tell me, but don't tell me they didn't give you a reason -- so I challenged him on it.

Q    And was the case closed at this point?

A    It was not closed, no.

Q    Were other IRS employees assigned to the case?    Was your team replaced?

A    After, yes.

Q    So to the best of your knowledge, the investigation remains open and the team has been replaced by other IRS personnel?

A    Yes.

MAJORITY COUNSEL 2.    And did we indicate who made that decision?    Was it at DOJ or --

Mr. Shapley.    I don't know if it was asked, but yes, Kareem Carter told me that DOJ had requested that change.

MAJORITY COUNSEL 2.    And do we know who at DOJ?    Was it the Tax Division? Was it the U.S. Attorney's Office in Delaware?

Mr. Shapley.    He said DOJ, is my recollection.

MAJORITY COUNSEL 2.    Okay.

BY MAJORITY COUNSEL 1:

Q    In your career at the IRS, have you ever been removed from an active investigation like this?

A    No, no.    And we even saw testimony from Don Fort, the former chief of IRS CI.    And I don't remember the context or who was asking the question, but he was asked about this issue and said, in your 30 years, had you ever seen a team removed like that? And his response was, no, I've never seen that.

Q    And this was recent testimony before Congress?

A    It was May 16th.

Q      What is your understanding about who has decision making authority about what IRS personnel work on any given investigation?

A      IRS personnel should be managed by IRS, not by DOJ.

Q      In this context of IRS working on cases with a different department, different agency, Department of Justice, are you aware of any formal documentation about how that relationship is managed, a memorandum of understanding, any kind of agreement about who has decision making authority on an issue like this?

A      I don't think I know of a memorandum, no.    No.

Q      And why do you believe you and your team were removed from the case?

A      I think the DOJ, because we were raising protected disclosures, that they wanted to get rid of us.    And it was twofold because we were making disclosures, but also because they knew that our disclosures were valid.

Q      Moving forward, only a week, May 22nd, the committee received another communication from your counsel.    It included an attachment that was a letter to the IRS commissioner, Daniel Werfel, regarding additional retaliation.

Can you talk about what happened in that instance?

A      Yeah.    So after being removed from -- my red line was October 7, 2022.

█████ case agent's red line was being removed from the case without cause.    And he decided to make that disclosure to the IRS commissioner because he thought that the people who were retaliating were at the highest levels of IRS CI, so he went to the next two levels, which is the deputy commissioner and commissioner of IRS.

Q      And how did IRS respond to that communication?

A      So ASAC Lola Watson sent him an email basically threatening him that he could have violated 6(e) with the communication with someone who's not on the 6(e) list. I only could assume that that's the commissioner, because our 6(e) lists are incredibly

robust.   I mean, the commissioner is on it now.   So, I would imagine Lola Watson is not on the 6(e) list and she's an ASAC, right?   Because ASACs come in, ASACs come out, and it's really the position.

So they threatened a 6(e) violation, which there was no 6(e) in there.   And also told him that there is no -- no information should be shared at any time outside of his chain.   It was like 2 minutes later, Kareem Carter, the SAC, sends an email to all the managers in the D.C. field office saying that you are to follow the chain of command, in no instances are you to provide information outside of that chain of command without their permission.

Q     Why is that problematic?

A     It was a direct threat.   Other people, like the co-case agent that is going to make her decision on what she wants to do, that is a shot across her bow, and anyone else that ever wants to comes forward, and it's just plain and simple.

Q     And did that communication about discussions not leaving the chain of command, did that include any language acknowledging exceptions for whistleblowers?

A     It did not.   There was a follow-up email from Deputy Commissioner O'Donnell yesterday where he sent out to everyone in the IRS basically -- it seemed as though they realized that they had done something wrong and they were trying to cleanse their error.   And they sent an email that had language about how to blow the whistle of 6103 and 6(e).   I believe that -- 6103 issues or 6(e) issues.   And my understanding is that's also deficient, because it did not have language in there that you can go to Congress and that there are ways that you can go to --

Q     So it did not include any reference or any language about individuals being able to contact Congress or communicate with Congress about allegations of wrongdoing?

A      That's correct.    Even in their attempt to cleanse, they still fell short.    It was

an email from deputy commissioner of services enforcement is what is says, but that's

Douglas O'Donnell.    And it was yesterday, May 25th, at 4:53 p.m.    And yes, there's no

language of being able to make those disclosures to Congress.

Q      Okay.    Other than the items that we've just been discussing, have there

been any other issues of potential retaliation that you would like us to know about?

A      I think that there is.    Can I have a second?

MAJORITY COUNSEL 1.    Go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. Shapley.    So this is emerging now.    We have a really large case, and it's

actually ████████'s case, just the best agent.    And this huge case, nationwide, with

around 30 to 40 spinoff investigations.    And we required the director of field operations

to buy on to the strategy.    And it was in January where I presented the strategy to them,

and all three DFOs agreed to the strategy.    And then it was in February, I don't have the

dates in front of me, DFO Mike Batdorf sends an email to all people across the country

who were working this case saying that we're going to pause on it.    So that was in

February.

And now we're still trying to work it.    We're still trying it push it forward.    We

have all these meetings, and they keep giving us -- they keep telling us ways that they

would approve it moving forward, but we can't move forward that way because there's

already grand jury material in it and because I'm not speaking about the Hunter Biden

case, I can say that.

BY MAJORITY COUNSEL 1:

Q      This case is different --

A       Different --

Q       Totally unrelated case?

A       Totally unrelated case.

Q       I'm sorry.    You're describing a totally unrelated case.    Is that right?

A       That is correct.    Yeah.

So even today I don't know -- what's the date?    The 26th of May, we're still on a pause.    And I think that it's directly related to coming forward and making these disclosures, because Mike Batdorf was the one that I initially called and said, with advice of counsel, to say, hey, I've retained counsel and I'm going down the road to blow the whistle, and then all this stuff starts happening.

Q       So you believe he may be retaliating by slowing down or impacting your duties and responsibilities on totally unrelated matters?

A       Absolutely.    And all three DFOs agreed to this strategy and then he paused it.    And the effect is now they can say, oh, well, you screwed this up or you didn't do something right or something happened, and it can ultimately affect me.

Q       And for the record, what does DFO stand for?

A       Director of field operations.

Q       Okay.

MAJORITY COUNSEL 1.    Our hour is up.

[Recess.]

                BY MINORITY COUNSEL 2:

Q       Just really these are clarifying questions.    The letter you wrote to the committee regarding your being removed from the Hunter Biden audit was on May 15th. On what date did the Sportsman update meeting occur?

A       Sure.    So, my lawyer sent that letter.    And also, it wasn't an audit.    It's a

criminal investigation, just to clarify.    But that meeting was 1:30 on May 15th.

Q    Okay.

A    And the letter went the same day.    Yes.

Q    Okay.    And could you clarify or explain what the IRS' response was with the ███████ disclosure up the chain?    Who exactly is Lola Watson and what is her role, and how does she fit into that disclosure?

A    Sure.    Yeah.    So ███████, one of my agents; me, SSA supervisor; ASAC, assistant special agent in charge Lola Watson; then SAC Kareem Carter.

Q    Okay.

A    So he sent the email to ASAC and above.    So ASAC, SAC, DFO, deputy chief, chief, deputy commissioner, commissioner.    And she, the ASAC Lola Watson was the one who responded directly to him about following the chain of command which just a small nuance is that she didn't send it to me, which would have been the chain of command, so --

Q    I see.    So she was someone who was on the original email, along with the commissioner, the deputy commissioner, all the way down.    In her response, did she also cc the commissioner, cc the deputy commissioner, or was that just sent directly to him?

A    The only address we could see was his, so we don't know if there was bcc.

Q    And presumably, since the meeting was on May 15th, that email to the commissioner was also May 15th or May 16th or sometime close thereafter?

A    I think it was the 12th, May 12th.    I think -- was it a Friday?

Q    Well, if the meeting didn't occur until the 15th, I'm trying to figure out --

A    Oh, no, no.    Oh, no.    Okay.    I'm sorry.    I wasn't following your question.

Q    So when was ███████'s email to the commissioner, et cetera?

A     Okay.    Okay.    I'm sorry.    I totally missed your question.

Q     Yeah.

A     So it was -- is the 15th a Monday or a Tuesday?    It was Monday or Tuesday was when that happened.    And then he sent the email either Thursday or Friday of the same week.

MINORITY COUNSEL 1.    15th is Monday.

Mr. Shapley.    Monday, yes.    So that's when I got the call that the team was removed, and he sent that email Thursday or Friday.

Mr. Leavitt.    Just to clarify, you received our letter, right, that had it as an attachment?

MINORITY COUNSEL 1.    Yes, we have the May 15 letter.

MINORITY COUNSEL 2.    Do we have the email with the ███ attachment?    I can't remember.

Mr. Leavitt.    May 22nd, I think, is the date we sent our letter.

MINORITY COUNSEL 1.    Yeah, we have that.

MINORITY COUNSEL 2.    We have it in our files.

And then I guess my only other question is, as far as personnel decisions go in terms of who assigns who to a case or who would remove someone from a case, is there any reason in the normal course of business that the commissioner of the IRS would be asked or have to approve any kind of movements at that level?

Mr. Shapley.    I don't know of that occurring before, so I don't know who would approve it.

MINORITY COUNSEL 2.    Okay.    I'm good.

MINORITY COUNSEL 1.    Thanks.    And I'm going to make mine brief, so I think we're almost done here.    That gives everybody hope.

BY <u>MINORITY COUNSEL 1</u>:

Q    I want to go back to exhibit 11.    That's [where] the WhatsApp messages were summarized.    I had a couple of clarifying questions on that.

Who is WA?    There's a WA --

A    That means WhatsApp.

Q    Oh, WhatsApp.    Okay.    That's not a person.

A    No.

Q    I was wondering how you guys knew it was WhatsApp.

Okay.    And then you mentioned when you were providing some explanation about these WhatsApp messages that Chairman Ye was talking about a partnership. What is that partnership?    And that was in connection with the July 31, 2017, message or so.    I know you were talking about that.

A    Sure.    Yeah, yeah.    I'm just --

Mr. <u>Lytle.</u>    Which message is it?    Can you direct him to it?

<u>MINORITY COUNSEL 1.</u>    I have written down here in my notes that it's the fifth message, July 31, 2017.    It talks about, "Will work with family."    That one.

<u>MINORITY COUNSEL 2.</u>    "If I can reshape this partnership to what the chairman intended."

Mr. <u>Shapley.</u>    Oh, oh.    Okay.    Yes.    Oh, I'm sorry.

BY <u>MINORITY COUNSEL 1</u>:

Q    What is the partnership?    Do you know what it does or what it's supposed to do?

A    In all of my review of the evidence in this case, I'm not exactly sure what Hunter Biden is doing for this money.    So the partnership, I'm not really sure what services he's providing as part of that partnership.

Was that your question?

Q      Yeah.    I was trying to see, if this is some sort of a real estate partnership or a -- I have no idea.    We don't know.

A      This particular CEFC deal is not a real estate deal.    No, it's not.    There are some dollar amounts in the last message, but I didn't really go into that too much.

Q      Okay.

MINORITY COUNSEL 1.    Okay.    We don't have anything else.

MAJORITY COUNSEL 1.    Okay.    Well, we want to thank you for --

Mr. Lytle.    Can we just have a follow-up?

MAJORITY COUNSEL 1.    Oh, sure.

Mr. Lytle.    I just have a couple of follow-up questions, if that's okay.

MAJORITY COUNSEL 2.    This is on the record?

Mr. Lytle.    Yes.

MAJORITY COUNSEL 2.    Okay.

BY MR. LYTLE:

Q      So, October 7, 2022, the meeting with Weiss where Weiss proclaimed he didn't have the authority to make charges.    You know that meeting, right?

A      Yep.

Q      Could you just name the people that were in attendance at that meeting, to the best of your recollection?

A      Sure.    Yeah.    So from the FBI it was SAC Tom Sobocinski, ASAC Ryeshia Holley.    IRS SAC Darryl Waldon.    I was ASAC at the time, and I was there.    And it was U.S. Attorney David Weiss and then Shawn Weede.    And Shannon Hanson.

So I don't know what Shawn Weede and Shannon Hanson's titles are, but they were like David Weiss' one and two type person.    Probably crim chief, first assistant, that

area.

Q      And so if someone wanted to just check with those folks, they could tell what they heard Weiss say at the same meeting that you were at.

A      Yep.

Q      Fair to say?

A      Yep.

Mr. Lytle.   Okay.    I don't have anything else.

MAJORITY COUNSEL 2.    I'm sure they're going to be eager to come in and speak with us.

MAJORITY COUNSEL 1.    Is there anything else that you would like to mention before we conclude today that we haven't already covered?

Mr. Shapley.   No.    Just thanks for listening.    My life's on the line here, so do what you can.

MAJORITY COUNSEL 1.    Thank you very much for your time and for a long day on a Friday before a holiday weekend.    We greatly appreciate it.    Have a good afternoon.

Mr. Shapley.   Thank you.

Mr. Lytle.    Off the record.

[Whereupon, at 4:11 p.m., the interview was adjourned.]

Certificate of Deponent/Interviewee


    I have read the foregoing _____ pages, which contain the correct transcript of the

answers made by me to the questions therein recorded.


_____

Witness Name


_____

Date

# **EXHIBIT 3**

IN THE MATTER OF:          )
                          )
**Whistleblower Disclosure Pursuant** )
**To 26 U.S.C. § 6103(f)(5)**      )
                          )

### STATEMENT OF GARY SHAPLEY

I, Gary Shapley, hereby provide the following statement:

1. I make this statement to supplement the testimony I previously provided to both the majority and minority staff of the United States Committee on Ways & Means on Friday, May 26, 2023.

2. Beginning in January 2020, I was assigned to work on the Hunter Biden investigation as a Supervisory Special Agent for IRS-Criminal Investigation, U.S. Department of the Treasury ("IRS-CI"). In that role, I supervised line agents in carrying out the investigation of Hunter Biden as that investigation related to potential criminal violations of the United States Code typically investigated by IRS-CI.

3. I continued in that role until I was removed from the investigation by the U.S. Department of Justice in May 2023, after providing protected disclosures concerning prosecutors' mishandling of the investigation of Hunter Biden, to include conflicts of interest, preferential treatment, deviations from normal investigative procedures and conflicting information provided by Attorney General Merrick Garland to Congress related to the independence of the U.S. Attorney for the District of Delaware.

4. Most recently, former Attorney General Bill Barr provided an interview in which he stated that information provided by a Confidential Human Source ("CHS") concerning an alleged bribery scheme by President Joe Biden was received through the Pittsburgh USAO and was determined it was not likely to have been disinformation. According to

1

Attorney General Barr: "…it was provided to the ongoing investigation in Delaware to follow up on and to check out."

5. Neither I nor the line IRS-CI agents acting under my supervision, nor the FBI agents working with IRS-CI, were ever provided the CHS information that Attorney General Barr recently referenced was sent to Delaware to have it "checked out." Prosecutors never provided such information to IRS-CI. As such, neither IRS-CI nor the FBI agents working with them were provided the opportunity to conduct a proper investigation into the allegations presented by this CHS. I, along with other IRS-CI investigators, requested to be a part of briefings that the Delaware USAO and DOJ were having with the Pittsburgh USAO during the investigation, but our requests were denied.

6. If IRS-CI investigators had participated in those briefings, we would have ensured that proper investigative steps were conducted to determine the veracity of the information provided by the CHS as it would have likely been material to the ongoing criminal investigation of Hunter Biden.

7. During a criminal investigation, it is pivotal that all investigative leads are shared with investigators so the appropriate investigative steps can be executed. This appears to be another example of prosecutors obstructing the investigative process. It is more likely than not that there are more examples of information that prosecutors concealed from investigators in addition to examples already provided to the committee during my previous testimony.

8. As a result of the CHS information being concealed by prosecutors from the IRS-CI and FBI investigators assigned to this investigation, we were unable to follow alleged criminal activity as would normally be completed during an investigation. Agents from

both IRS-CI and the FBI confirmed that, to the best of their knowledge, this information

was never provided to the investigators and no known investigative steps were taken by

IRS-CI or the FBI agents assigned to the Hunter Biden matter in order to determine if the

allegations could be substantiated.

Dated:  6/12/2023

Gary Shapley

3

# **EXHIBIT 4**

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   ████████

Thursday, June 1, 2023

Washington, D.C.

The interview in the above matter was held in room 5480, O'Neill House Office Building, commencing at 9:41 a.m.

Present:   Representative Jason Smith.

Appearances:

For the COMMITTEE ON WAYS AND MEANS:

███████████, MAJORITY COUNSEL

███████████, MAJORITY COUNSEL

███████████, MAJORITY COUNSEL

████████████, MAJORITY STAFF

████████████, MAJORITY STAFF

████████████, MAJORITY COUNSEL

███████████████, MINORITY COUNSEL

████████████, MINORITY COUNSEL

███████████████████, MINORITY COUNSEL

For ███████████:

DEAN ZERBE

PARTNER

ZERBE, MILLER, FINGERET, FRANK AND JADAV, LLP

█████████████████████

████████████

MAJORITY COUNSEL 1.    Let's go on the record.

Good morning.

This is a transcribed interview of an Internal Revenue Service criminal investigator.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on May 24th, 2023, indicating your desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Could the witness please state your name for the record?

Mr. ███████.   It's ███████████.

MAJORITY COUNSEL 1.    And counsel for the witness, please state your names for the record.

Mr. Zerbe.    Dean Zerbe.

MAJORITY COUNSEL 1.    On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is ████████████.    I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else here from the committee introduce themselves, starting with the chairman.

Chairman Smith.    Jason Smith, chairman of the Ways and Means Committee.

MAJORITY COUNSEL 2.    ████████████, also with the Ways and Means Committee staff.

MAJORITY COUNSEL 3.    ████████████, Ways and Means majority staff.

Ms. ██████.    ████████████, Ways and Means majority staff.

Ms. ███. ███████████, Ways and Means majority staff.

MINORITY COUNSEL 1. ██████████, Ways and Means minority staff.

Ms. ███. ██████████████, Ways and Means minority staff.

MAJORITY COUNSEL 1.   I'd like to now go over the ground rules and guidelines that we will follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity make an opening statement.

Following your statement, the questions will proceed in rounds.   The majority will ask questions first for 1 hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.   We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break, apart from that, please just let us know.

As you can see, there's an official court reporter taking down everything we say to make a written record.   So we ask that you give verbal responses to all questions.

Do you understand?

Mr. ██████. Yes, I do.

MAJORITY COUNSEL 1.   So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on the staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone down at the end of the table can hear you.   It is important that we do not talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete and truthful manner

possible, so we will take our time.    If you have any questions or if you do not understand one of our questions, please let us know.    Our questions will cover a wide range of topics, so if you need clarification at any point, just let us know.

If you honestly don't know the answer to a question or do not remember it, it's best not to guess.    Please give us your best recollection.    It is okay to tell us if you learned information from someone else.    Just indicate how you came to know the information.

If there are things you do not know or cannot remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with your counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that by law you're required to answer questions from Congress truthfully.

Do you understand?

Mr. ████.    Yes, I do.

MAJORITY COUNSEL 1.    That also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. ████.    Yes, I do.

MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements under 18 U.S.C.    Section 1001.

Do you understand that?

Mr. ████.    Yes, I do.

MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful answers to today's questions?

Mr. ▓▓▓▓.    No, there is not.

MAJORITY COUNSEL 1.    I would like to note that the information discussed here today is confidential.    As an IRS investigator, I know you understand the significance of our tax privacy laws.    Chairman Smith takes those tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

I'm sure you know 26 U.S.C. Section 6103 makes tax returns and returns information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, the statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. ▓▓▓▓.    I did.

MAJORITY COUNSEL 1.    Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. ▓▓▓▓.    I have.

MAJORITY COUNSEL 1.    And do you wish to disclose that information to the committee today?

Mr. ███. I do.

MAJORITY COUNSEL 1.   In addition to Section 6103(f)(5), the chairman of the Committee on Ways and Means has the authority under Section 6103(f)(4)(A) to designate agents to receive and inspect returns or return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has designated the individuals in this room for the purposes of receiving the information you wish to share.

The chairman considers this entire interview and the resulting transcript as protected confidential information under Section 6103.   That means that this interview can only proceed so long as everyone in the room is properly designated to receive the information.

The chairman has designated the court reporters and the related individuals that provide transcription services to the House of Representatives.

I would like to remind the witness and everyone in the room that 26 U.S.C. Section 7213 makes it unlawful to make any disclosure of returns or return information not authorized by Section 6103.   Unauthorized disclosures of such information can be a felony punishable by fine or imprisonment.

Given the statutory protections for this type of information, we ask that you do not speak about what we discuss in this interview to individuals not designated to receive such information.

For the same reason, any marked exhibits that we use here today will remain with the court reporters so that they can go in the official transcript and any copies of those exhibits will be returned to us when we wrap up.

Your letter to the committee references the fact that you have been removed from a high-profile case and that you are concerned about possible retaliation.

Chairman Smith values whistleblowers and knows that whistleblowers take significant risks when disclosing wrongdoing.    That is why there are legal protections in place for whistleblowers making disclosures to Congress.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers.    The IRS Commissioner replied, quote:    "I can say without any hesitation there will be no retaliation for anyone making an allegation," end quote.

We understand your removal from the case team came subsequent to that testimony from the Commissioner.    This is very troubling, and we will certainly discuss that in more detail today.

That's the end of my remarks.    Is there anything that my colleagues from the minority would like to add?

MINORITY COUNSEL 1.    No.    We'd just like to thank you for coming to talk to us today, and we look forward to hearing your testimony.

MAJORITY COUNSEL 1.    And with that, I'll give you the opportunity to make an opening statement.

Mr. Zerbe.    I don't have as nearly extensive [remarks], but just a couple of points, particularly with the chairman here.

We just want note that if the committee -- we made this point but just to have it -- that if the committee were to elect or choose to release the transcripts, we would ask for strong consideration for his anonymity in terms of that.    You can identify him in terms of his role and position and release the transcript.    But in terms of his identity, his specific name, we would ask that consideration, strong consideration, be given for keeping that anonymous.

And the second is, just a blanket point, is he'll be covering an enormous amount of topics ranging over a number of years today and to the best of his ability, but, obviously, to understand he is doing his best in terms of recall and remembering what is going on and making his best efforts in that.    But, obviously, folks are not infallible on that.    But we'll strive to be as accurate and complete as possible.

So, ██, go ahead.

Mr. ██████.    So as was stated, I am a special agent with the Internal Revenue Service Criminal Investigation.

I wanted to start out by saying I'm coming here to you today after someone from your committee reached out to my counsel to come in and testify.    I paid for my own flight to be here in front of you, as I do not live in the D.C. area.    I have not accepted any payments from anyone in coming here, and I have legal representation through my attorney, Dean Zerbe.

I felt that it was my duty as a government employee to abide by your request, and I think that it's important that all you should know from my recollection of what happened during the Hunter Biden investigation so that we can learn from it, fix some things so justice is served, and create policy so that it doesn't happen again to us in the future.

One thing that I know, people would say about me, is that I'm passionate about my job and my career at the IRS.    I always strive to be the most efficient and best agent I can possibly be, always fighting for justice, and I always try make sure that we are doing the right thing for the right reason.

But in doing the right thing, I've found that people will fight me tooth and nail and do everything in their own power to protect their own self-interests.

So if I get emotional during some of this, I apologize, but this has been 5 years of

my life.    So what's happened has been [difficult] -- yeah.    So I apologize for that.

I'm an American, and my allegiances are to my country and my government.    I'm also a gay man.    I have a husband, two dogs, a home, and a life full of family and friends. But above all else, I'm a human being.    My sexuality doesn't define me as a person.    It's just who I love.

I'd like to say one more thing regarding this topic of sexuality, especially since it's the start of Pride Month.    But people have said that I'm gay and people have said, because I'm gay and that I am working as the case agent on this investigation, that I must be a far-left liberal, perfectly placed to fit some agenda.    This was stuff that was on social media regarding me.

I can tell you that I am none of those things.    I'm a career government employee, and I have always strived to not let politics enter my frame of mind when working cases.

I've tried to stay so nonpolitical that in the last Presidential election I voted but had decided to not vote for the Presidential candidate because I didn't want to be asked that question in a court proceeding in the future and I didn't want to show any potential bias.

My political beliefs are simple.    I'm as middle of the road as they come but would consider myself to be a Democrat.    When I was younger, I grew up in a conservative household.    I also held conservative beliefs.    But over time those beliefs have changed.

At the end of the day, I will always vote for love, kindness, justice, and fairness, because that's what I believe God would want for all of us.

I heard something recently that I think is overly relevant:    The eyes are useless when the mind is blind.    Basically showing us that you can have the best investigators in the world, but if you don't have prosecutors, people willing to pursue justice, and are constantly putting up roadblocks, you'll never achieve a resolution.

I've been an agent with the IRS since 2010.    In 2007, I received my undergraduate degree in accounting from ██████████ and my MBA from ██████████, so my master's in business administration.    Prior to starting my career at the IRS, I worked as an external auditor for ██████████.

Throughout my career with the IRS, I have held multiple collateral positions, as well as worked a variety of criminal tax and money-laundering investigations.    Over the years, I have received "outstanding" on my performance evaluations in receiving multiple performance awards and have also received a quality step increase, which is one of highest-valued performance awards.

I was [a] healthcare fraud coordinator, worked criminal tax and money-laundering investigations of physicians, pharmacists, and medical billing companies.    I have authored and have been the affiant of multiple physical and electronic search warrants. I have authored and been the affiant on multiple seizure warrants, having seized millions of dollars' worth of criminal proceeds laundered through the purchase of homes, vehicles, jewelry, and the use of bank accounts.

I was a public information officer previously in which I worked as a liaison with the IRS and the U.S. Attorney's Office, our law enforcement partners, and the media partners in helping get publicity for our tax cases.

This collateral duty allowed me to get a whole different perspective of the why we do our job.    If you have a successful criminal tax case and no one hears about it, was it really successful?

The mission of the IRS is clear.    We are to investigate potential criminal violations of the Internal Revenue Code and related financial crimes in a manner that fosters confidence in the tax system and compliance with the law.

My agency has continually worked to show the American public this mission, it's

against the law to commit these tax offenses, and what would happen if they chose to do so.

[In] November of 2018, I transitioned out of being the public information officer and I transitioned to the International Tax and Financial Crimes group out of Washington, D.C., where we specialized in international tax crime tax cases.   We're a specialty group. We sit all over the U.S., and we primarily work international tax cases.

This was around the same time that I had initiated the criminal tax investigation into Robert Hunter Biden.   I will come back to that topic here in a few minutes.

But I wanted to give you guys an example of what I was working prior to this, something very similar that happened in that case, and kind of my perspective on that and the differences between that case and the Hunter Biden case.

While I was working as the public information officer, I took over as the case agent of an extremely complex captive insurance tax investigation.

This investigation was the first of its kind.   It had a lot of issues, to include age of the case, and I was coming in as the second assigned agent, as the previous agent was promoted.   So there's an example of why an agent might drop off [of a case].   They got promoted.

So I came in as the second agent, and I worked the case for approximately 3 years with attorneys from the Tax Division and the U.S. Attorney's Office.

One of the Tax Division attorneys assigned to that case is the same attorney that was assigned in the beginning of the Hunter Biden investigation.   His name is Jason Poole.   He was eventually promoted at DOJ Tax and oversaw the Hunter Biden investigation as [the] chief of [the] Northern [Area].   So chief of DOJ Tax Northern.

I know that Mr. Poole would say how good of an agent I was, how good my work was, and I think he would speak highly of me.

Now, why does this captive investigation matter?

Prior to joining the case, DOJ Tax had approved tax charges for the case and the case was in the process of progressing towards indictment.    Our assigned Assistant United States Attorney was promoted to judge, and DOJ Tax had made the decision to reinvestigate the case.

After working thousands of hours on that captive case, poring over evidence, interviewing witnesses all over the U.S., the decision was made by DOJ Tax to change the approval to a declination and not charge the case.

I was devastated when I found that out, but at the end of the day I understood.

We did everything we could to try to work through the issues and get the captive case ready for indictment.    I fought hard, having meetings with the leaders of my agency and DOJ Tax to try and get it charged.    But at the end of the day it was a difference in opinion, and DOJ Tax didn't want to set precedence.

I'm bringing this up to show you an example of difference in opinion between the investigators and prosecutors when it came to charging.    The captive case and the steps taken were significantly different than what happened with the Hunter Biden investigation, and hopefully I can show you that with my testimony here today.

So I have ultimately made the decision to come forward and agree to your request because I believe I made multiple attempts at blowing the whistle internally at the IRS. One of those was an email that I sent internally to the Commissioner of the IRS and was essentially intimidated and retaliated against after I sent that.

And I will bring that if you guys want.    I can bring that up later on.

Mr. Zerbe.    We can provide that email, right.

Chairman Smith.    Is it the current IRS Commissioner or the acting?

Mr. Zerbe.    Mr. Chairman, yes, it's the current.    This is the one that was in the

newspapers that was attached to the longer letter by Mr. Shapley.    You've essentially got most of the context of that letter.    But, yes, Mr. Chairman, it's within the last 2, 3 weeks.    So yes.

Mr. █████.    So I'm sitting here in front of you right now terrified.    In coming forward, I'm risking my career, my reputation,

and the casework that I'm working outside this investigation.    I believe that the Delaware U.S. Attorney's Office and DOJ Tax have a clear target on me and my supervisor's back, and I believe that they are waiting for an opportunity pounce on us.

My own agency retaliated against me, as I just stated, even after years of essentially being left on an island from them when it came to this investigation.

I did not ask to be in this position, nor do I want to be.    My supervisor, who I wholeheartedly respect, decided to blow the whistle on how this investigation was handled because his red line was crossed.

The timing of when he did that was something that we did not agree on but he felt he had to, and I wasn't going to stop him from doing what he thought was right.

I'd like to note that I wasn't present at the leadership meeting on October 7th, 2022, that Mr. Shapley and leaders from the IRS were a part of with U.S. Attorney David Weiss, the meeting where he made the statements about not being in charge.

I also wanted to continue to protect the record and my ability to testify as the case agent in the future, which is also a part of the reason I didn't come forward to you.

At the end of the day, I worked on a complex criminal tax investigation over the last 5 years, and the investigative process is 99.9 percent done, and we were in the process of bringing the case to indictment.    And I have emails and stuff that I can reference that show that.

Since October of 2022, the Delaware U.S. Attorney's Office and DOJ Tax have

pretty much stopped communicating with me and my team, and we have ultimately been removed and replaced from the investigative team.    I want to make that clear.    We were removed, and they replaced us with a new agent and a new supervisor.

I'm pleased to respond to the committee's request to assist them in oversight work and to provide information through statutorily authorized provisions of 6103(f)(5). I have reason to believe that there was gross mismanagement present throughout this investigation, that there was gross waste of funds relating to the tax dollars spent on investigating this case, and that there was an abuse of authority by DOJ Tax and the Delaware U.S. Attorney's Office.

I will present some evidence now and later, if needed. I will present evidence now and at a later date, if needed.    And I will leave it to you to make your own determinations, based on my testimony and the documents, what they say about the handling of this investigation.    Obviously, we have not provided any documents to you guys so far.

In providing this testimony, I will protect sensitive and secret material, first off. And I will also strive to protect current and ongoing investigations that are spin-offs from the Hunter Biden investigation.

I would also like to mention something else that's very important.    Sometimes I think the excellent work that the investigators did regarding this investigation is being overlooked.

I have worked with some of the best investigators on this team, some of the best investigators, by far the best forensic accountant with the FBI [I have] ever worked with. Amazing, intelligent people from the IRS, an amazing co-case agent who was there for me every step of the way, who took my calls when I felt like I couldn't go on with the investigation anymore because of what was being done and the roadblocks that were

being put in front of me.

My supervisor, Gary Shapley, best supervisor I've ever worked with in my life.    He was someone I could come to whenever I needed to vent, was someone who always fought with his heart and soul to do what was right, even if we didn't agree on the path, and would try to make sure that we always were heard.    He is someone I look up to as a leader in our organization.

Now, as for the prosecutors on the case, which included AUSAs from Delaware and line attorneys from DOJ Tax.    I considered a lot of these people my friends and we spent a lot of time together over the last 5 years.

Their conduct since October of 2022 has honestly been appalling, and I do not think that they are considering the human impact of the decisions they're making.

I have respected their work but think they got lost in the type of investigation they were overseeing.    Looking back on everything, they had the best investigators in the Nation and the prosecutors were the JV squad and weren't up to the task of handling such a big case.    They would often slow-walk investigative steps, often not follow the appropriate investigative procedure, and would say that we couldn't do or had to wait on certain steps because there were too many approvals in front of us.

I recently heard from another case agent on the investigation that the Delaware U.S. Attorney's Office loves to slow-walk cases and overthink everything.    They felt that this was exaggerated tenfold because of this case.

That agent also said that they had to work with this U.S. Attorney's Office.    So they had to keep the status quo and not raise any questions or issues that could potentially hurt that relationship.

I was different.    I was coming in from the outside.    I was able to bring up real issues, challenge their arguments, and it was apparent that they didn't like it.    It was

often met with rolling eyes, dismissing my ideas, and telling me that they would, quote, "think about it."

I started this investigation in November of 2018 after -- so this is going to go through kind of a timeline chronology of the case, just so you guys are aware.

I started this investigation in November of 2018 after reviewing bank reports related to another case I was working on a social media company.   Those bank reports identified Hunter Biden as paying prostitutes related to a potential prostitution ring.

Also included in those bank reports was evidence that Hunter Biden was living lavishly through his corporate bank account.   This is a typical thing that we look for in tax cases -- criminal tax cases, I should say.

In addition, there was media reporting related to Hunter Biden's wife, ex-wife, divorce proceedings basically talking about his tax issues.   And I wanted to quote some of the things that were said in her divorce filing which was public record.

"Throughout the parties' separation, Mr. Biden" -- referring to Hunter Biden -- "has created financial concerns for the family by spending extravagantly on his own interests, including drugs, alcohol, prostitutes, strip clubs, gifts for women with whom he had sexual relationships with, while leaving the family with no funds to pay legitimate bills.

"The parties' outstanding debts are shocking and overwhelming.   The parties have maxed-out credit card debt, double mortgages on both real properties they own, and a tax debt of at least $300,000."

This is all the information that I had in my hand in November when I wanted to open this investigation.

So I began talking with colleagues in my group, and they were asking me why would I want to open up a case like this.   Big cases, big problems was the thing I was

constantly hearing.

I responded to say it shouldn't matter the name of the person on whether we work a tax case or not.    It should be the merit of the evidence, the allegation, and the clear understanding of why we are opening that investigation.    So doing the right thing for the right reason.

After discussing the case with my previous supervisor at the time, Matt Kutz, he made a decision to look into the case further before sending it -- sending the case up for referral.

So I wanted to note something here.    When we get a bank report, a lot of times we are able to take the information in that and bring it over to the U.S. Attorney's Office to say, "Hey, look at this bank report.    We need -- are you guys interested in potentially opening up an investigation?"

So that's typical.    And because we're in D.C., he lived in D.C., we would have taken it to the D.C. U.S. Attorney's Office.

My manager at the time told me, "No, you cannot do that.    That's a tax disclosure issue."    I didn't agree with him because there's been multiple instances where we do that.    That's a normal part of our job.    But he was my manager, and I wasn't going to fight him on it, and he told me that I had to open this up the normal tax administrative way that we would do [for] these cases.

At this point in 2018, I believe that I was the only agent in the U.S. looking into Hunter Biden.    So I immediately drafted a criminal tax initiation package and sent it to my manager for his review.

I wanted to provide an example of something that my SSA [at that time] told me which caused me pause and concern.    This is from what I recall.    But he said a political family like this, you have to have more than just an allegation and evidence related to

that allegation.    In order for this case to move forward, you basically have to show a significant amount of evidence and similar wrongdoing that would basically illustrate a prosecution report.

So he's basically telling me that I have to show more than just non-[filed] tax returns and the information from the ex-wife in the divorce proceedings.

I did not agree with him at this time -- and I told him that we have to treat each taxpayer the same, it shouldn't matter on their name.    But he was my manager and I had to do what he said.

So after three of these initiation packages, he finally allowed me to push this forward to DOJ Tax for their review.

So the way that our grand jury cases -- or the way -- I'm sorry.    The way that our cases work is when the case is referred from IRS to DOJ Tax, the case has to go through our ASAC and SAC, and then it goes to DOJ Tax where they review and approve it and send it to the appropriate venue or jurisdiction.

So in [or] around March or April of 2019, the case went up to DOJ Tax.    And at that time we were told that William Barr made the decision to join two investigations together.    So at that point in time I had found out that Delaware had opened up an investigation related to the bank reports and that that occurred in January of 2019, so 2 months after I started mine.

So when I found out about their case and was told that we had to merge the two, I did a venue analysis.    I showed them that, "Hey, the venue's in D.C.    It's not in Delaware.    We need to work this in D.C."    But, ultimately, I was overruled, and it was determined to send the case, join the two case together, and work everything under Delaware.

So it was at that time that we had learned that the FBI in Delaware were referring

to the Hunter Biden -- were referring to Hunter Biden and the case by the name
"Sportsman."

So what were the potential issues I saw with working the case in Delaware?   We
were working with a small U.S. Attorney's Office who might not have ever worked a case
of this caliber.   Delaware was in the State in which the subject's father lived, and the
family was extremely well-known throughout the State, including people on the team.
And when I say team, the investigators and prosecutors on the team.

This was later evident by President Joe Biden -- well, he was formerly Vice
President at that time -- having to come into the FBI office on an unrelated matter and it
being joked with the team.

There's another issue where a magistrate judge in Delaware made an
inappropriate comment at the signing of the first electronic search warrant that caused
her to remove herself -- that caused her to recuse herself from the investigation.   This
set us back an additional 4 months as we had to draft new warrants and redo
investigative steps.

I want to correct the record on that and say that that's themself, so just so that
we're clear on that.

This is a few of the many issues that we encountered with working the case out of
Delaware.   But at the end of the day, I constantly remember telling myself and my
co-case agent and my supervisor that these are issues, we have to deal with it -- that we
have to deal with -- and there's nothing we can change.

Around the same time in 2019, I had emails being sent to me and the Hunter --
and the prosecutors on the case, the Hunter Biden prosecutors, from my IRS supervisor.
So this was Matt Kutz still.

From what I was told by various people in my agency, my IRS supervisor, Matt

Kutz, created memos which he put in the investigative files regarding the investigation potentially violating the subject's Sixth Amendment rights.    He also referred to Donald Trump's tweets at the time.

I recall that at one point I had to go around my supervisor and ask his boss, ASAC George Murphy, to tell him to stop sending me and the Hunter Biden prosecution team these emails and that I was searching media articles on a weekly basis and was aware of everything being written in the media regarding the case.

So one of the first disagreements I recall between the IRS investigators and the prosecutors was the idea of going overt.    When we work criminal tax investigations, there's an IRS policy in place that we need to interview the subject within 30 days of elevating the investigation.

I would like to note that there are reasons why we might wait to interview the subject of an investigation, to include potential undercover work, active crimes continuing to occur, and other covert investigative steps.    But with tax cases, the evidence is typically historical, which allows us to go overt sooner, which is why this is stated in the IRM.

I thought this to be even more true about wanting to go overt, because at the time of starting the investigation Hunter Biden had unfiled returns for 2016 and '17 and had unpaid taxes for '15.    And I wanted to put Hunter Biden on notice in the event that he filed tax returns and potentially paid his taxes.

In a normal investigation, we would typically advise the subject of the criminal investigation, try to get a statement from them, try to get an understanding of why there were unfiled returns.    And it sort of puts us on notice -- or puts them on notice that the IRS is looking into them currently and then it kind of preserves the record in an essence.

I was overruled during multiple meetings almost to the point that I couldn't bring

it up anymore to the attorneys, and they would get visually upset with me.   And I was continually being told that we had to stay covert to preserve potential evidence from the FBI side of the investigation.   I even offered just IRS agents going forward in interviewing the subject, just, "Hey, we have a criminal tax investigation.   We want to talk to you." But it was ultimately overruled.

So I can recall being assured by the AUSAs and DOJ Tax attorneys that we would still be fine with potential Spies evasion charges because other activities would be similar to us interviewing the subject, which included the Senate investigation at the time, as well as the Arkansas case related to Lunden Roberts.

So Spies evasion.   Spies evasion is essentially when you have unfiled returns.   So normally unfiled returns is a misdemeanor.   Spies evasion is a felony.   So it's essentially stating that they willfully evaded the requirement to file and/or pay their taxes, and there were overt acts present, that essentially that's the reason why they unfiled or didn't file the tax returns.

Mr. Zerbe.   Spies is spelled S-p-i-e-s.

Mr. ███.   Thank you.

So we did not end up going overt and conducting interviews until after the 2020 election on December 8th, 2020, after I continually pushed the issue at various meetings.

So I wanted to continue on with this, my memory of events from May 2019 to December 8th, the date we went overt with the case.

So throughout that time period we were obtaining multiple electronic search warrants, so email accounts.   There were QuickBooks accounts.   There was a Dropbox. There was an Apple iCloud.   There was the laptop.

And with Hunter Biden being an attorney, all of this information had to go through a lengthy review.   So it had to go through a filter team, a filter AUSA.   So they're

filtering out any attorney-client privilege documents.   And then ultimately we on the team, on the investigative team, would get the documents to review for relevancy or nonrelevancy.

Throughout this entire time, we're getting these email search warrants.   We're reviewing the records.   We're working as a team.   We're actually bringing in people to do the filter review.

Throughout all this time we're having biweekly meetings.   At these biweekly meetings, I am continually bringing up that we need to go overt.

There came a point in time to where there were some bank reports out there that were going to get released, and they were going to include potentially the names of the investigators from the IRS and the FBI who received those bank reports.

So with that being released in the public, we're like it's going to out our investigation, so we need to come out and go overt with the tax case.

And I remember there were always times to where we were always on an impending election cycle.   It was always the election being brought up.

In early 2020, it was the midterms.   I think that Iowa was the very first one where we weren't sure what we were allowed to do or we weren't -- it was always wait and see. And then ultimately --

Mr. Zerbe.   Correct.   So when you say the midterms, you mean the caucuses and the primaries for the Presidential run?

Mr. ████.   Yeah.   No, I'm sorry.   I mean the -- exactly.   I'm sorry.   The primaries.

So we on our side were preparing for the day of action.   We were trying to establish who were the witnesses we wanted to talk to, who were -- we wanted to do search warrants.   We wanted to do search warrants of physical residences.

In a failure to file case, that's typically what you want to do, is search warrants. So get inside the house and get evidence related to the unfiled returns, see if they were trying to get their returns filed and just never ended up doing it.

We were always talking about those search warrants, talking about going overt. And it was always we need [to] go through the evidence.   We need to go through all [of] the search warrant records.   We need to make sure that we've kind of gone through everything before we go overt.

And we didn't agree with it.   We pushed this up our management chain that we didn't agree with it.

Our leadership, so leadership within my office, my S-A-C, my SAC, she agreed that we needed to go overt, but at the end of the day they outweighed us on this.

One other thing I would like to note is September 4th, 2020, we had a conference call and [DOJ Tax and Delaware USAO] told us essentially that we were on pause from any overt activities or any activities that could be overt whatsoever.   So we couldn't -- we weren't allowed to issue subpoenas.

So I have an example of this -- so October 20th, 2020, right before the election, we're getting ready to go overt the week or two after the election.   The election's in early November.   We're getting ready to go overt after the election.

And we needed to do a walk-by to make sure where Hunter Biden lives.   That's typical of our -- we would go in general clothes, walk by the residence, see what's going on, see if there's Secret Service.

And in an email to Mark Daly, one of the DOJ Tax attorneys, he says:    "Tax does not approve.    This will be on hold until further notice."

I have never in my career have had Tax Division, let alone approve us doing a walk-by or anything like this.

So my response to him was:   "I'm sure I'll get asked."   So this is October 20th,

2020.   "But can you ask for the reasons why, since I think this would still be a covert

action, especially since the U.S. Attorney approved this?"

He says:   "Call when free."

And, ultimately, we never were able to do the walk by the residence until after the

election.   And that's ultimately when we went overt and were able to do the activities

that day on December 8th.

Another devastating blow came to the investigation when we lost one of the

AUSAs to the private sector in early 2020.

Former AUSA Jamie McCall, who was a judge advocate for the Marine Corps,

working primarily as a prosecutor, achieving the rank of captain in the Marine Corps, was

a hardworking, no-nonsense kind of AUSA.

I always thought in talking with him that he wanted to do the right thing for the

right reason.   He would constantly push the envelope, and it was apparent that he was

following the evidence and not working to create roadblocks.   I firmly believe that his

departure had a significant impact on the future of the investigation and the investigative

steps.

So I plan on providing you some more assistance -- or some more instances in

which the assigned prosecutors did not follow the ordinary process, where they

slow-walked and put in unnecessary approvals.

This is obviously not all of them, but is a small set of examples.   I can recall [a]

meeting prior to the 2020 election in September of 2020 when we were discussing [with

the prosecutors] potential additional electronic search warrants and covert subpoenas

related to the case.

One of the prosecutors suggested removing the subject's name from the request.

I said on that call that I didn't feel comfortable with removing the subject's name from any documents just based on what might or might not be approved, and I told them that I thought that that was unethical.

DOJ Tax Attorney Jack Morgan said that doing it without Hunter Biden's name would essentially get us most of what we were seeking.   I have never been a part of an investigation where we talked [with the prosecutors] about even removing the subject's name from a subpoena, especially a covert subpoena.

Okay.   So after the day of action on December 8th, 2020, the prosecutorial team met --

Mr. <u>Zerbe.</u>   Explain "day of action."

Mr. ▊▊▊.   Okay.   Day of action was when we went and attempted to do interviews.

All along we were preparing for doing interviews.   I had a list of probably 30 people and I tiered them.   So it was Tier 1, Tier 2.   And I had a proposal early on that said I want to go and talk to all these people.

It got whittled down to, I think, 10 people on the day of action, some of those people who we were only allowed to serve subpoenas and weren't allowed to talk to.

So that day of action happens.   We go and talk to everyone.

So that night, December 8th, 2020, the prosecutorial team met on a phone call. During that phone call we talked about a storage unit that Hunter Biden vacated when he vacated his Washington, D.C., office and stored a lot of the items in there.   That was uncovered through that day of action.

On the night, at the direction of Lesley Wolf, I prepared an affidavit in support of the search warrant for the storage unit.   And I thought, in looking back at this, that these were pretty telling.

Mr. <u>Zerbe.</u>   You need to be clear.   Lesley Wolf, who was Lesley Wolf?

Mr. ███.   Lesley Wolf was the assistant United States attorney in Delaware.

I say to her on December 8th, 2020:   "Sending the draft affidavit.   I guess I'm happy we drafted this before.   I kept the computer language in the warrant in case there are electronic devices."

So I'm going to move on to the next paragraph.

"We will work to get this approved ASAP on our end.   So please communicate your thoughts.   I would like to possibly execute this sometime next week.   I think that is reasonable, given the upcoming holiday."

Her response to me, December 9th, was:   "We are getting to work on this, but I want to manage expectations with you regarding timing.   It has to go through us, DOJ Tax, possibly OEO, and definitely [Eastern District of Virginia] (EDVA), who has never seen the case before, layer in the filter requirements in the Fourth Circuit, and it's just not clear it's going to happen next week, even with everyone making it a priority."

So that tells me two things right there.   That David Weiss wasn't really in charge. And it also tells me that I have never had a case [investigation] to where, if we needed to get records and preserve them, that we didn't do everything in our power to get a search warrant approved and get moving on that expeditiously.

So I guess with the storage unit -- we asked them to keep an eye on it and tell us if anyone went to it.   But it was highly unusual that I'm being told that we couldn't even do it the following week.

So let me go back to this.

So after I sent -- after we sent each other these emails, it was ultimately decided by AUSA Lesley Wolf to not do the storage unit search warrant.

On a phone call with AUSA Lesley Wolf -- and this is just from my recollection, I

didn't document this in notes -- I told her that I completely disagreed with her and that we weren't following the appropriate investigative steps to get the stuff in the storage locker and that I thought that she might be acting inappropriately.

At the time AUSA Wolf asked me if we had problems working together now and if I had issues with her moving forward.   I responded at the time that I didn't and that we could move forward.

After thinking about it further, I approached them with an idea, AUSA Wolf, and I said:   What if we didn't tell Hunter Biden's counsel about the storage unit?   He's been given a request for records.   What if at the time that he's given for those requests for records he doesn't access the unit?   And if he doesn't access the unit, we know he's not complying with that request.   So if at the end of that time he doesn't access it, let's do a search warrant on it then.   She told me she would think about it.

So I pushed this up to my leadership.   I pushed it through my SSA.   They all agreed with it.   They thought it was a great idea.   So they called David Weiss, the U.S. attorney in Delaware.

David said to them that -- they called it "█████ Plan."   "Yes, that sounds like a great idea.   Let's plan on doing that."   That's what he told them from what I was told after that call, on the call with -- on that call.

So I find out a couple days later that, on a phone call from them, that AUSA Wolf and DOJ Tax Mark Daly called Hunter Biden's counsel and told them about the storage location and said that the request for records includes the stuff [in] there.

So they literally went around my back, my idea, around what we [had] already talked about, and did something completely different.   And I guess it was at this point -- there were a lot of things that happened before this.   But it was at this point for me that I started to believe that the attorneys with the Delaware U.S. Attorney's Office

and DOJ Tax were not acting appropriately, they were not following the appropriate investigative steps, and that we were not a part of the trajectory and/or the planning of the investigation as we normally are.

I can recall another situation in which investigative activities were being held up by unnecessary approvals and constant slow-walking.   In essence, they were not letting me do my investigative job.

So this is an email regarding requesting documents.   So I say:   "Attached are these document requests for interviews I'm planning to do that are out of town."

So I'm planning to do these interviews, and I send those document requests to them.

Lesley Wolf says to me on September 9th, 2021:   "I do not think that you are going to be able to do these interviews as planned.   The document requests require approval from Tax Division.   At present, Jack and Mark are racing to get the EWC motion on Stuart's desk" -- so Stuart was the [Acting] Deputy [Assistant] Attorney General, Stuart Goldberg at Tax Division -- "Stuart's desk for approval before he leaves town for a week.

"Along with the approval for the" -- and I'm going to leave the name out of that -- "both of these items are higher priority and we can't pull time and attention away to move these subpoenas through.

"Appreciate that are you always trying to stay active and do some travel before your end, but we will be able to get these interviews and document requests done when we have a little more breathing room."

My response to her, September 10th, 2021, was:   "Okay.   I had planned stuff like this for weeks in advance to prevent this from happening.   I had brought up these interviews on multiple occasions, dating back to August 18.   And now we are being prevented from doing it 4 days before.

"This is making it difficult for me to do my job.     I don't understand why DOJ Tax senior management is needing to approve every simple document request and/or witness interview, and maybe this is a conversation that needs to be had at a higher level.

"I can push these interviews off.    Just know that I'm trying to do as much as I can to plan and get the tasks handed down to me accomplished in a timely manner in an effort to ultimately finish the pros report.

"I discussed with Mark" -- Mark Daly, DOJ Tax attorney -- "that interviews we had planned for the end of the month should be a priority as they relate to a former employee, previous business partners, and some 2018 expenditures.    I will have those subpoenas for those interviews in California to the pros team by next week so we don't have this issue again."

And so, again -- end of the month I request [to the prosecutors that] subpoenas go out -- or I request document requests to go out -- to go out and travel.    And Mark Daly, DOJ Tax attorney, says in an email to me on September 20th -- and these were document requests relating to prostitutes that Hunter was paying.

He says in this:    "Subject:    Emails sent to management with list of ten document requests to be served."

And he says:     "Ask whether they object."

And I said:    "You are the man.    I will fill you in tomorrow on my issues.    I'm almost at the end of my rope, and I am sick of fighting to do what's right.    Can you send me the final version so I can send them?"

So this is me further stating -- what I see as further stating to them that I'm sick of fighting for always doing what's right.    There were so many situations, and these are just a few, to where I'm fighting to get document requests to go do interviews.    I'm fighting to -- and it's just all:    Let me think about it.    There's too many approvals to go get that

done.

And then not only was I having issues with the prosecutors on the case, but then I had issues internally within the IRS.    And I had to go around my senior leadership to my director of field operations.    So that's the fourth person above me.

He told me that I can come to him any time with issues on this case -- it's the director of field operations, his name is Mike Batdorf -- that I can come to him at any time and with any issues that I'm having.

And was raising issues all along with so many various people in my management about the slow-walking, the issues that we were having with doing interviews, with doing document requests.

I said to him, Mike Batdorf, on September 20th:    "Again I hate to bother you with this.    I'm almost at the end of my rope, and I think I'm at the point again where I need your help.    I have a ton of interviews and travel planned and scheduled for the next 3 months.    Keeping on a timeline is extremely important, and I don't want this to continue to be a problem.    I don't mind the questions from management, but it feels like they are not listening to me."

That is a number one -- like the fact that management was not listening to me is an overarching theme regarding this investigation.    It felt like they left me on an island.

Mr. Zerbe.    Could you give the date of that email?

Mr. ███.    Yeah, September 20th, 2021.

Mr. Zerbe.    Let me just pause there for a second because I want to be mindful of the chairman.

I would say, ███, that he's probably going -- you've probably got about another 15 minutes to go.

Mr. ███.    Yeah.

Mr. <u>Zerbe.</u>   He's probably got 15 minutes to go in his opening statement, if that's all right, but we can also pause because I think you're going to get into the prosecutorial memo referral, which is kind of important, but kind of a natural break point.

So we're happy to keep going.   We're happy to pause.   And if the chairman's got any questions, because I know you're a busy fellow, we can do that, too.   So you tell me how you want to --

<u>MAJORITY COUNSEL 1.</u>   I think if you have 15 minutes, let's go ahead and finish that up.

Mr. <u>Zerbe.</u>   Okay.

<u>MAJORITY COUNSEL 1.</u>   And then we can take a short break.

Mr. <u>Zerbe.</u>   Okay.   Perfect.

Go ahead.   I'm sorry.

Mr. ████.   Okay.   I wanted to mention one more thing.   I can recall wanting to interview and getting records from Hunter Biden's children and members of the Biden family.   There were expenses paid for the children, as well as potential credit card expenditures and Venmo payments, that were deducted on the tax return.

On October 21st, 2021, AUSA Lesley Wolf told us it will get us into hot water if we interview the President's grandchildren.   That was completely abnormal, out of the question.   And it's a part of our normal process that we go and interview people, especially people who are receiving money or receiving payments related to a case like this.

So that's just another example of issues like that.

So in October of 2021, we had what was called a tax summit to where we all met together.   When I say "we all," so the prosecutors, so Jack Morgan and Mark Daly from DOJ Tax, Lesley Wolf and Carly Hudson from the U.S. Attorney's Office in Delaware.

So at that time we decided what charges we were going to push forward in the prosecution report.    So we all made the decision on that we were going to move forward with 2014, 2015, 2016, 2017, 2018, and 2019.    And it would be felony counts related to 2014 and felony counts related to 2018.    That was the decision made at that time.

So I drafted the prosecution report.    I spent all Thanksgiving, around that time, drafting this massive report.    Our reports are a lot of evidence.    There's a lot of stuff that goes into it.

So in November [I] drafted the report.    It went up to our internal counsel.    So they're called Criminal Tax counsel.    Went up to our internal counsel.

They review it for legal issues, and they actually give a recommendation to our leadership on whether to move the case forward or not.    They basically give an approval or a declination.

All along they were telling me that that -- CT counsel attorney was telling me -- her name was Christy Steinbrunner -- we're good to go on these, I'm going to give you [a] green [light].    So green being that you're good to go on those years, and yellow, yellow being caution.    She was telling me that they were going to concur to it.    I was hearing that all along.

And they took almost -- more than 60 days on their review, which is more than they're allowed.    Took more than 60 days.    And in February of 2022 -- and I'm not going to get into the details of this -- they end up sending a nonconcur, so a declination for all of the tax years at hand.

And I asked -- I messaged the CT attorney, Christy Steinbrunner, and I go:    You told me that we were concur, that we were good to go.

And she said:    I always told you it was green -- or I always told you it was green

and yellow.

I have to look at what the statement says.    But basically she told me what I stated in there, that it was a concur.

So that was one of the first times where I was like, well, gosh, now we have these issues with our U.S. Attorney's Office and DOJ Tax, and now I'm also having issues with CT counsel.

So our leadership ended up pushing that forward and ended up approving it and sending it to DOJ Tax in February or March of 2022.

So let me go to my notes here.

So February 25th, 2022, the IRS sent the prosecution report forward to DOJ Tax and the U.S. Attorney's Office.    So in my report proper venue for the case was in D.C. and California.    We had no venue in Delaware whatsoever for the tax charges.

I recall hearing --

Mr. <u>Zerbe.</u>    And why is that?

Mr. ████.    So for failure to file charges, if there are failure to file charges, it's where the subject lives.

If it's a false return or if it's an evasion charge -- so if it's false return, it's where the return is prepared or sent from.    If it's an evasion charge, it can be where the overt acts occurred.    So for 2014 and 2015, venue was D.C.    For 2016, '17, '18, and '19, the venue was in California.

On or about March 14th, 2022, they're now able to have what's called a taxpayer conference with defense counsel.    That gives an opportunity for defense counsel to come in and present:    Here are our defenses.    Here's why we don't think that you have a case.

All the cases I've ever been a part of, they're afforded one.    In this case I know

that they've had three.    With the most recent one, they've had four.    So that's high -- I have never heard of that in my career.

So they have the taxpayer conference.    On or about April 26th, 2022, they have a second taxpayer conference.    At that conference -- at that taxpayer conference they present defenses for 2014 and 2015.    We end up reinvestigating the case relating to 2014 and 2015.

I guess -- most importantly, I need to step back a second.

March of 2022, we are told -- I get a phone call that they are bringing the case forward to start -- I need to ask you a question about how I --

<u>MAJORITY COUNSEL 2.</u>    We can go off the record, please.

[Discussion off the record.]

[10:41 a.m.]

Mr. ████.   Okay.   So in March of 2022, we know that they are going to D.C. to open a case, okay?

So I'm told -- and this is from my recollection of conversations, and I do not have notes on this.   As I am the case agent, we wouldn't typically take notes on this.

I am told that it was sent to the line attorneys in the D.C. U.S. Attorney's Office. They got my prosecution report, all the information that we had, and said, hey, we want to open up this case here.   The line attorneys there said, here's the process.   We'll get you guys going.

Two days later, I find out another meeting was -- so meanwhile, presenting the case to D.C. was something we asked for but was denied.   We were not allowed to go there to present the case to D.C.   We were all to rely on the attorneys to go and do that.

So in March -- or a couple days later after that meeting, I get a phone call.   And this is -- from my recollection, from Mark Daly, the DOJ Tax attorney.   And I think he was a little bit too forward with his information he gave me.   But he basically said that now that the U.S. Attorney looked at the case, they don't want to move forward with it.

And essentially what he told me is that not only are they not going to join the case and give us assistance -- so give us another AUSA, give us someone to help there -- they also told our prosecutors that they don't think we have -- that we can -- or they don't think that we have the charges -- or not the ability, but the evidence for the charges to charge in D.C.

So not only was it a, no, we're not going to help you, but it was a, you shouldn't bring the charges here, essentially.

Mr. Zerbe.   Can we go off the record?

MAJORITY COUNSEL 1.    Off the record, please.

[Discussion off the record.]

MAJORITY COUNSEL 1.    On the record.

Go ahead.

Mr. ████.    So the first impression from the D.C. U.S. Attorney's Office was, yeah, this all looks great.    Here's the process.    It didn't sound like they were going to move to say no to it.    It sounded like, hey, the lower-level attorneys were like, whatever we need to do to get this going.    And then it changed.

So, I mean, that was frustrating for me.    But at the end of the day -- they're following this normal process that they call[ed] it.

So that all happened.    So we're no longer talking about D.C. anymore.    Now we have -- the defense is presented 2014, 2015, and I was having a lot of issues with the DOJ Tax attorneys and the AUSA regarding 2014 to 2015, because now they're doubting it. So what we ended up doing is reinvestigating all of it.

We ended up looking at the evidence, and we found emails that actually showed that Hunter Biden [had] planned [for] what happened that caused him to essentially evade his taxes for 2014.    We presented this.    We dug into it.    We figured this all out. And hopefully after this, I can go through some of that for you guys.

But we dug through this all.    And then we were like, we finally figured it out. This is why this happened.    And it felt like the line attorneys weren't listening to us. They weren't following the evidence.    They were saying, well, they provided this defense, so that's the way it has to be, versus us looking at it like, well, no, let's figure out the way that the evidence shows us.

So there was a heated argument between myself and Jack Morgan, the DOJ Tax attorney, where I said, I don't think you are looking at the evidence appropriately.    You

are saying something completely different than what the evidence is showing.

And he asks another time, do we have a problem here, ▮?   Are you questioning my ethics?   Are you questioning my integrity?   Another argument like that.

So we ultimately ended up asking for a meeting with David Weiss, the U.S. Attorney in Delaware.   We were afforded that.   And at that same time -- so this is in mid-June -- we met with David Weiss and all the leadership.   Including FBI, ASAC, SAC, all the people from FBI, and Stuart Goldberg, the [Acting Assistant Attorney General] of Tax Division.   We all met in D.C.   We were able to present on the findings regarding 2014, 2015, the case, and moving forward related to it.

We were constantly pushing David.   We were pushing our leadership with -- I'm using the wrong word.   We were reciting what the evidence showed.   And I'll show you what the evidence was.

Ultimately, what happened is we have a meeting.   A phone call.   It's in early August.   And we get a phone call, all the teams on it together.   So AUSA Lesley Wolf, Carly Hudson, Jack Morgan, and Mark Daly, DOJ Tax.

And they say at that meeting that we are going to approve the recommendation of charges for the -- and this is from my recollection.   They are going to approve the recommendation of charges for the 2017, 2018, and 2019 tax years and that the venue for those -- the appropriate venue for those is California.   They were not approving 2014, 2015.   And I don't remember if it included 2016.   I can't remember that off the top of my head.

But I want to say that -- in an email from Mark Daly on August 18th, 2022, after this phone call, he basically said, we have three upcoming interviews, these three interviews for weeks in September.   He says, in here, the week of September 19th, we may be conducting the case in two separate districts:   Delaware, Los Angeles.   And they

say for Los Angeles, they're going to intro the case and possible readback.    So that shows me that they're presenting the case out to California, they've approved the charges, and they're moving forward on it.

I want to say one more thing.    We also learned that they gave what's called discretion.    This is what I was told.    This is from my memory.    But that they didn't get full on approval.    They gave discretion to charge the case.    From my understanding with Tax Division, if they were to approve the charges, according to policy, California would have to charge the case.

So we have one last meeting with David Weiss, U.S. Attorney in Delaware, in early September -- it was either end of August, early September 2022 -- to talk about the 2014, 2015 tax year.    And at that meeting, David says to us -- and this is from my recollection -- that he agrees with us regarding the 2014, 2015 tax year.    They're great. Yes, we investigated it.    We figured it out.    But he has been getting concerns from DOJ Tax regarding the tax years because they viewed that, at a trial -- that it could affect the later years.    That the information regarding the subject's brother's death, the substance abuse -- that all those things could play a huge role and cause the jury to say essentially -- to have sympathy for him and to not convict on the charges.

At that time, David is telling us, well, I'm still weighing it.    I love the 2014, 2015. Essentially, I want to charge it.    And at that meeting, he tells us -- we ask him, when are we going to charge?    And he says, well, hopefully end of September.    It was kind of up in the air.

Then October 6th happens to where there's an article in -- I apologize.    So this gets into what happened and why we were ultimately removed.    So October 6th -- I believe is the date -- The Washington Post has an article.    In that article, it talks about this difference between the investigators and the prosecutors.

And there are statements that are made in there from Hunter Biden's counsel that basically is saying that we're not getting a -- we're getting a biased view and that -- threatening us with criminal wrongdoing if this is being leaked to the media.

So October 6th, that article comes out.    October 7th was the meeting with the leadership and David Weiss.    And that's where those statements were made regarding David saying, I'm not the deciding official on whether charges are filed.    He has no authority to charge in California, essentially, is what is told to me about that meeting.

After that article on October 6th, we have one more interview left.    We're still talking with the AUSAs.    They're still meeting with us.

October 12th, 2022, was the last investigative interview that we did.    I had a phone call -- I think it was around the week of October 22nd.    I have it in my notes over here.

But I had a phone call with AUSA Lesley Wolf, and she asked me for the significant case reporting that my manager sent up to [IRS] leadership.    She asked this as a part of discovery.    She didn't ask for --    Five months prior to this, we turned over some discovery.    It's highly unusual -- or I've never had it happen to where they've asked me for my manager's either emails or discovery.

And it was at that point that I believe things changed with them, and they saw some information in -- or I don't know what it was, but -- they request[ed] discovery to include emails from the team, but it also included emails and documents from supervisors.

And just so you know, that would be super unusual because -- imagine if the chief of our agency had to provide discovery in all the cases that we work.    It just would be impossible.

Anyways.    So, requests discovery.    And then -- I'm sorry.    We essentially get

removed from the investigation.    So at that point, we are essentially removed.

So I sent an email on December 7th that says, "So I was informed by my SAC that the meeting scheduled for tomorrow needed to be canceled and that he will field updates from now on.    Please confirm that this is correct and send out a meeting cancellation to the team."    This is December 7th, 2022, to Mark Daly, DOJ Tax.

Mark responds December 8th.    David -- meaning David Weiss, U.S. Attorney -- and Darrell -- Darrell Waldon, the SAC of IRS -- had been in conversation, and that's what they have decided.    I will let the team know.

So we found out through talking with our SAC that the attorneys had found -- we were always asking for updates on charging.    When are we going to charge?    When are we going to charge?    We were told that the prosecutors had found some emails that concerned them if they could actually charge the case.    That's what they said to us.

So at that point, I'm just -- I'm shocked.    And I'm like, you guys told me prior to this that these years are slam dunks.    We were in a whole posture to charge.    And then all of a sudden, they are saying this.

Continue to move forward to end of April.    The media article comes out regarding the whistleblower, and I don't think it was maybe 2 weeks later.

Mr. Zerbe.    Can we go off the record?

[Discussion off the record.]

MAJORITY COUNSEL 1.    We'll go on the record.

Mr. ▮▮▮▮.    I wish to close with one final thought.    I think about all of this, the difficult and grinding path that I and my colleagues have had to take in this matter, and how best it could be avoided.

I humbly view my role here today and response to the committee's request was to provide the facts as I best understood them, and to let Congress, the administration, and

the public consider those facts and determine the best path forward.

However, for myself, as I reflect, it is not difficult not to believe that appointing a special counsel in this matter is the best way to go forward to give everyone confidence in the fairness of our tax system.

While the impression was that the U.S. Attorney in Delaware has essentially the powers of special counsel in this case, free rein to do as needed, as is clearly shown, this was not the case.   The U.S. Attorney in Delaware in our investigation was constantly hamstrung, limited, and marginalized by DOJ officials as well as other U.S. Attorneys.   I view that a special counsel for this case would have cut through the toughest problems that continues to make problems for this case.

I would ask Congress and the administration, after reviewing the facts, to consider a special counsel for this case as well as consider the appropriateness of this special counsel taking under their authority all the related cases and spin-off investigations that have come forward from this investigation, related cases that I believe are subject to the same problems and difficulties we had.

Lastly, I would encourage Congress and the administration to consider establishing an official channel for Federal investigators to pull the emergency cord and raise the issue of the appointment of a special counsel for consideration by your senior officials.

I do not want my colleagues at the IRS, FBI, and other Federal law enforcement agencies to go through my frustrating and disheartening journey.   I believe having such a path will strengthen the public's confidence in their institutions and the fair and equal treatment of the Americans under law.

MAJORITY COUNSEL 1.   Let's go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.   We'll go back on the record.

And I'll turn it over to Chairman Smith to ask a few questions.

Chairman Smith.    Thank you.

Thank you for your opening statement and getting us started, and thank you for your bravery as to what you stated to do the right things for the right reasons.    We appreciate that.

A couple things that I want to talk about.    Earlier, you said you sent an email just a few weeks ago to the Commissioner of the IRS.    What was the email address that you sent the email to?

Mr. ████.    So I believe it was just Douglas -- I believe it was just his email that was in our directory --

Chairman Smith.    I just wanted to clarify if it was the same email that I have for him.   That's why I want to know if you could tell me what his email address that you sent --

Mr. Zerbe.    Sure.    We'll get it --

Mr. ████.    I don't have it with me, but I would need to go in my computer, and I can actually see the email.

Chairman Smith.    Exactly.    If you could get that to us, that would be helpful.   Also, could you tell if that email had been opened?

Mr. ████.    I didn't put [a] read receipt on it.

Chairman Smith.    Okay.    Did you get a response from that email?

Mr. ████.    No, I did not.

Chairman Smith.    Okay.    In that email, did it ask for him to look at it with concerns of the case?    What was the basis of the email?

Mr. ████.    Do you care if I read it?

Chairman Smith.    Sure.

Mr. ███.   I actually -- if you don't mind, like, it was something --

Mr. Zerbe.   Just to be clear, we're happy to share the email with you as well.   It was kind of either bring material or don't bring material.   So we had not wanted to --

Chairman Smith.   Read the email for the record.

Mr. Zerbe.   Yeah.

Mr. ███.   Okay.   So it went to Douglas O'Donnell, [Deputy] Commissioner, Daniel Werfel, Commissioner, Jim Lee, chief of IRS CI, Guy Ficco, which is deputy chief, Michael Batdorf, who was the director of field operations, Kareem Carter, who was my special agent in charge, and Lola Watson, who was my assistant special agent in charge.

It says, "My respective IRS leadership, first off, I apologize for breaking the managerial chain of command, but the reason I am doing this is because I don't think my concerns and/or words are being relayed to your respective offices.   I am requesting that you consider some of the issues at hand.   I'm sure you are aware I was removed this week from a highly sensitive case out of the Delaware U.S. Attorney's Office after nearly 5 years of work.   I was not afforded the opportunity of a phone call directly from my special agent in charge or assistant special agent in charge, even though this had been my investigation since the start."

And outside, I still have not received a phone call from my assistant special agent in charge or anyone in my IRS CI leadership other than my supervisor.

"I can't continue to explain how disappointed I am by the actions taken on behalf of our agency.   I want to echo that I love my job, I love my agency, and I am extremely appreciative of the job and position that I've had over the last 13 years.   There is a human impact to the decisions being made that no one in the government seems to care about or understand.   I had opened this investigation in 2018, have spent thousands of hours on the case, worked to complete 95 percent of the investigation, have sacrificed

sleep, vacations, gray hairs, et cetera.    My husband and I, in identifying me as the case

agent, were both publicly outed and ridiculed on social media due to our sexual

orientation.    And to ultimately be removed for always trying to do the right thing is

unacceptable, in my opinion.

"Again, my leadership above my direct manager, who was also removed, didn't

give me the common courtesy of a phone call, did not afford me the opportunity of

understanding why this decision was made, and did not afford me an opportunity to

explain my case.    If this is how our leadership expects our leaders to lead, without

considering the human impact -- or without considering the human component, that is

just unacceptable, and you should be ashamed of yourselves.    I am continually asking

myself, is this the kind of culture we want within the IRS and that I want to be a part of?

For the last couple years, my SSA" -- supervisor -- "and I have tried to gain the attention of

our senior leadership about certain issues prevalent regarding this investigation.    I have

asked for countless meetings with our chief and deputy chief, often to be left on an island

and not heard from.    The lack of IRS CI senior leadership involvement in this

investigation is deeply troubling and unacceptable.    Rather than recognizing the need to

ensure close engagement and full support of the investigatory team in this extraordinarily

sensitive case, the response too often had been that we were isolated, even when I said

on multiple occasions that I wasn't being heard and that I thought I wasn't able to

perform my job adequately because of the actions of the U.S. Attorney's Office and

Department of Justice.

"My concerns were ignored by senior leadership.    The ultimate decision to

remove the investigatory team from Delaware, without actually talking with the

investigatory team, in my opinion, was a decision made not to side with the investigators,

but to side with the United States Attorney's Office and the Department of Justice, who

we have been saying for some time has been acting inappropriately.    I appreciate your time and courtesy in reviewing this email.    Again, I can only reiterate my love for my work at CI and great appreciation for my colleagues and a strong desire for CI to learn from and be strengthened by my difficult experience.    I never thought in my career I'd have to write an email like this, but here I am.    Thank you, again, for your consideration with me."

And that email did receive a response.

Mr. <u>Zerbe.</u>    We'll go off the record.

[Discussion off the record.]

Chairman <u>Smith.</u>    Back on the record.

Mr. ███.    On May 19th, 2023, Lola Watson wrote to me.    On the subject line, it says, "Reminder:    Chain of command."

"Good afternoon, Special Agent ███.    We acknowledge your email received yesterday morning.    You have been told several times that you need to follow your chain of command.    IRS Criminal Investigation maintains a chain of command for numerous reasons to include trying to stop unauthorized disclosures.    Your email yesterday may have included potential grand jury material -- grand jury, a.k.a. 6(e) material -- in the subject line in contents of the email, and you included recipients that are not on that 6(e) list.    In the future, please follow previous stated directives and this written directive that no information should be sent to the director of field operations, deputy chief, chief, or any other executive without being sent through my office or the SAC's office first."

Chairman <u>Smith.</u>    The letter your counsel sent to the committee references your removal from the case.    I think you know that on May 15th, 2023, a letter was sent to me and Ranking Member Neal by another whistleblower's counsel, noting that the entire investigative team had been removed from the case.

Can you confirm that you were removed from the case?

Mr. ████.   I can confirm that I have been removed from the case, yes.

Chairman <u>Smith.</u>   How long had you been working on this investigation by the time you were removed?

Mr. ████.   Since November of 2018.   So approximately 5 years.

Chairman <u>Smith.</u>   Who informed you that you were being removed from the investigation?

Mr. ████.   I learned through my supervisor, Gary Shapley.

Chairman <u>Smith.</u>   How were you informed that you were being removed from this investigation?

Mr. ████.   He told me -- Gary Shapley told me that he was removed and I was removed.

Chairman <u>Smith.</u>   So it was by phone call?

Mr. ████.   Yes.

Chairman <u>Smith.</u>   Have you ever been removed from an investigation prior to the one at issue here?

Mr. ████.   Can we go off the record for a second?

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>   We can go back on the record.

Mr. ████.   So I want to be clear with this.   Can I explain what happened?

The assistant special agent in charge, Lola Watson, sent Gary an email -- not me, Gary Shapley -- my supervisor an email saying that they want to have a call regarding Sportsman.   So a Sportsman update call.   Gary, not feeling comfortable with our leadership, asked me to be on that call as a witness.   I was not invited on that call, but I participated via phone on that phone call.

And it was during that call that -- I overheard it, and they said that essentially the ITFC -- so our group was removed from the investigation, and they were going to replace us with some other agents within the D.C. Field Office that they didn't know the names of yet.   There was no mention of, we need you to tell ▮▮.   No mention of me whatsoever. It was just that we were removed from the case.

Chairman Smith.   Do you know who it was that said that on the call?

Mr. ▮▮▮.   That was Special Agent in Charge Kareem Carter.

Chairman Smith.   Okay.

Mr. ▮▮▮.   And I can tell you that Supervisor Gary Shapley really challenged him with, you're not doing the right -- you're not making the right decision here.   Really challenged him with, are you sure you want to make this decision?   So --

Chairman Smith.   And the individual that made that statement on the call, who was he employed by?

Mr. ▮▮▮.   The Internal Revenue Service.

Chairman Smith.   The IRS?

Mr. ▮▮▮.   Yes.

Chairman Smith.   Not the Department of Justice?

Mr. ▮▮▮.   Correct.

Chairman Smith.   Who are his supervisors?

Mr. ▮▮▮.   His supervisor would be Mike Batdorf, director of field operations, for the IRS Criminal Investigation.   And then above him would be Guy Ficco, deputy chief of IRS Criminal Investigation.   And then above him would be our chief, Jim Lee, IRS Criminal Investigation.

Chairman Smith.   And then who is above Jim Lee?

Mr. ▮▮▮.   The Deputy Commissioner, Daniel Werfel, and then Commissioner

Douglas O'Donnell.

Mr. <u>Zerbe.</u>    To clarify that, that's the Deputy -- the Commissioner is Werfel.

Mr. ███.    Yes.    You're right.    I'm sorry.

The Commissioner is Daniel Werfel.    Deputy Commissioner is Douglas O'Donnell.

Chairman <u>Smith.</u>    Have you ever been removed from an investigation prior to the one at issue here?

Mr. ███.    No, I have not.

Chairman <u>Smith.</u>    The May 15th letter notes that you and your team were informed that the change was at the request of the Department of Justice.    Is that your understanding?

Mr. ███.    Yes.

Chairman <u>Smith.</u>    But it was the IRS employee that, on the phone call, said you were removed?

Mr. ███.    Correct.

<u>MAJORITY COUNSEL 1.</u>    Why do you believe it was the Department of Justice?

Mr. ███.    I have a document I could go to, but I believe it's because he said it was at the Department of Justice's request.    That's just from my recollection of what I heard.

Chairman <u>Smith.</u>    If you have a document, that would be helpful.

Who was responsible for communicating your job duties and responsibilities?

Mr. ███.    It would be my supervisor.    My direct supervisor.    So Gary Shapley.

Chairman <u>Smith.</u>    Who has the ability to reduce or change your job duties and responsibilities?

Mr. ███.    Anyone from my supervisor all the way up to -- it could be anyone in

that chain of command.

Chairman <u>Smith.</u>    Could Commissioner Werfel have any responsibilities and direction of any of his employees at the IRS?

Mr. ████.    That, I don't --

Mr. <u>Zerbe.</u>    Let me rephrase the question.

I think, Chairman, you're asking, would the Commissioner have the authority to assign or reassign your duties if he chose to do so?

Mr. ████.    That was the purpose of my email, was to make him aware of what happened.    And I thought that he was -- I'll give you an example.

With a chief executive officer at a company, you would think that they're in charge of everything that happens within their company.    So that was where my thoughts were, is that if I'm having difficulty with my chain of command -- my leadership that I've gone to for so long on this case -- I had to go above them.    That was my thought.

Chairman <u>Smith.</u>    You've been an IRS employee how long?

Mr. ████.    13 years.

Chairman <u>Smith.</u>    13 years.

And do you view the Commissioner of the IRS as the top of the chain of command?

Mr. ████.    So I think that Janet Yellen out of the Treasury, since we're under the Department of Treasury, would be above that, but --

Mr. <u>Zerbe.</u>    Right.    Let me go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ████.    Yeah.    I would think that the Commissioner is in charge of the IRS.

Chairman <u>Smith.</u>    And of all of the 80,000-plus employees of the IRS?

Mr. ███. Yes.

Chairman <u>Smith.</u>   Who do you believe is responsible for your removal from the case team?

Mr. ███.   This is my opinion based on my observations and everything that I've seen so far.   It would be -- Department of Justice Tax would have been involved, so Mark Daly and Jack Morgan.   I think that Stuart Goldberg also would have had some say in this, who is the deputy attorney general for Tax Division.   And then David Weiss and the people that were part of the U.S. Attorney's Office, so Lesley Wolf and Carly Hudson. I would say that those people had some say.

Chairman <u>Smith.</u>   Is there anyone else at the IRS that we should talk to to fully understand how this decision was made?

Mr. ███.   It would be the special agent in charge, Kareem Carter.   And I think it's important that, on that phone call, we asked for a reason why and weren't given that.

Chairman <u>Smith.</u>   Have you been given a reason yet to this day?

Mr. ███.   No, we have not.   And I can tell you in my normal course of investigations I work, why an agent would be removed is for conduct.   So if they did something wrong.   But I've never seen it to where they would remove from a supervisor down -- anything like that ever.

Chairman <u>Smith.</u>   How many people were removed from this team?

Mr. ███.   So from the way that it was phrased on the phone call, it was my supervisor and our International Tax and Financial Crimes group.   So there's 12 people total in our group.

Chairman <u>Smith.</u>   So 12 people were removed counting the supervisor?

Mr. ███.   It would be 13 counting the supervisor.   But that's just me going off of my recollection.   It's around that figure.

Chairman Smith.   Okay.   One other thing that I want to just touch on that's a little bit different than this, in your opening statement, you were talking about an individual that made the statement to you saying that the President's grandchildren, you should not interview?   What was that?

Mr. ████.   Yeah.   So -- yeah.   So AUSA Lesley Wolf -- and this was in quotes, so this must have been something that my -- so I also want to be clear on something else. Normally in an investigation, if we're having a meeting or whatnot, we would take notes, investigative notes, but there really isn't much that goes into those notes in a meeting. And I didn't think I would need to document things that were being said during those meetings.

But at this time, after discussions we were having internally, my supervisor felt it necessary when some of the inappropriate comments that were being made -- to start documenting them.

So, yeah, it says in quotes, "will get us into a lot of hot water if we interview the President's grandchildren."   And I don't remember what ultimately happened with the grandchildren.   I know I have never interviewed them, and we have not interviewed them.

Chairman Smith.   And who was it that said that?

Mr. ████.   AUSA Lesley Wolf.

Chairman Smith.   Was it common when talking about this case to talk about how the President felt?

Mr. ████.   No, not how the President felt.   No, I don't think so.

Chairman Smith.   Or to even refer to it as the President's son or the President's grandchildren?

Mr. ████.   Yeah, I think there were times where we did refer to them as the

President's grandchildren, yes.   Like, for example, for James Biden, we would call him the uncle.   So that's how we referred to him, as the uncle.

Mr. <u>Zerbe.</u>   Let me go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>   Back on the record.

Mr. ██████.   There were a lot of times to where they would discuss the election or discuss politics, and I had to say, on multiple occasions, that I felt that it was inappropriate that they were saying it.   And there were things that would come up. For example -- even though there were smaller transaction amounts -- there were Venmo transactions that were paid to family and friends.   And some of these Venmo transactions were deducted.

So I continually asked, Can I go and interview them?   And can we understand what these payments were for?   If they made other payments?   And those were always met with no.   And I think one of them was Valerie Owens that we talked about that I wasn't allowed to go and do that interview.   I believe that Valerie is a relative of Joe Biden.   It might be his sister.   I don't -- all I know is she's a relative of his.

Yeah.   So standard practice is -- for any transaction, you want to go out -- and a lot of our job is hitting the pavement, going out and talking to people.   There was a lot of different investigative steps that we took, that even going and talking to the prostitutes, we found multiple people that he called his employees that were also prostitutes, and that he would have them clean his hotel room or -- there were a lot of these interviews that we ended up going and doing and talking to people that were so worth it, even though someone might -- we were always being told by the prosecutors, you guys are wasting your time going and doing that.   It's not worth it.   And literally, I would surprise them every time and find everyone.

Chairman <u>Smith.</u>    Thank you.

Mr. <u>Zerbe.</u>    Thank you.

Mr. ███.    Thank you.

BY <u>MAJORITY COUNSEL 1</u>:

Q    So to follow up on some of the chairman's questions, you mentioned Kareem Carter as the person who made the statement on the phone call about the removal of the team.    Is that right?

A    Yes.

Q    And you mentioned the chain of command up from there.

Do you know whether anyone else in that chain of command was aware of this decision?

A    I do not know that.    I think they are after my email.

Q    Understood.

But you don't know prior to that?

A    Yeah.    And to be completely candid with you, I was talking with my -- I essentially wanted to have a meeting or a sit-down and explain to -- now above all my leadership -- because at the end of the day, I don't think we would be sitting here right now if us as agents -- myself and the co-case agent and Gary -- were afforded the opportunity to sit down with our chief or deputy chief to explain to them, hey, guys, here's the problems we're encountering.    Here's the meeting that [we] just had.    What do we do to fix this?    Because we're the IRS.    They're Department of Justice.

Obviously, we refer the case to them to prosecute, but if we feel that something is going wrong with it, they should be there to help us through those problems, not putting their head down and not listening to us.

Q    So you mentioned Michael Batdorf and that he had told you previously that

you could go directly to him.    Is that right?

    A    Yes.

    Q    Did you do that at the stage where you learned that you were removed?

    A    I did not.

    Q    Okay.    Did you feel like you could talk to him about this issue?

    A    No, because I've been having other issues with him on another case I'm working that is -- I felt like that chain of -- that that relationship was broken.

    Q    When did that relationship start to break down?

    A    Probably since mid-October, maybe, would be my guess.    I mean, it's -- yeah.    It's definitely --

    Q    Mid-October 2022?

    A    Yes.

    Q    And you mentioned issues you were having with him on another case.    It's totally fine if you don't want to get into the specifics of that particular case, but can you generally describe the issues that you're referring to?

    A    Yeah.    I need to stay very, very high level on this.

I had received approval with a strategy related to this case.    And they backtracked that approval a couple weeks later and said to me that we need to put this on pause and that we'll get back to you on what strategy we're going to do moving forward.    And we're still on a pause right now.

    MAJORITY COUNSEL 1.    Can we go off the record real quick?

    [Discussion off the record.]

    MAJORITY COUNSEL 1.    We're back on the record.

        BY MAJORITY COUNSEL 1:

    Q    We were talking about the approval on the strategy for this other case.

And just to clarify, this is a totally unrelated matter?

A    Unrelated matter, yes.

Q    Okay.    And can you describe more about what happened to that strategy?

A    It felt like it was -- all along, we had been -- for the past probably year, we had been communicating a strategy on this case that is tackling a big problem and trying to tackle it efficiently, okay?    And it's a compliance issue in this area.

So we were briefing our [IRS] leaders and constantly having meetings about what we're planning on doing, and they were on all [of] these phone calls, and we were sending emails of our strategy.    And very recently, one of those strategies was moving forward on this compliance issue, and we were a go on it.

And a few weeks later, I receive[d] a phone call that basically says, you're being paused, and we're having to relook at what you were doing, and we will make a determination moving forward.

So now, to all my peers and the different people, I was the one pushing the strategy, and it got halted in place, and now I have to go back to [these] people and explain to them why -- it was just a mess.    It was an absolute mess.

Q    When did you get that phone call saying that you were being paused?

A    It was in February of 2023.    It was either a phone call or an email.

Q    And have you been able to proceed since then, or do you remain paused?

A    On that specific aspect of that investigation, as of right now, yes, we're still on a pause.

Q    So other than the removal from the case team, are there any other issues that have come to your attention that give you concern about possible retaliation?

A    Yeah.    So when I say there's a lot of this -- I sent an email on April 13, 2023, to Lola Watson, my assistant special agent in charge.    And I said, "So I want to put" -- [at

this point] we're still on the Hunter Biden investigation.

And I say, "So I want to put some stuff in front of you regarding updates I am hearing on the Sportsman, et al investigation, that I am not hearing through you or Kareem" -- Kareem Carter being the SAC -- "which is concerning to me.    I don't think that you or Kareem have any reason to keep things from me, but I wanted to make you both aware of some of these updates."

And some of these updates were Hunter Biden's counsel meeting with DOJ Tax -- or meeting with Main DOJ at the end of the month, which I viewed as a significant update that I hadn't heard through them.    Because remember that previous email, all communication was now [to go] through David Weiss and the SAC.

It also says here, "I have heard that David Weiss is currently asking for a pros memo" -- prosecution memo -- "from DOJ Tax approving the tax charges.    I would consider this a significant update since indicating that David is seeking the charging authority."

And then there's other related investigative questions that I had, but I thought that this was another email in the chain that was, like, no one's -- we were essentially removed since --

Q    So this is prior to what we could call formal removal in May 2023.    Is that right?

A    Yes.

Q    So at this time, you were still officially on the case.    Is that right?

A    Yes.

Q    Okay.    Is it your testimony that, although you hadn't been formally removed, you felt that you had been cut out of the case prior to that?

A    Yes.    Absolutely.

Q    Okay.    And when did you first feel that you were cut out of the case?

A    It most likely would have been at the end of October.    When they requested my discovery so that -- the significant case reporting and the emails from my supervisor.    That was when I felt that the -- or I didn't feel.    I thought that the posture changed with our relationship.

[Discussion off the record.]

Mr. ████.    We're back on the record?

MAJORITY COUNSEL 1.    Yeah.

Mr. ████.    So October 6th was the Post article.    And I remember hearing from them that that touched super close to the investigation and that they felt that [it] was information that's coming [from] inside the investigation.

All along, all up until this point, we would constantly be on the forefront of, Hey, any media updates?    What's going on?    On our weekly calls, we would always discuss media.

Prior to this, there were other leaks.    After our day of action in December of 2020, we got word that a couple of the news sources were going to release an article on the investigation.    This was a couple days prior to us going public -- going overt.

So that leak happened, and nothing changed after that one.    And everything indicated, even in communication in meetings from what I recall -- we thought that the leak was potentially from someone in [the] Department of Justice.    So we would constantly be talking about, yeah, it's not an IRS person.    It's not anyone on the team. It's always -- it appeared like it was someone from Department of Justice.    So that's what kind of shocked me with this moving forward.

I was interviewed by an investigator -- I think they were with TIGTA.    I told them, I didn't leak anything.    I thought that the leak might have come from either defense

counsel, or from DOJ like the other ones came.    But what I can tell you, and I've told this to the prosecution team, I've done everything that I can to keep my record clean and to keep my ability to testify as the case agent as clean as I possibly can.

And it honestly -- it hurt.    It hurt that these are people I talked with on a daily basis.    And even after the investigators came and I told them that I didn't leak the information, it was a complete shutoff of talking.

So it was end of January, early February, I am told about a meeting that is held with FBI only.    There's no IRS people there.    And it's regarding some of the spin-off investigations.    And one of the former forensic accountants who was on the case was a part of that meeting.    So they were moving on with some of our other spin-offs.

We had other tax spin-off investigations that were completely stopped.    We haven't done anything on those since.    But yet they were moving on those other ones. But we were not there.

BY <u>MAJORITY COUNSEL 1</u>:

Q    And is that atypical?

A    Yes.    Normally, we would have been invited, especially because those other spin-off cases -- one of them has a tax component to it.

Q    And the timing of that was late January, early February 2023?    Is that right?

A    Yes.

Q    Okay.

A    I did hear from FBI that they were being treated the exact same way -- that they had to communicate through their SAC to the U.S. Attorney in Delaware.

Q    Can you tell us who you heard that from?

A    So I could -- so her name -- I'm not meaning to be -- so it's Michelle Hoffman. I know she's a career employee there.    I would ask that if her name could be redacted,

that we redact it.

Q       Understood.

A       But I don't want -- because she's not someone that would want to be brought into something like this.    She has a career.

Q       Understood.

Taking a step back on the issue of spin-offs, how would it typically work if you were working a large case and you learn of other information that leads you to think you need to investigate a spin-off in another issue?    What kind of process would normally play out?

A       So the process is a little bit different because we're with this international tax group.   We can work cases anywhere.    So the venue for the stuff we work really doesn't matter.

But typically within our agency, if we have a spin-off and there's -- there were other spin-offs in this case that we spun off the information to another IRS office.    So we actually met with them.   We sat down.   Here's the evidence.    And then they took the case on after that.

But the ones that I held closely in this case were ones that were in the area of where we were working this case, and they were -- it was information -- they were current investigations I was conducting.

Q       So the nature of these specific spin-offs would typically involve your international tax group --

A       Yes.

Q       -- on a going-forward basis?

A       Yep.

Q       Okay.    So after October 2022, any other concerns or instances that might

be considered retaliation that you have?

A    None that I can think of.

[Discussion off the record.]

Mr. ███.    Could I say something else real quick?

MAJORITY COUNSEL 2.    Of course.

Mr. ███.    So what's kind of the most shocking to me is that we were on the trajectory of charging the case.    And we literally finished our investigative steps.    The pros memo from Department of Justice Tax was written.    I had worked with the -- they call it a third-party person who reviewed the case.    I had discussions with him.    And in all reality, we were looking towards indicting.

And to hear from the DOJ Tax people -- they weren't sure whether David was going to able to sign the indictment alone or whether it would have to be David and the U.S. Attorney in that area.

And now, I've come to learn through everything that David couldn't sign an indictment that's out of district.    He had to have that U.S. Attorney there.    That's what my understanding is, at least.    And I've come later to hear -- through multiple people, that California also said no.

So now you have -- and that's another frustrating part was we asked to present this after we found this new information related to 2014 and 2015 to D.C.    We wanted to present the case, the facts.    And we were not afforded that.    We wanted to do the same thing to California.    And we were not afforded that.    It was always, we'll handle it.

And this is very atypical.    Up until October, we were very involved with -- here's the evidence.    Here -- helping them out through their writing of their pros memo.

BY MAJORITY COUNSEL 2:

Q    Can we just break down each of the years involved and help us understand

how much money is at stake?

A      Yes.

Q      Starting with 2014?

A      Okay.    So 2014 -- it would have been false return and evasion of assessment that we were looking into.    So 7206(1) -- Title 26, [U.S.C. Section] 7206(1), and Title 26, [U.S.C. Section] 7201.    I'm going to go through the charges, and then I can go through them by year, if that's okay.

Q      Okay.

A      And then 2015, we proposed charges for Title 26 United States Code [Section] 7203, failure to timely pay tax.

Tax year 2016 was, again, [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2017 was [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2018 was [Title 26, U.S.C. Section] 7201, evasion of assessment and payment; [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax; and [Title 26, U.S.C. Section] 7206(1), false return.

So just to be clear, failure to timely file and pay tax -- that's a misdemeanor.    And false return -- false return and evasion are felonies.    So false return is basically that an item you report on your return is false.    So it's a little bit different than the elements for evasion, but it is essentially the same thing.

And then 2019 was failure to timely file and pay.

So Hunter Biden had had a lot of tax issues, even predating all of this stuff.    Back in 2002, he filed his Form 1040 late-filing and owing over $100,000 in taxes; 2003, owed more than $100,000 dollars in taxes; 2004, late-filed and owed more than $20,000 in taxes; and then 2005, late filed his personal return and owed over $100,000 in taxes.

[11:47 a.m.]

Mr. ███████.   So he had a history of tax issues.

So those tax issues is why he asked for Eric Schwerin to be his finance accounting person.   So that happens in 2006, 2007, because of the issues that Hunter was having with his taxes.

So Eric Schwerin actually creates an entity called Owasco P.C., which was a C Corp. And so the problem that Hunter was having was he was receiving a lot of [Form] 1099 income.   So that [Form] 1099 income wasn't having any taxes withheld.   So that's why he was owing a ton of money when it came to filing his returns.

So he created this C Corporation.   The C Corporation would take in this 1099 income, and it would pay him a salary in W-2 wages.   So Eric Schwerin sets that up.

BY <u>MAJORITY COUNSEL 2</u>:

Q      Do you know what he was doing to earn the money?

A      At that time I believe it was legal work.   I don't remember off the top of my head.   But I know that he worked for a law firm for a period of time.   Oldaker Biden -- my memory is not the best on that.   I do know it was for legal services.

Moving forward -- and the reason why this was so important is -- for 2014, so he enters into this Burisma contract.   And the Burisma contract is with him and Devon Archer.   So they were earning a million dollars a year, both of them, for being put on this board.   And essentially Archer was put on the board one month before Hunter was.   So as a part of getting on that board, Hunter sends an email to Devon Archer, stating here's my plan for how we're going to pay -- or here's our plan for what we're going to do with this million dollars.

At that time Devon Archer and Hunter Biden were also looking into this Bohai

Harvest investment.    There was about a million dollars that they had to put forward.

Hunter didn't have the money to put that forward.    So Devon was, like, why don't I take

part of the Burisma money.    We can pay another part of it to you and then half of it will

go into the investment in this Chinese company.

So [Hunter Biden] sets this out in this email and what ends up happening is -- so

imagine this.    If you are an owner of a company and your friend tells you that, I want to

pay my wages to your company and you're going to loan the money back to me, that's

essentially what happened here.    He took loans from that corporation -- which were

distributions.    And he didn't pay taxes on those loans.

So what we had found is that -- can I pause for a second?

MAJORITY COUNSEL 2.    Off the record.

[Discussion off the record.]

Mr. ████.    Back on the record?

BY MAJORITY COUNSEL 2:

Q    Yes.

A    All right.    So essentially for 2014, we had found that Hunter didn't report

any of the money he earned from Burisma.

So the reason why this is important is because Hunter set it up this way, to

not -- to essentially earn the money through his friend's corporation and then have his

friend pay him back half of the money as loans, quote, unquote, loans.    So --

Q    How much in tax liability are we talking about here?

A    Okay.    So -- no, these are the -- oh, you printed it up.

Mr. Zerbe.    Yeah, I --

Mr. ████.    Okay.    So -- the most conservative approach would have been

$124,845 in tax loss.    So this would have --

Mr. <u>Zerbe.</u>   For what year?

Mr. ███.   For 2014.

So this would include payments that he would have received directly from Rosemont Seneca Bohai, so $315,000, payments that were made by the Rosemont Seneca Bohai entity by Archer for Sportsman or for Hunter's benefit, so $4,500 that was paid to a medical bill, and then another medical bill of $6,000.   So that's the most conservative approach.

In addition to this, we had a Porsche that was purchased through Rosemont Seneca Bohai that was for Hunter's benefit.   That was from Novartus holdings which is Kegnes Rakishev.   Kegnes Rakishev is a Kazakhstan official or a Kazakhstan person.

And from what we were told, this was paid for Hunter to build a Tesla dealership in Kazakhstan.   I took it to be that it was for future business that the two of them might have together.   But the --

BY <u>MAJORITY COUNSEL 2</u>:

Q    So none of this was taxed.

A    None of it was taxed.

Q    And to date none of it has been paid or prosecuted.

A    So none of this has been paid or prosecuted.

And I would also like to note that the statute has run out on these tax years or on the 2014 tax year.

Q    Okay.

A    They were extending that statute up until December of --

Q    It's a 6-year statute?

A    Yes.   They were extending that statute -- he was signing statute extensions. And from the best of my knowledge, he never continued to sign those.   And I do not, as I

know it today, that the 2014 tax year, the statute's gone.    I have brought up that --

Mr. <u>Zerbe.</u>    Right.    Go ahead.

Mr. ███████.    I have brought up that if we went based on an evasion theory, that he evaded these taxes -- so one more step to this is Hunter to his counsel told them about this scheme.

So basically said -- Devon Archer was handling the taxes and I was taking some of the money as loans.

So there's documentation of this and the date, everything.    So we viewed that as he's lying to his attorney.    He's telling his attorney exactly what happened, and he's trying to cover it up.    But ultimately it gets found out, and then Eric Schwerin ends up investigating it and figures out that, hey, you didn't report this money.    You need to file an amended return.

It's actually included on the marital separation agreement this tax due and owing related to this unfiled or related to this amended tax return.

So they actually were preparing and trying to file the [amended] returns.    We have found out that Hunter might have received advice that if you don't have the money to pay your taxes, then you don't have to -- then I wouldn't file your tax return or that amended tax return.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    Under what conceivable theory did DOJ not find that to be worthwhile to prosecute?

A    They believed -- they believed the fact that the -- they believed their defense that the money was a loan and that -- so through our investigation we did find out that --

Q    What did they contend it was a loan for?

A    Well, that was our argument, that you can't loan yourself your own money.

It just doesn't make any sense.    So --

Q    I mean, this just seems to be a series of sham transactions, correct?

A    So, yes, I would agree that the transactions would -- you would want to sham the transactions, yes.

I do know that, there were some issues prevalent that were brought up related to Devon Archer and his credibility.    So, also having a potential witness there, was also a problem.

But I offered, well, why don't you have the agent testify to this email?    The email's pretty clear in what he's setting out here.    Why doesn't an agent testify to this?

Q    At least with respect to the Burisma income --

A    Okay.

Q    -- he's getting a million dollars a year.    It started at least part of the way through 2014.    Okay.    So maybe it's 600 and --

A    So it's $666,667.

Q    Okay.    So he received 600 -- you know, north of $660,000 for serving on the Burisma board by all accounts for doing nothing.    And that money completely escaped taxation, correct?

A    A portion of it was taxed.    The reason why a portion of it was taxed -- and I don't want to get into the details.    But the money held in the account that was going towards investments, so the half that was going for that Bohai Harvest investment, that half, because there was no offsetting expense, would have been taxed.

Q    Okay.

A    Does that make sense?

Q    Okay.    Yes.

A    Because there was no offsetting expense, he wasn't deducting the payments

he's making, so Archer wasn't deducting the payments he's making on the return, that money would have been taxed.    So that money Archer would have paid some taxes over for about half of it.

     Q    Okay.

     A    That's why in our theory our most conservative approach would have been half the money.

     Q    Okay.    Okay.    What can you tell us about 2015?

     A    Okay.    So for --

     Q    He's getting a million dollars from Burisma in 2015, correct?

Mr. <u>Zerbe.</u>    Excuse me.    I want to make sure.

<u>MAJORITY COUNSEL 2.</u>    We're off the record here.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>    Okay.    We're back on the record.

Mr. ███.    So 2014 and 2015 are interrelated because this is -- during 2014 and 2015, Hunter is having his [Burisma] payments paid to Rosemont Seneca Bohai.    So essentially what happens in 2015, the amount of taxes he owes at the end of the year, which I'm going to explain in a second, is because of what happened in 2014, because of this setup.

     But what he brought up that I wanted to reiterate is the 2014-2015 tax year can still be in play.

     And so what ended up happening is we were assigning statute extensions.    We were having these meetings on the 2014-2015 tax year.    And I believe that from what happened is, because D.C. said no, they have since let that statute run.    So they no longer asked for statute extensions.

     I never got ahold of those statute extensions.    I don't know what they look like.

But what I could say is, if we had a neutral person come in here, in explaining my theory that in an evasion case, it's your last affirmative act.   If there are affirmative acts which [I believe] there are within the last 6 years, then we could potentially work that tax year.

Mr. <u>Zerbe</u>.   And you use affirmative acts.

Mr. █████.   I believe that there could be but I'd have to look at -- I would argue that there could be.   And then that being the meeting that he had with his attorneys where he basically tells them what happened and I view that as a lie, because what he did was actually different than what happened.

BY <u>MAJORITY COUNSEL 2</u>:

Q      Okay.

A      So 2015?

Q      2015.

A      All right.   So in early 2016, Hunter and Devon Archer receive a document request related to Devon Archer's Tribal bonds scheme.   So that document requests from Hunter.

So Eric Schwerin says:   What's this Rosemont Seneca Bohai entity?   You always told me that you had it taken care of.

So Eric Schwerin starts investigating it.   Starts investigating it in March and April. Eric realizes that the [Burisma] money from 2014 wasn't reported.   So they need to report that, the money that Rosemont Seneca Bohai is earning, [on Hunter's] 2015 [tax extension].

So on the extension they include income from Burisma.   They pay a large amount of money with the extension.   And when the return is filed, Hunter owes, with this 2015 filing, so October 15, 2016, he owes $176,550 with no payment.   So at the time of filing, it's that amount.

In May of 2017, Hunter starts a self-imposed $10,000-dollar-a-month payment plan, making seven payments of $10,000 over the period May of 2017 through March of 2018, and then stops.

So our theory was with our case was that the amount that he owed after that payment plan stopped would be the most conservative amount.   So it would be $100,675.

But you could argue that the actual amount that he reported when he filed his return and did not pay $176,000, that that would be the tax amount [charged].

BY <u>MAJORITY COUNSEL 2</u>:

Q     Okay.

A     And that amount has been paid.   That amount has since been paid.

Q     The $176,000?

A     The amount that was owed for the 2015 tax year, yes.

Q     Okay.   And what was that amount?

A     It was over $100,000.   So it was including penalties and interest.

Q     So 2015's off the table now?

A     2015, yes, 2015 would be off the table because it followed the 2014 tax year. So that was D.C.

Q     Okay.   When you sought to get this prosecuted in D.C., what year was that for?

A     2015.

Can you ask the question again.   I'm sorry.

Q     Well, if you say 2015 has been paid --

A     Oh, so --

Q     I'm just trying to reconcile.   You said 2015 has been paid.

A      Yeah, so --

Q      But 2015 was also sent to the U.S. Attorney's Office in D.C. for prosecution.

A      With a willful failure to timely file and pay [charge] --

Q      Uh-huh.

A      -- the statute is that the taxes are owed.

And even if you pay them after --

Q      Uh-huh.

A      -- the crime still --

Q      Okay.

A      -- occurred.

Q      Okay.    Fair enough.

A      Yes.    2014 and 2015 in D.C.

Q      Okay.    And then what can you tell us about 2016?

A      Okay.    For 2016, there's quite a few things.    So --

Q      Is this D.C. or California, 2016?

A      2016, he didn't file his personal return.    But he did file his C Corp return.

Q      Okay.

A      So he filed one of them but didn't file the other.

And on the personal return, he didn't report payments he received, personal payments he received from Rob Walker.

Q      Uh-huh.

A      So it was $162,179, which would have given additional tax due and owing of $69,000.

Q      Okay.

A      But those payments, there was a reliance issue with that.    He had told this

or Eric Schwerin had told his accountants about those payments -- or the receipt of that money, in the beginning of the year, the [accountants] dropped it off later.   So we knew that there was going to be an issue with that.

So the only thing on the table for that year was the failure to timely file and pay the taxes for his personal return --

Q     Okay.

A     -- which would have been $45,661 that he filed with -- when his [Form] 1040 was [filed] --

Q     Okay.   And how about 2017?

A     Could I say some other stuff regarding 2016 --

Q     Okay.

A     -- real quick?    During the fall of 2017, Eric Schwerin and his accountant, Bill Morgan -- and I have to say that Bill Morgan has since passed away.    He died in 2019. But that was his accountant.

Both made a significant effort in getting Hunter -- in getting the prepared returns to Hunter.   They sent multiple emails to Hunter and even a package with the returns, ready to go in his office.    All he had to do was sign it and mail it in.

In an email from Hunter to Eric Schwerin on November 17, 2017, he says:    "Also, I just saw last week the unmarked envelope in the office requiring signature for my taxes."

This email further confirms that Hunter received the 2016 tax returns but failed to file them timely with the IRS.

And the venue for that would have been California.

Q     Is that because he moved to California?

A     With the failure to file, it would have been where you lived.    I'd have to

look back in my notes.    But this one also could be D.C. or California.

Q     Okay.    When did he move to California?    Do you know?

A     I know he officially moved April 1st, on or about April 1st, 2018.

Q     2017?

A     Yes.

Failure to timely file and to pay taxes owed when -- so this is for both his

corporate and personal returns.

Q     Uh-huh.

A     The taxes owed when he filed his Form 1120 was $13,630.    I don't believe

that those taxes have since been paid but -- to the best of my knowledge I don't believe

that the corporate taxes, that small amount has been paid.

Q     Okay.

A     And then for his personal return, failure to timely file and pay his taxes owed

when his Form 1040 was filed, $581,713.

Q     So half a million dollars.

A     Yep.    And that has been paid and that is through, which it's in the media, is

through Kevin Morris paid that.

Q     When was that paid?

A     That was paid in and around October of 2020 or October 2021 -- I

apologize -- 2021.

Q     Okay.    How about 2018?

A     All right.    So 2018 was the false return year, but then you also have failure

to timely file and pay because these are the returns that were filed late.

So what ended up happening is Hunter goes out to California in 2018.    In his

book he's talking about substance abuse and drug use and all these different --

prostitution --prostitution use and all this different type of stuff.

So in 2019, he marries his wife, Melissa Biden, Cohen-Biden.   And he is newly sober.   At that same time, I believe there's also a Senate investigation, and he also is having the Arkansas child support payment case.   And then at that same time he also had the ex-wife that he was in breach of the marital separation agreement.   So he has all these things coming to a head.

And it's not until November of 2020 -- let me go back to the first page.   It's not until November of 2019 -- I apologize -- 2019 that he hires Edward White & Company as his new accountants.   So he hires Edward White.   They're out in California.   And the reason why is the judge in the Arkansas court case asked for tax returns.

Q     Okay.

A     We believe that that was part of the reason why.

So February of 2020, he files his 2017 and 2018 Forms 1040 and 1120.   2016's [Form 1040 was] not filed at that point.   July of 2020 --

MAJORITY COUNSEL 2.   I should note we're at our hour mark.   We want to be respectful of our time.   So we may have to push pause.

MINORITY COUNSEL 1.   Okay.   That's great.

EXAMINATION

BY MINORITY COUNSEL 1:

Q     Thank you very much for appearing before us today.

I have some questions that I wanted to go over from some of the things that you had already mentioned, and I want to make sure that I actually had them correct in my notes.   Some things should be relatively straightforward.

You talked about being on the case, and you were assigned to the case November of 2018.   This was in your opening statement.   You were talking about the fact that you

had gotten some comments from some of the AUSAs about the case itself.

You had said, quote, "After three of these filings, they said that we could go forward."

What were the three filings that you were referring to?    This was in the context of, I guess, moving the case forward.

Mr. <u>Zerbe.</u>    Can we go off the record here?

<u>MAJORITY COUNSEL 1.</u>    Off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ████.    My initiation packet, so sending the case forward to get -- we call it subject case.    It's an SCI.    It's elevating the case to actually working the investigation.

My first one showed the unfiled returns and the taxes owed for 2015 and that was it on my first package.    So that was the wrongdoing that we were alleging.

And my supervisor goes:    You don't have enough.    You need to find more.

So I kept digging for more and more.

And even after that point, he goes:    You haven't found enough.

So I ended up searching bank reports that [I] ran on the periphery of what we were looking at.

So I ran bank reports for Burisma, and in those bank reports I had found additional payments that Hunter had received.    And then at that point I had found that Hunter did not report the income for 2014 related to Burisma.

So now I had a false return year.    So that alone -- it was basically so much evidence that I put in there -- allowed us to elevate the case.

BY <u>MINORITY COUNSEL 1</u>:

Q    You filed three of those initial reports?    Is that what the three filings were,

or was it three times going back to him?

    A    Three times going back to him.   That would be the correct way to state it.

    Q    Shortly after that, you talked about in March and April of 2018 that Attorney General Barr had made a decision to join the cases.   And then you said that Delaware had opened the case.   You said January of -- is that 2019 or 2018 or 2020?   I didn't get the year.

    A    It was January of 2019 --

    Q    Okay.

    A    -- that Delaware, U.S. Attorney's Office, and FBI had opened up the investigation.   They wouldn't have been able to see in our IRS system that we had a case open.

    Q    Okay.

    Mr. <u>Zerbe.</u>   Let me go off the record.

    [Discussion off the record.]

    <u>MAJORITY COUNSEL 3.</u>   Back on the record.

    Mr. ████.   Okay.   So that would have been that we joined -- you're talking about one that we joined together?

        BY <u>MINORITY COUNSEL 1</u>:

    Q    [Nonverbal response.]

    A    May of 2019.

    Q    Okay.   You're talking about 2019.   You were mentioning the fact that there was a George Murphy that was writing memos or emails and documenting some of his conclusions that were on the other side regarding this case.

    Could you tell us more about him?   What's his title and who is he and how does he relate to you in terms of your chain of command?

A       So it was actually Matthew Kutz.    He was my supervisor at the time and from the articles that he was sending me, I would say he had more of a liberal view than I had and it was pretty obvious from the things he would send me and discuss.    And that's just me making an observation.

So I later found out about these memos that were put in the file regarding the issues that he saw with the investigation, the fact that we even had it opened.    So I only learned about those after.

And then it came to a point to where he's sending us so many media articles about different issues that I had to tell him stop, please.    And I had to go around him.    And that's when I went to my ASAC at the time, George Murphy, who was above him.

MAJORITY COUNSEL 2.    Off the record.

MAJORITY COUNSEL 1.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    On the record.

Mr. ████.    So these articles were a lot about -- were a lot of articles regarding Trump and getting a fair investigation and things related to that, Trump's tweets and stuff like that.    So, that's what drew me to my conclusion.

BY MINORITY COUNSEL 1:

Q       What was the purpose behind him sending you the Trump tweets?    What was he trying to get at, or was he trying to give you more information for your case? Why would he send those, or do you know?

A       Yeah, I think he was bringing up concerns with potentially us prosecuting the case down the road, potential issues we're going to incur.    I don't remember the exact email that he sent that caused me to be -- that he had to stop sending me some of the news articles, because it wasn't even the fact that he was sending me these news articles.

It was the opinion he was providing in those emails that I did not agree or that I did

not -- not agree with but did not think was appropriate.    That's --

Q    Okay.    You mentioned -- this is a little ways later -- I believe on September

the 9th of 2021 that you had an email.    You were reading through it, and you had

mentioned that Stuart Goldberg was leaving town.

You said there was a name that you wanted to leave out when you were reading

the email.    What was that name?

A    So it was the name of Hunter's personal counsel, George Mesires.

Q    Okay.    Moving forward -- and we are into October 12th of 2022.    You had

mentioned, I think, at some point that you had maybe a list of 30 individuals you wanted

to interview.    Then they had maybe dwindled that down to, say, 10.    On October 12th

of 2022, you said the last interview took place.

How many interviews did you do in total?

A    Of witnesses?    Well over 60.

Mr. <u>Zerbe.</u>    No, no, no.

Of the 30 that you had put in the list, take her through what happened to that list

of the 30.

Mr. ████.    Oh, okay.    So of the 30, of the 30 that were in the list, I believe we

talked to or had the opportunity to talk to all of them or a majority of them.

And there were even additional ones that came after that.    So I think total in the

case we talked to maybe 60 witnesses, if not more.

BY <u>MINORITY COUNSEL 1</u>:

Q    Is that typical for the amount of taxes that were owed in this case that you

would talk to 60 witnesses?

A    Yeah, so I would say when it's a joint investigation with FBI and

IRS -- especially for a false return to where they're deducting things that appear personal, that would be typical that you would go out and talk to people around him at the time, that these returns are around, or that the tax returns are around.

I guess this kind of has a nuance, though.    So a lot of the issues that we were encountering were regarding substance abuse.    So his frame of mind, was he -- like he was obviously involved in these large dollar deals.    But -- how did he act?    Was he in a clear frame of mind?    Was he a functioning addict?    All those different things were important and why we went and talked to a lot of the witnesses we talked to.

Q      Okay.    A little bit later on you had mentioned that he was sending Venmos to family and friends.    In particular, one person was Valerie Owens, his sister.

What was the amount of these Venmo transactions?    I know you wanted to reach out and talk to the individuals.    What was the size of the Venmo transactions?

A      I'd have to look back at them, but they were between zero and $2,000.

And I know that some of the family members were on trips and went to visit with Hunter during this time period.    So that's why some of those things, if they were out there, visiting him and he's claiming that these are business deductions, they would give insight as to where, what business was he doing, stuff like that.

Q      Is this typical that you would want to talk to people's grandchildren and relatives when they have amounts that are between zero and $2,000?    Is that typical?

A      So I can say for the kids -- there was Columbia school tuition, $30,000.    That was deducted -- I believe that was for ██████ or █████.    There was prep, study prep, checks that were deducted for one of the kids or one of -- and when I say the kids, one of Hunter's kids.

So it wasn't just those smaller dollar amounts.    There were others that were included in there.

BY <u>MINORITY COUNSEL 2</u>:

Q      Following up on that, the deductibility of tuition expenses and fees is sort of a matter of law.    Right?

A      Yeah.

Q      -- its treatment is pretty clear in the Tax Code one way or the other.

What kind of information would you generally hope to gain from talking to the grandchildren about payments that were sent?

A      So there were other payments or other credit card payments, so for clothing, for jewelry, for certain things.    There's a ton of different expenses that were also included in there, in addition to something like Columbia or prep or the tuition.

So as a part of our cases -- you have to have a third party that comes in.    And we can't just rely on that statement that, oh, it's not deductible.    We have to actually call someone in, as a witness, to --

Mr. <u>Zerbe.</u>    Confirm.

Mr. ███.    -- confirm what that's for.    There's a legal term for it, but I can't think of it off the top of my head, for why we have to do that.

BY <u>MINORITY COUNSEL 1</u>:

Q      Typically, and we're asking here, if the IRS goes to investigate an individual for taxes that weren't filed or weren't paid, such as the situation that we're in now, the IRS goes out and talks to all of their relatives and grandchildren and other people, 60-plus witnesses, that's typical for a case?

A      What I would say to that is every case is different.    You have to follow where the evidence leads you.    If evidence is leading you to family members or people receiving payments on behalf of that person, then those would be leads that you would go and follow.

So in addition to some of this stuff that we've been talking about, he also had members of his family, including Lunden Roberts, on his payroll.    We know that during the time period she was paid, she did not work for him.    So he was deducting things for salary for employees that were his family members.    A lot of those witnesses are people we would go and talk to.

Q    Before you get to this point, is there any set of questions that you send out to the person that they can answer and respond back to you?    Or is it at the point that it reaches your group it's like, 60 interviews?    You're out, talking to every person that they know.

Is there an opportunity for the person to agree or not agree to anything that you're saying is personal and maybe not a proper business deduction?

A    So when it comes to witnesses, those interviews are voluntary.    They don't have to talk to us if they don't want to.    So a part of what we do in our job is we go out there and we interview witnesses.    So there are situations where we can let them know that we're coming but the majority of the time we go and it's a surprise visit.    So they don't know that we're coming.    They're not prepared for what they're going to say. That's typical of our cases.

Q    Is this in a situation where the person contests what they owe, or do you just do this off the bat if it gets referred to your unit?

Mr. Zerbe.    I didn't hear that que -- can you --

Mr. ██████.    Yeah.

Mr. Zerbe.    Can you say it one more time, ██████?    I'm sorry.

        BY MINORITY COUNSEL 1:

Q    I'm trying to understand if, in this situation, was there some opportunity where any taxpayer -- doesn't even have to be this particular one -- does the taxpayer

have an opportunity to see the facts and decide whether they're going to contest what you're saying?    Could he have just paid this at the very beginning is my question?

A    So -- I guess the problem with that would be the reason why -- let's take a step back, big picture.

So there's IRS civil.    So they're coming in, and they would do audits.    They would do all different sorts of type of work related to civil issues.    So that essentially means that you made a mistake on your return.    You didn't report something.

Where we come in, IRS criminal investigation, is that there was a willful omission or there was a willful criminal act that you took part in, in order to either evade your taxes, to file a false return, to not file timely your tax return, to not pay your taxes.

There's a big difference and there's a big distinction between what's civil and what's criminal.

And so with us on the criminal side, as far as your question goes, does he get an opportunity to come in and explain, so once our case is referred we offer the person an opportunity to talk to us.    We go and do an interview.    If he has an explanation, a lot of people will offer their defenses at that time.

In this case, December 8th, 2020, we went and tried to interview Hunter.    And he declined to be interviewed.    So that's his choice.    That's his right.    But we did afford him an opportunity to explain what happened.

And then as far as when the case is referred, when a case is referred for prosecution to Department of Justice tax, the target or the subject of that case is entitled to what's called a taxpayer conference.    And that's where they meet with their defense counsel, and their defense counsel says here are my defenses.    Here's why I don't think you should charge me.

Q    And did he do that?

A      His account[ant] -- I was not allowed at those meetings which, to be honest with you, that -- sometimes they don't have us at these -- at those meetings.     But with a case like this, of this caliber -- we asked to be at those meetings.     They said that we couldn't be there.     I know of other agents that are at those taxpayer conference meetings.

Q      Okay.     I want to get some sense generally of your caseload and what you work.     How many cases do you currently have?     How many cases did you have back in 2018 when this case was assigned to you?

A      I was new to the group.     So this was one of two cases that I was working at the time.     And then moving forward to right now, I have one large case.     But it includes probably 80 tangential cases -- or 80 sort of spinoff cases that I'm trying to manage and work, as well.

That's abnormal.     Normally for an IRS special agent, normally it's one or two cases that they're working a year because of how much work goes into them.

Q      You mentioned that one of your other cases is paused.     How many cases do you have that are paused?     I don't know how you count the one large one with the 80 tangentials.     But how many of those are paused?

A      Probably 20-ish.     Let me rephrase that.     I would say 10 to 15.

Mr. <u>Zerbe.</u>     Why are they paused?     You might expand on that.

BY <u>MINORITY COUNSEL 1</u>:

Q      I was going ask that question.     So, yeah, go ahead.

A      They are second-guessing the strategy that we're putting forward on those.

Q      Do you have any idea of a timeline when they would get back to you on when they would lift the pause?

A      I didn't -- I was told it was going to be quick.     And it -- I know that my

supervisor is meeting with some of the leadership today to talk about it.

Q      In your cases that you've had, first starting back since November of 2018, coming forward, have you had disagreements in other cases that you've been working?

A      Yeah, yes.

Q      How did that play out?    How do your disagreements play out generally?

A      I can give you an example of in another situation I was working, we also had a person who had failed to file returns and they earned a significant amount of money and they went out into -- I need to be -- so they had that situation at hand.

I went to the prosecutors on the case.    And I said, hey, this person has these unfiled returns.    I'm thinking that specifically with what has happened -- and specifically with what has happened in news reporting related to them, I think we need to go talk to them.

And they were, like, well, no, you probably shouldn't do that.

They at the beginning onset they did not agree with me.    So me and my supervisor, we sat down with them.    And we said here's the reasons why we should go forward and interview [them].    Put [them] on notice regarding a potential tax investigation and see if [they] want to come in and talk to us.

And they were a "no" in the beginning and they changed to being a "yes" and we actually went out and did that and that is turning out to be something successful right now.

Q      Is that the same supervisor that you had on this case or --

A      Yes.

Q      -- is it a different supervisor?

A      Same supervisor, Gary Shapley.

But I want to draw your -- so remember that captive insurance case that I talked

about?   That was a huge disagreement.   I was honestly devastated by that.   And I met with top, top officials on presenting the evidence and presenting the case.   And at the end of the day it was still a "no."

And that was a huge -- I felt that the evidence was strong enough but their opinion was different than mine.   So that was something that -- that's the best example that I can give of that.

Q     You said that there are 12 people, roughly, in your group?   Is that correct?   How many are in your group?

A     Twelve.

Q     Twelve.     Those twelve individuals, did they all -- oh, go ahead.

A     Approximately 12.     Let me --

Q     Okay.     Approximately 12.     Did all 12 of those individuals work on this case?

A     So in some form or fashion, they would have either helped with interviews, been a secondary on interviews.     There are a couple of newer agents who haven't had time to help in our group.

But, I think the notion that our group was removed was they weren't going to assign it to another person within my group, if that makes sense.     They wanted to go outside of that.

Q     How many groups like yours are at IRS?

A     There's only one International Tax and Financial Crimes group.     There are similar groups but they work different things.     So there's a Cybercrimes group.     They specifically work cybercrime cases.     There's an Excise Tax group.     They work alcohol, tobacco.     I forget what specific name they have.     But they only work those types of cases.

So we have specialty groups that are established around.    We're unique to the international tax realm.

Q    Do you have any questions?

BY MINORITY COUNSEL 2:

Q    I do have a few questions.    I apologize that I was late.    I had a preexisting commitment this morning.

I want to also clarify some things in your statement.

Could we talk a bit about C.T.?

A    Sure.

Q    Who is Christy Steinbrunner exactly?    What was Christy Steinbrunner's position?    Do I have that name right?    Christy Steinbrunner?

A    Yeah, Christy Steinbrunner.

Mr. Zerbe.    Can you spell it?

Mr. ███.    She had that correct spelling over there.    So I think --

Mr. Zerbe.    Okay.    Good.

Mr. ███.    She is essentially a line attorney with the national office, and she deals directly with our international tax group.

BY MINORITY COUNSEL 2:

Q    But was she a part of C.T.?

A    Can you say that again?

Q    I think in your testimony we said that the report went up to C.T. --

A    Yep.

Q    -- and that Christy Steinbrunner had been saying all along that this was good to go.    This was the green light.    Or a yellow light.    I'm trying to figure out what the relationship between her and C.T. was.

[Discussion off the record.]

Mr. ████.   So within IRS we have what's called Criminal Tax counsel.   They're our advisory internal counsel for the IRS.   So, when we send a case initiation package forward to DOJ tax, it has to go through their review, as well.   And they provide [an] advisory [opinion].

BY MINORITY COUNSEL 2:

Q   And so Christy Steinbrunner was not part of that advisory group per se.

A   She is -- she's the line attorney who does the initial review --

Q   Okay.

A   -- of the prosecution report.

Q   I see.   Then it goes to some sort of review panel?   I'm still trying to figure out --

Mr. Zerbe.   We'll just take you through it again.   Okay.   So --

Mr. ████.   So from my understanding -- and this is what I've learned after is she reviews the prosecution report.   She reviewed our package.   So let me step back even further.

So this entire case, since Christy was the one who reviewed my initiation package, she's someone I've been communicating to with issues, evidentiary issues, what's been going on in the case.   So I've been keeping her apprised with everything that's been going on.

So when the case comes to her, she's not just taking this cold.   When the case gets up to C.T. counsel, she reviews it and writes what's called a CEM, a Criminal Evaluation Memo.   That CEM, she was telling me the entire time, was a concur and it was what she was calling a green and a yellow light, green for the later tax years, yellow for the earlier tax years.

And what I had learned is that needs to go up to a panel at [CT-Counsel], their national office, because of this case, for them to review.

And what I've heard on the back end -- this is technically hearsay -- is that they all agreed with her recommendation.    But then it went to people above her and they told her that -- your writing appears like you want to give a nonconcur.    So this needs to be a nonconcur to all charges.

BY <u>MINORITY COUNSEL 2</u>:

Q     And there's no document that was produced out of C.T. memorializing that nonconcur judgment?

A     So they provided a -- what, the Criminal Evaluation Memorandum?    So there is a document that is, yeah, that memo.

Q     That's a document that Christy Steinbrunner wrote.    And the idea is that -- and I'm just sort of trying to -- she was told that -- because I assume initially when she wrote it, she concluded, this was a green or a yellow.

Was she instructed to change her evaluation or was there a subsequent other written document that evaluated the work that she's submitted and gave other reasons why there was a nonconcurrence?

A     So, I mean, I don't know that.    Obviously, there has to be records of what went up and then what came back down.    So there is definitely -- if it's there, it's there.

But, I have an exchange with her through Messenger where I said to her:    Did you know that they were always saying it's going to be a nonconcur?

Ms. Steinbrunner responded:    "What?    No. I sent them a yellow light."

After discussing this, I couldn't believe, because we were doing everything in our power to show -- because normally what happens is, if they give us a nonconcur, we try to go back to them with additional evidence or additional investigative work so that they

can give us a concur.

The fact that it came back just a flat nonconcur to all years, it was one of many blows that we encountered.

Q    Right.

A    I had even suggested sending the report up without the subject's name, putting in just the Doe so that people couldn't see.    But they said it would be too hard to take out the details related to the subject, that people would know who it was.

Q    Can you describe for me to the best of your ability why Christy Steinbrunner -- you just said that she represented to you that her recommendation was a yellow.    What is the difference between a yellow and a green?    Why would a recommendation be yellow as opposed to green?

A    So from what my understanding that she said is, yellow is we're concurring but we're giving cautionary statements of these are the legal impediments that we see. So these are the legal issues that we see.    Even though we're agreeing to move it forward, we think that these issues might come up.    But a red is basically, we don't think you should move forward on this.

Q    Were there specifics that she mentioned as far as what legal issues might, what the hazards of litigation were in particular?

Mr. ████.    Can we go off the record?

MAJORITY COUNSEL 2.    Off the record.

[12:46 p.m.]

MAJORITY COUNSEL 1.    We can go back on the record.

Mr. ███.    Part of the impediments were how a jury was going to look at this.

BY MINORITY COUNSEL 2:

Q    And that being because a jury might find the facts sympathetic?

A    Yes.

Q    You alluded to that possibility as well -- when the case went higher up -- or at least -- I'm not sure if you heard this information directly or if this was information that you testified that you heard indirectly regarding a decision that one part of the DOJ had reportedly made that suggested that facts that might have come out in 2014 or 2015 could create something of a sympathetic taint for later tax years.

Is that something that typically, in your role primarily as an investigator, you would discuss in a normal course of business with those who made the prosecuting decision?

A    Yeah, because those are things that we want to counteract throughout our investigation, or those are things that we need to address as a part of our investigation.

Q    And --

Mr. Zerbe.    I'm sorry.    Go ahead.

MINORITY COUNSEL 2.    Oh, no, no, I think that you're sort of anticipating my next question.

BY MINORITY COUNSEL 2:

Q    Would you be able to describe what those factors might have been that would give concern to those making a prosecuting decision?

A    Yeah.    So, you're referring to the meeting that we had with David Weiss,

the U.S. attorney, in September of 2022.

In that meeting he had alluded that DOJ Tax was of the mindset that the jury's sympathy -- related to the death of his brother and the drug use -- would affect the later tax years, and that David, at that time, was weighing whether to go forward based on that or not because he was getting swayed one way or the other.    And David said he felt strongly with the evidence and what we were presenting.

And another part I want to add in is, when we say that the scheme is developed in 2014 -- so 2014, Hunter is entering this million-dollar board agreement with Burisma. So, he is very well aware.    He's not apparent to be on drugs at that point.    It's not until Beau dies in May of 2015 that he kind of falls off the wagon and all these different issues start arising.

So I guess that's also important, is that during his sober -- or not his sober time, but during a clear-of-mind time, he's engaging in this agreement.    And then that caused the false return to be prepared.

But, looking back at everything, I don't know if those meetings held with us were just to make us happy, because David didn't -- we were already told no by D.C., and they told us not to bring forward a case.    I don't even know if at that time whoever at DOJ leadership told them, because I've learned later that he was told that he can't get special counsel authority to charge the case in D.C. and that he needed to follow the normal process.

Q       Okay.    Thank you.    That's a helpful clarification.

Just a few other specific follow-ups.

Going back now to the CT report and your work.    I don't know if it was a report per se.    But you learned of some judgment on this panel.    You went on to say that the leadership nonetheless, notwithstanding this recommendation, ended up pushing this

case through to the DOJ Tax.

What do you mean by "our leadership" in that decision?

A       So I don't know -- I know it has to go up to the special agent in charge, but I
don't know if it went above him.    I thought it would have to go above him.    But it was
either the director of field operations or the special agent in charge approves the referral
that ultimately sends the case to Department of Justice Tax Division.

And so what happens at that point is DOJ Tax then reviews it.    In this case, they
established a third-party reviewer, John Kane, to come in and look at the merits of the
evidence.    And then, he's supposed to take an objective view of the case, which he was
doing.    And that then goes to Stuart [Goldberg, Acting Deputy Assistant Attorney
General] to ultimately be approved or declined.

Q       In your discussion of the various frustrations that you experienced along the
way in terms of conducting your investigation, you discussed internal IRS issues and that
often you went to the director of field operations, for instance, and that there was a lot of
slow-walking involved in the IRS.

Do you think that the fact that they approved or pushed forward, in IRS leadership
and the director of field operations, a case which had otherwise received a negative or a
nonrecommended charge from this review panel is indicative of the fact that they weren't
trying to slow-walk anything?    How do you reconcile, I guess is my --

A       No, I understand what you're saying.

So CT counsel is advisory.    They took the maximum amount of time to review this
case that they could possibly take.    That's first off.

As far as my leadership goes, we're trying to point out that the slow-walking and
the approvals for everything, a lot of that happened at the U.S. Attorney's Office in
Delaware and DOJ Tax level.    So it wasn't more -- and we were just trying to make our

leadership aware of all those issues that we were encountering.

Q    So the slow-walking was not from the internal IRS per se, or maybe it was at the behest of DOJ --

A    Yeah.

Q    -- you suspect?

A    Yes.    And I would like to say that -- it appeared that our agency had their head down and didn't want to know any of the details or problems that we were having. We would communicate a lot of issues up, and they would say that they're communicating those higher than them, but we would never know if that were to happen.    We only ever met one time with the chief on this investigation, and it was towards the middle of our investigation.

I wanted to -- maybe this fits, maybe this doesn't, but -- communication issues.

So there's an FBI supervisor -- this is August 25th, 2022.    So Garrett Curley is his name.    He was an acting supervisor over the group that was working this case.

He says:    "I know we have our monthly meetings" -- and this is going to Lesley Wolf, AUSA for Delaware -- "but dissemination of information in between those meetings is being missed.    At least for me, I'm finding out about meetings, updates, and interviews well after the fact, which is causing me to send the wrong information to my headquarters.    I figured with everyone's schedules, an easiest way to correct this is through an email chain or going back to weekly meetings."

Lesley's response on August 25th, 2022, was:    "Garrett (ph), please stand down on this until we've had a chance to connect the next week."

So he was basically shut down after he was like:    You guys aren't communicating to me.

Q    Did you know if they ended up connecting?

A    I believe that they did end up connecting, yes.

Q    In my experience, sometimes having long email chains on things like that, sometimes things are missed.    Maybe what she was suggesting was a phone call would be easier to talk about.

A    Well, we were such a big team, there was a lot of this happening to where -- like us not being included in the taxpayer conference meetings.    There was a lot of information turned over at those meetings that we didn't hear about or we heard about late.    So there was definitely a breakdown in communication of what we heard.

And one thing that I want to be clear on, that there was information -- and I don't know the detail of that information that was withheld from us -- but there was information withheld from the investigators.

And some of that was withheld for privilege.    But there was other things -- we went out and talked to one of the potential prostitutes.    And there were videos that I've seen out there on Twitter, on the internet, and information related to that person that I had never seen before.

And I brought this up as an issue.    I'm like:    I'm seeing things here.    Why am I not seeing that from you guys?    And when I say "you guys," the prosecutors.    And there was a notion that some information was being held back from us, and I don't know what that information was.

Q    Because we discussed this earlier, that there were leaks, there were multiple leaks throughout the course of the investigation.

Would you say that the number of leaks to the media was typical in this case compared to a normal case in CI?

A    I would say, in my personal opinion, I would say it was low.    With a case of this high-profile nature, I would have thought it was low.

Q      But in terms of a comparably high-profile case anyway.    There were leaks, and there were some -- but you think --

A      So I'd go back --

Q      What's an example of another high-profile case that we're comparing that to?

A      So some of the information that was released -- or some of the information that was leaked related to the Trump classified documents.    So that case.    So there were actual pictures that were leaked from inside the search warrant.    And this is what my memory of seeing things in the media.    So that's something that I remember.    But, I mean -- yeah.

Q      I guess my follow-up is, do you think in a case where there have been leaks and there's perhaps concern about leaks through the media, it's appropriate for, in some cases on some levels, for information to be held in a tight group to sort of -- prevent further leaks?

A      I do understand what you're saying.    But if the investigators don't get the material to investigate the case -- typically -- we investigate the evidence, and we send that to the prosecutors to review, or here's the pertinent stuff.    It's not the other way around, typically.

So I am following what you're saying, but we had, in my opinion, we had no concerns of leaks on our internal team.    Prior to us going overt, prior to that December 8th day of action, up until a couple days before, there were no leaks at all.    So that just shows you how tight-knit our group was.

Q      I have one more question, and then I can turn to ███ again.

I want to skip way forward again to the removal of your team from the investigation.    I guess I have a few questions.

As far as you know, is there still an active investigation in the matter?

A     Yes.

Q     Obviously, the IRS is a very large organization, 80,000-some employees.

I think you recited it for the chairman, but just to confirm -- in terms of layers of review between you and Commissioner Werfel, are we talking six, seven, roughly?

A     One, two, three, four, five, six.    So he'd be number seven.

Q     Number seven.

In the normal course, would you expect that the Commissioner of the IRS would have direct knowledge of any kind of personnel shifting or maneuvers seven levels down?

A     I would think in a case of this nature, if I were a leader of -- if I were in charge of an agency, I would want to know about stuff that's going on with inside the IRS, and here's the reason why.    It is things like this can affect the reputation of the agency. You know what I mean?    It's a big risk with something like this out there.    And, that's my opinion.

Q     But you have no reason to believe that Commissioner Werfel knew of this short of his being informed by perhaps his deputy or someone below under the normal course of events, someone in the command would have to explicitly inform Commissioner Werfel.    For instance, Commissioner Werfel would not in the normal course directly make these personnel changes.

A     So I would say that he knew that there were, prior to my email, he knew that there were whistleblowers related to this case because they specifically asked him about whistleblowers within the IRS.

Mr. Zerbe.    I want to make sure -- you made one point.    I think you need to clarify it for him.    He asked if the case is going forward.

I think for everybody here, explain though that it's not just kind of Garanimals

where they can swap you in and out.    Talk about, you not being on the case, you have to put somebody in new, but kind of how that impacts.    I just want you to understand that.

Mr. ███.    So what's frustrating -- and I think it's obvious is he removed two of the people who have been challenging and been kind of like this is the -- we're trying to do the right thing, we're trying to do the right thing.    And it was kind of like we got loud enough, and they found an avenue to remove us.

I have been told by so many people on this case that we're where we are today because of my work.    It's 5 years of an investigation.    You can't just pick up that and move it onto someone else.

And if they removed all the prosecutors, DOJ Tax, and had a brand-new team, I would understand that completely if that's the decision that they made.    But they just removed us.    Not our management -- I mean, that right there should tell you a lot.

Did I answer that?

Mr. <u>Zerbe.</u>   Yeah.    Let me go off the record.

[Discussion off the record.]

Mr. ███.    On the record.

I just want to say that I made every effort to -- when we work these cases, you have to be careful of what you might say that could be used against you if you were to go to trial or if you were to go in front of a grand jury.    Usually, the IRS special agent is the final witness, the summary witness.    So things that you put out there in emails, they can attack you at a later date.

So I did everything that I could to possibly make the record as clean as it possibly could, investigated the case, but in doing that, here's all the things that happened because of that.

<u>MINORITY COUNSEL 2.</u>   ?

BY <u>MINORITY COUNSEL 1</u>:

Q    Okay.    I only have one other question that I wanted to go back to.

In your cases that you have, the what I would say spin-offs and everything that you've worked since November of 2018, are there any other cases that involve sensitive individuals that you would consider to be sensitive cases?

A    Not of a political nature.

Q    Okay.    Is this the only case that involves, say, children or family members of a politician?

A    Yes.

Q    Okay.    Are there any cases that involve politicians themselves?

A    That I've been removed from or --

Q    Just that you've worked since November of 2018.

A    That are spin-offs of this case?

Q    Just in general.    I'm trying to --

Mr. <u>Zerbe.</u>    I don't think she's trying-- let me think about it.

Let me go off the record?

[Discussion off the record.]

Mr. ████.    On the record.

This is the only one that is of a nature that's politically sensitive.    So the answer to your -- yes, this is the only one.

<u>MINORITY COUNSEL 1.</u>    Those are all my questions for now.    Thank you.

Mr. <u>Zerbe.</u>    Can I suggest, if we could take a break.

<u>MAJORITY COUNSEL 1.</u>    We'll go off the record.

[Recess.]

<u>MAJORITY COUNSEL 1.</u>    We'll go back on the record.

We've got a series of questions we're going to jump back into.    I know you had a lot of prepared materials, and I just want you to know that when we get to the end, we'll make sure to give you an opportunity if there's anything we haven't covered.    So I don't want you to think it's your last chance to cover stuff.

BY MAJORITY COUNSEL 1:

Q    Okay.    When we last left off our questioning, we had, I think, just gotten through tax year 2018.

A    Yep.

Q    Could we go back to what we were talking about?    And can you tell us what we need to know about tax year 2019?

A    And do you guys care if I -- so I want to put this in an even bigger picture. And I'm sorry I didn't start out with this, but now that I've got some food in my belly.

Global income streams for everyone altogether, so it's for the period 2014 through 2019, our investigative years, so the total global transfers that Hunter and his associates would have received from Ukraine, Romania, and China was $17.3 million, approximately.    Okay?    So a staggering amount.

So Burisma paid to everyone involved $6.5 million.    Burisma to Blue Star, $540,000.    Burisma to Boies Schiller -- that was the law firm that Hunter was of counsel for -- $288,000.    So that's $7.3 million to those people.

Approximate total transfers from the Romania company -- I say the Romania company, I just want to keep it at that -- to everyone was $3.1 million.    The total transfers from HW III to everyone was $3.7 million.    Total transfers from State Energy HK to Rob Walker was $3 million -- or to Robinson Walker, LLC, correct that.

Total transfers from CEFC Infrastructure to Owasco P.C. was $100,000.    So that's $6.8 million.    So that gives you $17.3 million.

Of this amount, for the period 2014 through 2020, I have extended it one more year, but it pretty much ends at the end of 2019, that's when income stops coming in, it's $8.3 million.   This is what Hunter would have received of that.

So total Burisma net of Devon Archer payments was $2.6 million.   Total transfers from the Romania company via Rob Walker was $1 million.   Total transfers from HW III net any payments to James Biden was $2.3 million.   The total transfers from CEFC was $100,000.   Total transfers from State Energy HK from Rob Walker was $664,000.

You also have cash that was deposited.   That was $50,000.   You have a chip diamond and a larger diamond.   The larger diamond from various reports that I've read, it's about $80,000.   We still don't know where that diamond is at to this day.

You have the Porsche, which was $142,000.   You have half of an investment in a company called American Well that was $25,000.   You have medical payments made by Archer, that's $10,000.   So these are all approximates.   Let me just reiterate that.   And then you have the one-third capital contribution made into Bohai Harvest that was $325,000.

You also have other [Form] W-2 payroll that he received of $859,000.   So that gives you a total of $8.3 million.

This does not also include any benefit or payments received by Kevin Morris. Okay.

MAJORITY COUNSEL 2.   When Kevin Morris paid the 2017 tax bill --

Mr. █████.   He paid the 2017 tax bill, yes.

MAJORITY COUNSEL 2.   That's a taxable event, correct?

Mr. █████.   So can I -- since it's 6103, can I --

Mr. Zerbe.   You can explain it.

Mr. █████.   Okay.   So on Hunter's 2020 tax return --

MAJORITY COUNSEL 2.   Let me ask you this.   Did he plus it up?

Mr. ███.   Did he?

MAJORITY COUNSEL 2.   Plus it up?

Mr. Zerbe.   Let him --

MAJORITY COUNSEL 2.   Okay.

Mr. ███.   What do you mean by "plus it up"?

[Discussion off the record.]

Mr. ███.   Okay.   Yeah.   No, I apologize.

BY MAJORITY COUNSEL 2:

Q    No worries.

A    So on his 2020 tax return, personal tax return, Hunter stated:   "See statement in 2020.   The taxpayer received financial support from a personal friend totaling approximately $1.4 million.   The parties agreed in 2020 to treat the support as a loan and later documented their agreement in a promissory note in the amount of $1.4 million, 5 percent interest.

"The promissory note requires periodic payments between 2025 and 2027.   The promissory note was executed by both parties on October 13th, 2021.

"The taxpayer is treating this amount as a loan for tax purposes.   The balance of the financial support is treated as a gift.   No amount of the support is treated as a reported taxable event on this tax return."

So that's what was filed with the return.

Q    And has that transaction been investigated or --

A    I'm no longer a part of an investigation related to that.

Q    Okay.   That wasn't the question.

The question was, do you know if that has been investigated by the IRS?

A      So I'm going to --

Q      It's a voluntary interview.    If you're not comfortable saying, you don't have

to answer the question, any of our questions.

A      It goes back to one of my -- if there is potentially a current investigation

that's out there to --

Mr. <u>Zerbe.</u>    Let's go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>    Go back on the record?

Mr. <u>Zerbe.</u>    Yes.

<u>MAJORITY COUNSEL 2.</u>    Is there anything else about the tax years of 2014

through 2019 that we haven't discussed that ought to be made clear?

Mr. ███.    Yeah.    There's 2018 that we left off on.    I went through the global

payments.

So 2018 was the false tax return year.

If we don't include relevant conduct -- so relevant conduct is conduct that we

didn't subpoena or that we didn't get records for that could, at sentencing, be included.

So if you don't include relevant conduct and it's just expense items that we

investigated, Hunter underreported his tax return by $500,000 or -- give me one second.

That's including relevant conduct.

Okay.    So he underreported his total income by $267,000, if you are using the

most conservative approach, and that is a tax loss of $106,000.    So that includes

deductions for personal wages and salaries paid, personal travel expenses paid, personal

children expenses that he paid, and personal other expenses that he paid.

So let's talk about his 2018 tax year.

2018 was so significant because, at the same time he is writing his book, he is

having the returns prepared.    And the statements in his book completely contradicted what was being deducted on his tax return.    He essentially said in his book that he was in a drug-addled haze and was essentially learning how to cook crack, was some of the quotes in the book.

So some of the items that he deducted were personal no-show employees.    He deducted payments that were made to who he called his West Coast assistant, but she was essentially a prostitute.

He made payments -- there's an $18,000 wire that is made to one of these individuals, and on the wires they say $8,000 in wage and $10,000 in golf -- $10k golf club member deposit.    And we know that that $10,000 went to pay for a sex club.    He went to a sex club, and we've talked to the person that owned that sex club, and they confirmed that he was there.    And the guy has to pay $10,000, and the girl -- whoever is referring him there doesn't have to pay anything.    So that was deducted on the tax return.

The Columbia tuition was deducted on the tax return.    There were all of these sorts of things.    And the thing that showed his involvement in it is he would actually go through the bank statements and would highlight items that were -- either he was excluding from being deducted or that he was highlighting from his personal accounts to deduct on his tax return.    So it was kind of twofold.

And in addition -- because what we viewed that the accountants didn't feel comfortable with the information being provided by Hunter, they actually made him sign what's called a representation letter.    And essentially with this representation letter, he's representing that all the income is being reported and all the deductions are being -- they're for business nature, and they're being reported properly.

BY <u>MAJORITY COUNSEL 1</u>:

Q     Why do accountants have clients sign those kind of letters?

A     I've never seen that in my career.

Q     Do you have an understanding of why they did that in this case?

A     So the timing of it occurred after he started submitting a lot of these expenditures.   So his expenditures that year were very, very high.

He also tried to -- the money that he earned from Hudson West III, he tried to say that that was a loan.   Same thing we have all going along back to Burisma -- I'm loaning from my own capital in the company -- even though he didn't put any capital in the Hudson West III.   It was zero.   So he was trying to say that it was a loan.   But the accountants were so good that they really dug into it, and they were like:   No, no, no, you can't deduct this -- or you can't take this as a loan on your tax return.

He tried to -- or he deducted expenses for hotel rooms for one of his drug dealers or what we believed to be one of his drug dealers.

He deducted a hotel room for his dad, Joe Biden.   There is an invoice in the dad's name -- I'm sorry.   Not the dad, but Joe Biden's name.   The President, President Joe Biden's.

MAJORITY COUNSEL 2.   For how many nights?

Mr. ████.   What was that?

MAJORITY COUNSEL 2.   For how many nights?

Mr. ████.   It was for two nights.

And let me correct the record.   President Joe Biden's name.   And, yeah, that was included.

There was a significant amount of expenses deducted related to his girlfriend at the time, Airbnbs related to her, hotel rooms.   So he deducted a lot for the Chateau Marmont, and he actually was blacklisted and thrown out of the Chateau Marmont.   We

actually have videos -- or we have photos of the rooms and the destruction that was done to the rooms.

> BY <u>MAJORITY COUNSEL 1</u>:

Q      When he deducted two nights for Joe Biden -- he deducted those as business expenses?   Is that right?

A      Yes.

Q      Was --

A      From what I believe.   I apologize.   I didn't mean to interrupt you.   From what I believe, yes.

Q      Okay.   And were you aware of any business that he was involved in with Joe Biden?

A      So this is a complicated issue, and we really -- there was the 10 percent for the big guy in the Sinohawk deal.   We know that the Sinohawk deal never went through. And that relates to CEFC and China.   So essentially, Hunter cut everyone out of that.

And we do know that there were WhatsApp -- I believe it was WhatsApp messages found that there is clear indication -- and Hunter is saying this in those WhatsApp messages, that:   I'm sitting here with my dad ready to make a deal, we're waiting for the phone call.   And that was one of the -- I mean, we couldn't believe that we saw that. That was more indication that the dad might have been involved.

I know that we wanted to get location data because I went to the prosecutors with this, and they, again, came back at me with:   Well, how do we know that?   He could just be lying and claiming that the dad -- that his dad's there, but his dad is not there.

And I said:   Well, this is what we would normally do.   And I have it on a meeting agenda where we talk about location data.   And I don't know if the FBI ever did anything

with it, but I would think it would be a road we would want to go down or that we could

go down, and the reason being that, if President Joe Biden was getting any source of

income, whether it's through someone else's entity or for his benefit at some point, that

could be income.    So that's why it would matter to us.

Q    Anything else on tax year 2018?

A    There was the fact that he deducted some hotel and travel expenses.    So

they argued that, well, he tried to make his best effort.    And they -- and when I say

"they," that's Hunter and his counsel.    I would argue that this shows that they are

making an effort to not make it look as suspicious.    Deducting everything would be

overly suspicious in an audit, and therefore he tried making as many deductions as he

could to minimize his tax.    That's what my beliefs would be.

There is something else.    So I told you guys about the additional income.    But

you also had the unfiled returns.    So on his personal return for 2018, he owed taxes of

$620,901.    And then for 2019, for the personal return -- so that would have also been a

failure to file year -- that was $197,372.

And there were definitely some issues with the 2019 return.    He withdrew

money from a 529 plan.    It was in the ballpark -- I think I actually -- hold on one second.

Let me go into my notes and see if I -- I have the email here.

Q    Can I ask you something a little more general?

So given all these specific aspects that you're referring to of activities with regard

to tax returns that would you agree, at least, rise to the level of suspicious?

A    Yeah.

Q    What's your general view of why someone would engage in these kinds of

deductions, reporting of expenses, et cetera?

A    So from what I believe based on the evidence is his alimony and his child

support payments are based on how much income he earns.    So if he reduces his income, he doesn't have to pay as much.

Q      And what are you basing that opinion on?

A      I would be basing that on discussions I had with prosecutors on the case and my review -- so my recollection of this isn't as clear, but I do recall that coming up in reviewing the marital separation agreement.

And the reason why I say it's complicated is because it changes as you go throughout the years.    So I don't remember the specifics, but I know that that was a part of it.

Q      Okay.    Understood.

You mentioned CEFC.    Did you look at an entity called CEFC Infrastructure Investment, LLC?

A      I believe so, yes.

Q      Do you know what kind of business CEFC was involved in or pursuing?

MAJORITY COUNSEL 1.    Can I go off the record?

Mr. ████.    Yeah.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record?

Mr. ████.    I don't feel comfortable disclosing anything further on that issue.

BY <u>MAJORITY COUNSEL 1</u>:

Q      Understood.    Okay.

The U.S. House Committee on Oversight and Accountability has publicly identified

a series of companies, mostly LLCs, that are connected to this taxpayer.    We'd like to

walk through the list of companies and ask simply whether or not you've come across

them in the course of your investigation.    A yes-or-no answer is fine.

Lion Hall Group, LLC?

A      Yes.

Q      Owasco P.C.?

A      Yes.

Q      Robinson Walker, LLC?

A      Yes.

Q      Skaneateles LLC?

A      Skaneateles, yes.

Q      Seneca Global Advisors, LLC?

A      Yes.

Q      Rosemont Seneca Partners, LLC?

A      Yes.

Q      Rosemont Seneca Principal Investments, LLC?

A      Yes.    Yeah, I know.    It's abbreviated RSPI.

Q      Rosemont Realty, LLC?

A      Yes.

Q      Rosemont Seneca Technology Partners, LLC?

A      Yes.

Q      Rosemont Seneca Thornton, LLC?

A     Yes.

Q     Rosemont Seneca Advisors, LLC?

A     Yes.

Q     Rosemont Seneca Bohai, LLC?

A     Yes.

Q     JBB SR, Inc.?

A     Yes.

Q     RSTP II Alpha Partners, LLC?

A     Yes.

Q     RSTP II Bravo Partners, LLC?

A     Yes.

Q     Owasco, LLC?

A     Yes.

Q     Hudson West III, LLC?

A     Yep.

Q     Hudson West V, LLC?

A     Yes.

Q     And CEFC Infrastructure Investment U.S., LLC?

A     Yes.

Q     Okay.    Did there come a time when you learned about testimony from Attorney General Garland before Congress?

A     Yes.    So that was actually something I was going to get into in my closing.

So Attorney General Merrick Garland appeared before the Senate Appropriations Committee in April -- April 22nd, 2022.    At this hearing, when he was questioned about the Hunter Biden investigation, he said:    "Because we put the investigation in the hands

of a Trump appointee from the previous administration who is the U.S. attorney for the District of Delaware, and because you have me as the Attorney General who is committed to the independence of the Justice Department from any influence from the White House in criminal matters, the Hunter Biden investigation is being run by and supervised by the United States attorney for the District of Delaware, he is in charge of that investigation, there will no interference of political or improper kind."

Q    And in your experience with the case, did you find that to be accurate?

A    Can I say at the time and where I sit now?

Q    Sure.

A    So at the time -- I don't remember when this topic of what Merrick Garland said came up -- when exactly this came up, but I can tell you that I always viewed it as David was our advocate sometimes.    David was -- if we wanted to go with a big issue, we went to him.

Q    You're referring to David Weiss?

A    David Weiss.    I apologize.    The U.S. attorney.

So if we wanted -- and I viewed him as he's a Republican from the prior administration.    We have to have faith that he's going to do the right thing and that he's going to push this forward and that he is the person we need to get in front of to tell -- because there were times where we didn't believe that what we were stating regarding the evidence was getting to him.    Because our understanding of the evidence was different than what some of the line attorneys' understanding of the evidence, and we wanted to present on that.    It was the 2014, 2015 issue.

And I'm thankful that we ultimately were able to.    But now looking back at it, I think that -- it depends on when he asked for a special counsel, but those meetings that he had with us were for naught because we didn't end up charging 2014, 2015.

Q      So looking back on it now -- what is your opinion of whether his testimony was accurate?

A      I guess I would say that's not up to me to make that determination, but -- in what I know --

Mr. <u>Zerbe.</u>   Do you want to take a break?    A pause?

Mr. ███.    Yeah.    Off the record, please.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ███.    So in response to your question, I can't speak to what Merrick Garland thought at the time or what he might have been made aware of at that time.    I was only aware of certain people within the chain that were aware of this investigation.

But looking back at it, the U.S. attorney, David Weiss, he had to follow the normal process.    He had to go to Washington, D.C., the U.S. Attorney's Office, them saying no. So he really wasn't in charge.    He had to follow the process.

And at the end of the day, he went to political appointees, and he's technically not a political appointee, so it's all back to square one again.

BY <u>MAJORITY COUNSEL 1</u>:

Q      We were talking about a hearing in 2022, which we have as April 26th.    I think you said 22nd, but I think it was April 26th.

A      Okay.

Q      The next year, moving forward to 2023, March 1st, 2023, Attorney General Garland was again testifying before Congress and was asked whether, without special counsel authority, a U.S. attorney could bring charges in other jurisdictions outside of Delaware.

Attorney General Garland said that he had been advised that he has full authority

to make those kind of referrals that you're talking about or bring cases in other jurisdictions if he feels it's necessary, and I will assure that if he does, he will be able to do that.

Based on what you testified to earlier, in your opinion, did U.S. Attorney Weiss have that authority to bring charges in other jurisdictions?

A     In what he said, I look kind of at the words from Merrick Garland, and he said he has the full authority to make the referrals.    Did I hear that correct?

Q     Correct.

A     And, yes, he's in charge of making those referrals, but whether --

Mr. Zerbe.    Read the whole quote again.

BY MAJORITY COUNSEL 2:

Q     Let's just back up here.

The Attorney General said the U.S. attorney in Delaware has been advised that he has full authority to make those kinds of referrals that you were talking about.

A     Yes.

Q     Or bring cases in other jurisdictions if he feels it's necessary.    And I will assure that if he does, he will be able to do that.

And the record reflects -- and correct us if we are wrong -- that the U.S. attorney in Delaware tried to bring a criminal case in D.C., and the U.S. attorney in D.C. said no.

A     That's correct.

Q     The U.S. attorney for Delaware, Mr. Weiss, tried to bring a case in California -- was it the Central District of California?

A     Yes.    It was wherever Los Angeles -- yes.

Q     And he was told no.

A     Yes.

Q      Okay.   So going back to what the Attorney General said, how do you reconcile those two?   Maybe the Attorney General didn't know.   Maybe they were actively keeping information from the Attorney General.   But it's either that or he's lying.

A      Yeah.

Q      Are we missing something?

A      No, I agree with you completely.   And when he said that and I looked back on things, it was completely different from what I recall happening.

My understanding of a person -- so this is from my understanding from what I have heard from other cases that have happened.   If you are a special counsel, you have full authority to bring it wherever.

So I do not know if this is true.   And I'm sure you guys will figure this out.   But DOJ Tax doesn't say:   "Okay, you're approved to charge the tax charges."   I believe that special counsel has authority to bring whatever charges wherever they want.   And in my observations over the past 5 years, that is completely different than what happened.

Q      And the Q&A continues, and it just puts a finer point on it.   And this is with Senator Grassley at the March 1st, 2023, hearing.

Grassley asks as a follow-up:   "Does the Delaware U.S. attorney lack independent charging authority over certain criminal allegations against the President's son outside the District of Delaware?"

And the Attorney General responded:   "He would have to bring…if it's in another district, he'd have to bring the case in another district.   But as I said, I have promised to ensure that he is able to carry out his investigation and that he be able to run it.   And if he needs to bring it in another jurisdiction, he will have full authority to do that."

And as we have seen, he tried to bring the case to the U.S. Attorney's Office in

D.C., to the U.S. Attorney's Office in the Central District of California, and he was denied, and he did not have full authority to bring the case, and he did not have special counsel authority.   Isn't that correct?

A     Yes.

Q     And like you testified earlier, we're not talking about $2,000.   Okay?   This isn't a $2,000 type of prosecution.   This is -- and I believe your number was $8.3 million for Hunter Biden.   And on top of that, it was $17.3 million for the group of folks and companies and concerns involved here.   Isn't that correct?

A     Yes.

MAJORITY COUNSEL 1.   On the issue of special counsel authority, do you know whether U.S. Attorney Weiss requested special counsel authority?

Mr. ███.   I only know this secondhand from what my supervisor told me after that October 7th meeting, that --

MAJORITY COUNSEL 1.   And this is what you know -- [who did you hear this] from secondhand?

Mr. ███.   I know this from Gary -- my supervisor, Gary Shapley -- telling me about what happened during that meeting.   That --

Mr. Zerbe.   Let's go off.

[Discussion off the record.]

Mr. ███.   So I heard it was a contentious meeting.   My SAC and my supervisor were there.   There were members from FBI there.   And they had asked him about this, about bringing the case in D.C., and he explained that he was essentially told no.   And then he went back and asked for special counsel authority, and they told him no.   I don't think they said who he went back to, but they told him no.

BY MAJORITY COUNSEL 1:

Q    So you don't know who he requested special counsel authority from?

A    Yes, I do not know that.    But I know that they ultimately said:    No, follow the normal process.

Q    Do you know when he requested special counsel status?

A    That, I do not know.

Q    Do you know if he did it more than one time?

A    That, I do not know.

Can I add one more thing to the special counsel?    So there are multiple discussions within my agency up to our leadership.    So when I say our leadership, [up] to the DFO.    So the director of field operations saying:    This is a case where we need a special counsel brought in; because of all the problems we're having, we need a special counsel.    And he literally looked at us and was like:    I don't know what that means.    I don't know how to even do that.

And then also to that point, I recall discussions with our FBI counterparts on the case, the same issue.    And I thought that they were trying to raise the special counsel issue up through their leadership.

On that note, I just want to let you guys know that the way that FBI and their leadership -- their leadership was very, very much involved in this investigation.    I heard of multiple times that they were reporting up to their leadership, meeting with their leadership.    They had to advise them on this.

And when I say I felt like we were out on an island, we were left out on an island as it comes to this case.    And there was a clear difference between what the FBI was doing and what we were doing when it came to reporting this case and issues up to leadership.

Q    When you say FBI leadership was involved, do you know how high up at the

FBI?

    A    That, I do not know.

    <u>MAJORITY COUNSEL 2.</u>    You testified this morning in your opening statement that there was a very long list of incidents where the prosecutors in Delaware would not let the investigative team pursue certain matters, whether it was to go overt at a certain point of time, whether it was to conduct interviews, or whether it was with the storage unit.

    And my question is, how do you reconcile that long list of efforts to shut down avenues of investigation?    How do you reconcile that with, ultimately, the U.S. Attorney's Office in Delaware did try to bring charges in both D.C. and California?

    Mr. ██████.    I don't mean to toot [my horn] -- they had me.    They had me that pushed -- traveling on weekends.    I know that people on the case would say that we would not have a tax case right now if it wasn't for me.    If it wasn't for my investigative abilities and the evidence that we found through our investigation, if it wasn't for that, then we wouldn't be sitting here today talking about potential charges.

    <u>MAJORITY COUNSEL 2.</u>    So is it fair to say that, despite their efforts to shut down avenues of investigation, they couldn't fail to bring the case because of the evidence you and the rest of the team brought to light?

    Mr. ██████.    To be honest with you, I think they were -- this is just me talking from my opinion and my perspective -- I think they were always afraid of:    well, that's going to be too many approvals, let's not do that.    They were afraid of all these different things.

    That might touch the campaign, so we can't talk about that right now.    That might touch this area, so we can't talk about that right now.    And it was always, well, we'll sit here and we'll think about it.    We might be able to do it because I'm going to

keep pressuring them to do it.

So I had a long list that I tracked all of our interviews.    And I was like, this is when we're doing this.    I was very organized, and I was very much, like this is what we're doing to get this case done.    And I scheduled everything out.    And I didn't want it to be on me that I was the reason why we didn't pursue the charges in the case.

BY MAJORITY COUNSEL 1:

Q    Do you take that thorough approach to all your cases?

A    Absolutely.

Q    And did you have any reason to pursue this case with any more vigor than any other case?

A    Yeah, I often ask myself:    Am I too much in the weeds, and am I too far into the case that I really don't understand what's going on?

So what I did to combat that was we presented on the issues to neutral third parties.    So our DFO, he sat in for:    Here is the evidence that we had.    Am I looking at this the wrong way?    Am I perceiving this?    And all the people within that chain of command agreed with what we -- that's why it ultimately was pushed forward.

Q    So it wasn't just you pursuing this case on your own?

A    No.

Q    Okay.    I want to go back to what you testified earlier about the day of action.

On that day -- which I understand to be the time when the investigation would go overt.    Is that correct?

A    Yes.

Q    How many interviews were you planning to conduct on that day?

A    So our planning for -- I want to say the approximate number would be 10.

Q      And how many interviews did you actually conduct on that day?

A      So we met with pretty much everyone.    Only one person ended up talking that day.

Q      And who was that?

A      Rob Walker.

Q      And was there anyone you were unable to talk to?

A      Yeah.    There were a lot of people that we were unable to get in touch with.

Q      And why were you unable to get in touch with them?

A      So one of those was the subject, Hunter Biden.    So he had a Secret Service protection detail.    So getting access to him was pretty hard.

Q      Are there ways you can get access to someone that has Secret Service protection?

A      So I didn't go and do that interview.    It was -- if we would have gone a week earlier or when we were supposed to go in the beginning of November.    We were supposed to go, I believe, November 10th, 11th, or 12th.

And it got pushed for -- I don't remember the ultimate reason, but there were a lot of different things being thrown in.    That the election wasn't finalized yet.    That we were still technically on a pause.

So I think there were a lot of different balls in the air, and we just didn't go forward at that time.

So the decision was made out of my hands to not -- and if we would have went, then he wouldn't have had a protection detail.    So we would have been able to do the interview.

Q      Did someone attempt to interview him on the day of action?

A      Yes.

Q      And who was that?

A      Gary Shapley, my supervisor, and Joe Gordon, the supervisor at the FBI.

Q      And they were unable to interview the subject?

A      Correct.

       BY <u>MAJORITY COUNSEL 2</u>:

Q      Do they believe they were hampered by having somebody tipped off --

A      Yeah.   I was --

Q      -- that the interviewees were coming?

A      Yeah.   I was informed of that by my supervisor after.   And I know that that's an issue that he's brought up to me regarding letting Hunter's team -- or letting the transition team know, I think, is the way that my boss put it to me.

Q      Letting the transition team know, the political team?

A      I don't know which.   All he ever told me was it was the transition team. What that entailed, I don't know.

[2:30 p.m.]

BY MAJORITY COUNSEL 2:

Q      Okay.    This isn't the first time that we've heard about the subject, or the target, being tipped off.    You mentioned this morning in context of the storage unit that you did say it was Mark Daly and Lesley Wolf --

A      Yes.

Q      -- contacted Hunter Biden's lawyers and tipped them off about the storage unit --

A      Yes.

Q      -- when you had developed a plan where you were going to not alert anyone on the Hunter Biden side of the storage unit, wait and see if they went to get responsive materials, which you knew was in the storage unit, correct?

A      Yes.

Q      And so by contacting Hunter Biden's lawyers, they totally blew the plan.

A      Yes.

Q      Is that not favoritism?

A      I would hope they weren't doing that for favoritism, but yes, it does look like favoritism.

Q      Was there any other, during the course of the investigation -- I know it's 5 years.    So, there's a lot of time period here.    Were there other instances where the Hunter Biden camp was tipped off by U.S. Attorney officials, or DOJ Tax officials?

A      This might not go into that area.    But, this is something that I wanted to bring that up I thought was -- so in the Washington -- was it Washington -- hold on.    I think it was Washington Post.

In The Washington Post article that came out on October 6th that I referred to, Chris Clark, which is Hunter Biden's lawyer, said in a statement to the newspaper that he's had no contact whatsoever with any Federal investigative agent.    Therefore, a rendition of this case from such an agent is inherently biased, one-sided, and inaccurate.    It is regrettable that law enforcement agents appear to be violating the law to prejudice a case against a person who is a target simply because of his family name.

And, when he said that, it made me think back on we weren't allowed by the prosecutors at any of the taxpayer conferences.    So we couldn't even meet Chris Clark to hear whatever the defense might be.

So I don't know if that was a strategy so that he could make that claim.    I don't know.    But, looking back at specifically what he said, that caused me pause.

Q    Do you think Chris Clark or the lawyers for Hunter Biden actively procured your absence from those meetings?

A    I think they could have, yes.    They could have asked for the agents to not be there.

Q    At these taxpayer conferences, do defense counsel have an opportunity to set the terms ordinarily for those meetings?

A    So I'm usually not in charge of them, but I've never heard of them before.

Q    But you've never been excluded before either, is that correct, to your knowledge?

Mr. Zerbe.    Let's go off the record.

MAJORITY COUNSEL 3.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.    We'll go back on the record.

Mr. ██████.    So I know of agents that are part of those taxpayer conferences, one

specifically with Mark Daly.    There are other cases where he doesn't have communications with defense counsel without an agent there.    I do know that.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    So you found it unusual that you were excluded?

A    Yes, especially with a case like this.

Q    Okay.

A    Can I make one more comment?

Q    Of course.

A    It was relayed to us that his counsel said something like if you charge this case, good luck with finding a job outside of here or good luck with -- it's career suicide I think is what he said.

Q    And who was that related to?

A    I believe that was --

Q    Was that at the taxpayer conference?

A    I don't know when that occurred.    So I don't know which situation that would have occurred.

Q    How was it related to you?

A    It was just relayed to me through either one of the attorneys or through David Weiss.    I don't remember who said it to us.

Q    So you just don't recall who relayed that to you?

A    Correct.

Q    Okay.

Mr. ████.    Can we go off the record for a second?

[Discussion off the record.]

Mr. ████.    Back on?

MAJORITY COUNSEL 2.    On the record.

Mr. ███.    Thanks.    Yeah, so not being there, apparently there was information brought up during those meetings that we didn't hear until weeks after, if we heard everything.    So there could have been things said there that were never relayed to us.

And it's super important for us because if there's defenses being put out there, we're going to want to know everything, because we're the investigators.    We go back and -- when I say the first taxpayer conference, they presented defenses on 2014-2015. We took their defense and worked through them and tried to refute them with the evidence.    And not being there gave a whole -- it wasn't efficient.    It wasn't -- I don't know.

BY MAJORITY COUNSEL 1:

Q    So you testified earlier that there was a time when you got the sense that investigators had not been provided all the information.    You had seen public reporting. Videos, you mentioned.    Were you aware of Hunter Biden's laptop?

A    Yes.

Q    Did the IRS have access to the material on that laptop?

A    So it was obtained by the FBI, and it was an IRS search warrant.    So it was a Title 26 IRS search warrant of that laptop.

Q    Can you explain that for a second?    So it was a Title 26 search warrant meaning --

A    It was only tax charges and the initial warrant that allowed to us essentially get access to the laptop.    So we had to get a search warrant of it and it wasn't --

Q    And the FBI executed that search warrant?

A    So it would have been done by the FBI forensic, like their forensics team.

Q      And was the information on that laptop shared with IRS investigators investigating the alleged tax crimes?

A      So it's quite complicated, and my memory is not the best when it comes to the laptop, because there were   storage backups to it.    There was also the laptop.

We had different members of our team that would -- we had one agent who looked through the laptop.    We had one agent who looked through backups of it.    So there were a variety of people kind of tackling it all at once.    That's kind of how we tried to do everything.

So from what I do know -- and this has been -- I believe I've gone back through statements that were documented -- that there were some things that were held back from us for one reason or another.    But I don't still know what that is.

Q      Were you aware of any other limitations placed on investigators in this case that we haven't discussed?

Mr. ██████.   Can we go off the record?

[Discussion off the record.]

MAJORITY COUNSEL 2.    Okay.    Back on the record.

Mr. ██████.    Yeah, things related to the campaign were kind of, at least during the investigative stages, were off limits.

BY MAJORITY COUNSEL 1:

Q      Do you mean the Presidential campaign?

A      Yes, the Presidential campaign.

Q      In 2020.

A      No.    This would have -- yes, but we would not have found out about it until after -- everything was done.    So this would have been when we went overt.

Does that make sense?

Mr. <u>Zerbe.</u>   Go off the record.

<u>MAJORITY COUNSEL 3.</u>   Off.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>   Back on the record.

Mr. <u>Zerbe.</u>   Go ahead.

Mr. ███.   It would occur after our day of action, after we went overt.   And I recall there being a crisis management meeting.   And because of attorney-client privilege issues, and potentially issues related to the campaign, I felt that some things were off limits discussing.

BY <u>MAJORITY COUNSEL 1</u>:

Q   Why did you feel that way?

A   Because during interviews there was an atmosphere that made it very difficult to ask questions because -- and I know I wasn't the only one that felt this way -- that you get eyes rolling or --

Q   From whom?

A   From Lesley Wolf or from Mark Daly or whoever was -- it was a very intimidating atmosphere sometimes to ask questions.

And the same thing goes from our -- we had biweekly meetings that I would run. And I didn't have a problem with bringing up challenging issues.   But every single time I brought up challenging issues, they would get shot down.

And I recall having phone calls immediately after with my supervisor and my co-case agent and wanting to pull my hair out because I'm just trying get this case done.

Q   And those ideas would be shot down by Lesley Wolf?

A   Would be shot down by the prosecutors on the call.   So it would be Lesley Wolf or Jack Morgan or Mark Daly.

Q      Anyone else?

A      It wasn't all the time, but it did happen.

Q      Other than the three people you mentioned, anyone else that would fall into the role of shooting down ideas?

A      And I want to go back for a second.    It was I'm going sit here and think about it, and then you'd have to bring it up again.    We're thinking about it.    When I say "shooting down," I want to be very loose about that question.

Q      Let me clarify my question.    So you mentioned the creation of an atmosphere that -- would it be accurate to say -- would make you second-guess raising issues?

A      Yeah, absolutely.

Q      Okay.    And other than Lesley Wolf, Jack Morgan, and Mark Daly, was there anyone else that you think created that atmosphere?

A      No.

           BY MAJORITY COUNSEL 2:

Q      Do you have any information about whether Lesley Wolf was doing this because she wanted a job in the administration?    Did she try and get a job with Main Justice?

A      I have not heard that.    This is my personal opinion that Lesley's always been -- she's a really good arguer.    I actually talked with another case agent about that she's really good at arguing and really good at talking her way out of do[ing] whatever.

           And it was a lot of things.    I'll be completely honest with you.    If we would have brought this case in SDNY, who I know was super aggressive because you see it all the time, I don't think we'd be sitting here right now.    If we were to bring this in -- maybe even D.C. U.S. Attorney's Office from the get-go, I don't think we'd be here right now.

BY <u>MAJORITY COUNSEL 1</u>:

Q    I want to go back to something you mentioned earlier regarding a walk-by of Hunter Biden's residence.    I believe you testified that Mark Daly told you that someone had denied your ability to do that walk-by.

A    Yeah.

Q    Who was it that denied that walk-by?

A    It doesn't say.    So it would have been any manager above him.    So it would have been anyone in his management chain --

Q    At DOJ.

A    -- at DOJ Tax.    And I could tell you that's never happened to where you had someone weighing in on whether you could do a covert action, walking by someone's house.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Why did you have to get approval for that?

A    Because we were in a posture at that point that we couldn't do anything that appeared -- any investigative activities pretty much whatsoever.

Q    But you weren't wearing an IRS windbreaker, and you weren't driving a car marked with IRS letters on it.    So how would anyone possibly know?    It's a free country. You're allowed to drive by any house you want.

A    Yeah, I didn't want it -- because I think at that time we were trying to do surveillance of pretty much everyone we were going to potentially interview.    So he was just another one of the people that we wanted to do that for.    I guess I don't know --

Q    But did you have to travel to do the walk-by?

A    No, we would have sent an agent from that area --

Q    Okay.

A    -- out to help.

Q    And was it ordinary that you would have to ask permission from the prosecutors to do something like that in any other case?

A    Not at all ordinary.

Q    So this was special to the Hunter Biden case.

A    Yes.    So it says:    Tax does not approve.

So whatever that means, tax does not approve.

BY MAJORITY COUNSEL 1:

Q    What is that email in reference to?

A    This is in reference -- this is October 20th, 2020, walk-by of possible residence.

And Mark Daly says:    Tax does not approve.    This will be on hold until further notice.

BY MAJORITY COUNSEL 2:

Q    And the plan was you were just going have an IRS agent out in California walk by the house?

A    Yes.

Q    Drive by the house.

A    Yes.

Q    Check it out.

A    Uh-huh.

Q    Not stop, not interview anyone, not interview neighbors.

A    Nope.

Q    Not knock on the door.    Just drive by the house.

A    Yes.

Q     That was denied.

A     Yes.

        BY <u>MAJORITY COUNSEL 1</u>:

Q     We talked earlier about the potential of interviewing I believe it was
President Biden's grandchildren.   Is that right?

A     Yes.

Q     So that would be Hunter Biden's children?

A     Yes.

Q     And the interest in conducting their interviews is because Hunter Biden
made payments to those individuals?   Is that right?

A     Or made payments for the benefit of them.

Q     And the interest in interviewing them about those payments was not
because he made those payments but was because he deducted those on his taxes.   Is
that correct?

A     Correct.

Q     And what type of evidence would you need to properly evaluate whether a
deduction was properly taken in an instance like this?

A     So you'd want a statement from -- so there's two points to this.   You'd first
get the records from, let's say it's Columbia school.   You get records from Columbia
school, and they would show you why the person paid that $30,000.   So that's step one.

        Step two would also be, if it's paying for someone else, finding out why that
person paid that.   Was there any business purpose or reason for paying that?   If it was -
- she did work for me and in return for doing some work for me, I paid for this, so that
could potentially be a deduction, so reasons like that.

        And I want to be clear on this.   I believe what happened down the road is that

there was a potential of it being stipulated, that the kids' expenses were for personal

purposes, so it being stipulated from his counsel.    But I don't know if we ever officially

got that or -- someone -- an attorney can say that and you can still go back on that down

the road.    You know what I mean?

Q    In the absence of a stipulation like that, would it be normal to interview a

third party who received a payment that was then deducted on taxes and there was a

reason to question the deduction?

A    Yes.    And to be honest with you, sometimes it doesn't matter the dollar

amount.    Sometimes -- I've had cases of mine to where there was a small deduction.

But then they told us about this information that was completely unrelated to this.

Oh, he told me to open up this bank account for him.

And it can lead on to something that's completely different.

Q    In a typical case, would you consider the interviews of individuals like this to

be a completely reasonable step in an investigation like the one you were conducting?

A    Yes.

Q    One other clarifying question on something you mentioned earlier.    You

mentioned that when you opened the case at IRS, in the course of moving it forward, you

learned that the U.S. Attorney's Office had opened their own case.    Is that right?

A    Yes.

Q    And those two cases were merged.    Is that right?

A    Yes.

Q    And my understanding of your testimony earlier is that the merger of those

two cases created a process that would be different from if the case had just proceeded

at the IRS.    Is that right?

A    Can you rephrase that question?

Q      What would happen in a typical case if the two cases had not been merged?

A      Oh, we would have opened the case -- the case would have been sent to the intake, so the tax intake, specifically the tax intake at the D.C. U.S. Attorney's Office. They would have evaluated our -- it's called a [Form] 9131, but -- basically our work product.   And they would have done the paperwork to get an investigation going.

So Delaware could have done their own, and we would have done our own thing in D.C.

Q      Under the auspices of the U.S. Attorney in the District of Columbia?

A      Yes.   Because sometimes there are cases to where you have split venue, and sometimes you do want to merge both of them.   But I do know of -- yeah, so, it just honestly depends.   There are situations where both are true.

MAJORITY COUNSEL 2.   Our hour's up.

Mr. Zerbe.   Can we take a quick break and just breathe in and out?

MAJORITY COUNSEL 3.   Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.   We'll go back on the record.

BY MINORITY COUNSEL 1:

Q      Okay.   I wanted to go back to something that you mentioned earlier.   You said that in March/April -- and I think you meant 2018, but I'm not sure -- that Bill Barr made the decision to join these cases together.

A      So that would have been 2019.

Q      2019.

And then you said that the case in Delaware was opened January of 2019?   Is that correct?

A      Yep.

Q      Okay.    And then this case was opened May of 2019?

A      So the cases were joined May of 2019.

Q      How was it communicated to you that Bill Barr joined these cases together?

A      I believe it was my manager that told me.    My manager would have been Matt Kutz.

Q      How would he have known?    Would that have come from Justice somewhere or where does that come from --

A      From his leadership, most likely, when we were told -- we were essentially told that we had go up to Delaware to meet them.    And the decision was made at his direction, from what I recall.

Q      "His" being Bill Barr?

A      Yes.

Q      Okay.    Was there any other discussion of Bill Barr taking interest in this case that you heard of beyond it being joined?

A      Not at all.

Q      Was there any reporting up the chain that you know of to Bill Barr?

A      No, not that I know of.

Q      Okay.    Who were the Justice attorneys on the case at the time that Bill Barr decided to join these cases together?

A      So you had Assistant U.S. Attorney Lesley Wolf, Assistant United States Attorney at the time, Jamie McCall.    And then from DOJ Tax it would have been Kimberly Shartar.    And I believe it was either -- I think that was Jason Poole, [DOJ Tax,] but I don't know if he was promoted at that point.    It could have been also Mark Daly[, DOJ Tax]. So it was two or three attorneys from DOJ Tax.

Q      These attorneys that were on the case, did they change when the new

administration started in 2021?

A     Could you elaborate more on that?

Q     So Lesley Wolf --

A     Okay.

Q     -- she was there in 2018, 2019 when these cases were joined.    Is she still on the case?

A     Yes.

Q     And was she --

A     From what I know, yes.

Q     Okay.    Was she on the case at the beginning of 2021?

A     Yes.

Q     January 1 of 2021?

A     Yes.

Q     The same thing with Jamie McCall.    Was he on the case at the very beginning when Bill Barr joined these cases together?

A     Yes, he was.

Q     Was he on the case January 1 of 2021?

A     No.

Q     He was gone?

A     Yes.

Q     Okay.

A     And they were --

Q     Was someone else put on the case?

A     Yes.    Carly Hudson.

Q     When did Carley join the case?

A     At some point in 2020.

Q     Do you know how attorneys are added to cases?     Do you know if that would have been a Bill Barr decision?

A     I don't know, but I don't think so.

Q     What about Kimberly Shartar?

A     Shartar.

Q     Shartar.    Was she --

A     Shartar.

Q     Was she on the case at the beginning?

A     I believe so, yes.

Q     Was she still on in 2021?

A     No.    She left for a position to become an Assistant United States Attorney in another district.

Q     Was someone else appointed, or put on the case?

A     At some point, Jack Morgan was put on [from] DOJ Tax.

Q     Do you know when he was added?

A     That I do not know.

Q     Would it have been before 2021?

A     Yes.

Q     Jason Poole and Mark Daly -- one of them was on at the beginning?

A     Yes.

Q     One of them was still on in 2021?

A     Yeah, Mark Daly was still on in 2021.

Q     Is he still on the case now?

A     I believe so, yes.

Q      Okay.    Now you mentioned the storage unit and the decision regarding the search.    That was in 2020, correct?

A      Yes.

Q      At the time that the search decision was being made in 2020, were these individuals, the ones that we discussed that were there in 2020, were they the ones that would have made the decision about the storage unit?

A      One of those people, yes.    It would have been up to Lesley Wolf and Mark Daly and potentially Jack Morgan.

Q      But that was a decision still made under the prior administration, and it was made sometime in 2020 after Bill Barr had joined the cases, correct?

A      Yeah, I don't know if by that point -- I don't know when Bill Barr left Main DOJ.

MAJORITY COUNSEL 2.    December 23rd --

Mr. ▮▮▮▮.    Okay.

MAJORITY COUNSEL 2.    -- 2020.

BY MINORITY COUNSEL 1:

Q      In your experience, would you think that individuals that had been working a case would change their position because a new administration comes in in 2021?

A      I have never seen that, and I would have reason to hope to believe that that wouldn't happen.    And I have no indication that it was because of a change of administration.

Q      It seems as if they were acting -- in my mind their actions seem consistent over the two administrations, that they had a position that they took and they continued with that position going forward when they made their decision to -- when you probably left the case or even today, since we don't know what's going on today in the case.

A     Yeah, I would to like say something to that, that it wasn't always all bad as it might -- I know I'm bringing up some of the things that have happened that I thought were out of the ordinary and what, looking back, might have been improper.     There was some good that we did, too.

So I don't want it to appear like it was just -- but it was definitely an atmosphere and it was -- as you can see in my emails and, looking back, it was very hard for me to do my job.    I was not handheld but --

Mr. Zerbe.     Handcuffed.

Mr. ████.     -- handcuffed.

MINORITY COUNSEL 2.     How unusual, or in your experience, how frequently have you seen cases merged from the DOJ and IRS?

Mr. Zerbe.     Let's go off the record.

MAJORITY COUNSEL 3.     Off the record.

[Discussion off the record.]

BY MINORITY COUNSEL 2:

Q     That's what I'm asking.     How common is that circumstance?

Sorry.     Back on the record.

A     I have never had that happen in my career.

Q     Would you say it was something of an unusual occurrence for the Attorney General himself to order that?

A     Looking back at it, I think he was trying to utilize the resources that he had. And I recall doing venue analyses for them to determine where proper venue was, to see if -- but everything that I did said that we were -- there's no residence of Hunter other than his dad's residence, his dad, President Biden, in Delaware.

So his return preparers are in, I think it's Maryland, his -- at the time were in

Maryland.    So everything was pointing to outside of Delaware.

    Q    Well, when you say utilize his resources, is it usual for the Attorney General to take a specific interest in a case that maybe conservatively would be of, you know, $1 million in value to the U.S. Government, which, although obviously is a lot of money to the folks sitting here, is pretty small, small dollars relative to the entirety of the fiscal --

    A    Can ask you your question again?    I apologize.

    Q    Does the Attorney General usually weigh in on cases where you're talking about $1 million?

    A    I've never had that happen before.

    Q    To your knowledge, did Attorney General Barr weigh in, or seek updates on the investigation after those cases were joined?

    A    Not to my knowledge.

    BY <u>MINORITY COUNSEL 1</u>:

    Q    You mentioned that the FBI leadership was involved in the case.

    A    Uh-huh.

    Q    And there was some reporting up the chain that you were aware of regarding the FBI leadership's being kept in the loop, I guess, for lack of a better word.

    A    Yes.

    Q    When did that start, that you became aware of it?    And when did it start, the reporting up the chain at the FBI?

    A    I would honestly say it started in the beginning.    I was constantly hearing about them having to report up their chain regarding what was going on.    And towards the end of the case, what was kind of -- it wasn't amusing to me but, the fact they were updating their leadership on a tax investigation.    So their high-up leadership, I should say, was more caring about what we were doing in our investigation.

Q       When you say that the FBI leadership was kept in the loop from the beginning, do you mean November of 2018-ish, in 2018 when you first got involved?

A       So my knowledge of it would have started occurring in the summer of 2019.

Q       Did that continue through 2020?

A       I believe so.

Q       Are you aware of the FBI leadership at any point talking to Attorney General Barr and his leadership regarding this case?    Are you aware of any meetings like that?

A       Not that I'm aware of.

Q       I want to ask a little bit more about the grandchildren.    You said that it's not abnormal to talk to relatives and family.    How old were the grandchildren that you were seeking to interview?

A       We never got -- I honestly don't even know.    I know one of them had to have been in college, so college age, yeah.    To be honest with you -- because we were never allowed to go do it -- normally I would have pulled public reporting, or I would have pulled information that would tell me this.

But because we weren't going to go do it, I didn't need to pull any of that.    So I didn't know their age.

Q       But college age?

A       The one, yes, I believe is college or has graduated from college.

Q       When asked whether this was a reasonable step, you said that you thought that it was a reasonable step to interview someone because another person took a deduction regarding them on the tax return?    That's typical at the IRS?

A       It's not -- in my opinion, that's more of a blanket statement.

How we do our jobs is if -- when we're doing an investigation and we're looking into someone's tax returns, we find the areas that there might be fraudulent deductions.

If this is a deductions case, we look at the deductions.

So if we have a payment that's made to ABC company, and on the memo line it says for whatever their daughter's name is, then we would want to go and talk to that person.    Why was this payment made on your behalf?

And then that's kind of the reason or the line of why we do those interviews.

Q       Okay.    You mentioned that, for instance, your first step might have been to go to Columbia school and ask about the $30,000 and get their records.

Why would that have not been enough to establish what the $30,000 was for if it was for tuition?    Why the extra step of trying to talk to the grandchild?

A       So like I said, typically if -- there could be a situation where I did work for someone, and then instead of giving me actual monetary compensation, they pay for my school.    So that could be a deduction for you, a legitimate deduction.    So as a part of our investigation, we have to figure that out.

BY MINORITY COUNSEL 2:

Q       Did you, as a part of your investigation, talk to all of the hotels where payments were flagged?

A       Almost 100 percent of them.    There was a significant amount of them, yes, specifically for 2018.

Q       What were you seeking in talking to the hotels?

A       We were seeking records regarding hotel stays and the reason for the expenses.    I have the answer for you.    It's a Boulware [Greenberg] issue.    So that's what the legal term is for it: Boulware [Greenberg].    That's why you want to go to a third party to find out.    So we can't just rely on that, this looks personal.    We have to actually go and figure that out.

Q       Is that the name of a case?

A       I believe so, yes.

            BY <u>MINORITY COUNSEL 1</u>:

Q       In talking to the hotels, did you establish who stayed in the hotels each of the nights that were deducted?

A       Yes, we got information from the hotels about whose name was on the room.    If there were any issues with the rooms, yeah, there was a lot of information that we got from the hotels.

Q       You mentioned one of the nights was in the name of President Biden?

A       Yes.

Q       Okay.    Do you know if his Secret Service was there with him that night?    Is that on your hotel records?

A       That I do not know.

Q       Were you able to establish that he was actually in the hotel?

A       No, I was not.

Mr. <u>Zerbe.</u>    Can we go off the record?

<u>MAJORITY COUNSEL 3.</u>    Off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 3.</u>    On the record.

Mr. ███.    Back on the record.    I apologize.

I have a receipt of something that was purchased from the person, whoever stayed there, a receipt for food for room service.

            BY <u>MINORITY COUNSEL 1</u>:

Q       Oh, you have the receipt that someone was in the hotel room?

A       Yes.

Q       Okay.    But not necessarily who it was in that hotel room?

A       Correct.

Q       Okay.    When you interviewed the hotel, did you interview the employees, as well?

A       So let me be clear on this.    We didn't interview the hotel in this situation. We would have asked for records from the hotel.

BY MINORITY COUNSEL 2:

Q       Would you submit that asking for records from a business is less intrusive than surprising an individual for an interview with the Justice Department or the IRS Criminal Investigation Unit?

A       When we do interviews, or when we do records requests, we don't -- at least in my profession, we don't consider what's least intrusive.    We consider that for search warrants.    But when it comes to going to someone's door and knocking on it to see if they want to submit to a voluntary interview, I would not consider that intrusive.

Q       Is it not that you wouldn't consider it intrusive per se?    It's just whether it's intrusive or not is something that you would not factor into in your investigative process?

A       So if it's a situation of either interviewing someone or issuing them a records request, both of them require me going to them to give it to them or to actually go there and talk to them.    So both -- in the situation with a hotel, you can mail those certified mail.

Q       Right.

A       But in terms of individuals, we can't -- there are situations where we could mail them, but typically we go to the door and we knock.

MINORITY COUNSEL 2.    Can I --

MINORITY COUNSEL 1.    Go ahead.

BY MINORITY COUNSEL 2:

Q      What is the purpose of a drive-by?

A      To establish if someone's living there, if they're present at home, their modus of -- when they are home and when they're not home.    It's to give people or to give the investigators an idea of just their normal course of what they're doing.

And it's also to establish in this case, if there was Secret Service out front, if there was a protection detail.    All those various things come into play.

Q      In order to establish, for instance, whether the person is home, whether it's lived in, what their pattern of usage of the home was, it's not merely sort of walking by casually on the street.    It's repeatedly doing so, correct?

A      It doesn't necessarily have to be repeatedly doing so.

Q      But it often can be?

A      It can be, yes.    In our job, we are trained and taught to do surveillance without being caught.    So that's part of our training, surveillance or a drive-by or a walk-by.

Q      Do we know if Mr. Biden's house was, for instance, at the end of a cul-de-sac?    On a street?    Had a sidewalk where people typically walk?

A      I think this one was in Venice Beach.    It so was just on a -- I think I have actually been there.    There was a sidewalk.    It's a normal neighborhood.

BY MINORITY COUNSEL 1:

Q      On surveillance, you had mentioned that you had roughly 60 people that you wanted to interview.    Did you put surveillance on all 60 of those individuals?

A      No.

Q      On how many of them?

A      Let me be clear on that, that it was originally, we had a larger group of people that we first wanted to interview.    That got smaller, smaller, and smaller until we

got to 10.    I believe that all 10 of those people, we did some sort of surveillance to get eyes on them before doing our day of action.

Mr. Zerbe.    Just off the record.

MAJORITY COUNSEL 3.    Off.

[Discussion off the record.]

MAJORITY COUNSEL 3.    Back on.

BY MINORITY COUNSEL 1:

Q    I think that I was talking more broadly than just the day of action.

A    Okay.

Q    Of all the people that you interviewed, which I assume it's roughly 60 or more, how many had surveillance of any sort?    A drive-by?    A walk-by?    A sit in front of their house?    How many people?

A    It would have been just in that first very instance, the people that we did that December 8th activity related to.

Q    So the 10.    And would the --

A    It would approximately be the 10.

Q    Approximately 10.

Would you have done your surveillance over a number of days?    Weeks?    Is it one day?    One hour?    How long?    How much surveillance?

A    I honestly don't know.    Some of the time we can -- they have a specialty unit within the FBI that can go and do surveillance if we need it of that particular person.

Q    Related to the day of action, which was going to be in 2020 under the prior administration, you had surveillance out on roughly 10 individuals, the ones that you were planning to do the interviews of on that day.

A    And I think it was only to establish that they lived there, to verify that the

person lived there.

Q       Who are the 10?    Do you know who they were?

A       I honestly do not.

Q       Does it include his family members?    Any family members?

A       It does, but it -- so one of the family members that we weren't able to -- they didn't allow us to interview but we were able to serve a records request was James Biden and Sara Biden -- I don't think that we did surveillance of them at all -- his ex-wife, Kathleen Buhle.    And this is all from my memory.    So it was on that day or around that day.    There was also, I believe, Hallie Biden?

Q       Who is Hallie Biden?

A       That is his deceased brother's wife -- widow.    I'm sorry.

            BY MINORITY COUNSEL 2:

Q       For clarity, this was in October of 2020?    I'm sorry.    The date of action, what date are we looking at again?

A       December 8th.

Q       December 8th, 2020.

Do you think that, given the fact that many of these were relatives of the President-elect, there would be media presence possibly surrounding some of these individuals?

A       Not that I was aware of.

Q       But if there were to be media presence in some form or another, would that be of concern to either the Department of Justice or the Criminal Investigation Unit?

A       I don't know -- what I can say from my normal process and procedure, if I saw the media out front of someone's house, maybe I might wait until the next day, or wait until that media -- it just depends on the situation.    If it's an interview that I need,

the whole purpose of that was that we were trying to somewhat take people off guard, surprise, and get information from them.

But this was their personal residences.   I wouldn't expect the media to be outside their personal residences.

Q     Can I go back to something that you said -- my colleagues were asking questions previously.   We were referring to Lesley Wolf.   Our counterparts asked whether she was potentially looking for a job in the administration and you suggested -- not that you were aware of and the like.

But then you said something to the effect of, if we had brought this case in SDNY or D.C., we wouldn't be here right now.   That surprised me a bit.   And, leaving SDNY aside, I'm curious why you have that opinion about D.C., when we've learned that D.C. declined to take this case up?

A     So it was a President Biden-appointed attorney who I believe said no to working this case in Washington, D.C.

When a lot of times when another U.S. Attorney's Office gets a case at the absolute end of that case, they don't like it very much because they didn't do the investigation.   So what I was trying to say by that was the D.C. U.S. Attorney's Office and New York, they've worked cases of this caliber.   So they know how to aggressively work these cases.

And this is just from my observations and opinion.   Let me clarify that.   But that's personally what I believe.

Q     In your experience, the Attorney General's Office in Delaware has historically not pursued either tax crimes or other financial crimes with any vigor?

A     No, I don't want to say that at all.   I would want to say that it's a smaller U.S. Attorney's Office.   So a lot of times when you have a smaller U.S. Attorney's Office,

they're a lot less -- I don't want to use the wrong word here.

It's just it's -- the problem that the agent that I spoke with that's from that U.S. Attorney's Office that said that they love to slow-walk things.    It's very common in that office.

Yeah, I said earlier that they were the JV squad, in my opinion, and weren't up to the task of tackling this.

Q    Was this your first time working with that office?

A    Yes.

Q    So safe to say, you were frustrated with working with that office.    But at the same time, as a general matter, as a condition of your job, when you have to work with different U.S. Attorney Offices around the country, oftentimes you get sort of different flavors in an office.

A    Yes.

Q    Is that safe to say?

A    Yes.

Q    At least to an extent, sort of understanding the flavor of how that office worked is part and parcel of your job.

A    Yes.

BY <u>MINORITY COUNSEL 1</u>:

Q    Can I go back to the $10,000 payments that were made per month?    You mentioned that he was making payments voluntarily.    Is that correct?    Or did he have --

A    Yes.

Q    -- some sort of installment agreement with the IRS?

A    He had a quasi-payment plan that he set up through his accountant, paying $10,000 a month.    But, yes, he had something set up.    It wasn't actually officially set up

with the IRS though.

Mr. <u>Zerbe.</u>   Let's go off the record.

<u>MAJORITY COUNSEL 2.</u>   Off.

[Discussion off the record.]

<u>MAJORITY COUNSEL 3.</u>   On.

<u>MINORITY COUNSEL 1.</u>   Back on.

Mr. ███.   Okay.   So it wasn't an official monthly installment agreement, no. It was self-imposed through his accountant.

And I would also like to say that his passport was revoked.   He wasn't able to get another passport because of the delinquent taxes.

They sent multiple notices.   There's an actual email where he asked how long he can go without paying his taxes.   And, meanwhile, let me reiterate that in the time after this, when he stopped the payment plan -- he stops making the payment plan.   He earns, I think it's over -- I don't want to mistake this number.   He earns $2.4 million from Hudson West III but can't make the $10,000 payment he was making on his taxes.

BY <u>MINORITY COUNSEL 1</u>:

Q   What was the date of when he stopped making the payments?

A   March 5th, 2018.

Mr. <u>Zerbe.</u>   Is the last payment?

Mr. ███.   Is the last payment, yes.

BY <u>MINORITY COUNSEL 1</u>:

Q   Do you know how much he had paid by that point on the $10,000 payments, how many months he had paid?

A   Seven of them, $70,000.

Q   Okay.   I want to go back to the loan.   You said that the way that they set it

up was that there was something attached to his return and it said that part of this was a loan and there was an interest rate of 5 percent.

 A Uh-huh.

 Q Okay. Did you look into any paperwork regarding that loan?

 A We did attempt to obtain that note, yes. We did attempt to obtain it, yes.

 Q Did you obtain it, or you just attempted?

 A I don't recall, and I go back to my previous statement that I don't feel comfortable going any further than.

 Q Okay. Okay.

 <u>MINORITY COUNSEL 2.</u> For clarity's sake, though, because I just want to make sure something is clear on the record -- do you agree that, assuming that there is a true loan, which is to say, a promissory note with interest, and the interest is [paid]-- it's not a sham. There's nothing untoward about that loan -- an individual making a loan for the ability of another person to satisfy his tax liability. There's no tax fraud element to such a thing.

[3:33 p.m.]

Mr. ████.   It honestly depends if you're able to sham the transaction.

BY <u>MINORITY COUNSEL 2</u>:

Q      Assume it's a true loan.    It's a true honest loan.    This is not a trick question.    I'm not -- I'm just trying to --

A      So, yes, if something is a loan, we would give them the benefit of the doubt. And our most conservative approach is that it's not income, correct.

Q      Similarly, in the case of someone who provides someone with funds out of detached and disinterested generosity in order to satisfy their tax liability, that would be considered a gift and thus not subject to Federal income tax, at least by the recipient?

A      There would be gift tax reporting requirements, and those would have to be upheld, but --

Q      By the donor?

A      Correct.

Q      I want to make sure that, at least on the face of the transaction as described to us, there are certainly two avenues under which such an arrangement would not raise any flags from the perspective of the Internal Revenue Service?

A      Correct.

BY <u>MINORITY COUNSEL 1</u>:

Q      All right.    I want to go back to a little bit of the discussion on the Washington Post article and the comment by Chris Clark, and then there was a question to you.

The statement was that you had heard something somewhere that someone had maybe said that, if they were to charge this, it would be career suicide.    That was

hearsay, third party, that --

A     Yes.

Q     -- you just heard from a third party?

A     Yes.

Q     You have no name as to who said that?

A     I believe it came from Chris Clark, but I only know that from --

Q     But you don't know anyone inside that said this would be career suicide to charge this?

A     Inside the --

Q     The IRS.

A     Oh, yeah.   No, I -- no.   No, no, no.   No.

Q     Okay.   What about from Justice?   Did you hear anybody say that?

A     No.

Could I add one more thing?   I know this is on your time but.

There are potential other spin-offs and things that were in the process of being worked that I somewhat fear are going to get lost in the shuffle of everything that went on in that because, essentially, all I'm having to do is turn my information over to the next case agent.   So that is of a definite concern to me, and it's why I think I've been so vocal on the special counsel perspective and having that neutral person come in there and essentially review the evidence and make his decision.

          BY MINORITY COUNSEL 2:

Q     Can I ask one more question?   I did have one more note that I wanted to raise.

What is the difference between making a referral or bringing a case in the case of Mr. Weiss?   I'm sort of curious.   At least from your perspective, what is the difference

between those two things, at least as spoken by Attorney General Garland?

A     I would -- this is my assumption based on that.    It's referring the matters from your jurisdiction to another jurisdiction.    So referring the work to the other jurisdiction to where you want to charge the case.    So that's bringing the case.

Q     Those seem to be synonyms, as you're describing them.

Mr. Zerbe.    I just want him to see the writing.    I think there's a referral to the case or to bring cases.

Mr. █████.    Yeah, that leads me to believe that statement right there that he has full authority to do whatever he wants with his cases.

BY MINORITY COUNSEL 2:

Q     Admittedly, it's an ambiguous term or phrase because he does say make a referral or bring a case.    I'm trying to understand what the difference between those two are because you pointed out that he did make a referral and he had authority to make a referral, but what would bringing a case be?    What would he do differently if he were to bring a case as opposed to make a referral?

A     So you have this right here where it says, "I have not heard anything from that office that suggests they are not able to do anything that the U.S. Attorney wants them to do."

And the U.S. Attorney wanted them to bring charges in the District of Columbia. And that completely contradicts that statement.

Mr. Zerbe.    Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. █████.    So each of these two statements showed to me that there wasn't going to be anything political involvement in this.    That you had this neutral person from

the prior administration that's coming in, and that he's going to be able to do whatever he wants.    And that's what they have confidence in.

The problem I saw was that you have President-appointed U.S. Attorneys who are a part of the process now, so now it has become political again.    So you have a political appointee from a different party that was literally just nominated.    I think it was U.S. Attorney Estrada.    And this is the first thing he gets on his desk.    So the President just appoints me, and this is the first thing that I've got to deal with.

And the part that was -- I know I use this word a lot -- frustrating was that this was for the years that they told us were slam dunks.    Slam-dunk cases.    I was told that by the AUSAs and the DOJ Tax attorneys.

BY UNDERLINED:MINORITY COUNSEL 1:

Q    Could it be that, when there's a referral, the receiving AUSA -- it's at their discretion then to decide to bring the case versus just bringing the case directly?

A    Yeah.    Yes.

Q    Could it be that the AUSAs that received it have other considerations based on their jurisdiction and cases that they've seen that have been successful in their own jurisdiction?

A    Yes, that is true.    AUSAs can provide guidance based on what they know from their area.

Q    The AUSA -- Weiss -- he was Trump-appointed, correct?

A    Yes.

Q    The two -- well, at least for D.C., the AUSA was Biden-appointed, correct?

A    Yeah.    If you want, the name of him -- just so we're clear for the record.    I have it.    Matthew Graves.

Q    Matthew Graves.

But it isn't that one is more correct than the other, it's just that you have two AUSAs, and they have different opinions of the case?

A     So I go back to Merrick Garland's statement that he says.     "He is in charge of that investigation.     There will not be interference of any political or improper kind."

Q     I guess what I'm asking is, if the situation had been turned around and he had taken the case, then we wouldn't be here.

So, as long as it's a yes, then there's no political interference, but if there's a no, then there is political interference?     That can't be the way that we decide whether or not an AUSA brings a case.

A     So I guess I want to be clear here.     I was not afforded an opportunity to present to D.C. on the merits of the case, what we had found through our investigation for 2014, 2015.     I was not afforded the opportunity to present to the Los Angeles U.S. Attorney or the U.S. Attorney's Office with the evidence that we had found in this case. That was not given me the opportunity.

So that right there alone, I think, is improper on its face.     The people that know the case the best, the case agents that work the case, should be the ones that present on the material.

The thing that draws me pause is the conversations I had with Mark Daly in March 2022 to where -- they get the case.     They get the referral.     They're like, here's what we're going to do to help you guys.     And then a few days later, they meet with the U.S. Attorney, and the U.S. Attorney says, someone in that -- this is all what I heard from it. They said, not only are we not going to help you with that case, but we also don't think you should bring charges here.     So that led me to believe that there might be something else going on there.

Q     In the other cases that you have, have there not been any disagreements in

any of those cases in your career?    When cases go up to the AUSAs, they just take them all?   They take every case that IRS sends?

A      They do not, no.

            BY MINORITY COUNSEL 2:

Q      In general, in your experience -- well, I'll just say this.

In my working experience, I often would love to be the person who -- when I feel like I'm closest to the facts -- is the one presenting the information to the principal, making the [decision] -- but quite frankly, I don't always get that opportunity.    I think it's an experience that many of us in our legal careers have experienced.

Is this the only time that you haven't been able to present your case to the decision-maker and someone above -- the level above you was in charge of doing that instead?   Or even two levels above you?

A      Well, yes, there are situations like that.    But from what I know, no one from the IRS, my agency, got to present to the D.C. U.S. Attorney's Office or California.

MINORITY COUNSEL 1.    We're good.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

            BY MAJORITY COUNSEL 2:

Q      During our discussion of the 2018 tax year, you mentioned that Hunter Biden was making business expenses for prostitutes?

A      Yes, in some circumstances.

Q      Could you give us a little bit more information on that?    What was the nature of the -- was he paying for -- were they on the payroll?    Was he paying for travel?

A      In some situations, they were on payroll, and that was to get them health insurance in certain situations.    There was --

Q      So he's paying for health insurance for his prostitutes?

A      Not necessarily for -- so let me go back and -- so one of his girlfriends was on the payroll and --

Mr. ██████.   Off the record, please, for a second.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>   Back on the record.

Mr. ██████.   So Lunden Roberts, she was on his payroll.   She was not working. She was actually living in Arkansas pregnant with his child, and she was on his payroll.

There were expenditures for one of -- he called it his West Coast assistant, but we knew her to also be in the prostitution world or believed to be in the prostitution world. And he deducted expenses related to her.   She relates to the sex club issue.

And then there were -- and I know that my counsel brought this up earlier. There were some flying people across State lines, paying for their travel, paying for their hotels.   They were what we call Mann Act violations.

Q      Where he was paying for the travel of an individual to fly out to California or wherever?

A      Or Boston or wherever he was at.   D.C.   I think one of them -- he flew someone for the night.   So, yeah, there were situations like that as well.

Q      And were those Mann Act violations referred to the Justice Department?

A      I know that they were compiling them together.   I don't know what they ended up doing with them.   I know there was an effort at some point to compile them, but I don't know what ultimately happened with them.

Q      And did you interview any of the prostitutes that traveled across State lines --

A      I don't --

Q    -- for that purpose?

A    I don't remember.    There were -- so let me use the correct term here.    If there were prostitutes -- some ended up being his girlfriends.    So, they all kind of morphed and changed.    So I want to be accurate in how I represent them.    But there were a lot of females that I believe he was having sexual relationships with that I ended up interviewing.

Q    And he was paying money for the purpose of a sexual relationship, correct? To the best of your knowledge?

A    To the best of my knowledge, yes.

Q    Okay.    The discussion last round about the Attorney General Barr's involvement, are you aware of the Justice Department policies and procedures that relate to sensitive investigative matters and political matters?

A    I am not.

Q    And do you know if the Attorney General, under the DOJ rules and procedures, has to make some of these decisions?

A    I did not.

Q    Would it surprise you if, in fact, the Attorney General does have to sign off on certain things when it relates to the son of a Presidential candidate or an incoming President-elect?

A    It wouldn't surprise me at all.

Q    Okay.    When Joe Biden stayed at a hotel and Hunter Biden expensed that as a business expense, did you come across any other evidence that Joe Biden was involved with business dealings of Hunter Biden other than the 10 percent for the big guy that you mentioned earlier?

A    Yeah, I'd also mention the WhatsApp.    The indication in there that

regarding -- right before they entered into the CEFC deal --

Q    Okay.

A    -- that the data was there.    And then as far as the trip out to California and the hotel stay, we don't know whether that was for a business purpose -- we just know it was supposedly deducted.

Q    And that was in 2018?

A    Yes.

Q    Okay.    So Joe Biden wasn't the Vice President at that time?

A    No.

Q    Correct?    And he wasn't President?

A    No.

Q    So he didn't, to the best of your knowledge, have Secret Service detailed during 2018, correct?

A    Not that I'm aware of.

Q    It's my understanding -- I think we can stipulate that former VPs get Secret Service for, I think, 90 days or 6 months after their term of office, but then the Secret Service is no longer applicable.

You have no reason to believe that he had Secret Service during the 2018 timeframe, do you?

A    No.

Q    Okay.    Just a question about working with the U.S. Attorney's Office in Delaware.

It seems like the elephant in the room is that -- correct me if I'm wrong, but -- Joe Biden and anyone in the Biden family is royalty in Delaware.    Is that not the case?

A    It was definitely something that was overly apparent in the State, yes.

Q      So whether the President is a Republican or a Democrat, if you are in the district of Delaware, and you are in the U.S. Attorney's Office, and you are trying to bring a case against a family member of Joe Biden, that inherently has its challenges, doesn't it?

A      Yes.

Q      Because Joe Biden is, in effect, royalty in Delaware, correct?

A      I don't know if I would use the term "royalty," but I think he is someone that's a big deal within that State.

Q      Right.    And so all the nonpolitically-appointed officials in the office certainly could be affected by the fact that we're dealing with Joe Biden, correct?    In that office?

A      I went into it with the belief that I would hope that that wouldn't happen. But it being in the Delaware area, it very well could have happened that way.

Q      Okay.    And Lesley Wolf wasn't a political appointee, correct?

A      She was -- not to the best of my knowledge.

Q      Okay.    And Mark Daly wasn't a political appointee, was he?

A      Not to the best of my knowledge.

Q      And Jack Morgan wasn't a political appointee, correct?

A      Not to the best of my knowledge.

BY MAJORITY COUNSEL 1:

Q      And when the U.S. Attorney in D.C. declined, that U.S. Attorney was a political appointee, right?

A      Yes.

Q      And that person was appointed by President Joe Biden.    Is that correct?

A      From the best of my knowledge, yes.

Q      And in the Central District of California, they declined charges in that U.S. Attorney's Office.    Is that correct?

A       From what I have been told through third party, yes.

Q       And that person, that U.S. Attorney, was a political appointee appointed by President Joe Biden.    Is that correct?

A       Yes.

Q       And Attorney General Garland was appointed by President Joe Biden.    Is that correct?

A       Yes.    I would also like to add, I don't know if -- since this recent testimony or things that have happened recently -- if some of this has changed, so --

Q       Understood.

A       And they very well could change their stance, and so I want to make that clear.

Q       Sure.    Is there anything else that we haven't covered today that you would like to share with us?

A       Yeah.    So when we were going through all these issues, we actually sat down after a meeting -- when I say "we," it's me, Gary Shapley, and my co-case agent, Christine Puglisi.

And we wanted to -- at that time -- so this might have been 1 or 2 years ago.    I don't recall the time.    I'm sure if we go back, we can figure it out.    It probably was about a year ago.

But we wanted to get down on paper so that we knew at the time all the problems that we were dealing with.    And we have a list of -- what is it -- seven different areas, and they include lack of transparency, outside the normal course of an investigation, recurring unjustified delays, enforcement actions, misrepresentation of investigator's requested actions, investigator discussions related to the conduct of prosecutors.    And defense counsel bullying and threats.

This is actually in here.    Prosecutors told investigators on a call on August 12th, 2022, that Defense Attorney Chris Clark threatened them, stating that their careers would be ruined if they brought various charges against Hunter.

They also said -- which I think that this is important, too -- in several other conversations, prosecutors told investigators that defense counsel requested meetings with high-ranking DOJ officials before any charging decisions were made.

Q    And at the time that Chris Clark made those statements, he was representing Hunter Biden.    Is that right?

A    Yes.

Q    And Hunter Biden's father was the President of the United States.    Is that right?

A    Yes.

Q    And the people that he made that statement to were employees of the Justice Department.    Is that correct?

A    Yes.    And a lot of these things, I think we've already gone over in detail. I'm going to look through here and see if there's anything that stands out that is important to you guys.

MAJORITY COUNSEL 2.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    We'll go back on the record.

Mr. ███.    So June 15th, 2022, the meeting with Stuart Goldberg, [Acting Deputy Assistant Attorney General].    The meeting with DOJ Tax at Main DOJ where the purpose of the meeting was misrepresented to the agents.    We had no idea that they were going to bring up a huge presentation to everyone there regarding the reasons why we shouldn't charge this case.

So they presented on their stuff.    I ended up presenting on my side our understanding of the evidence and the investigation.    And it caught us off guard because they misrepresented that meeting to us.

BY MAJORITY COUNSEL 1:

Q      Who was present at that meeting?

A      So you had the SAC and ASAC at the time of FBI.    You had my leadership, which included my supervisor.    Gary Shapley.    That included my SAC at the time.    So that would have been Darrell Waldon.    And I believe my DFO was also present there.    I could be wrong on that.    His name was Mike Batdorf.    Stuart Goldberg was there.    He was the DAG.    David Weiss was there.    Lesley Wolf, Jack Morgan, Mark Daly, and then the agents from the FBI who were part of the case team.

Q      And who gave the presentation?

A      Jack Morgan and Mark Daly.

Q      So not David Weiss?

A      Not David Weiss.

This was lack of transparency section.    "Assistant U.S. Attorneys irrationally dismissed most suggestions from the investigators, creating an environment where investigators were apprehensive to bring up differing opinions."

There's one in here that -- can I do something off the record?

MAJORITY COUNSEL 1.    Go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. ▮▮▮▮▮.    "Prosecutors at one point instructed investigators not to complete any other work that was not specifically tied to the tax year 2014."

And the whole reason behind that was because we were running out of our

statute.    We had an issue with our statute that year.    So they made us focus everything in our work on 2014.

"Prosecutors instructed investigators not to ask questions in a certain area because they did not want to get DOJ PIN" -- Public Integrity -- "involved because that would result in another layer of approvals."

Yeah.    There was -- "A recurring discussion occurred between the FBI and IRS CI" -- so agents with both -- "about the unprofessional conduct engaged by the prosecutors."

And this is under investigator discussions related to conduct of prosecutors.

"FBI telephoned IRS CI in May or June of 2022 suggesting that we request a special counsel be assigned."

Q    Do you know who at the FBI made that call?

A    I do not know.    But I believe that was the supervisor at the time, Joe Gordon.

"At several times during this investigation, we were made aware that FBI leadership was confused and concerned about the path the case was taking.    Evidence of this concern was that the Baltimore FBI SAC at the time attended a meeting at Main DOJ at the Tax Division knowing that only tax charges were on the table being discussed. The FBI SAC asked several questions about the tax case and presented rebuttals to DOJ Tax attorneys, who were presenting on defenses raised by defense counsel.    The FBI SAC made comments during breaks while talking with Gary Shapley that the issues raised by DOJ Tax that might result in not charging are nonsense."

There was one more thing that I was going to bring up, but I --

Q    You've shared a lot with us.

Who was the FBI SAC -- that made the comment you just referred to regarding

"nonsense"?

A    So I would have to get that.    I know I have it.    So we owe you the IRS Commissioner's email, and I can get you that.

Q    Okay.    Is there --

Mr. Zerbe.    What does he want?

Mr. ████.    The IRS Commissioner's email.

Mr. Zerbe.    I got that.

Mr. ████.    And then the SAC that attended the -- we called it the Tax Summit.

Mr. Zerbe.    Okay.

MAJORITY COUNSEL 1.    I'm going to go ahead and stop there and turn it over to my colleague.

BY MINORITY COUNSEL 1:

Q    We want to follow up.

You mentioned a June 15, 2022, meeting where you say they misrepresented the purpose of the meeting, and they presented the reasons why you should not charge. What were some of the reasons that they gave at the meeting?

A    More so a lot of the evidence related to the defenses that were presented. So I'll give you an example.

I had an argument with one of the DOJ Tax attorneys regarding the loan.    The Burisma money loan.    And he was telling me -- so the money kind of switches in 2017. Hunter starts paying Archer half of his money from Burisma starting in 2017.    And they actually enter into an agreement stating that they're going to do that from that point on. Because at that point, Archer is no longer on the board because he had his pending legal issue going on.

So they kept saying that that money being sent to Archer in the later years was a

repayment of loan.    And I literally held up the document.    I'm like, there's this

document that literally lays this out that this is for services rendered related to the

Burisma board.    And there's no indication at all, whatsoever, that this money is a loan.

And that was the part where it just got so frustrating with -- I'm showing you

evidence, and you're just not listening to me.

BY MINORITY COUNSEL 2:

Q    But they had a whole presentation prepared on their decision not to charge?

A    It wasn't on their decision not to charge.    It was all the reasons why we

shouldn't charge for 2014, 2015.

Q    How long would you say that presentation was?    Was it a PowerPoint?

A    I don't remember, to be honest with you.

Q    But presumably, there were a litany of reasons?

A    Yeah.    So when they found out the defense -- that the money was a loan

and that part of the taxes were paid, they threw their hands up and they were like, oh,

this -- it was essentially like this is the end of the world.

And what me and the investigator did is we figured it out.    We found out stuff

after that that we didn't know before.    And we spent so much time working through the

issue and showing how it wasn't a loan at all.    There's no indication of it whatsoever.

Again, I go back to -- you can't loan yourself your own income.

Q    Can I ask a bit about -- you mentioned just in response to ████'s

question -- or it was related around this information.

You said the prosecutors asked you to limit some of your [questions] -- I'm not

sure exactly what you suggested they were limiting    -- because they didn't want to get

DOJ Public Integrity involved.    Can you talk a little bit more about what DOJ Public

Integrity is?

A        It's just another level of approval that, for certain issues, will come and opine and approve whether -- I believe that Public Integrity is involved if you're issuing a subpoena to an attorney.    If they're involved in that.    So there are certain things where they give their approvals for whether you can do something or not.

Q        Does Public Integrity -- I'm sort of trying to get a sense of what would you say the general purpose of that unit or that approval process is?    What is the point of it?

A        I believe when cases are of a political nature and when there's complex issues, or when you need someone outside of your team to opine on something, they're the people you go to.

Q        So --

A        That's my understanding.    So this is -- I'm not a part of DOJ.    So I only know this from what I've heard.

Q        Doesn't the fact that prosecutors were sort of trying to avoid that extra layer of review indicate -- not that they were trying to stonewall the process, but actually rather trying to expedite the process?

A        I guess I'm confused by the question.

Q        Well, presumably, another layer of review would only add time to various steps along the investigative process, right?

A        I just -- I wanted to follow the evidence.    I wanted to do the right thing. And I go back to -- if David is truly in charge and he's supposed special counsel, why are we going to these approvals?    Why can't David, who is in charge of the investigation, just allow us to do it?

Q        I guess I don't know the answer to that question.

But are these -- I don't know to what extent -- maybe you can tell me.    Does David have the authority to bypass all DOJ approval processes at his discretion?

A    I don't think so.    But, in my opinion, that would be something that you guys would have to figure out.    What authority did he -- and, everything is pointing to me that he didn't have that authority.

Q    As a matter of course, can an AUSA, bypass those kinds of procedures? Who would need to grant permission to bypass the standard DOJ procedures such as getting approval from the Public Integrity?

A    Yeah -- I would look at current special counsel cases.    What approvals are they having to get?    What are they having to do?    So that's what I would do if I were trying to figure out an answer to that.

I had no issue -- to be honest with you, I had no issue with getting the approvals. But when you're putting the approvals as a roadblock that we don't want to do it because, well, that's going to take too much time to get those approvals and when we're trying to put everything out there to follow the right path, that is frustrating.

Q    I guess what I'm wondering is, is there a balance?    In any organization, you know, there are processes and approvals.

It incumbent upon the prosecutors to sort of weigh the probative value of the evidence that they might potentially gather with the speed and other issues potentially related to Public Integrity and the like that could be intended in gathering that evidence?

A    I understand what you're saying, but, yeah, I don't know how to appropriately answer that.

Mr. Zerbe.    I just want to make sure you answer --

Mr. ████.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

MINORITY COUNSEL 2.    I don't have anything else.

MINORITY COUNSEL 1.   That's it.   We have nothing else.

BY MAJORITY COUNSEL 1:

Q     I just have a couple follow-ups or maybe just one.

If someone meets all the elements for a crime of willful evasion and are found to, in conjunction with that, owe a liability, and they pay off that liability years later when they've been caught, has a crime still been committed?

A     Yes.

Q     Is there anything else we haven't covered today that you would like to share with us?

A     Not that I can think of.

MAJORITY COUNSEL 1.   With that, I have no further questions.   I'd like to thank you for making this disclosure and for coming in and for your service.   Thank you very much.

[Discussion off the record.]

MAJORITY COUNSEL 1.   Back on the record.

Mr. ▌▌▌.   Any of the agents' names that I've said, if those could be redacted. Because, I'm coming forward as a witness.   I'm asking for those protections as well, but I don't want to ruin people's careers because they're a part of this investigation, so --

MAJORITY COUNSEL 1.   We understand your request, and we'll take that under advisement.

Mr. ▌▌▌.   Okay.

MAJORITY COUNSEL 1.   Thank you.

Off the record.

[Whereupon, at 4:21 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee


I have read the foregoing _____ pages, which contain the correct transcript of the

answers made by me to the questions therein recorded.




_____

Witness Name




_____

Date

# EXHIBIT 5



# ZMF F&J

ZERBE, MILLER, FINGERET, FRANK & JADAV
3009 Post Oak Boulevard, Suite 1700
Houston, Texas 77056
Tel: 713 350 3529 * Fax: 713 350 3607

June 19, 2023

The Honorable Jason T. Smith
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

The Honorable Richard Neal
Ranking Member
Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

**RE:    Interview Of Whistleblower X – Clarification and Update**

Dear Chairman Smith and Ranking Member Neal:

On behalf of my client, Mr. X, I thank you for inviting him to testify recently before the Professional Staff of the Ways and Means Committee in a bipartisan process. I greatly appreciate the courtesies that the staff extended to my client.

After having been given an opportunity to review the transcript of his interview, Mr. X thought it would be helpful for the work of the Committee to clarify and update the transcript through this letter.

The clarification: Mr. X recalls in his testimony that he was told (roughly five years ago) by a supervisor that it was then-Attorney General William Barr who directed that the proposed case be merged with an ongoing case in Delaware. Mr. X is confident he was told by his supervisor that the merging of the cases was at the direction of an official at the Department of Justice. However, on further reflection, Mr. X cannot definitively state that that his then-supervisor said that that the Department of Justice official directing the merger of the cases was AG Barr. Separate from that conversation with his supervisor, Mr. X has no independent knowledge of who at the Department of Justice directed that the cases be merged.

The update: Since Mr. X's testimony, there have been multiple news articles recently that reference an FBI Form 1023 Document regarding information provided from a Confidential Human Source in June of 2020. This information provided on this Form 1023 related to the subject and company xxx. In news articles, former AG William Barr is cited in saying that this Form 1023 was reviewed by the Western District of Pennsylvania and was ultimately shared with David Weiss, U.S. Attorney overseeing the subject Investigation.

Letter to Jason T. Smith & Richard Neal
June 19, 2023
Page 2 of 2

As Mr. X has testified, he was the IRS-CI Case Agent over the subject investigation at the time – and Mr. X has stated to me that he has never seen this FBI Form 1023 and that he does not recall ever hearing about this information being turned over in any meetings with the prosecution team in Delaware.

Further, Mr. X informed me that this information could have been relevant to Mr. X's investigation at the time of the subject as it related to a claim of $5 million being paid to the subject which directly ties to email correspondence reviewed between subject and a business partner of subject sent in May of 2014, which is believed to reference the $5 million being paid to subject from company xxx.

I hope this information assists the Committee in its review and consideration of this matter.  Thank you.

Sincerely,

Dean Zerbe

# **EXHIBIT 6**



**COMMISSIONER**

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

June 7, 2023

The Honorable Jason Smith
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Smith:

Thank you for the opportunity to brief you and Committee staff last week regarding criminal tax procedures and IRS whistleblower protections. I think it was a constructive meeting, and I hope that it furthers the Committee's important oversight work. As I mentioned, we are happy to provide further briefings on these topics to the extent it would be helpful to the Committee.

Thank you also for understanding that there are significant restrictions on our ability to speak about specific pending criminal tax matters. As you know, we are obliged to treat all tax return information as confidential, including with respect to taxpayers who are under criminal investigation. Indeed, as we discussed, there are even stricter limitations for many criminal cases, designed to ensure that taxpayers who are presumed innocent until charged and proven guilty receive due process and impartial treatment before courts of law. I know that the Committee shares our commitment to adhering to these laws, both to ensure that taxpayer rights are protected, and to ensure that our tax enforcement mission is properly executed. We will do all that we can to further the Committee's oversight work in a manner consistent with these provisions.

In addition, thank you for providing feedback regarding our whistleblower procedures. As we discussed, I think it is critical to adhere to robust procedures to ensure that whistleblower claims, including allegations of retaliation, are fairly and objectively evaluated. We must avoid prejudging allegations in any way. Likewise, we must avoid reacting in any manner that even inadvertently discourages IRS employees from presenting concerns in good faith. For this reason, I believe that the role of independent investigative authorities in this context is critical. In particular, the Treasury Inspector General for Tax Administration (TIGTA) plays an invaluable role, finding facts independently and providing IRS employees a venue to voice concerns that is removed from their management chain. In cases involving judicial proceedings, where IRS employees work at the direction of Department of Justice attorneys, the Department of Justice Inspector General (DOJ-IG) may play a similar role.

2

As we have discussed, in a matter you referenced where IRS personnel allege retaliation, the IRS has made a referral to TIGTA. In an abundance of caution, to ensure that an Inspector General with appropriate jurisdiction and authority is apprised of the matter, we also submitted a referral this week to the DOJ-IG. We are enclosing herewith, for your reference, copies of the referral letter to TIGTA and the referral email to DOJ-IG, including attachments. *Please note that these enclosures contain confidential taxpayer information*; please do not disclose these to anyone who does not possess authority to access such information under Section 6103 of the Internal Revenue Code.

In addition, Committee staff has advised us that one of the referenced employees has submitted a grievance with a separate independent investigatory authority, the Office of Special Counsel (OSC). Accordingly, the IRS has been in communication with OSC as well. Of course, going forward, we will cooperate fully with any inquiry that OSC pursues.

Apart from the above independent investigative authorities, there are of course important roles for IRS management, and for the IRS Commissioner in particular, to ensure that whistleblowers are supported and protected. To begin with, as I mentioned in my prior letter, when an Inspector General or other investigative authority produces findings of fact and/or recommendations, it is important for IRS management to take all necessary corrective measures. It is vital to respond robustly to any conclusive findings of impropriety by IRS personnel – including to make it abundantly clear that any identified retaliation against whistleblowers will not be tolerated in any circumstance. More generally, there are other important steps that the IRS should take to properly "set the tone." Part of this process involves ensuring that all employees are aware of whistleblower rights and protections. As discussed above, there are often legal restrictions – sometimes multiple layers of restrictions – that limit our employees' ability to share information about their work; employees need to have guidance about how they can voice workplace concerns without violating the law. As we discussed, the IRS recently put out such guidance to clarify and summarize employees' obligations and options with respect to criminal tax cases. These are "safe harbors," so to speak, for such employees to make whistleblower allegations without violating legal restrictions. For your reference, I have also enclosed a copy of this guidance.

I hope it is evident from the above, and from our briefing last week, that the IRS takes seriously its obligations to support whistleblowers, as well as its obligations to protect taxpayer confidences and to protect the integrity of judicial proceedings that underlie much of our work. It can be challenging to manage all of these obligations, and I know that the Committee is navigating many of these same issues.

You referenced in our meeting that the Committee spoke with an IRS employee who presented as a whistleblower in the aforementioned matter, and you asked us for the names of any IRS personnel who have potentially relevant information about allegations

3

of retaliation with respect to this employee. For the reasons discussed above, I do not think it would be appropriate for IRS management to get out ahead of the independent investigative authorities that have been asked to conduct fact-finding in this case. I do not want IRS management to interfere, or to be perceived to be interfering, in these independent investigations. Without conducting such investigations, and before reviewing findings of fact from Inspectors General or other relevant investigative authorities, it is not evident to me what IRS personnel might potentially have information that may be relevant.

Accordingly, I respectfully suggest that you connect with either TIGTA, DOJ-IG, or OSC, who may be in a better position to help identify IRS personnel with information potentially relevant to your inquiry. These independent authorities are also positioned to advise you on potential legal limitations that may impact a given employee's ability to answer questions from the Committee; they may thus help you determine the best scope of inquiries to pursue. Of note, should the Committee request to interview an IRS employee in this matter, we would also consult the Department of Justice for advice as to whether any witness's testimony would be precluded under the Federal Rules of Criminal Procedure or any other relevant provision of law governing judicial proceedings. In addition, in cases where we are aware that an independent investigative authority such as TIGTA or OSC is conducting an investigation, it is our practice to consult with such authority before any outreach to employees, to ensure that we do not disrupt or influence any investigatory work they are conducting. If any such issues arise, we will of course advise you promptly; and if there is a way to work through them, we will do so.

As we have discussed, we are copying Ranking Member Neal on this correspondence. We understand that you have designated Ranking Member Neal and his staff to have access to Section 6103 materials with respect to this matter.

I hope this information is helpful. If you have questions, please contact me, or a member of your staff may contact Amy Klonsky, National Director, Legislative Affairs, at ███

Sincerely,

Daniel I.
Werfel

Digitally signed by Daniel
I. Werfel
Date: 2023.06.07
13:48:27 -04'00'

Daniel I. Werfel

Enclosures (3)

cc:   The Honorable Richard Neal
      Ranking Member, Committee on Ways and Means



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

DEPUTY COMMISSIONER

May 23, 2023

Russell George
Inspector General
Treasury Inspector General for Tax Administration
Washington, D.C.

Dear Inspector General George,

In light of recent media reports regarding whistleblower correspondence, and since we have been emailing with you on this issue piecemeal, I wanted to take this opportunity to clarify and confirm our respective roles in any investigatory process. As you and your staff review this, please bear in mind that Commissioner Werfel and I stand ready to assist TIGTA in any way that is helpful and appropriate in all investigative matters. Our goal is to safeguard the integrity of any investigation into employee allegations of wrongdoing, and to ensure that we comply with related provisions of law. Accordingly, by the Commissioner's calls to you of April 20 and May 16, 2023, we referred this matter to TIGTA to conduct appropriate review of employee allegations. In all of this, we welcome your input as to how we can best support you and would like to confirm with you that the IRS' role in this and similar matters is to support TIGTA in any investigation it might undertake.

To review, the Commissioner and I (and several other IRS managers) received an email on Thursday, May 18, 2023, from an IRS-Criminal Investigation employee who presented as a whistleblower. As I assessed that this email might contain information within the ambit of Federal Rule of Criminal Procedure 6(e), I conferred with the Commissioner and his staff, and we agreed to delete the correspondence from the Commissioner's mailbox without him opening it and to coordinate with IRS Criminal Investigation to forward the email to Department of Justice attorneys for Rule 6(e) review.[1] I advised you on May 18 of the fact that we had received this correspondence, deleted it from the Commissioner's mailbox, and submitted it to DOJ for Rule 6(e) review. On Sunday, May 21, 2023, after DOJ completed its review and per DOJ's direction, I submitted this correspondence to you with a minor redaction to protect Rule 6(e) material.

---

[1] As we discussed, as Deputy Commissioner for Services and Enforcement, I am on Rule 6(e) access lists, as a matter of course, for all grand jury cases worked by IRS-CI agents. In accordance with longstanding IRS practices to ensure that specific taxpayer matters are handled by career civil servants, the Commissioner is not on any Rule 6(e) lists. In accordance with longstanding procedure, we defer to DOJ attorneys to ultimately assess whether a document contains or comprises grand jury information within the meaning of Rule 6(e).

2

On Saturday, May 20, 2023, the Commissioner and I received a second email on behalf of a purported whistleblower.  Again, upon conferring with the Commissioner and his staff, I directed that staff delete the email from the Commissioner's mailbox without him reviewing it, and I coordinated with IRS Criminal Investigation to forward the email to DOJ for Rule 6(e) review.  DOJ determined that the correspondence did not contain Rule 6(e) material, and so I forwarded this second email to you on Tuesday, May 23.

With the benefit of now having had time to reflect on the above, please advise us if you suggest that we handle future correspondence of this nature any differently.  More generally, we understand that it is proper and best practice – again, in the chief interest of ensuring the integrity of any necessary factfinding – for TIGTA or another appropriate independent investigative authority, rather than the Commissioner's Office or any other element of IRS management, to oversee any and all necessary investigations into allegations presented by employees alleging wrongdoing including retaliation.

Please advise us, of course, if there is any way that we can support TIGTA in its assessment of or response to the above IRS employee correspondence.  Finally, if it would be helpful for us further to discuss this matter for any other reason, please do not hesitate to reach out to me.

Sincerely,

Douglas W. Odonnell

Digitally signed by Douglas W. Odonnell
Date: 2023.05.23 17:54:22 -04'00'

Douglas W. O'Donnell
Deputy Commissioner for
    Services and Enforcement

**From:** O'Donnell Douglas W
**Sent:** Monday, June 5, 2023 8:38 PM
**To:**
**Subject:** FW: Whistleblower Retaliation -

Hi Jon,

I am forwarding to you per an email from Carlton Forbes in ODAG. I intended to send to the IG but the email address we had was incorrect.

Please let me know whether you require any further information.

Sincerely,

Doug

Douglas W. O'Donnell (he/him/his)
Deputy Commissioner, Services & Enforcement
(Desk)

**From:** O'Donnell Douglas W
**Sent:** Monday, June 5, 2023 3:30 PM
**To:**
**Subject:** Whistleblower Retaliation -

Dear Inspector General Horowitz,

I am the IRS Deputy Commissioner for Services & Enforcement and am responsible for the IRS Criminal Investigation Division among a number of other business segments involved in federal tax administration.

I write to you today regarding an IRS employee who has alleged retaliation in a criminal tax matter. As reflected in the enclosed correspondence, the IRS has made a referral in this matter to the Treasury Inspector General for Tax Administration (TIGTA). In order to ensure that an Inspector General with appropriate jurisdiction and authority is apprised of the matter, we are also hereby referring the matter to your office. We trust that you will dialog with TIGTA as to the appropriate path forward. Please advise us if and as we may be of support to you in addressing this employee's allegations.

I am providing two attachments for purposes of sharing context. The first – TIGTA Letter, 5-23-23 from DCSE to IG – provides background as to when a referral was made to TIGTA. The second – 2020-05-20 Letter to IRS with attachments – provides information transmitted to me by the individual reporting retaliation for being a whistleblower. For clarity, the attachments to the second letter include a redacted version of an email sent to me by an employee who has not to my knowledge made a claim as a whistleblower. If you feel like having the referenced redacted email, e.g., where metadata could be helpful, then please let me know and I will transmit it to you.

I am available to speak if it would be helpful.

Sincerely,

Doug

Douglas W. O'Donnell (he/him/his)
Deputy Commissioner, Services & Enforcement
█████████████(Desk)



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

DEPUTY COMMISSIONER

May 23, 2023

Russell George
Inspector General
Treasury Inspector General for Tax Administration
Washington, D.C.

Dear Inspector General George,

In light of recent media reports regarding whistleblower correspondence, and since we have been emailing with you on this issue piecemeal, I wanted to take this opportunity to clarify and confirm our respective roles in any investigatory process. As you and your staff review this, please bear in mind that Commissioner Werfel and I stand ready to assist TIGTA in any way that is helpful and appropriate in all investigative matters. Our goal is to safeguard the integrity of any investigation into employee allegations of wrongdoing, and to ensure that we comply with related provisions of law. Accordingly, by the Commissioner's calls to you of April 20 and May 16, 2023, we referred this matter to TIGTA to conduct appropriate review of employee allegations. In all of this, we welcome your input as to how we can best support you and would like to confirm with you that the IRS' role in this and similar matters is to support TIGTA in any investigation it might undertake.

To review, the Commissioner and I (and several other IRS managers) received an email on Thursday, May 18, 2023, from an IRS-Criminal Investigation employee who presented as a whistleblower. As I assessed that this email might contain information within the ambit of Federal Rule of Criminal Procedure 6(e), I conferred with the Commissioner and his staff, and we agreed to delete the correspondence from the Commissioner's mailbox without him opening it and to coordinate with IRS Criminal Investigation to forward the email to Department of Justice attorneys for Rule 6(e) review.[1] I advised you on May 18 of the fact that we had received this correspondence, deleted it from the Commissioner's mailbox, and submitted it to DOJ for Rule 6(e) review. On Sunday, May 21, 2023, after DOJ completed its review and per DOJ's direction, I submitted this correspondence to you with a minor redaction to protect Rule 6(e) material.

---

[1]  As we discussed, as Deputy Commissioner for Services and Enforcement, I am on Rule 6(e) access lists, as a matter of course, for all grand jury cases worked by IRS-CI agents. In accordance with longstanding IRS practices to ensure that specific taxpayer matters are handled by career civil servants, the Commissioner is not on any Rule 6(e) lists. In accordance with longstanding procedure, we defer to DOJ attorneys to ultimately assess whether a document contains or comprises grand jury information within the meaning of Rule 6(e).

2

On Saturday, May 20, 2023, the Commissioner and I received a second email on behalf of a purported whistleblower.  Again, upon conferring with the Commissioner and his staff, I directed that staff delete the email from the Commissioner's mailbox without him reviewing it, and I coordinated with IRS Criminal Investigation to forward the email to DOJ for Rule 6(e) review.  DOJ determined that the correspondence did not contain Rule 6(e) material, and so I forwarded this second email to you on Tuesday, May 23.

With the benefit of now having had time to reflect on the above, please advise us if you suggest that we handle future correspondence of this nature any differently.  More generally, we understand that it is proper and best practice – again, in the chief interest of ensuring the integrity of any necessary factfinding – for TIGTA or another appropriate independent investigative authority, rather than the Commissioner's Office or any other element of IRS management, to oversee any and all necessary investigations into allegations presented by employees alleging wrongdoing including retaliation.

Please advise us, of course, if there is any way that we can support TIGTA in its assessment of or response to the above IRS employee correspondence.  Finally, if it would be helpful for us further to discuss this matter for any other reason, please do not hesitate to reach out to me.

Sincerely,

Douglas W. Odonnell

Digitally signed by Douglas W. Odonnell
Date: 2023.05.23 17:54:22 -04'00'

Douglas W. O'Donnell
Deputy Commissioner for
    Services and Enforcement

  

May 20, 2023

*Via Electronic Transmission*

The Honorable Daniel Werfel
Commissioner
Internal Revenue Service

Dear Commissioner Werfel:

We represent Supervisory Special Agent (SSA) Gary Shapley.  Five days ago, you were copied on a letter to various committees of Congress warning that the IRS had removed our client's entire team of investigators from a criminal tax case in an apparent act of retaliation aimed at some of those employees who had expressed concerns about the Department of Justice (DOJ) improperly allowing politics to infect its decisions.

This action was inconsistent with your testimony to the House Committee on Ways and Means that there would be "no retaliation" against whistleblowers at the IRS.  It was our understanding that although the IRS executed the reprisal, it did so on behalf of DOJ officials who had the motive to retaliate because it was the propriety of their own actions that had been called into question by the protected disclosures.

Yesterday, we became aware that even after receiving the May 15 letter to Congress, the IRS has inexplicably decided to initiate additional reprisals against these special agents, apparently for a protected disclosure directly to you.  This is unacceptable and contrary to the law, which clearly prohibits it.

Our client learned that one of the agents he supervises—the case agent on the case our client is blowing the whistle on—sent you an email in which he wrote:

> As I'm sure you were aware, I was removed this week from a highly sensitive case...after nearly 5 years of work.
> * * *
> There is a human impact to the decisions being made that no one in the government seems to care about or understand...[T]o ultimately be removed for always trying to do the right thing[] is unacceptable in my opinion...[M]y leadership above my direct manager—who was also removed—didn't even give me the common courtesy of a phone call, did not afford me the opportunity of understanding why this decision was made, and did not afford me an opportunity to explain my case.  If this is how our leadership expects our leaders to lead, without considering the

human component, that is just unacceptable and you should be ashamed of yourselves.

* * *

For the last couple years, my SSA and I have tried to gain the attention of our senior leadership about certain issues prevalent regarding the investigation. I have asked for countless meetings with our chief and deputy chief, often to be left out on an island and not heard from. The lack of IRS-CI senior leadership involvement is deeply troubling and unacceptable...[W]hen I said on multiple occasions that I wasn't being heard and that I thought I wasn't able to perform my job adequately because of the actions of the USAO and DOJ, my concerns were ignored by senior leadership[]. The ultimate decision to remove the investigatory team...without actually talking to that investigatory team, in my opinion was a decision made not to side with the investigators but to side with the US Attorney's Office and Department of Justice who we have been saying for some time has been acting inappropriately.[1]

In response to making his good faith expression of reasonable concerns—concerns shared by our client—the case agent had a right to expect that his email would be taken seriously, considered, and addressed professionally without retribution, as the law requires.

Instead, the IRS responded with accusations of criminal conduct and warnings to other agents in an apparent attempt to intimidate into silence anyone who might raise similar concerns. Specifically, the Assistant Special Agent in Charge emailed the case agent suggesting, without any basis, that he might have illegally disclosed 6(e) grand jury material in his email to you.[2] While such a claim is utterly baseless and without support in the law or facts of this matter,[3] the language of the response suggests the case agent may have been referred for investigation, an even more intimidating form of reprisal likely to chill anyone from expressing dissent. Furthermore, the Acting Special Agent in Charge issued a contemporaneous email to supervisors—including our client—admonishing employees to obey "the chain of command," writing: "There should be no instances where case related activity discussions leave this field office without seeking approval from your direct report."[4]

As Commissioner, you are responsible by statute for preventing prohibited personnel practices, such as whistleblower retaliation.[5] As the May 15 letter you received made clear, the salary of government officials can be withheld if they "prohibit[] or prevent[], or attempt[] or threaten[] to prohibit or prevent, any other officer or employee of the Federal Government from having any direct oral or written communication or contact with any Member, committee, or subcommittee of the Congress[.]"[6] This includes requiring that an employee "seek[] approval from [their]

---

[1] Email from case agent to Deputy Commissioner for Services and Enforcement Douglas O'Donnell, et al., May 18, 2023, 9:58 AM (Exhibit A).
[2] Email from Assistant Special Agent in Charge Lola Watson to case agent, May 19, 2023, 1:20 PM (Exhibit B).
[3] Rule 6(e)(2) of the Federal Rules of Criminal Procedure prohibits certain enumerated persons from disclosing "a matter occurring before a grand jury." Clearly, none of the assertions the IRS has complained of indicate any matters occurring before any grand jury, such as testimony occurring before the grand jury or grand jury deliberations.
[4] Email from Acting Special Agent in Charge Kareem Carter, May 19, 2023, 1:23 PM (Exhibit C).
[5] 5 U.S.C. § 2302(c)(3).
[6] Consolidated Appropriations Act, 2023, Pub. L. 117–328, Div. E, Sec. 713.

direct report." Our legal team has experience ensuring this provision was enforced against other agencies.[7]

Furthermore, agencies may not adopt nondisclosure policies which "prohibit[] or restrict[] an employee...from disclosing to Congress, the Special Counsel, [or] the Inspector General...any information that relates to any violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or any other whistleblower protection[.]"[8] Agency communications which purport to "implement or enforce any nondisclosure policy" are therefore required by statute to include the following statement notifying employees that no nondisclosure policy can modify their statutory rights and responsibilities, including the rights to communicate with Congress and blow the whistle:

> These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling."[9]

No appropriated funds may be used to enforce a disclosure policy which does not comply with these requirements,[10] and attempting to enforce such a policy is a prohibited personnel practice.[11]

Finally, we would reiterate that 18 U.S.C. § 1505 makes it a crime to obstruct an investigation of Congress. Under 26 U.S.C. § 6103(f)(5), the House Committee on Ways and Means and the Senate Committee on Finance have been apprised of matters related to the case on which our client is in the process of scheduling congressional interviews related to this case.

---

[7] *See* Government Accountability Office, B-325124.2, *Department of Housing and Urban Development—Application of Section 713 of the Financial Services and General Government Appropriations Act, 2012 (Reconsideration)*, Apr. 5, 2016 (*available at* https://www.gao.gov/assets/b-325124.2.pdf); press release, "Goodlatte, Chaffetz and Grassley Urge HUD to Hold Employees Accountable Following GAO Report," Apr. 5, 2016 (*available at* https://judiciary.house.gov/media/press-releases/goodlatte-chaffetz-and-grassley-urge-hud-to-hold-employees-accountable); letter from Charles E. Grassley, Jason Chaffetz, and Bob Goodlatte to Julian Castro, Jun. 22, 2016; letter from Charles E. Grassley, Jason Chaffetz, and Bob Goodlatte to Ben Carson, May 3, 2017 (*available at* https://www.judiciary.senate.gov/imo/media/doc/2017-05-03%20CEG%20JC%20BG%20to%20HUD%20(GAO).pdf); letter from Aaron Santa Anna to Charles E. Grassley, Jason Chaffetz, and Bob Goodlatte, Jun. 19, 2017 (*available at* https://www.judiciary.senate.gov/imo/media/doc/06-19-17%20Santa%20Anna,%20Aaron%20to%20CEG%20re%20GAO%20Legal%20Opinion%20Financial%20Services%20and%20General%20Government%20Appropriations%20Act_Redacted.pdf).
[8] 5 U.S.C. § 2302(b)(13)(B).
[9] 5 U.S.C. § 2302(b)(13)(A).
[10] Consolidated Appropriations Act, 2023, Pub. L. 117–328, Div. E, Sec. 743.
[11] 5 U.S.C. § 2302(b)(13).

The IRS must immediately cease and desist intimidating our client for simply exercising his Constitutional right to petition Congress[12] and his statutory right against retaliation for doing so.[13] Please immediately issue corrective guidance clarifying the aforementioned supervisor communications lest they chill the disclosures of other IRS whistleblowers who may wish to come forward.

Cordially,

/Tristan Leavitt/                                       /Mark D. Lytle/
Tristan Leavitt                                         Mark D. Lytle
President                                               Partner
Empower Oversight                                       Nixon Peabody LLP


ATTACHMENTS


cc:     The Honorable Janet Yellen
        Secretary, U.S. Department of the Treasury

        The Honorable Russell George
        Inspector General for Tax Administration, U.S. Department of the Treasury

        The Honorable Henry Kerner
        Special Counsel, Office of Special Counsel

---

[12] First Amendment, United States Constitution.
[13] 5 U.S.C. § 2302(b)(8)(C).

# Exhibit A



From:
Sent: Thursday, May 18, 2023 9:58 AM
To: O'Donnell Douglas W <█████████████████>; Werfel Daniel I <█████████████████>; Lee James C
<█████████████; Ficco Guy A <█████████████; Batdorf Michael T <█████████████████>; Carter
Kareem A <█████████████; Watson Lola B <█████████████████>
Subject: █████ Investigation-Removal of Case Agent
Importance: High

My Respective IRS Leadership –

First off, I apologize for breaking the managerial chain of command but the reason I am doing this is because I don't think my concerns and/ or words are being relayed to your respective offices. I am requesting that you consider some of the issues at hand.

As I am sure you were aware, I was removed this week from a highly sensitive case out of the ███████ USAO after nearly 5 years of work. I was not afforded the opportunity of a phone call directly from my SAC or ASAC, even though this had been my investigation since the start.

I can't continue to explain how disappointed I am by the actions taken on behalf of our agency. I want to echo that I love my job, I love my agency and I am extremely appreciative of the job and position that I have had over the last 13 years.

There is a human impact to the decisions being made that no one in the government seems to care about or understand. I had opened this investigation in 2018, have spent thousands of hours on the case, worked to complete 95% of the investigation, have sacrificed sleep / vacations / gray hairs etc., my husband and I (identifying me as the case agent) were publicly outed and ridiculed on social media due to our sexual orientation, and to ultimately be removed for always trying to do the right thing, is unacceptable in my opinion. Again, my leadership above my direct manager -who was also removed - didn't even give me the common courtesy of a phone call, did not afford me the opportunity of understanding why this decision was made, and did not afford me an opportunity to explain my case. If this is how our leadership expects our leaders to lead, without considering the human component, that is just unacceptable and you should be ashamed of yourselves. I am continually asking myself, is this the kind of culture we want within the IRS and that I want to be a part of.

For the last couple years, my SSA and I have tried to gain the attention of our senior leadership about certain issues prevalent regarding the investigation. I have asked for countless meetings with our chief and deputy chief, often to be left out on an island and not heard from. The lack of IRS-CI senior leadership involvement in this investigation is deeply troubling and unacceptable. Rather than recognizing the need to ensure close engagement and full support of the investigatory team in this extraordinarily sensitive case, the response too often had been that we were isolated (even when I said on multiple occasions that I wasn't being heard and that I thought I wasn't able to perform my job adequately because of the actions of the USAO and DOJ, my concerns were ignored by senior leadership). The ultimate decision to remove the investigatory team from ███████ without actually talking with that investigatory team, in my opinion was a

1

decision made not to side with the investigators but to side with the US Attorney's office and Department of Justice who we have been saying for some time has been acting inappropriately.

I appreciate your time and courtesy in reviewing this email. Again, I can only reiterate my love for my work at CI and a great appreciation for my colleagues – and a strong desire for CI to learn from and be strengthened by my difficult experience. I never thought in my career that I would have to write an email like this, but here I am. Thank you again for your consideration with me.



**Special Agent**
**International Tax & Financial Crimes Group (ITFC)**
**Washington DC Field Office**
**Cell:**

# Exhibit B



**From:** Watson Lola B <                                  >
**Sent:** May 19, 2023 1:20 PM
**To:**                          <                          >
**Subject:** Reminder - Chain of Command

Good Afternoon Special Agent          ,

We acknowledge your email received yesterday morning. You have been told several times that you need to follow your chain of command. IRS-CI maintains a chain of command for numerous reasons to include trying to stop unauthorized disclosures. Your email yesterday may have included potential grand jury (aka 6e material) in the subject line and contents of the email, and you included recipients that are not on the 6e list.

In the future, please follow previously stated directives and this written directive that no information should be sent to the DFO, Deputy Chief, Chief or any other executive without being sent through my office and the SAC office.

*Lola Watson*
*Assistant Special Agent in Charge*
*Washington DC Field Office*
*IRS-Criminal Investigation*
                *(Cell)*

1

# Exhibit C

| | |
|---|---|
| **From:** | Carter Kareem A |
| **To:** | ▮▮▮▮▮▮▮▮ * ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; ▮▮▮▮▮▮▮▮▮▮ |
| **Subject:** | REMINDER - Field Office Chain of Command |
| **Date:** | Friday, May 19, 2023 1:23:40 PM |

ASACs/SSAs/SIAs-

As I've previously stated in staff meetings, chain of command is important to the successful communication and operation within a field office. Following chain of command prevents confusion, conflict, and misunderstandings.

There should be no instances where case related activity discussions leave this field office without seeking approval from your direct report (i.e. SA to SSA to ASAC to SAC). By following the chain of command, we can all work together to ensure that our team is successful.

Kind Regards ,

Kareem Carter
(Acting) Special Agent in Charge, Washington DC Field Office
Internal Revenue Service – Criminal Investigation
Cell: ▮▮▮▮▮▮▮▮

**From:** *Deputy Commissioner Services & Enforcement
**Sent:** Thursday, May 25, 2023 4:53 PM
**To:** &&ALL DCSE Employees
**Subject:** IRS Employees Working with Taxpayer Information in Grand Jury and non-Grand Jury Matters



## A message from Doug O'Donnell
### Deputy Commissioner for Services and Enforcement

Good evening IRS Services & Enforcement colleagues,

I am writing to you all given concerns related to reporting of and reports of allegations of wrongdoing. The IRS is deeply committed to protecting the role of whistleblowers, and there are robust processes and procedures in place to protect them. We take any issue involving whistleblowers seriously.

IRS employees may be entrusted with access to information that includes materials subject to protection under the Federal Tax laws, e.g., Section 6103, and Federal Rule of Criminal Procedure 6(e). As such, if you become aware of potential wrongdoing involving activities where information is subject to protection under either or both Section 6103 and/or 6(e), you have options for reporting this wrongdoing.

Employees who reasonably believe, with respect to a *grand jury matter*, that there is evidence of a (1) violation of law, rule, or regulation; (2) gross mismanagement; (3) a gross waste of funds; (4) an abuse of authority; or (5) a substantial and specific danger to public health or safety, should: (i) report such evidence to their supervisor; (ii) report such evidence to any management official; *or* (iii) report such evidence to the Department of Justice Inspector General (DOJ IG) and notify Treasury Inspector General for Tax Administration (TIGTA) that a referral of a grand jury matter has been made to DOJ IG. Such employees are authorized to disclose return and return information, as necessary, in such communications with the DOJ IG.

Employees who reasonably believe, with respect to a ***non-grand jury matter***, that there is evidence of a (1) violation of law, rule, or regulation; (2) gross mismanagement; (3) a gross waste of funds; (4) an abuse of authority; or (5) a substantial and specific danger to public health or safety, should: (i) report such evidence to their supervisor; (ii) report such evidence to any management official; ***or*** (iii) report such evidence to TIGTA.

Notwithstanding the above, with respect to any matter involving classified information, you are reminded that you must follow classified information protocols.

Sincerely,

Doug

Douglas W. O'Donnell (he/him/his)

Deputy Commissioner, Services & Enforcement